# Islam Declaration

# Exhibit 1

**CONSENT TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

**THIS CONSENT TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Consent**"), dated as of April 17, 2023 (the "**Effective Date**"), is made among Epic Alabama Maritime Assets, LLC, a Delaware limited liability company, Alabama Shipyard Arapaho, LLC, a Delaware limited liability company, Alabama Shipyard Wright's Well, LLC, a Delaware limited liability company, collectively, jointly and severally, the "**Borrowers**"), Alabama Maritime Asset Holdings, LLC, a Delaware limited liability company ("**Alabama Holdings**"), Alabama Shipyard, LLC (f/k/a Epic Alabama Shipyard, LLC), a Delaware limited liability company ("**Alabama Shipyard**"), Epic Recycling Services, LLC, a Delaware limited liability company ("**Epic Recycling**"), Epic Alabama Recyclers, LLC, a Delaware limited liability company ("**Epic Alabama Recyclers**"; Epic Alabama Recyclers together with Alabama Holdings, Alabama Shipyard, and Epic Recycling are, collectively, the "**Guarantors**"), White Oak Global Advisors, LLC, a Delaware limited liability company, in its capacity as administrative agent (in such capacity, "**Administrative Agent**") and the Lenders party to the Loan and Security Agreement (as defined below) from time to time including White Oak Global Advisors, LLC in its capacity as a Lender (each a "**Lender**" and collectively, the "**Lenders**").

WHEREAS, Borrowers, Guarantors, ERP Environmental Fund, Inc., a West Virginia corporation, the Lenders and Administrative Agent are parties to that certain Amended and Restated Loan and Security Agreement dated as of July 22, 2019 (as amended, restated or modified from time to time, the "**Loan and Security Agreement**");

WHEREAS, Borrower intends to enter into that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of April 17, 2023, in the form attached hereto as **Exhibit A** (such Purchase and Sale Agreement in such form, the "**Austal Purchase Agreement**"), and together with the other documents, instruments and agreements executed and delivered in connection therewith or otherwise relating thereto (the "**Designated Transaction Documents**"), by and among Epic Alabama Maritime Assets, LLC, a Delaware limited liability company, as seller and Austal USA, LLC, an Alabama limited liability company, as purchaser ("**Austal**"), pursuant to which Austal will purchase forty-six (46) acres of owned, unused land, among other assets (the "**Real Estate**") from Alabama Shipyard for a total consideration of $32,420,159.66 (the "**Designated Transaction**");

WHEREAS, Borrower has requested that Administrative Agent and Lenders consent to the execution and delivery of the Designated Transaction Documents, the consummation of the Designated Transaction and the release of the Liens of the Administrative Agent on the Real Estate in connection with the consummation of the Designated Transaction; and

WHEREAS, upon the terms and conditions set forth herein, Administrative Agent and Lenders are (i) willing to consent to the execution and delivery of the Designated Transaction Documents, the consummation of the Designated Transaction and (ii) release Administrative Agent's Liens on the Real Estate in connection with the consummation of the Designated Transaction.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the parties hereby agree as follows:

**SECTION 1    Definitions; Interpretation.**

(a)    **Terms Defined in Loan and Security Agreement**. All capitalized terms used in this Consent (including in the recitals hereof) and not otherwise defined herein shall have the meanings assigned to them in the Loan and Security Agreement.

(b)    **Interpretation**. The rules of interpretation set forth in Section 1.02 of the Loan and Security Agreement shall be applicable to this Consent and are incorporated herein by this reference.

**SECTION 2    Consent.** The provisions of the Loan and Security Agreement and the other Loan Documents to the contrary notwithstanding, subject to the satisfaction (or waiver in writing by Administrative Agent) of the conditions precedent set forth in Section 5 hereof, Administrative Agent and all Lenders hereby consent to the execution and

delivery of the Designated Transaction Documents, the consummation of the Designated Transaction and the release of the Liens of the Administrative Agent on the Real Estate in connection with the consummation of the Designated Transaction.

**SECTION 3**    **[Reserved].**

**SECTION 4**    **[Reserved].**

**SECTION 5**    **Condition of Effectiveness.** The effectiveness of this Consent shall be subject to the satisfaction of each of the following conditions precedent:

(a)    Administrative Agent shall have received this Consent, duly executed and delivered by each party hereto.

(b)    All other documents and legal matters in connection with the transactions contemplated by this Consent shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Administrative Agent.

**SECTION 6**    **Condition Subsequent.** Administrative Agent shall have received fully executed versions of each Designated Transaction Document and all other material documentation associated with the Designated Transaction within three (3) business days of the date hereof, (ii) there are no material Designated Transaction Documents, other than (A) the Purchase and Sale Agreement, and (B) those material documents, instruments and/or agreements executed and delivered in connection with the Designated Transaction that are in form and substance reasonably satisfactory to Administrative Agent (it being acknowledged and agreed that the Purchase and Sale Agreement in the form attached as **Exhibit A** hereto is satisfactory to Administrative Agent) (the documents referenced in clauses (A) and (B), collectively, the "Material Designated Transaction Documents"), and (iii) there shall have been no amendments, modifications or supplements to the Material Designated Transaction Documents that are (individually or in the aggregate) adverse to the interests of Administrative Agent or any Lender other than with the consent of Administrative Agent. The failure to comply with the foregoing shall constitute an immediate Event of Default.

**SECTION 7**    **Consent and Reaffirmation of Guarantors.** The undersigned Guarantors each hereby: (a) represents and warrants to Administrative Agent and Lenders that the execution, delivery, and performance of this Consent (i) are within its powers, (ii) have been duly authorized by all necessary action, and (iii) do not and will not (A) violate any material provision of federal, state, provincial, local, or foreign law or regulation applicable to it or its Subsidiaries, the Organizational Documents of it or its Subsidiaries, or any material order, judgment, or decree of any court or other Governmental Authority binding on it or its Subsidiaries, (B) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of such Guarantor, other than Permitted Liens, or (C) require any approval of any holder of its Equity Interests, other than consents or approvals that have been obtained and that are still in force and effect; (b) consents to the amendment of the Loan and Security Agreement as set forth in this Consent; (c) acknowledges and reaffirms its obligations owing to the Lending Parties under any Loan Document to which it is a party; (d) agrees that each of the Loan Documents to which it is a party is and shall remain in full force and effect; (e) reaffirms, acknowledges, agrees and confirms that it has granted to Administrative Agent a perfected security interest in the Collateral pursuant to the Loan Documents in order to secure all of its present and future Obligations to the Lending Parties; and (f) represents and warrants that it has read and understands this Consent, has consulted with and been represented by independent legal counsel of its own choosing in negotiations for and the preparation of the Amendment, has read this Consent in full and final form, and has been advised by its counsel of its rights and obligations hereunder. Without limiting the generality of the foregoing, each of the undersigned Guarantors hereby restates, ratifies and reaffirms each and every term and condition set forth in the Loan and Security Agreement and the other Loan Documents to which it is a party effective as of the date hereof and, as applicable, as amended by this Consent. All Obligations owing by each Guarantor are unconditionally owing by such Person to the Lending Parties, without offset, defense (other than defense of payment), withholding, counterclaim or deduction of any kind, nature or description whatsoever. Each Guarantor hereby further ratifies and reaffirms the validity and enforceability of all of the Liens and security interests heretofore granted, pursuant to and in connection with the Loan and Security Agreement or any other Loan Document, to Administrative Agent, for the benefit of the Lenders, as collateral security for the Obligations under the Loan Documents in accordance with their respective terms, and acknowledges that all

2

of such Liens and security interests, and all Collateral heretofore pledged as security for such Obligations, continue to be and remain collateral for such Obligations from and after the date hereof.

Although each Guarantor has been informed of the matters set forth herein and has acknowledged and agreed to same, they each understand that neither Administrative Agent nor any Lender has any obligations to inform it of such matters in the future or to seek its acknowledgment or agreement to future amendments, and nothing herein shall create such a duty.

**SECTION 8    Miscellaneous.**

(a)    **Loan Documents Otherwise Not Affected; Reaffirmation**.  Except as expressly amended pursuant hereto or referenced herein, the Loan and Security Agreement and the other Loan Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed in all respects.  The Lenders' and Administrative Agent's execution and delivery of, or acceptance of, this Consent shall not be deemed to create a course of dealing or otherwise create any express or implied duty by any of them to provide any other or further amendments, consents or waivers in the future.  The Borrowers and each Guarantor hereby reaffirms the grant of security under Section 3.01 of the Loan and Security Agreement and each grant of security under each Loan Document and hereby reaffirms that each such grant of security in the Collateral secures all Obligations under the Loan and Security Agreement and the other Loan Documents, including without limitation any Term Loans funded on or after the Seventh Amendment Effective Date, as of the date hereof.

(b)    **Release**.  In consideration of the agreements of Administrative Agent and each Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrowers and each Guarantor, on behalf of itself and its successors, assigns, and other legal representatives, hereby fully, absolutely, unconditionally and irrevocably releases, remises and forever discharges Administrative Agent and each Lender, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Agent, Lenders and all such other persons being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Borrowers, or such Guarantor, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Consent, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Loan and Security Agreement, or any of the other Loan Documents or transactions thereunder or related thereto. Borrowers and each Guarantor understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.  Borrowers and each Guarantor agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(c)    **No Reliance**.  Each Borrower and each Guarantor hereby acknowledges and confirms to Administrative Agent and the Lenders that such Person is executing this Consent on the basis of its own investigation and for its own reasons without reliance upon any agreement, representation, understanding or communication by or on behalf of any other Person.

(d)    **Binding Effect**.  This Consent binds and is for the benefit of the successors and permitted assigns of each party.

(e)    **Governing Law**.  **THIS CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW 5-1401 AND 5-1402.**

(f)    **Complete Agreement; Amendments**.  This Consent and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements with respect to such subject matter. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Consent and the Loan Documents merge into this Consent and the Loan Documents.

(g)    **Severability of Provisions.**  Each provision of this Consent is severable from every other provision in determining the enforceability of any provision.

(h)    **Counterparts**.  This Consent may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Amendment.  Delivery of an executed counterpart of a signature page of this Consent by facsimile, portable document format (.pdf) or other electronic transmission will be as effective as delivery of a manually executed counterpart hereof.

(i)    **Loan Documents**. This Consent and the documents related thereto and delivered in connection herewith shall constitute Loan Documents.

*[Signature Pages Follow]*

4

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Consent, as of the date first above written.

**BORROWERS:**

**Epic Alabama Maritime Assets, LLC**, a Delaware limited liability company, as Borrower

By: **Alabama Maritime Asset Holdings, LLC**, a Delaware limited liability company, as its Member

By: _____
Name: Nyall Islam
Title:   Director

**Alabama Shipyard Arapaho, LLC**, a Delaware limited liability company, as Borrower

By: _____
Name: Nyall Islam
Title:   Authorized Signatory

**Alabama Shipyard Wright's Well, LLC**, a Delaware limited liability company, as Borrower

By: _____
Name: Nyall Islam
Title:   Authorized Signatory

[Signature Page to Consent to Amended and Restated Loan and Security Agreement]

**GUARANTORS:**

**Alabama Maritime Asset Holdings, LLC**, a Delaware
limited liability company, as Guarantor

By: _____
Name: Nyall Islam
Title:   Director


**Alabama Shipyard, LLC**, a Delaware limited liability
company, as Guarantor


By: _____
Name: Greg Wagner
Title:   Authorized Signatory


**Epic Recycling Services, LLC**, a Delaware limited liability
company, as Guarantor

By: _____
Name: Nyall Islam
Title:   Authorized Signatory


**Epic Alabama Recyclers, LLC**, a Delaware limited liability
company, as Guarantor


By: _____
Name: Greg Wagner
Title:   Authorized Signatory


[Signature Page to Consent to Amended and Restated Loan and Security Agreement]

**GUARANTORS:**

**Alabama Maritime Asset Holdings, LLC**, a Delaware limited liability company, as Guarantor

By: _____
Name: Nyall Islam
Title:   Director

**Alabama Shipyard, LLC**, a Delaware limited liability company, as Guarantor

By: _____
Name: Greg Wagner
Title:   Authorized Signatory

**Epic Recycling Services, LLC**, a Delaware limited liability company, as Guarantor

By: _____
Name: Nyall Islam
Title:   Authorized Signatory

**Epic Alabama Recyclers, LLC**, a Delaware limited liability company, as Guarantor

By: _____
Name: Greg Wagner
Title:   Authorized Signatory

[Signature Page to Consent to Amended and Restated Loan and Security Agreement]

**ADMINISTRATIVE AGENT AND LENDERS:**

**WHITE OAK GLOBAL ADVISORS, LLC**, a Delaware limited liability company, as Administrative Agent

By: _____

Name:    Barbara McKee

Title:     Authorized Signatory

**WHITE OAK GLOBAL ADVISORS, LLC**, a Delaware limited liability company, not in its individual capacity but as Investment Manager for the Lenders

By: _____

Name:    Barbara McKee

Title:     Authorized Signatory

[Signature Page to Consent to Amended and Restated Loan and Security Agreement]

**SUMMIT REVOLVER FUND SPV, L.P.,**
as a Lender

By: Special Distribution SPV General Partner, LLC its
General Partner

By: _____
Name: Barbara McKee
Title: Authorized Signer

[Signature Page to Consent to Amended and Restated Loan and Security Agreement]

**PINNACLE FUND SPV, L.P.**,
as a Holder

By: Special Distribution SPV General Partner, LLC its
General Partner

By: _____

Name: Barbara McKee
Title: Authorized Signer

**EXHIBIT A**

<u>Austal Purchase Agreement</u>

(See attached)

## PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions ("**Agreement**") is made and entered into as of this _8TH_ day of March, 2023 ("**Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**Seller**"), and AUSTAL USA, LLC, an Alabama limited liability company ("**Purchaser**").

WITNESSETH:

**WHEREAS**, Seller is the owner in fee simple of certain real property located in the County of Mobile, Alabama, as more particularly described in this Agreement; and,

**WHEREAS,** Purchaser desires to purchase from Seller, and Seller desires to sell, transfer, and assign to Purchaser, such real property on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
## PROPERTY

**1.1    Property.** Purchaser shall purchase and accept from Seller, and Seller shall sell, transfer and assign to Purchaser, for the Purchase Price hereinafter set forth, and upon and subject to all of the terms and conditions contained herein, all of Seller's right, title and interest in and to the real property described in Section 1.2 hereof (collectively referred to herein as the "**Property**").

**1.2    Description of Property.** The Property shall consist of the following:

(a)    Land.  That certain real property particularly described in "**Exhibit A**" attached hereto (the "**Land**");

(b)    Improvements.  All improvements to and structures in and on the Land (the "**Improvements**");

(c)    Rights and Appurtenances.

(1)    Land.  All rights and appurtenances pertaining to the Land, including, without limitation, all easements benefiting the Land, any right, title, and interest of Seller in and to any adjacent roads, streets, alleys, or rights-of-way, and all development rights and any other entitlements relating to development;

(2)    Water.  Any rights and appurtenances pertaining to the water adjoining the

1

Property and real property located under the water, including, without limitation, any right, title, and interest of Seller in and to any dolphins and/or pier remnants.

Seller and Purchaser hereby acknowledge and state that the Property shall not include any inventory, tools, stock in trade, accounts receivable, trade names, trademarks, service marks, copyrights, patents, cash, accounts or reserves associated with the Property or any business activities of Seller conducted thereon.

## ARTICLE II
## CONSIDERATION

**2.1    Earnest Money Deposit.**    Within eight (8) days after the Effective Date, Purchaser shall deposit the sum of THREE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($3,250,000.00) with Baronne Title of Alabama, LLC, (the **"Escrow Agent"**), as earnest money (the **"Earnest Money"**) to guarantee the faithful performance by Purchaser hereunder and to be applied to the Purchase Price at the Closing (as hereinafter defined). The Earnest Money shall be held in a non-interest bearing trust account or Purchaser, prior to delivering the Earnest Money to Escrow Agent, may elect to have Escrow Agent open an interest bearing account by providing Escrow Agent with a W-9 and paying the costs associated with opening the interest bearing account.  All interest earned on the Earnest Money shall be paid to the party obtaining the Earnest Money if this Agreement is terminated prior to closing or applied, along with the Earnest Money, as a credit to the Purchase Price at closing.

**2.2    Purchase Price.**  The purchase price for the Property shall be THIRTY-TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($32,500,000.00) (the **"Purchase Price"**), which shall be payable at closing by wire transfer of immediately available funds.

**2.3    Liabilities**.    Except to the extent expressly assumed by Purchaser in this Agreement or to the extent Purchaser receives a credit therefore at Closing, Purchaser shall not assume or otherwise be liable for the following (the "**Excluded Liabilities**"): any liabilities or obligations, fixed or contingent, known or unknown, first incurred by Seller, or any entity related to Seller, or to which its business or assets first became subject prior to the Closing (as hereinafter defined); any liabilities for taxes arising from the operation of its business or any taxes incurred by Seller, or any entity related to Seller, in connection with this Agreement and the sale of the Property contemplated hereby; any indebtedness of Seller; any liabilities relating to any breach of contract, breach of warranty, tort, infringement, or violation of law by Seller, or any entity related to Seller; any liability arising from or relating to the termination of any employee of Seller, or of any entity related to Seller; any liability arising from any employee benefit plans of Seller, or any entity related to Seller; and any other liability not expressly assumed pursuant to this Agreement. Seller agrees to hold harmless and indemnify the Purchaser from all Excluded Liabilities. Seller does not assume, and Purchaser agrees to hold harmless and indemnify Seller from, any and all liabilities that arise or accrue or otherwise relate to the period from and after the Closing.

## ARTICLE III
## DELIVERIES TO PURCHASER

2

**3.1**      **Title Commitment and Survey.**

(a)      Title Commitment. Within fifteen (15) days following the Effective Date, Seller, at Seller's expense, shall cause to be delivered to Purchaser a binding commitment to issue an owner's policy of title insurance covering the Land (the "**Title Commitment**") issued by Baronne Title of Alabama, LLC (the "**Title Company**"), on the current ALTA standard form. In the Title Commitment, the Title Company shall agree to insure merchantable title to the Land in the name of the Purchaser, free from the Schedule B standard printed exceptions (to the extent the same are capable of deletion without additional cost to Seller) and all other exceptions other than Permitted Exceptions determined in accordance with Section 4.2. The Title Commitment shall have attached thereto complete, legible copies of all instruments noted as exceptions therein. The Title Commitment shall be updated on the day prior to the Closing Date to reflect the state of the title up to the most recent date the Probate Court of Mobile County, Alabama certifies its records as being verified and indexed through (the "**Updated Title Commitment**").

(b)      Survey.  Seller has already provided to Purchaser copies of any existing and historical boundary, topographical, bathymetric or other surveys of the Property in Seller's possession or to which Seller has ready access.  Purchaser has ordered and received a new survey of the Land from Lawler & Company Surveyors (the "**Survey**").

**3.2**      **Reports.**  Seller has already provided to Purchaser copies of any environmental assessments, building plans and specifications, as-built drawings, engineering reports, architectural plans, utility plans, and any and all other reports that Seller has in its possession or to which it has ready access with respect to the Property.

**3.3**      **Warranties.**  There are no HVAC, roof, equipment, and other warranties relating to the Property.

**3.4**      **Contracts/Leases.**  There are no leases, service, maintenance, and other contracts relating to the Property except for the sublease dated July 1, 2019 entered into by and between Epic Alabama Shipyard, LLC, as sublandlord, and AM/NS Calvert LLC ("**Calvert**"), as subtenant (the "**Calvert Lease**").  The Calvert Lease will be terminated at or prior to Closing.

**ARTICLE IV**
**TITLE AND REVIEW PERIOD**

**4.1**      **Title and Survey Review Period.**  Purchaser shall have a period of twenty (20) days following the date on which Purchaser receives the Title Commitment (the "**Title and Survey Review Period**") to inspect and evaluate the Title Commitment and Survey and make any objections to the same. Upon the expiration of the Title and Survey Review Period, if Purchaser shall not have given to Seller written notice of any objections to the Title Commitment and/or Survey, then all matters set forth in the Title Commitment and/or Survey shall be deemed to have been accepted by Purchaser. Upon the expiration of the Title and Survey Review Period, if Purchaser shall not have given to Seller the termination notice described in Section 4.2, then the Earnest Money shall thereupon be and become non-refundable.

3

**4.2**     **Title Commitment and Survey Objections.**

(a)     During the Title and Survey Review Period, Purchaser shall examine the Title Commitment and the Survey and if either discloses any defects, including but not limited to liens, encumbrances, easements, encroachments, defects in title, or any other similar or dissimilar matters affecting the Property which are unacceptable to Purchaser in Purchaser's sole and absolute discretion ("**Title Objections**"), or if Purchaser shall not be completely satisfied with all aspects of the Title Commitment and/or Survey in Purchaser's sole and absolute discretion, Purchaser may, at Purchaser's option, either (i) terminate this Agreement, in which event the Earnest Money shall be refunded to Purchaser and this Agreement shall be deemed canceled and terminated and neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder except for obligations or liabilities which expressly survive the termination of this Agreement; or (ii) deliver written notice to Seller ("**Title Objection Notice**"), prior to the expiration of the Title and Survey Review Period, identifying any Title Objections that Purchaser has and giving Seller the opportunity to cure such Title Objections.  If Purchaser delivers a Title Objection Notice to Seller, any item not identified in such Title Objection Notice as being unacceptable to Purchaser shall be deemed approved by Purchaser and constitute a **"Permitted Exception"**. If Purchaser does not deliver a Title Objection Notice to Seller, all items revealed in the Title Commitment and the Survey shall be deemed approved by Purchaser and constitute a Permitted Exception.

(b)     If Purchaser delivers a Title Objection Notice to Seller, then within ten (10) business days after delivery of Purchaser's Title Objection Notice, Seller shall deliver a written response to Purchaser stating whether Seller will take action necessary to cure any of the Title Objections identified in Purchaser's Title Objection Notice.  If Seller elects to cure any Title Objections, Seller will complete such action at Seller's expense and to Purchaser's reasonable satisfaction prior to the Closing.  In the event Seller fails to respond to Purchaser's Title Objection Notice, Seller shall be deemed to have elected not to cure any of Purchaser's Title Objections.  In the event Seller fails to respond, cannot or elects not to cure one or more of Purchaser's Title Objections, Purchaser shall have five (5) business days following receipt of Seller's response or, if no Seller response, five (5) business days following Seller's ten (10) business day response period to, at Purchaser's election, either (i) terminate this Agreement, in which event the Earnest Money shall be refunded to Purchaser and this Agreement shall be deemed canceled and terminated and neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder except for obligations or liabilities which expressly survive the termination of this Agreement; or (ii) take title to the Property subject to such Title Objections and proceed to the Closing, in which event all unsatisfied Title Objections shall constitute Permitted Exceptions.

**4.3**     **Inspection of the Property.**  Purchaser accepts the Property in its current AS IS, WHERE IS condition.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

4

**5.1     Seller's Representations and Warranties.**     Seller makes the following representations and warranties, which shall also be true and correct as of the Closing Date:

(a)     Title to Property. On the Closing Date Seller shall be the sole fee owner of the Property and shall have good and marketable title thereto, free and clear of (i) all liens, claims, mortgages, easements, agreements, and encumbrances caused by or arising through Seller, except for the Permitted Exceptions, and, (ii) to Seller's knowledge, all other liens, claims, mortgages, easements, agreements, and encumbrances except for the Permitted Exceptions.

(b)     Authority of Seller. (i) Seller is a validly organized entity in good standing under the laws of the state of its organization; (ii) Seller is fully authorized to enter into this Agreement and to perform its obligations under this Agreement; (iii) the person(s) executing this Agreement on behalf of Seller are duly authorized by Seller to enter into, execute, deliver, perform, and consummate this Agreement on behalf of Seller; and (iv) this Agreement when executed shall constitute the valid and binding obligation of Seller, enforceable in accordance with its terms.

(c)     No Default. Neither the execution of this Agreement, nor the performance or observance by Seller of any term or provision of this Agreement, nor the consummation of the transactions contemplated hereby will conflict with, or result in a breach of, the terms, conditions, or provisions of, or constitute a default under, any Agreement or instrument to which Seller or its assets are bound.

(d)     OFAC.    Seller, its employees, principals, members and direct and indirect shareholders owning at least a 10% indirect interest in Seller are not named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, on behalf of, or instigating or facilitating the transaction contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation.  Seller is not engaging in the transaction contemplated by this Agreement, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Seller have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Seller is prohibited by law or that the transaction contemplated by this Agreement or this Agreement is or will be in violation of law. Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

(e)     Outstanding Contracts. Seller has not entered into, and to the best of Seller's knowledge (except as may be set forth in any Permitted Exceptions), neither the Property nor any portion thereof is subject to, any outstanding contracts of sale (other than this Agreement), options to purchase, or rights of first refusal.

(f)     Proceedings. No condemnation proceedings, attachments, execution proceedings, general assignment for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending or threatened against Seller, nor (i) is any such attachments, execution proceeding, or general assignment for the benefit of creditors, insolvency, bankruptcy, or reorganization anticipated or contemplated by Seller, or (ii) to the best of Seller's knowledge, is any condemnation proceeding anticipated or contemplated.

(g)     Claims or Litigation. No actions, suits, claims or proceedings are pending or, to the knowledge of Seller, threatened against either the Seller or the Property except for those disclosed on **Exhibit C**. In addition, there are no claims relating to the Property, including any claims that might, through passage of time, litigation, or otherwise, result in liens on any of the Property or claims against any of the Property except for those disclosed on **Exhibit C**.

(h)     No Violations. Except as disclosed to Purchaser, Seller has not received written notice of any non-compliance with environmental laws, which non-compliance has not been cured.

**5.2     Purchaser's Representations and Warranties.**

(a)     Authority/Execution. Purchaser represents and warrants to Seller that (i) if Purchaser is an entity, Purchaser is a validly organized entity in good standing under the laws of the state of its formation; (ii) Purchaser is fully authorized to enter into this Agreement and to perform its obligations under this Agreement; (iii) the person executing this Agreement on behalf of Purchaser is duly authorized by Purchaser to enter into, execute, deliver, perform, and consummate this Agreement on behalf of Purchaser; (iv) neither the execution of this Agreement nor the performance or observance by Purchaser of any term or provision of this Agreement, nor the consummation of the transactions contemplated hereby will conflict with, or result in a breach of, the terms, conditions, or provisions of, or constitute a default under, any Agreement or instrument to which Purchaser or its assets are bound; and (v) this Agreement when executed shall constitute the valid and binding obligation of Purchaser, enforceable in accordance with its terms.

(b)     OFAC. Purchaser, its employees, principals, members and direct and indirect shareholders owning at least a 10% indirect interest in Purchaser are not named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Purchaser is not engaging in the transaction contemplated by this Agreement, directly or indirectly, on behalf of, or instigating or facilitating the transaction contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation. Purchaser is not engaging in the transaction contemplated by this Agreement, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering. To Purchaser's knowledge, none of the funds of Purchaser have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Purchaser is prohibited by law or that the transaction contemplated by this Agreement or this

Agreement is or will be in violation of law. Purchaser has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**6.1**     <u>Conditions to Purchaser's Obligation to Close.</u>  The obligation of Purchaser to consummate the transaction contemplated by this Agreement is subject to the satisfaction on the Closing Date of the following conditions precedent:

(a)     <u>Representations and Warranties True at Closing.</u> The representations and warranties of Seller contained in this Agreement shall be true on the Closing Date in all material respects as though such representations and warranties were made on, and as of, such date.

(b)     <u>Compliance with this Agreement.</u> Seller shall have performed and complied in all material respects with all terms, provisions, covenants, obligations, conditions, and agreements required by this Agreement.

(c)     <u>The Calvert Lease.</u> The Calvert Lease will be terminated at or prior to Closing.

(d)     <u>[Reserved]</u>.

(e)     <u>Closing Documents.</u> Seller shall have delivered to Purchaser the items set forth in Section 7.2 of this Agreement.

(f)     <u>Title Commitment.</u> Title Company is irrevocably committed to issuing a title policy subject only to the Permitted Exceptions, which, for the avoidance of doubt, will not include any monetary liens or mortgage liens except to the extent that the same constitutes a Permitted Exception.

(g)     <u>[Reserved]</u>.

(h)     <u>Subdivision Approval.</u>  Purchaser shall have received all necessary approvals for the subdivision of the Property, including approval from the Planning Commission of the City of Mobile and recording of the final subdivision plat ("**Subdivision Plat**") creating the two lots being purchased by Purchaser in the public records of the Office of the Judge of Probate of Mobile County, Alabama.  Upon recording of the Subdivision Plat the legal description of the Land (attached hereto as Exhibit A) shall be replaced with the new legal description of the subdivided lots created by the recording of the Subdivision Plat. Purchaser shall use diligent, commercially reasonable efforts to obtain all such approvals and to record the Subdivision Plat.

If any of Purchaser's conditions have not been satisfied in full at the Closing, or have not been waived in writing by it, Purchaser may elect to cancel and terminate this Agreement, in which event the refundable portion of the Earnest Money shall be returned to Purchaser and this

7

Agreement shall be null and void and the parties shall not have any further obligation or liability to each other hereunder except for obligations or liabilities which expressly survive the termination of this Agreement.

**6.2** <u>**Conditions to Seller's Obligation to Close.**</u> The obligation of Seller to consummate the transaction contemplated by this Agreement is subject to the satisfaction by Purchaser on the Closing Date of the following conditions precedent:

(a) <u>Representations and Warranties True at Closing.</u> The representations and warranties of Purchaser contained in this Agreement shall be true on the Closing Date in all material respects as though such representations and warranties were made on, and as of, such date.

(b) <u>Compliance with this Agreement.</u> Purchaser shall have performed and complied in all material respects with all terms, provisions, covenants, obligations, conditions, and agreements required by this Agreement.

(c) <u>Closing Documents.</u> Purchaser shall have delivered to Seller the items set forth in Section 7.3 of this Agreement.

(d) <u>Subdivision Approval</u>. Recording of the Subdivision Plat in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

**ARTICLE VII**
**CLOSING**

**7.1** <u>**Time and Place.**</u> Unless this Agreement is terminated as provided herein, the purchase and sale transaction contemplated hereunder shall be consummated (the "**Closing**") within ten (10) days after the recording of the Subdivision Plat at a time and location as shall be mutually agreed upon by Seller and Purchaser. The date on which the Closing hereunder actually occurs is referred to herein as the "Closing Date". If the Closing does not occur on or before **Friday, May 26, 2023** (the "**Outside Closing Date**"), then either Purchaser or Seller may elect to terminate this Agreement by delivering a notice of termination to the other Party. If this Agreement terminates pursuant to this Section 7.1, then (i) Purchaser's rights and obligations to purchase, and Seller's rights and obligations to sell, the Property shall immediately terminate, (ii) the escrow shall be canceled, (iii) neither Party shall have any further obligation to the other except as otherwise expressly set forth in this Agreement, (iv) each document then with the Escrow Agent shall be returned forthwith to the Party which deposited same with the Escrow Agent, (v) the Earnest Money (other than any portion of the Earnest Money which has become non-refundable as of the date of such termination in accordance with the express terms of this Agreement) shall be delivered forthwith to Purchaser, and (vi) the Parties hereto shall each pay one-half (1/2) of any escrow fees and related charges.

**7.2** <u>**Items to be Delivered at Closing by Seller.**</u> At or prior to Closing, Seller shall deliver or cause to be delivered to Purchaser, or the Escrow Agent to be held in escrow for Purchaser, each of the following items properly executed and notarized where applicable:

8

(a)    A statutory (limited) warranty deed ("**Deed**") in the form attached hereto as Exhibit B conveying to Purchaser the Land and Improvements;

(b)    A Foreign Investment in Real Property Tax Act affidavit in the form attached hereto as Exhibit D;

(c)    Any reasonable and customary documents and instruments that the Title Company may reasonably require in order to issue the Title Insurance Policy;

(d)    All keys in Seller's possession relating to the Property;

(e)    Such other documents and instruments as may be necessary, incidental, or appropriate to effectuate the purchase and sale transaction contemplated by this Agreement; and

(f)    A closing statement prepared by the Escrow Agent and executed by Seller.

**7.3    Items to be Delivered at Closing by Purchaser.**    At or prior to Closing, Purchaser shall deliver or cause to be delivered to Seller, or the Escrow Agent to be held in escrow for Seller, each of the following items properly executed and notarized where applicable:

(a)    The Purchase Price by wire transfer of immediately available funds;

(b)    Any reasonable and customary documents and instruments that the Title Company may reasonably require in order to issue the Title Insurance Policy;

(c)    Such other documents and instruments as may be necessary, incidental, or appropriate to effectuate the purchase and sale transaction contemplated by this Agreement; and

(d)    A closing statement prepared by the Escrow Agent and executed by Purchaser.

**7.4    Possession.**    Possession of the Property is to be given to Purchaser on the Closing Date.

## ARTICLE VIII
## CLOSING COSTS AND PRORATIONS

**8.1    Expenses of Closing.**    The expenses of Closing shall be paid in the following manner:

(a)    Seller shall pay: (i) the cost of the Title Commitment and of a standard form owner's policy of title insurance; (ii) one-half (1/2) of the escrow fee and/or closing fee imposed by the Escrow Agent incident to the Closing; (iii) the cost of preparing, executing, and acknowledging the Deed and other documents to be delivered at Closing by Seller pursuant to Section 7.2 of this Agreement; (iv) one-half (1/2) of the cost of the survey and fees and expenses incurred in getting the subdivision plat approved and recorded; and (v) one-half (1/2) of all other costs associated with closing the transaction.

(b)    Purchaser shall pay: (i) the cost of recording the Deed, including any documentary stamps and/or deed/transfer taxes applicable thereto; (ii) the cost of preparing, executing, and acknowledging the documents to be delivered at Closing by Purchaser pursuant to Section 7.3 of this Agreement; (iii) the costs related to due diligence of the Property with the exception of the costs referenced in clause (vi) hereunder; (iv) one-half (1/2) of the escrow fee or closing fee imposed by the Escrow Agent incident to the Closing; (v) the cost of any endorsements to the owner's policy of title insurance requested by Purchaser and the entire cost of any loan policy of title insurance; (vi) one-half (1/2) of the cost of the survey and fees and expenses incurred in getting the subdivision plat approved and recorded; and (vii) one-half (1/2) of all other costs associated with closing the transaction.

### 8.2    Proration of Taxes and Expenses.

(a)    Taxes. All ad valorem taxes, personal property taxes, and special assessments (collectively, "**Taxes**") levied or assessed against the Property will be paid by Seller if due and payable on or before the Closing Date and will be paid by Purchaser if due and payable thereafter; provided, however, that the Taxes for the tax fiscal year in which the Closing occurs (the "**Tax Proration Period**") shall be prorated between Seller and Purchaser on and as of the Closing Date, and Seller will bear only that portion of such Taxes which the number of days in the Tax Proration Period to and including the Closing Date bears to the total number of days in the Tax Proration Period. In the event the Taxes for the tax fiscal year in which the Closing occurs are not determinable at the time of the Closing, such Taxes shall be prorated on the basis of the Taxes for the preceding tax fiscal year, and the parties shall re-prorate the Taxes for the tax fiscal year in which the Closing occurs within thirty (30) days following receipt of the actual tax bills for such tax fiscal year. The party responsible for the payment of any additional tax to the other party upon such re-proration shall pay such additional tax to the other party within thirty (30) days following such re-proration of the Taxes by the parties. Purchaser expressly acknowledges and agrees that any and all special assessments to which the Property is subject which are payable in installments will continue to be paid in installments, and Seller will be obligated to pay only those installments which are due and payable on or before the Closing Date, and Purchaser assumes and agrees to pay all installments thereof and all other Taxes which are due and payable after the Closing Date, subject to the foregoing provisions for proration of the Taxes for the Tax Proration Period.

(b)    Utilities. All utility services and fuel shall be prorated as of 12:01 a.m. on the Closing Date (the "**Cut-Off Time**") between Seller and Purchaser. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall reprorate the amount for such utilities and fuel and pay any deficiency in the original proration to each Party to which such obligation shall survive the Closing as well as the termination of this Agreement. Seller shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

(d)    Other Adjustments and Prorations.  All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a property similar to the Property shall be adjusted and prorated between Seller and Purchaser accordingly.

(e)    Survival.  This Section 8.2 shall survive the Closing.

**8.3    [RESERVED]**

**8.4    Brokerage Commission.**  Seller and Purchaser each represent and warrant to the other that it did not engage any broker, agent, finder or other third party in connection with the purchase and sale described herein. Seller and Purchaser each agree to indemnify the other and hold the other harmless from and against any and all claims, actions, liabilities, losses, costs, damages, expenses, and judgments, including, but not limited to, attorney fees and costs of litigation, which either party shall suffer or incur because of any claim by any broker, agent, finder or other third party engaged by the other party for any brokerage or finder's fees, agent's commissions or other like payments in connection with this Agreement or the sale and purchase of the Property or any portion thereof.

**ARTICLE IX
CONDEMNATION AND CASUALTY**

**9.1    Condemnation.**  In the event that on or after the Effective Date and prior to the Closing Date all or any portion of the Property is taken by the exercise of the power of eminent domain or by conveyance in lieu thereof, or any such taking is threatened, by a governmental authority or any other body vested with the power of eminent domain, Seller shall notify Purchaser in writing of such fact promptly after obtaining knowledge thereof. If the Property is the subject of a condemnation that occurs on or after the Effective Date Purchaser may, at Purchaser's option, terminate this Agreement by written notice thereof to Seller within fifteen (15) days after Seller notifies Purchaser of the condemnation, in which event the Earnest Money shall be refunded to Purchaser, and this Agreement shall be deemed canceled and terminated and neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder except for obligations or liabilities which expressly survive the termination of this Agreement. In the event Purchaser does not deliver written notice of termination as described above, Purchaser shall be deemed to have elected to proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Seller shall deliver to Purchaser at the Closing any awards actually received by Seller attributable to the Property from such condemnation or assign to Purchaser Seller's rights to such awards and there shall be no reduction in the Purchase Price.

**9.2    Casualty.**  In the event that any portion of the Property shall be damaged or destroyed by fire or other casualty on or after the Effective Date and before the Closing Date, Seller shall notify Purchaser in writing of such fact promptly after obtaining knowledge thereof. If the Property is the subject of a casualty that occurs on or after the Effective Date Purchaser may, at Purchaser's option, terminate this Agreement by written notice thereof to Seller within fifteen (15) days after Seller notifies Purchaser of the casualty, in which event the Earnest Money shall be refunded to Purchaser, and this Agreement shall be deemed canceled and terminated and neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder

11

except for obligations or liabilities which expressly survive the termination of this Agreement. In the event Purchaser does not terminate this Agreement as described above, Purchaser shall be deemed to have elected to proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Seller shall deliver to Purchaser at the Closing any insurance proceeds actually received by Seller attributable to the Property from such casualty or assign to Purchaser all of Seller's right, title and interest in any claim (or in the proceeds thereof if such assignment of such claim is not permitted) under any applicable insurance policies in respect of such casualty, and there shall be no reduction in the Purchase Price.

**9.3**    **Risk of Loss.**  Subject to the foregoing provisions of this Article, risk of loss until Closing shall otherwise be borne by Seller.

**ARTICLE X**
**REMEDIES**

**10.1**    **Purchaser's Remedies.**

(a)    Pre-Closing Remedies.   In the event that any warranty or representation of Seller contained in this Agreement shall prove to be untrue in any material respect, or in the event that Seller breaches or fails to satisfy, comply with, or perform any of the conditions, covenants, agreements, or obligations to be satisfied, complied with or performed by Seller under this Agreement, or if Seller fails or refuses to consummate the purchase and sale of the Property contemplated by this Agreement, then Purchaser, at its sole option, may either: (i) declare this Agreement terminated and the Earnest Money shall be returned to Purchaser, and thereafter neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder except for obligations or liabilities which expressly survive the termination of this Agreement, or (ii) pursue a claim against Seller for specific performance. If Seller is obligated to sell the Property to Purchaser but sells the Property or a portion of the Property to another party in breach of this Agreement such that an action for specific performance is not available, Purchaser shall be entitled to pursue a claim for actual damages (i.e., the differential between the Purchase Price and the actual purchase price, if greater than the Purchase Price). Purchaser expressly waives any and all other rights, claims or remedies against Seller including, but not limited to any claims for lost profits, expenses incurred, consequential, special or punitive damages. Purchaser must commence any action for specific performance within sixty (60) days after the Closing or the Outside Closing Date, whichever is later.

(b)    Post-Closing Remedies.

(i)  All representations and warranties contained in this Agreement, liability for breach of any covenant of Seller and the Seller indemnities shall survive the Closing for a period of nine (9) months (the "**Survival Period**") and shall not merge into any of the documents delivered at Closing.

(ii)  Notwithstanding the foregoing, Purchaser acknowledges and agrees that with respect to any post-Closing claims, Seller shall have no liability for, and Purchaser shall not make any claim on account of, any breach of any representation or warranty or any

12

covenant of Seller except to the extent the aggregate measure of such claims exceeds Seventy Five Thousand Dollars ($75,000.00) after which recovery shall be from the first Dollar.  Except as otherwise set forth in this Agreement, in no event shall the aggregate liability of Seller to Purchaser for any (and all) post-Closing claims with respect to breaches of any representations or warranties or any Seller covenant exceed an amount equal to One Million Dollars ($1,000,000.00).

(iii)  Notwithstanding anything contained in this Agreement to the contrary, in no event shall Seller have any liability for a claim made by Purchaser after Closing if, prior to Closing, Purchaser has knowledge of any fact or circumstance which makes such representation or warranty untrue or of any breach of any other covenant or agreement and nonetheless elects to proceed with the Closing.

(iv)  This Section 10.1(b) shall survive the Closing and shall not be deemed merged into the Deed or any conveyance document delivered at Closing.

**10.2    Seller's Remedies.**  In the event that any warranty or representation of Purchaser contained in this Agreement shall prove to be untrue in any material respect, or in the event that Purchaser breaches or fails to satisfy, comply with, or perform any of the conditions, covenants, agreements, or obligations to be satisfied, complied with, or performed by Purchaser under this Agreement, or if Purchaser fails or refuses to consummate the purchase and sale of the Property contemplated by this Agreement, then Seller, at Seller's option, may declare this Agreement terminated and retain the Earnest Money as full and complete liquidated damages for such breach.

## ARTICLE XI
## ESCROW PROVISIONS

**11.1    Disbursement of Escrow Funds.**  Upon delivery to the Escrow Agent of a written notice executed by both Purchaser and Seller authorizing release of all or any portion of the Escrow Funds ("**Affidavit**"), to a designated person or entity, the Escrow Agent shall disburse same in accordance with the Affidavit as soon as is reasonably practicable and the Escrow Agent shall thereupon be released and discharged from any and all further obligations arising in connection with this Agreement with respect to the released funds.  The Escrow Agent shall be entitled to rely upon any Affidavit delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein and without requiring substantiating evidence of any kind.  The Escrow Agent may act in reliance upon any signature believed by it to be genuine and may assume that the person signing the Affidavit has been duly authorized to do so.  The Escrow Agent shall disburse the Escrow Funds in accordance with the express provisions of this Agreement, and shall not make, be required to make, or be liable in any manner for its failure to make, any determination under this Agreement, including without limitation any determination of whether Purchaser or Seller has complied with the terms of this Agreement or is entitled to delivery of payment of any or all of the Escrow Funds or to any other right or remedy thereunder.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between Purchaser and Seller, nor shall the Escrow

13

Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.

**11.2    Dispute or Question of Fact**.  In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from either Purchaser or Seller which, in its opinion, conflict with any of the provisions of this Agreement, or in the event of other dispute or question of fact, Escrow Agent shall be entitled to refrain from taking any action until it shall be given a direction in writing signed by both Purchaser and Seller which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or until the issues have been resolved by a final and non-appealable determination by a court of competent jurisdiction, or, at the Escrow Agent's option, the Escrow Agent may deposit the Escrow Funds into the registry of the Circuit Court of Mobile County, Alabama via an interpleader action and have Purchaser and Seller cited to appear and prove their entitlement to the Escrow Funds.  Purchaser and Seller agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  Upon any delivery of Escrow Funds into the registry of the court, the Escrow Agent shall thereupon be released and discharged from any and all further obligations arising in connection with this Agreement.

**11.3    Reimbursement of Fees and Expenses**.  Purchaser and Seller agree to each be responsible for one-half of all reasonable expenses, disbursements, and advances, including, without limitation, fees and expenses of Escrow Agent's in house or outside counsel, incurred or made by it in connection with the performance, modification and termination of this Agreement not to exceed $10,000.00.  If any fees, expenses or costs incurred by, or any obligations owed to, the Escrow Agent are not promptly paid when due, the Escrow Agent may reimburse itself from the Escrow Funds.  Prior to disbursement or deposit of Escrow Funds into the registry of the court as authorized in this Agreement, Escrow Agent shall have the right to withhold any amount due and owing to Escrow Agent plus any fees, costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with any additional administration or termination of the Escrow Agreement (including without limitation fees and expenses of Escrow Agent's in house or outside counsel).

**11.4    Resignation of Escrow Agent**.  Escrow Agent may at any time resign as such by delivering notice of its resignation to Purchaser and Seller and by delivering the Escrow Funds to a successor Escrow Agent agreed to by Purchaser and Seller in writing.  If a successor Escrow Agent is not appointed by the other parties within thirty (30) days after delivery of Escrow Agent's resignation, then and in that event Escrow Agent may at any time thereafter deposit the Escrow Funds into the registry of the Circuit Court of Mobile County, Alabama in an interpleader action and have Purchaser and Seller cited to appear and prove their entitlement to the Escrow Funds.  Upon any delivery of the Escrow Funds as provided in this paragraph into the registry of the court, the Escrow Agent shall thereupon be released and discharged from any and all further obligations arising in connection with this Agreement.

**11.5    Limitation Of Liability Of Escrow Agent**.  THE ESCROW AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN, SUFFERED OR OMITTED TO BE TAKEN BY IT EXCEPT TO THE EXTENT THAT A FINAL NON-APPEALABLE ADJUDICATION

14

OF A COURT OF COMPETENT JURISDICTION DETERMINES THAT THE ESCROW AGENT'S NEGLIGENCE OR WILLFUL MISCONDUCT WAS THE PRIMARY CAUSE OF ANY LOSS TO EITHER PURCHASER OR SELLER. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.

**11.6**    **No Obligation to Incur Liability**.  Under no circumstances shall Escrow Agent be required to risk or advance its own funds or otherwise incur financial liability or potential financial liability in the performance of its duties or exercise of its rights hereunder.

**11.7**    **Indemnification Of Escrow Agent**.  Purchaser and Seller shall indemnify and hold the Escrow Agent harmless from and against any liability, loss, damage or expense (including, without limitation, reasonable and documented attorneys' fees) that the Escrow Agent may incur in connection with this Agreement and its performance hereunder or in connection herewith, except to the extent such liability, loss, damage or expense arises from its willful misconduct or negligence. The indemnification provided for under this Agreement shall survive the termination of this Agreement and the resignation or removal of the Escrow Agent.

## ARTICLE XII
## ENVIRONMENTAL

**12.1**    As a material and integral consideration for Seller entering into this Agreement and the execution and delivery of the Deed from Seller to Purchaser at Closing, Purchaser acknowledges that the Property is sold "**AS IS, WHERE IS**" and except as otherwise specifically represented herein, including but not limited to the representations contained in Section 5.1, hereby disclaims (i) any warranty (whether express or implied, or arising by operation of law) guaranty or representation, oral or written, concerning the nature and physical condition of the Property, including the suitability thereof for any and all activities and uses Purchaser may elect to conduct thereon, (ii) the availability of utilities to service the Property, and (iii) the compliance of the Property or its operations with any laws, ordinances or regulations of any government or other body. Purchaser further waives and releases Seller from any and all claims or causes of action to which Purchaser may have or hereafter may be otherwise entitled, based on vices or defects in the Property, or any improvements or component parts thereof, including, without limitation, for return or diminution of the Purchase Price under any theory of law. Except as otherwise specifically represented herein, including but not limited to the representations contained in Section 5.1, Purchaser further assumes the risk of all vices and defects in the physical condition of the Property, whether those vices or defects are latent or not discoverable upon simple inspection, and including those vices or defects, knowledge of which would deter Purchaser from making this purchase.

**12.2**    Except as otherwise specifically represented herein, including but not limited to the representations contained in Section 5.1, Purchaser further waives and releases Seller from any and all Purchaser claims, demands, causes of action, liens, losses, damages, liabilities, costs and

15

expenses of any and every kind or character, known or unknown, fixed or contingent, under any applicable federal, state or local laws, rules, ordinances, permits, approvals, orders or regulations relating to the environment as they now exist or may subsequently be modified, supplemented or amended. The foregoing is an agreement between Seller and Purchaser, shall not constitute an assumption by Purchaser and may not be relied upon by any third party. The terms and provisions of this Article XII shall expressly survive the Closing.

**ARTICLE XIII**
**GENERAL PROVISIONS**

**13.1**    **Benefit.**   This Agreement shall inure to the benefit of and be binding upon Purchaser and Seller and their respective heirs, legal representatives, successors, and assigns.

**13.2**    **Assignment.**   Purchaser may not assign this Agreement or any of its right, title, and interest in and to this Agreement, to any person, firm, corporation, limited liability company, or other entity at any time without the prior written consent of Seller which consent may be withheld in Seller's sole and absolute discretion.

**13.3**    **Attorney Fees.**   In the event either party employs an attorney or otherwise takes action to enforce its rights under this Agreement, the unsuccessful party shall pay all reasonable costs and expenses, including reasonable out-of-pocket attorney fees, incurred by the successful party in such action.

**13.4**    **No Waiver.**   No waiver by any party of any other party's failure to comply with or breach of any term or provision contained in this Agreement, and no failure by any party to insist upon any other party's strict performance of or compliance with any term or provision contained in this Agreement shall operate as, or be construed to be, a waiver of such term or provision, nor shall it be deemed to be a waiver of any other term or provision of this Agreement.

**13.5**    **Notices.**   Any notice required or permitted to be given hereunder shall be in writing and shall be deemed to have been delivered upon actual receipt by the addressee by hand delivery, or when delivered Federal Express, signature required to Seller or to Purchaser as follows:

Seller:       Epic Alabama Maritime Assets, LLC
660 Dunlap Drive
Mobile, Alabama 36602
Attention: Samantha Johnston

With Copy to: Clay A. Lanham via email only to:
clanham@joneswalker.com
And
Kelton Tonn via email only to:
ktonn@alabamashipyard.com
AND
Greg Wagner via email only to:

16

                                    gwagner@alabamashipyard.com
                                    AND
                                    Tim DeLong via email only to:
                                    tdelong@alabamashipyard.com

            Purchaser:          Austal USA, LLC
                                    100 Austal Way
                                    Mobile, AL  36602
                                    Attention: Rusty Murdaugh, CEO

            With copy to:  Jerome E. Speegle (e-mail only)
                                    jspeegle@speeglehoffman.com


**13.6    Governing Law.**  This Agreement shall be interpreted, construed and governed according to the laws of the State of Alabama.

**13.7    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute a single fully executed Agreement. A facsimile signature of any party shall be considered to have the same binding legal effect as an original signature.

**13.8    Incorporation of Exhibits.**  Each and every exhibit referred to or otherwise mentioned in this Agreement is attached to this Agreement and is incorporated into and shall be construed to be made a part of this Agreement by such reference or other mention at each point at which such reference or other mention occurs, in the same manner and with the same effect as if each exhibit were set forth in full and at length every time it is referred to or otherwise mentioned.

**13.9    Entire Agreement.**  This Agreement supersedes all prior discussions and agreements between Purchaser and Seller with respect to the purchase and sale of the Property. This Agreement contains the sole and entire agreement and understanding between Purchaser and Seller with respect to the purchase and sale of the Property, and there are no agreements, understandings, warranties or representations between Purchaser and Seller other than those set forth herein with respect thereto. This Agreement may not be altered, enlarged, modified, or changed except by a writing executed by Purchaser and Seller.

**13.10   No Survival.**  Except as to provisions of this Agreement that expressly provide for survival, none of the terms, provisions, conditions, representations, warranties, covenants, and agreements contained in this Agreement shall survive the consummation of the purchase and sale of the Property on the Closing Date.

**13.11   Time of Performance.**  Time is of the essence in the performance of all obligations under this Agreement.

**13.12   Date.**  In the event that any date set forth in this Agreement falls on, or any time

17

period set forth in this Agreement expires on, a Saturday, a Sunday, or a federal or state holiday, such date shall be automatically extended to the next day which is not a Saturday, a Sunday, or a federal or state holiday.

**13.13  Captions; Construction.**  The captions and headings used in this Agreement are inserted only for convenience and in no way define, describe, extend, or limit the scope of the particular provisions to which they refer, or the meaning or intent of this Agreement. The words "herein," "hereof," "hereunder," and other similar compounds of the word "here" as used in this Agreement shall refer to the entire Agreement and not to any particular provision or paragraph.

**13.14  Severability.**  If any term, provision, covenant, or condition contained in this Agreement shall be invalid or unenforceable to any extent, the remainder of the terms, provisions, covenants, and conditions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

**13.15  Post-Closing Matters.**

(a)    Post-Closing Work. In the event Purchaser determines to make material improvements to the waterfront portion of the Property, Purchaser agrees to consider engaging Seller as its prime contractor to make such improvement and Purchaser will include Seller in its request for proposal.

(b)    Post-Closing Lease. Purchaser shall enter into a lease in the form attached hereto as **Exhibit E** with Alabama Shipyard, LLC, a Delaware limited liability company ("**ASY**") leasing a portion of the Property to ASY for completion of the scrapping of the MSS3.

**13.16  Dunlap Drive.**  Purchaser will take responsibility for repair and maintenance of that portion of the 60' wide private road known as Dunlap Drive from the end of City of Mobile's responsibility at the south side of the Pinto Pass Bridge running south through and adjacent to Lot 1 to the southern property line of Lot 1 (as shown in hash marks on the survey attached as **Exhibit H**).  Purchaser shall maintain Dunlap Drive in a good and workman like manner suitable for industrial shipyard traffic and in accordance with any applicable laws, ordinances or regulations. Seller will retain maintenance of those portions of Dunlap Drive that run through or adjacent to the property retained by Seller unless maintained by the Alabama State Port Authority.  In addition, Purchaser agrees to comply with the terms and conditions contained in the Declaration of Covenants, Conditions, and Restrictions dated July 12, 2010 and recorded on July 16, 2010 at Book: 6677, Page: 446 ("**DCCR**") and be responsible for its pro rata share of the maintenance obligations and costs imposed by the DCCR with respect to the Property.

**13.17  Mutual Access and Utility Easement Agreement.**  At Closing, Seller and Purchaser shall enter into a Mutual Access and Utility Easement Agreement in the form attached hereto as **Exhibit G** (the "**Easement Agreement**").

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**SELLER:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _____

Name: ___John Herren___

Its: ___Manager___

**[SELLER'S SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]**

PURCHASER:

**AUSTAL USA, LLC**
**an Alabama limited liability company**

By: _____

Name: _____

Its: _____

**[PURCHASER'S SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]**

# EXHIBIT A
## LEGAL DESCRIPTIONS OF THE LAND

**Lots 1 and 3 as shown on the preliminary subdivision plat pasted below.**



**Upon recording of the subdivision plat, the legal description of the Property conveyed to Purchaser will be:**

Lots 1 and 3 as shown on the subdivision plat of Pinto Island Industrial Park record on _____ _____, 2023 as Instrument #_____ in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

#100878543v1
LEGAL_US_W # 114594837.10
#100994486v1

**EXHIBIT B**

**FORM OF DEED**

*This Instrument Prepared By*
*And Upon recording return to:*
JONES WALKER LLP
Clay A. Lanham
11 North Water Street, Suite 1200
Mobile, Alabama 36602

---

## LIMITED WARRANTY DEED

---

**STATE OF ALABAMA**
**COUNTY OF MOBILE**

KNOW ALL MEN BY THESE PRESENTS, that EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**Grantor**"), for and in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged to have been paid to Grantor by AUSTAL USA, LLC, an Alabama limited liability company ("**Grantee**"), does, subject to the matters and exceptions hereinbelow set forth, hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee, and its successors and assigns forever, the following described real property, situated in Mobile County, State of Alabama, (the "**Land**"), as more particularly described in **EXHIBIT "A"** attached hereto and by this reference made a part hereof.

TOGETHER WITH all improvements located thereon, but expressly excluding improvements and structures owned by any tenant or other third party ("**Improvements**"), without warranty, all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining thereto, and without warranty, all right, title, and interest of Grantor, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land (the foregoing, together with the Land, are herein referred to as the "**Property**"), subject only to those matters set forth and described on **EXHIBIT "B"** attached hereto and by this reference made a part hereof (herein collectively referred to as the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the same unto Grantee, and it successors and assigns forever.

And, except as to the matters, exceptions and easements herein set forth, Grantor, hereby covenants with Grantee, and its successors and assigns, that Grantor is seized of an indefeasible estate in fee simple in the Property, that the Property is free and clear of all encumbrances except as noted above, that Grantor has good right to sell and convey the Property, and Grantor, does hereby WARRANT and will forever DEFEND the title to the Property unto Grantee, and its successors and assigns, against the lawful claims of all persons claiming by, through or under Grantor, but not otherwise.

*[signature page follows]*

IN WITNESS WHEREOF, the said Grantor has executed this deed this the _____ day of _____ , 2023.

GRANTOR:

**EPIC ALABAMA MARITIME ASSETS, LLC**
**A Delaware limited liability company**

By: _____

Name: _____

Its: _____

STATE OF ALABAMA          )
COUNTY OF MOBILE          )

I, the undersigned Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of  EPIC  ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2023.

[SEAL]                        _____
                              NOTARY PUBLIC
                              My Commission Expires:_____

EXHIBIT A

TO DEED

Legal Description

Lots 1 and 3 as shown on the subdivision plat of Pinto Island Industrial Park record on _____ _____, 2023 as Instrument #_____ in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

EXHIBIT B
TO DEED

Permitted Exceptions

[To be added.]

## EXHIBIT C

## Schedule of Litigation

<u>**Pending Litigation**</u>:

| Matter | Plaintiff | Defendant | Type of Case | Court | Case No. |
|---|---|---|---|---|---|
| McCoy vs Hooks & ASY | Charles McCoy | Mike Hooks LLC and Alabama Shipyard, LLC | Third Party Personal Injury Claim | 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana | 2019-3818 |
| Clarke vs AMAH | Thomas M. Clarke and Ana M. Clarke | Alabama Maritime Asset Holdings, LLC | Contract Dispute | Supreme Court of the State of New York, County of New York | 655874-2021 |
| Hyatt vs ASY | Michael Hyatt | Alabama Shipyard, LLC | Workers Comp Claim | N/A | N/A |
| Hyatt vs ABR Logistics | Michael Hyatt | ABR Logistics, LLC, Thomas Johnson, and QBE UK Limited | Personal Injury; Potential Third Party Indemnity Demand | US District Court Eastern District of Louisiana | 2-21-cv-04004-EEF-KWR |
| Craig vs ASY et al | Gloria Craig | A.W. Chesterton Company, et al | Personal Injury - Asbestos | Circuit Court of Mobile County, Alabama | 02-CV-2023-901064.00 |
| Dolbear vs ASY et al | Cecil K. Dolbear, individually and as Special Administrator of the Estate of Bennie L. Dolbear, Deceased | 4520 Corp. Inc., as successor to Benjamin F. Shaw Company, et al | Personal Injury - Asbestos | In the Circuit Court Third Judicial Circuit Madison Count, Illinois | 22-LA-2022LA001818 |
| NLRB Charge | Amontea Keyes | Alabama Shipyard, LLC | Threatened Retaliation | US Government National Labor Relations Board | 15-CA-309817 |
| Yalledy vs ASY | Mark Yalledy | Alabama Shipyard, LLC | Third Party Personal Injury | In the Circuit Court of Mobile County, Alabama | 02-CV-2019-900119.00 |

<u>**Potential/Threatened Litigation**</u>:
1.   None.

## EXHIBIT D

## FORM OF FIRPTA CERTIFICATE

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform _____ ("**Transferee**") that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, a _____ ("**Transferor**"), the beneficial owner of _____, a _____ (U.S. employer identification number _____), the undersigned, in his/her capacity as _____ of Transferor, but not individually, hereby certifies to Transferee the following on behalf of Transferor:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in Treasury Regulation § 1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is _____; and

4.      Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated as of _____, 20__.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

**<u>TRANSFEROR</u>**:

_____, a _____

By:_____

Name:_____

Title:_____

THE STATE OF _____          §

                                                      §

COUNTY OF _____          §

    This      instrument      was      acknowledged      before      me      on
_____, 20__, by _____,
_____ of _____, a _____,
on behalf of said _____.

_____

___

Notary        Public,        State        of

_____

## EXHIBIT E
## FORM OF POST-CLOSING LEASE

STATE OF ALABAMA

COUNTY OF MOBILE

### LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made and entered into this _____ day of _____, 2023 ("**Effective Date**"), by and between AUSTAL USA, LLC, an Alabama limited liability company (hereinafter referred to as "**Lessor**"), and ALABAMA SHIPYARD, LLC, a Delaware limited liability company (hereinafter referred to as "**Lessee**").

### RECITALS:

A. Lessee was the owner of certain property described in that certain agreement for purchase and sale of real property between Lessor as "Purchaser" and Lessee as "Seller" (the "**Purchase Agreement**"). The Purchase Agreement describes various properties which are to be acquired simultaneously with the execution of this Lease Agreement, with the property subject to this Lease being a portion of the property described in the Purchase Agreement and purchased by the Lessor. The real property more particularly described on "**Exhibit A**" attached hereto (the "**Leased Property**") is the property which is subject to this Lease Agreement and is currently owned by the Lessor as a consequence of the closing of the purchase contemplated in the Purchase Agreement.

B. Lessor and Lessee have agreed that Lessee will lease the Leased Property from Lessee for the sole purpose of completing the scrapping of the "MSS3."

### WITNESSETH:

### ARTICLE I

### PREMISES AND TERM

1.01    Lessor, for and in consideration of the rents, covenants and agreements hereinafter reserved, mentioned and contained on the part of the Lessee to be paid, kept and/or performed, has demised and leased, and by these presents does demise and lease unto Lessee, and Lessee does hereby take and hire, upon and subject to the conditions hereinafter expressed, the Leased Property. Notwithstanding anything else contained in this Lease, Lessor reserves unto itself, its employees, agents, contractors and invitees, access over and across the Leased Property for ingress, egress and utilities to serve Lessor's property lying adjacent to the Leased Property.

1.02    The Leased Property is hereby leased to Lessee, its successors and assigns, for a term commencing on the Effective Date and expiring upon the first to occur of June 30, 2023 or completion of the scrapping of the MSS3 ("**Lease Term**").

ARTICLE II

RENT

2.01    The monthly rent payable by Lessee shall be $10,000.00 per month.

2.02.    All rents payable hereunder shall be paid in advance to Lessor at the offices of Lessor at <u>Austal USA, LLC, 100 Austal Way, Mobile, AL 36602</u> (or such other place as Lessor may hereafter designate to Lessee in writing), on or before the first day of each month during the Lease Term.

2.03    If the first day of the Lease is not the first day of the month, and/or if the last day of the Lease is not the last day of a month, then the rent payable for such month shall be pro rated based on the number of days in such first or last month of the Lease which the Lessee had possession of the Leased Property.

ARTICLE III

USE OF LEASED PROPERTY

3.01    The Lessee may use the Leased Property only for the purpose of completing the scrapping of the MSS3 and for no other purpose.  No gas, oil, fuel, chemical barges or hazardous materials shall be moored at any time on the Leased Property in violation of any applicable environmental laws.

3.02    Lessee understands that the character of the use of the Leased Property and improvements thereon as provided in Paragraph 3.01 is a special consideration to the making of this Lease by Lessor, and Lessee covenants that neither the Leased Property nor any improvements thereon shall be used for any purposes other than as provided in Paragraph 3.01 without obtaining the prior written consent of Lessor, which consent Lessor agrees shall not be unreasonably withheld.

3.03    [Reserved]

3.04    [Reserved]

3.05    Should one party to the Lease violate any provision of this Lease, then upon receipt of written notice of the default, the party in default shall have thirty (30) days thereafter within which to cure any default.  In the event the default remains uncured after thirty (30) days, then the other party shall have the option to immediately declare this Lease terminated and of no force and effect or, in the alternative, to seek  specific performance including, but not limited to, injunctive relief by virtue of the provisions of this Article III.  The rights of the parties under this

Paragraph 3.05 shall be in addition to, without waiver by or limitation of, all rights and options under this Lease.

3.06    This Lease is made and accepted by Lessee without warranty or representation by Lessor of any nature, including, but not limited to, any warranty as to the fitness or condition of the Leased Property or of any pipe piles, bulkheads or mooring cells situated on the Leased Property.  During the Lease Term and subject only to the terms and conditions herein, Lessor guarantees to Lessee the quiet and peaceful possession of the Leased Property.

ARTICLE IV

REPAIRS AND MAINTENANCE OF LEASED PROPERTY

4.01    Lessee shall be responsible for all expense and cost to repair damage caused by Lessee, its employees, agents, contractors, or invitees on or to the Leased Property or any improvements or fixtures located thereon including, but not limited to, damage to or destruction of the mooring cells/balls, all bulkheads, pilings, railings and bridges.  It is agreed that the Lessor shall not be responsible for inspecting, testing and/.or maintaining mooring balls/cells, bulkheads or pilings.

4.02    The Lessee shall maintain and keep the Leased Property, in clean condition, consistent with other ship repair facilities.  At the end of the Lease Term, or any extension thereof, the Lessee shall repair any damages to the Leased Property caused by Lessee, its employees, agents, contractors or invitees.

ARTICLE  V

INSURANCE

5.01    Lessee shall procure and maintain at its own expense, in full force and effect during the term of this Lease, property and liability insurance adequate for the risks involved as follows:

(a)    Protection and Indemnity insurance (Form SP-23, Revised (1/56)) including bodily injury and property damage liability on all owned vessels, including voluntary and compulsory wreck removal, with a limit of $1,000,000.00

(b)    Marine General Liability insurance, on an occurrence form, including wharfinger's liability insurance, and coverage for  blanket contractual liability, products/completed operations, premises-operations, broad form property damage, personal injury liability, independent contractors, sudden and accidental pollution (including clean-up and removal), with a combined limit of $1,000,000.00, per occurrence for bodily injury or death, or damage to or loss of property of any person or entity and with all leased facilities included as premises covered by such insurance.

(c)    Vessel Pollution Liability insurance, including shipyard coverage, clean-up and removal costs with a per occurrence limit of $5,000,000.00.

(d)    Automobile Liability insurance for owned, non-owned, and hired automobiles, with a combined single limit per occurrence of $1,000,000.00, with respect to injury to or death of, or damage to or loss of the property of, any person or entity.

(e)    Bumbershoot and Excess Liability Insurance, providing coverage excess to those limits described in (a), (b), (c) and (d) above, including a dropdown provision for reduced or exhausted aggregates, with a limit of $20,000,000.00.

5.02    All of Lessee's policies listed in paragraph 5.01 above shall name Lessor named as an additional insured, but only to the extent of the indemnity obligations assumed by Lessee in this Agreement. All of Lessee's policies listed in paragraph 5.01 above shall include a waiver of subrogation in favor of the Lessor, but only to the extent of the indemnity obligations assumed by Lessee in this Agreement and shall be primary and non-contributory to any polices of Lessor. Lessee shall endeavor to provide to Lessor thirty (30) days advanced written notice of cancellation (ten (10) days' notice of non-payment of premium) of insurance required herein.

5.03    All insurance provided for in this Article shall be valued and enforceable policies and such policies required above shall be placed with insurers with an A.M. Best rating of A-VIII or better.  Lessee shall furnish a certificate of insurance in standard ACORD form to Lessor evidencing the insurances required by this Article.


ARTICLE VI

LESSORS' RIGHT TO PERFORM LESSEE'S COVENANTS

6.01    Lessee agrees that if it shall at any time fail to make or perform any act required herein after written notice from Lessor and the expiration of a 30 day cure period, then Lessor may, but shall not be obligated to, without further notice to or demand upon Lessee and without waiving or releasing Lessee from any obligation contained in this Lease, make or perform the act on behalf of Lessee.   All necessary and reasonable sums so paid by Lessor, and all necessary and reasonable incidental costs and expenses in connection with the performance of any such act paid by Lessor shall be payable by Lessee to Lessor as additional rent and shall be due and payable on demand, and Lessee agrees to pay any such sum or sums as aforesaid.  Lessor shall have (in addition to any other right or remedy of Lessor) the same rights and remedies in the event of non-payment of any such additional rent by Lessee as in the case of default by Lessee in the payment of rent.  Notwithstanding anything to the contrary contained hereinabove, Lessee retains the right to contest in good faith any claim by any third party against it or Lessor involving the Leased Property.

## ARTICLE VII

## COMPLIANCE WITH ORDERS, RULES, AND ORDINANCES

7.01    Lessee agrees that in the maintenance, operation, use and occupancy of the Leased Property during the term of this Lease, Lessee will, without cost to Lessor, promptly comply with all laws, permits, ordinances and certificates of occupancy issued pursuant to any law or by any public officer and the orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof, and of any other body hereafter constituted exercising similar functions foreseen or unforeseen, ordinary as well as extraordinary, structural as well as non-structural, which may be applicable to Lessee's use and occupancy of the Leased Property.  Lessee shall likewise observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force with respect to the Leased Property or to the use or manner of use of the Leased Property.

7.02    Lessee shall have the right to contest by appropriate legal proceedings, in the name of the Lessee or Lessor or both, but without cost or expense to Lessor, the validity of any law, ordinance, certificate, order, rule, regulation or requirement of the nature in Paragraph 7.01 herein referred to, and if by the terms of any such law, ordinance, certificate, order, rule, regulation or requirement, compliance therewith may legally be held in abeyance without the incurrence of any lien, charge or liability of any kind against the Leased Property or any interest of Lessor or Lessee therein and without subjecting Lessor to any liability, civil or criminal, of whatsoever nature for failure to comply therewith,  Lessee may postpone compliance therewith until the final determination of any such proceedings, provided that all such proceedings shall be prosecuted with all due diligence and dispatch, and if any lien, charge or civil liability is incurred by reason of noncompliance, Lessee may nevertheless make the contest aforesaid  and delay compliance as aforesaid, provided that Lessee furnishes to Lessor security reasonably satisfactory to Lessor against any loss or injury by reason of such non-compliance or delay therein and prosecutes the contest aforesaid and delay compliance as aforesaid, with due diligence and dispatch.  In no event, however, shall the proceedings or anything else mentioned in this Paragraph 7.02 affect the payment of rent set forth in Article II hereof, unless the same results in making useless or unfit all or a portion of the Leased Property, in which event there shall be an equitable and pro- rata abatement of all rent unless same is caused by Lessee's act or omission.

## ARTICLE VIII

## LIENS

8.01    Lessee shall not suffer or permit any vendors, mechanics, laborer's or materialman's statutory or similar lien to be filed against the Leased Property or any interest of Lessor or Lessee therein by reason of work, labor, services or materials supplied or claimed to have been supplied to Lessee or anyone holding the Leased Property or any part thereof through

or under Lessee.  If any such lien shall at any time be filed against all or any part of the Leased Property, Lessee shall, within thirty (30) days after notice of the filing thereof, cause the same to be released and discharged; provided, however, that Lessee may contest any such claim in the same manner and subject to the same terms and conditions as are provided in Paragraphs 6.01 and 7.02 hereof with respect to Lessee's right to contest impositions.

ARTICLE IX

COVENANT AGAINST WASTE / ENVIRONMENTAL COVENANT

9.01    Lessee covenants subject to the terms of this Lease not to do or suffer any waste or damage to, or impairment of the value of the Leased Property.

9.02    Lessee shall not cause any Hazardous Materials to be generated, brought onto, used, stored, or disposed of in or about the Leased Property in violation of any applicable laws. Lessee shall comply at all times during the term of the Lease, and any extensions, with all laws, rules or regulations governing the use, storage, and disposal of Hazardous Materials.  For purposes of this Lease, the term Hazardous Materials shall mean any hazardous or toxic substance, material, or waste in any concentration that is or becomes regulated by the United States of America, the State of Alabama, or any local governmental authority having jurisdiction over the Leased Property, and shall include:

(a)    Any "hazardous substance," as that term is defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 United States Code sections 9601-9675);

(b)    "Hazardous waste," as that term is defined in the Resource Conservation and Recovery Act of 1976 (42 United States Code sections 6901-6992k);

(c)    Any pollutant, contaminant, or hazardous, dangerous, or toxic chemical, material, or substance, within the meaning of any other applicable federal, state, or local law, regulation, ordinance, or requirement;

(d)    Petroleum products, asbestos containing materials ("ACM's") in any form or condition, and polychlorinated biphenyls ("PCB's") and substances or compounds containing ACM's or PCB's; and

(e)    Radioactive material, including any source, special nuclear, or byproduct material as defined in 42 United States Code sections 2011-2297g-4.

9.03    Lessee hereby agrees to indemnify and hold Lessor, its officers, directors, members, contractors, parents and subsidiaries, harmless from all loss, cost (including any remediation fees or expenses), damage, claim and expense incurred by Lessor on account of (i) the violation of any representation, warranty or covenant set forth in this Article 9, (ii) Lessee's failure to perform any of its obligations set forth in this Article 9, or (iii) Lessee's, its employees', agents', contractors', or invitees', actions which fail to fully comply with all

environmental laws, rules and regulations, or with all occupational health and safety laws, rules and regulations,  This indemnification shall survive the termination of this Lease and the exercise of any right or remedy under this Lease

## ARTICLE X

### INSPECTION OF PREMISES BY LESSOR

10.01    Lessee agrees to permit Lessor and the authorized representatives of Lessor to enter the Leased Property at all reasonable times for the purposes of (a) inspecting the same and (b) making any necessary repairs to the mooring cells, bulkheads or pipe piles or any other part of the Leased Property or improvements or appurtenances thereon and performing any work therein that may be necessary by reason of Lessee's default under the terms of this Lease. Nothing herein shall imply any duty upon the part of Lessor to do any such work which, under any provision of this Lease, Lessee may be required to perform, and the performance thereof by Lessor shall not constitute a waiver of Lessee's default in failing to perform the same.  Lessor may, during the progress of any such work on or to the Leased Property, keep and store upon the Leased Property all necessary materials, tools and equipment.  Lessor shall not in any event be liable for inconvenience, annoyance, disturbance or damage to Lessee or any sublessee or occupant of the Leased Property by reason of making such repairs or the performance of any such work on or to the Leased Property, or on account of bringing materials, supplies and equipment onto or through the Leased Property during the course thereof, and the obligations of Lessor under this Lease shall not thereby be affected in any manner whatsoever; nonetheless, such work will be scheduled in such a manner so it shall not interfere with the Lessee's full and free use of the Leased Property.

## ARTICLE XI

### ASSIGNMENT AND SUBLETTING

11.01  Lessee  shall not assign, sublease, mortgage or otherwise alienate or encumber this Lease or the Leased Property without the prior express written consent of Lessor in each and every case which consent shall not be unreasonably withheld.

## ARTICLE XII

### INDEMNIFICATION

12.01    Lessee agrees to defend, indemnify and hold Lessor, its officers, directors, members, parents and subsidiaries, harmless from and against any and all claims, demands, judgments, causes of action, loss or damage, including personal injury or death, to any and all persons or property, including environmental liability for pollution, contamination, remediation, and/or clean-up, or for any civil fines or penalties levied by the Environmental Protection

Agency of the United States or the Alabama Department of Environmental Management, arising from actions of Lessee, its servants, employees, agents, contractors, sub-contractors, and licensees, customers, or invitees, regardless of cause.

12.02  Under no circumstances shall the Lessor be responsible for consequential, indirect or incidental damages, including but not limited to, down time, loss of use, loss of profits, loss of revenue and damage to equipment or vessels.

12.03  Lessor agrees to defend, indemnify and hold Lessee, its officers, directors, members, parents and subsidiaries, harmless from and against any and all claims, demands, judgments, causes of action, loss or damage, including personal injury or death, to any and all persons or property, including environmental liability for pollution, contamination, remediation, and/or clean-up, or for any civil fines or penalties levied by the Environmental Protection Agency of the United States or the Alabama Department of Environmental Management, arising from actions of Lessor, its servants, employees, agents, contractors, sub-contractors, and licensees, customers, or invitees, regardless of cause.

12.02  Under no circumstances shall the Lessee be responsible for consequential, indirect or incidental damages, including but not limited to, down time, loss of use, loss of profits, loss of revenue and damage to equipment or vessels.


ARTICLE XIII

DEFAULT

13.01  Should Lessee at any time violate any of the conditions and provisions of this Lease, or fail to pay any rental or to perform any other obligation of Lessee under the terms of this Lease, punctually when due and as stipulated herein, or upon adjudication of Lessee in bankruptcy, the appointment of a receiver for Lessee, or the filing of a bankruptcy, receivership or petition by or against Lessee, whether voluntary or involuntary, or upon Lessee's suspension, failure or insolvency (each such event being hereinafter referred to as an "**Event of Default**"), Lessee shall have thirty (30) days after receipt of written notice of such Event of Default in which to cure said Event of Default.  In the event Lessee fails to cure such Event of Default then Lessor shall have the following remedies:

(a) Lessor may re-enter and take possession of the Leased Property, exclude the Lessee from possession thereof, and lease the same for the account of the Lessee, holding the Lessee liable for the rent and other payments due hereunder up to the effective date of such leasing, and for deficiency, if any, of the rent and other amounts payable hereunder to the extent rent and other amounts collected under such new lease do not cover rent and other payments due hereunder;

(b)    Lessor may terminate this Lease, exclude the Lessee from possession of the Premises, and hold Lessee liable for the balance then due hereunder, in which event the rights of Lessee in the Leased Property and the use and possession thereof shall terminate

and Lessor shall have no obligation to re-let or find a substitute tenant for the Leased Property;

(c)    Lessor may declare immediately due and payable all installments of rent thereafter coming due hereunder; and

(d)    Lessor may take whatever other action at law or equity may appear necessary or desirable to collect the rent then due, or to enforce any obligations, covenants or agreement of the Lessee under this Lease.


ARTICLE XIV

CONDEMNATION

14.01  Should the Leased Property (including without limitation any improvements) be condemned  (or sold under threat of condemnation) in its entirety in the exercise of the power of eminent domain, or should the premises be partially condemned (or partially sold under threat of condemnation) but to such an extent as to render the same unfit or unsuitable for operation of the business of Lessee, then  and in either such event this Lease shall be automatically terminated and of no further force and effect.

14.02   Should said Leased Property be partially condemned in the exercise of the power of eminent domain (or a part sold in lieu thereof) or the use thereof be rendered partially  useless to Lessee for the purposes described in Paragraph 3.01 because of any requirements mentioned in Paragraph 7.01 (which are not caused by Lessee's act or omission) and should the remaining portion of the Leased Property be fit or suitable for the operation of the business of Lessee, then this Lease shall continue in full force and effect, in which event there shall be an equitable and pro-rata abatement of all rent.


ARTICLE XV

MISCELLANEOUS

15.01  All notices under this Lease shall be deemed to have been given by sending by Federal Express, or UPS, next day delivery, and by e-mail and addressed as follows:

Lessors:    Austal USA, LLC
            Rusty Murdaugh, CFO
            100 Austal Way
            Mobile, Alabama 36602
            Rusty.murdaugh@austalusa.com

Lessee:     Epic Alabama Maritime Assets, LLC
            660 Dunlap Drive
            Mobile, Alabama 36602
            Attention: Samantha Johnston

Either party may change its aforesaid address by giving fifteen (15) days written notice to the other party.

15.02   If any term or provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, then the remainder of this Lease or the application thereof to any person or circumstance shall, to any extent, be valid and enforceable.  The remainder of this Lease or the application of any such term or provision to any person or circumstance other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each remaining term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

15.03   The captions of this Lease are for convenience and reference only and in no way define, limit or describe the scope or intent of this Lease nor in any way affect this Lease.

15.04   This Lease shall be construed and enforced in accordance with the laws of the State of Alabama.

15.05   No agreement hereafter made shall be effective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such  agreement is in writing and signed by all parties.

15.06   It is further covenanted and agreed by and between the parties hereto that the covenants and agreements herein contained shall, subject to the provisions of this Lease, bind and inure to the benefit of the heirs, successors and assigns of the respective parties hereto.  All of the terms, covenants, provisions and conditions shall survive the termination of this Lease for any reason, including termination by the Lease Term expiring.

15.07   **WAIVER OF JURY TRIAL**.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREES THAT:

(a)      NEITHER LESSOR, LESSEE, NOR THEIR RESPECTIVE HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS OR ASSIGNS, SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, CROSS-CLAIM OR OTHER ACTION OR PROCEEDING ARISING FROM OR BASED UPON THIS LEASE.

(b)      NEITHER LESSOR, LESSEE, NOR THEIR RESPECTIVE HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS OR ASSIGNS, SHALL SEEK TO CONSOLIDATE ANY CLAIM AS TO WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY CLAIM IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED.

(c)      THE PROVISIONS OF THIS SECTION 15.07 HAVE BEEN FULLY NEGOTIATED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS.

(d)    THIS SECTION 15.07 IS A MATERIAL INDUCEMENT FOR LESSOR AND LESSEE TO ENTER INTO THE LEASE.

15.08  Attached hereto as **Exhibit B** is a bathymetric survey of submerged land ("**Baseline Survey**") which Baseline Survey includes the submerged portion of the Leased Property.  Within fourteen (14) days after the end of the Lease term, Lessee shall have a bathymetric survey of the submerged portion of the Leased Property performed ("**Second Survey**") and provide a copy of the same to Lessor.  Lessee shall be responsible for removing any structures on the floor of the submerged portion of the Leased Property revealed by the Second Survey that are not shown on the Baseline Survey.

EXECUTED this ___ day of _____, 2023.

**LESSOR:**

**WITNESSES:**

**AUSTAL USA, LLC**
**An Alabama limited liability company**

_____

By:_____

Name: _____

Name:_____

_____

Its:_____

Name: _____


**WITNESSES:**

**LESSEE:**

_____

**ALABAMA SHIPYARD, LLC**
**A Delaware limited liability company**

Name: _____

_____

By:_____

Name: _____

Name:_____

Its:_____

**EXHIBIT A**

**DESCRIPTION OF LEASED PROPERTY**

Beginning at a point lying and being 107.05 feet South and 550.00 feet East of Mobile Harbor Pierhead and Bulkhead point B, according to U.S. Army Corps of Engineers control traverse dated 1958, said point B being at Alabama State Plane Coordinate, West Zone NAD 83 position, North 248,213.18 and East 1,800,200.35, said Point of Beginning being at Alabama State Plane Coordinate, West Zone NAD 83 position, North 248,106.13 and East 1,800,750.35; Thence N-02°-56'-57"-E for 313.67 feet; Thence S-87°-03'-03"-E for 497.87 feet; Thence S-02°-36'-59"-W for 313.68 feet; Thence N-87°-03'-03"-W for 499.42 feet to the Point of Beginning and containing 156,412 square feet or 3.591 acres, more or less.



# EXHIBIT B

## BASELINE SURVEY

**EXHIBIT G**

**FORM OF MUTUAL ACCESS AND UTILITY EASEMENT AGREEMENT**

*This Instrument Prepared By
And Upon Recording Return To:*
JONES WALKER LLP
Clay A. Lanham
11 North Water Street, Suite 1200
Mobile, Alabama 36602

---

**MUTUAL ACCESS AND UTILITY EASEMENT AGREEMENT**

---

**STATE OF ALABAMA**

**COUNTY OF MOBILE**

This Mutual Access and Utility Easement Agreement ("**Agreement**") is entered into as of the ___day of _____, 2023 ("**Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**EAMA**") and AUSTAL USA, LLC, a Delaware limited liability company ("**Austal**"). Collectively, EAMA and its successors owning all or any portion of the EAMA Land (as hereinafter defined) and Austal and its successors owning all or any portion of the Austal Land (as hereinafter defined) are referred to herein as the "**Parties**" and individually are sometimes referred to as a "**Party**".

RECITALS

A.    EAMA is the owner in fee simple of certain real property located in Mobile County, Alabama, legally described on **Exhibit A** attached hereto (the "**EAMA Land**").

B.    Austal is the owner in fee simple of certain real property located in Mobile County, Alabama, being legally described on **Exhibit B** attached hereto (the "**Austal Land**").

C.    EAMA has agreed to provide to Austal an access easement over and across that portion of the approximately 60' private drive known as Dunlap Drive located on the EAMA Land, as depicted on the subdivision plat of the Pinto Island Industrial Park recorded on _ _____, 2023 as Instrument # _____ (the "**Subdivision Plat**") for access to and from the Austal Land pursuant to the terms set forth herein (the "**Access Easement on the EAMA Land**").

1

D.     Austal has agreed to provide to EAMA an access easement over and across a that portion of the approximately 60' private drive known as Dunlap Drive located on the Austal Land, as depicted on the Subdivision Plat for access to and from the EAMA Land pursuant to the terms set forth herein (the "**Access Easement on the Austal Land**"). The Access Easement on the EAMA Land and the Access Easement on the Austal Land are sometimes hereinafter collectively referred to as the "**Access Easements**".

E.     EAMA has agreed to provide to Austal a utility easement over, under and across that portion of the EAMA Land where utilities lines currently exist as of the Effective Date and five (5) feet on either side of the same (the "**Utility Easement on the EAMA Land**") for the use, maintenance, repair and replacement of the existing utility lines currently serving the Austal Land pursuant to the terms set forth herein.

F.     Austal has agreed to provide to EAMA an utility easement over and across a portion of the Austal Land where utilities lines currently exist as of the Effective Date and five (5) feet on either side of the same (the "**Utility Easement on the Austal Land**") for the use, maintenance, repair and replacement of the existing utility lines currently serving the EAMA Land pursuant to the terms set forth herein.  The Utility Easement on the EAMA Land and the Utility Easement on the Austal Land are sometimes hereinafter collectively referred to as the "**Utility Easements**".

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<u>Recitals</u>.  The foregoing recitals are hereby incorporated herein by reference.

1.     <u>Grant of Easements</u>.

(a) <u>Access Easements</u>.  EAMA does hereby grant to Austal a perpetual, non-exclusive, assignable, apportionable and appurtenant access easement on, over and across the Access Easement on the EAMA Land for vehicular and pedestrian access to the Austal Land from the public right of way known as Dunlap Drive  where it ends just on the South side of Pinto Pass and turns into a private road as generally depicted on the Subdivision Plat, which easement is appurtenant to and for the benefit of the Austal Land. Austal does hereby grant to EAMA a perpetual, non-exclusive, assignable, apportionable and appurtenant access easement on, over and across the Access Easement on the Austal Land for vehicular and pedestrian access to the EAMA Land from the public right of way known as Dunlap Drive where it ends just on the South side of Pinto Pass and turns into a private road as generally depicted on the Subdivision Plat, which easement is appurtenant to and for the benefit of the EAMA Land.  The Access Easements, together with the benefits and burdens thereof, shall run with, and bind, the  EAMA Land and the Austal Land.  EAMA reserves the right to use and/or improve the Access Easement on the EAMA Land in any manner that is not inconsistent with the rights herein granted.  Austal

2

reserves the right to use and/or improve the Access Easement on the Austal Land in any manner that is not inconsistent with the rights herein granted. The Parties acknowledge and agree that the EAMA Land and/or the Austal Land may be further subdivided into multiple parcels and that each such subdivided parcel shall be entitled to use the Access Easements and that upon such subdivision the owner of each portion of the EAMA Land and/or the Austal Land will be a Party. Until the Access Easement on the Austal Land is dedicated to the City of Mobile, Alabama, the Access Easement on the Austal Land will be an easement appurtenant to the EAMA Land. Until the Access Easement on the EAMA Land is dedicated to the City of Mobile, Alabama, the Access Easement on the EAMA Land will be an easement appurtenant to the Austal Land.

(b)     Maintenance of the Access Easements. Austal will be responsible for the repair and maintenance of that portion of the 60' wide private road known as Dunlap Drive located on the Austal Land. EAMA will be responsible for the repair and maintenance of that portion of the 60' wide private road known as Dunlap Drive located on the EAMA Land unless maintained by the Alabama State Port Authority. Each Party shall maintain the portion of Dunlap Drive they are responsible for in a good and workman like manner suitable for industrial shipyard traffic and in accordance with any applicable laws, ordinances or regulations. In addition, the Parties agree to comply with the terms and conditions contained in the Declaration of Covenants, Conditions, and Restrictions dated July 12, 2010 and recorded on July 16, 2010 at Book: 6677, Page: 446 ("**DCCR**") and be responsible for its pro rata share of the maintenance obligations and costs imposed by the DCCR with respect to the Austal Land and/or EAMA Land.

(c) Utility Easements. EAMA does hereby grant, bargain, sell and convey unto Austal and its successors owning all or any portion of the Austal Land a perpetual, assignable and non-exclusive utility easement in, upon, over, under and across the Utility Easement on the EAMA Land, for the use, maintenance, repair and replacement of the existing utility lines currently located on the EAMA Land as of the Effective Date for the purpose of providing said utilities to the Austal Land. Austal does hereby grant, bargain, sell and convey unto EAMA and its successors owning all or any portion of the EAMA Land a perpetual, assignable and non-exclusive utility easement in, upon, over, under and across the Utility Easement on the Austal Land for the use, maintenance, repair and replacement of the existing utility lines currently located on the Austal Land as of the Effective Date for the purpose of providing said utilities to the EAMA Land.

(d)     Terms of the Utility Easements. The Utility Easements granted herein shall only be for the purpose of allowing a Party to maintain, repair or replace the existing utility lines on the other Party's property and do not grant either Party the right to install new utility lines on the other Party's property without first obtaining the other Party's written consent. Each Party shall have the right to relocate, at that Party's sole cost and expense, the Utility Easement and utility lines located on its land if necessary to accommodate the Party's future development and construction of improvements on its land, provided, (i) such relocation continues to provide the other Party with substantially similar rights for and access to the utilities being relocated, (ii) the relocating Party gives the other Party at least ninety (90) days written notice of such planned relocation prior to commencing work thereon, and (iii) there is no material interruption of the ability of the non-relocating

Party to access the utilities being relocated as needed to service non-relocating Party's remaining property. In the event a Party exercises its right to relocate a Utility Easement and utility lines, it agrees to do so in the manner least intrusive to the other Party and with the least interruption in said utility services. No utility lines shall be placed above ground without the express permission of the Party owning fee simple title to the relevant portion of the land on which such utility lines are to be located.

The Party owning fee simple title to the relevant portion of the Utility Easements reserves the right, for itself and its successors owning all or any part of the Austal Land or the EAMA Land, to grant from time to time and at any time, utility easement rights within the Utility Easements to any governmental entity, utility company, service provider or other person that has a duty or privilege, duly granted and/or certificated or authorized by law and/or by any local, state or federal commission, department or agency having lawful authority so to grant or certificate, of providing a utility or beneficial service of use or useful in the development, improvement, maintenance, occupancy and use of all or any part of the Austal Land or the EAMA Land.

The Party owning fee simple title to the relevant portion of the Utility Easements reserves, for itself and its successors owning any part of the Austal Land or the EAMA Land, all right, title, interest, and privilege as may be exercised and enjoyed without interference with or abridgement of the easement rights hereby conveyed, including without limitation the right to improve and use the surface of any part of the Utility Easements for any lawful purpose not otherwise inconsistent with the easement rights hereby conveyed and covenants hereby declared.

3.    Default. If any Party hereunder fails to perform its obligations under this Agreement after written notice and thirty (30) days to cure, then any other Party may, in its sole discretion (a) seek specific performance of such obligation, (b) perform such obligation on behalf of the nonperforming Party and the nonperforming Party shall reimburse the performing Party for the reasonable costs and expenses related to such performance within thirty (30) days after written demand; or (c) pursue all legal and equitable remedies against the nonperforming Party. If any Party shall take any action on behalf of any nonperforming Party, then (i) the performing Party shall be deemed to have an easement over land owned by the nonperforming Party to the extent reasonably necessary to compete such action, (ii) any action related to construction, maintenance or replacement work shall be subject to the terms of the maintenance easements set forth herein, and (iii) the nonperforming Party shall on demand reimburse the Party paying such sum or taking such action for the monies actually expended by it plus a fee equal to ten percent (10%) of such sum.

4.    Liability Insurance. Each Party shall, at all times during the term of this Agreement, maintain or cause to be maintained in full force and effect a commercial general liability insurance policy covering the EAMA Land or the Austal Land, respectively, including coverage for any accident resulting in bodily injury to or the death of any person and consequential damages arising therefrom, and property damage, in an amount not less than $2,000,000 per occurrence and including coverage of contractual liability. Each Party's commercial general liability policy shall cause each other Party to be an

additional insured. A Party that is to be named as an additional insured need not be named individually or by an endorsement to such policy, but may be named as part of a class or group of parties granted additional insured status under such policy. Each Party shall furnish to each other Party requesting the same in writing evidence that the insurance referred to in this Section is in full force and effect.

5.  Easements Appurtenant. The easements, rights, obligations and liabilities set forth herein shall be deemed to be easements appurtenant to the EAMA Land and the Austal Land. Any transferee of any part of the EAMA Land or the Austal Land shall automatically be deemed, by acceptance of the title to any portion of the EAMA Land or the Austal Land, to be a Party, to have received all of the rights and benefits and to have assumed all obligations of this Agreement relating thereto to the extent they affect the property acquired and to have agreed with the then Party(s) of all other portions of the EAMA Land and the Austal Land to do any and all things reasonably required to carry out the intention of this Agreement and the transferor shall upon the completion of such transfer be relieved of all further liability under this Agreement to the extent they affect the property transferred, except liability with respect to matters that may have arisen during its period of ownership of the portion of the EAMA Land or the Austal Land so conveyed that remain unsatisfied.

6.  Notices. Any notices, requests or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or a widely recognized national overnight courier service or mailed by United States registered or certified mail, return receipt requested, postage prepaid and addressed to each Party at its address as set forth below:

> To EAMA:  Epic Alabama Maritime Assets, LLC
> 660 Dunlap Drive
> Mobile, Alabama 36602
> Attention: Samantha Johnston

> To Austal:  Austal USA, LLC
> 100 Austal Way
> Mobile, AL 36602
> Attention: Rusty Murdaugh, CEO

Any such notice, request or other communication shall be considered given or delivered, as the case may be, on the date of hand or overnight courier delivery or upon receipt by certified mail but not more than three (3) days after deposit in the United States mail as provided above. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, request or other communication. By giving at least five (5) days prior written notice thereof, any Party may from time to time at any time change its mailing address hereunder.

7.  Severability. If any term or condition of this Agreement shall be invalid or unenforceable for any reason, the remainder of this Agreement shall not be affected thereby.

#100994486v1

8.    <u>Amendment</u>.  This Agreement may be amended, modified or terminated only by a written instrument executed by all the Parties.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

6

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**EAMA:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _____

Name: _____

Its: _____

STATE OF ALABAMA    )
COUNTY OF MOBILE    )

I, the undersigned Notary Public in and for said County in said State, hereby certify that _____, whose name as_____of  EPIC   ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the_____day of _____, 2023.

[SEAL]

_____
NOTARY PUBLIC

My Commission Expires:_____

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**AUSTAL:**

**AUSTAL USA, LLC**
**An Alabama limited liability company**

By: _____

Name: _____

Its: _____

STATE OF ALABAMA     )
COUNTY OF MOBILE     )

    I, the undersigned Notary Public in and for said County in said State, hereby certify that _ _____, whose name as_____of AUSTAL USA, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the_____day of _____, 2023.

                       _____

[SEAL]                  NOTARY PUBLIC

                         My Commission Expires:_____

## CONSENT AND SUBORDINATION

The undersigned, as holder and beneficiary of that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Epic Alabama Maritime Assets, LLC to White Oak Global Advisors, as Administrative Agent, dated December 21, 2018 and recorded on December 27, 2018 as Instrument # 2018071818 in the public records of the Office of the Judge of Probate of Mobile County, Alabama (the "**Mortgage**"), hereby consents to the foregoing Mutual Access and Utility Easement Agreement ("**Agreement**") executed by Epic Alabama Maritime Assets, LLC and Austal USA, LLC to which this Consent and Subordination is attached and agrees that the lien of the Mortgage shall be subject and subordinate to said Agreement so that in the event of any foreclosure of or execution upon the lien of the Mortgage, said Agreement shall survive such foreclosure or execution.  Except as subordinated, the Mortgage shall remain in full force and effect.

**WHITE OAK GLOBAL ADVISORS**

By: _____

Name: _____

Its: _____

STATE OF _____)
COUNTY OF _____)

I, the undersigned Notary Public in and for said County in said State, hereby certify that _ _____, whose name as_____of WHITE OAK GLOBAL ADVISORS, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the_____day of _____, 2023.

[SEAL]              _____
                    NOTARY PUBLIC
                    My Commission Expires:_____

**EXHIBIT A**

**<u>EAMA LAND</u>**

Lot 2 as shown on the subdivision plat of Pinto Island Industrial Park record on _____ _____, 2023 as Instrument #_____ in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

**EXHIBIT B**

**AUSTAL LAND**

Lots 1 and 3 as shown on the subdivision plat of Pinto Island Industrial Park record on _____
_____, 2023 as Instrument #_____ in the public records of the Office of
the Judge of Probate of Mobile County, Alabama.

# EXHIBIT H
## DRAWING OF ROAD MAINTENANCE



## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (this **"First Amendment"**) is made and entered into as of this _____7_____ day of _____April_____ _____, 2023 (**"First Amendment Effective Date"**), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company (**"Seller"**), and AUSTAL USA, LLC, an Alabama limited liability company (**"Purchaser"**). Capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed in the Agreement.

### RECITALS

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**"), with respect to certain real property described therein; and,

**WHEREAS,** the parties hereto desire to amend the Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

1.    **Amendments.**

    1.1    **Exhibit G, Mutual Access and Utility Easement Agreement.** Clause 4 of the Mutual Access and Utility Easement Agreement is deleted in its entirety and the following shall be substituted therefor:

    "4. Liability Insurance. Each Party shall, at all times during the term of this Agreement, maintain or cause to be maintained in effect a commercial general liability or marine general liability insurance policy covering the EAMA Land or the Austal Land, respectively, including coverage for any accident resulting in bodily injury to or the death of any person and consequential damages arising therefrom, and property damage, in an amount not less than $2,000,000 per occurrence and liability assumed in an insured contract. Each Party's commercial general liability policy shall cause each other Party to be an additional insured. A Party that is to be named as an additional insured need not be named individually or by an endorsement to such policy, but may be named as part of a class or group of parties granted additional insured status under such policy. Each Party shall furnish to each other Party requesting the same in writing evidence that the insurance referred to in this Section is in effect."

    1.2    An amended copy of Exhibit G, is attached to this First Amendment for further handling by the parties.

#101154445v2

1.3     The first sentence of Section 7.1 of the Agreement is deleted and replaced with the following:

"Unless this Agreement is terminated as provided herein, the purchase and sale transaction contemplated hereunder shall be consummated (the "**Closing**") at a time and location as shall be mutually agreed upon by Seller and Purchaser. Seller and Purchaser agree that the target Closing Date shall be Tuesday, April 11, 2023.

## 2.     General Provisions.

2.1     This First Amendment may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

2.2     Except as amended by this First Amendment, the Agreement shall remain in full force and effect.

### [SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date first above written.

**SELLER:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _John Herren (Apr 7, 2023 16:41 CDT)_

Name: John Herren

Its: Manager

**[SELLER'S SIGNATURE PAGE TO FIRST AMENDMENT]**

**PURCHASER:**

**AUSTAL USA, LLC**
**an Alabama limited liability company**

By: _____

Name: _Rusty Murdaugh_____

Its: _Austal USA President_____

**[PURCHASER'S SIGNATURE PAGE TO FIRST AMENDMENT]**

### EXHIBIT G

### FORM OF MUTUAL ACCESS AND UTILITY EASEMENT AGREEMENT

*This Instrument Prepared By*
*And Upon Recording Return To:*
JONES WALKER LLP
Clay A. Lanham
11 North Water Street, Suite 1200
Mobile, Alabama 36602

### MUTUAL ACCESS AND UTILITY EASEMENT AGREEMENT

**STATE OF ALABAMA**

**COUNTY OF MOBILE**

This Mutual Access and Utility Easement Agreement ("**Agreement**") is entered into as of the ⁷ day of April, 2023 ("**Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**EAMA**") and AUSTAL USA, LLC, a Delaware limited liability company ("**Austal**"). Collectively, EAMA and its successors owning all or any portion of the EAMA Land (as hereinafter defined) and Austal and its successors owning all or any portion of the Austal Land (as hereinafter defined) are referred to herein as the "**Parties**" and individually are sometimes referred to as a "**Party**".

### RECITALS

A.    EAMA is the owner in fee simple of certain real property located in Mobile County, Alabama, legally described on **Exhibit A** attached hereto (the "**EAMA Land**").

B.    Austal is the owner in fee simple of certain real property located in Mobile County, Alabama, being legally described on **Exhibit B** attached hereto (the "**Austal Land**").

C.    EAMA has agreed to provide to Austal an access easement over and across that portion of the approximately 60' private drive known as Dunlap Drive located on the EAMA Land, as depicted on the subdivision plat of the Pinto Island Industrial Park recorded on March 30, 2023 as Instrument # 2023019114 (the "**Subdivision Plat**") for access to and from the

1

#101154445v2

Austal Land pursuant to the terms set forth herein (the "**Access Easement on the EAMA Land**").

D.   Austal has agreed to provide to EAMA an access easement over and across a that portion of the approximately 60' private drive known as Dunlap Drive located on the Austal Land, as depicted on the Subdivision Plat for access to and from the EAMA Land pursuant to the terms set forth herein (the "**Access Easement on the Austal Land**"). The Access Easement on the EAMA Land and the Access Easement on the Austal Land are sometimes hereinafter collectively referred to as the "**Access Easements**".

E.   EAMA has agreed to provide to Austal a utility easement over, under and across that portion of the EAMA Land where utilities lines currently exist as of the Effective Date and five (5) feet on either side of the same (the "**Utility Easement on the EAMA Land**") for the use, maintenance, repair and replacement of the existing utility lines currently serving the Austal Land pursuant to the terms set forth herein.

F.   Austal has agreed to provide to EAMA an utility easement over and across a portion of the Austal Land where utilities lines currently exist as of the Effective Date and five (5) feet on either side of the same (the "**Utility Easement on the Austal Land**") for the use, maintenance, repair and replacement of the existing utility lines currently serving the EAMA Land pursuant to the terms set forth herein. The Utility Easement on the EAMA Land and the Utility Easement on the Austal Land are sometimes hereinafter collectively referred to as the "**Utility Easements**".

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Recitals. The foregoing recitals are hereby incorporated herein by reference.

1.   Grant of Easements.

(a) Access Easements. EAMA does hereby grant to Austal a perpetual, non-exclusive, assignable, apportionable and appurtenant access easement on, over and across the Access Easement on the EAMA Land for vehicular and pedestrian access to the Austal Land from the public right of way known as Dunlap Drive where it ends just on the South side of Pinto Pass and turns into a private road as generally depicted on the Subdivision Plat, which easement is appurtenant to and for the benefit of the Austal Land. Austal does hereby grant to EAMA a perpetual, non-exclusive, assignable, apportionable and appurtenant access easement on, over and across the Access Easement on the Austal Land for vehicular and pedestrian access to the EAMA Land from the public right of way known as Dunlap Drive where it ends just on the South side of Pinto Pass and turns into a private road as generally depicted on the Subdivision Plat, which easement is appurtenant to and for the benefit of the EAMA Land. The Access Easements, together with the benefits and burdens thereof, shall run with, and bind, the EAMA Land and the Austal Land. EAMA reserves the right

#101154445v2

to use and/or improve the Access Easement on the EAMA Land in any manner that is not inconsistent with the rights herein granted. Austal reserves the right to use and/or improve the Access Easement on the Austal Land in any manner that is not inconsistent with the rights herein granted. The Parties acknowledge and agree that the EAMA Land and/or the Austal Land may be further subdivided into multiple parcels and that each such subdivided parcel shall be entitled to use the Access Easements and that upon such subdivision the owner of each portion of the EAMA Land and/or the Austal Land will be a Party. Until the Access Easement on the Austal Land is dedicated to the City of Mobile, Alabama, the Access Easement on the Austal Land will be an easement appurtenant to the EAMA Land. Until the Access Easement on the EAMA Land is dedicated to the City of Mobile, Alabama, the Access Easement on the EAMA Land will be an easement appurtenant to the Austal Land.

(b)     Maintenance of the Access Easements. Austal will be responsible for the repair and maintenance of that portion of the 60' wide private road known as Dunlap Drive located on the Austal Land. EAMA will be responsible for the repair and maintenance of that portion of the 60' wide private road known as Dunlap Drive located on the EAMA Land unless maintained by the Alabama State Port Authority. Each Party shall maintain the portion of Dunlap Drive they are responsible for in a good and workman like manner suitable for industrial shipyard traffic and in accordance with any applicable laws, ordinances or regulations. In addition, the Parties agree to comply with the terms and conditions contained in the Declaration of Covenants, Conditions, and Restrictions dated July 12, 2010 and recorded on July 16, 2010 at Book: 6677, Page: 446 ("**DCCR**") and be responsible for its pro rata share of the maintenance obligations and costs imposed by the DCCR with respect to the Austal Land and/or EAMA Land.

(c) Utility Easements. EAMA does hereby grant, bargain, sell and convey unto Austal and its successors owning all or any portion of the Austal Land a perpetual, assignable and non-exclusive utility easement in, upon, over, under and across the Utility Easement on the EAMA Land, for the use, maintenance, repair and replacement of the existing utility lines currently located on the EAMA Land as of the Effective Date for the purpose of providing said utilities to the Austal Land. Austal does hereby grant, bargain, sell and convey unto EAMA and its successors owning all or any portion of the EAMA Land a perpetual, assignable and non-exclusive utility easement in, upon, over, under and across the Utility Easement on the Austal Land for the use, maintenance, repair and replacement of the existing utility lines currently located on the Austal Land as of the Effective Date for the purpose of providing said utilities to the EAMA Land.

(d)     Terms of the Utility Easements. The Utility Easements granted herein shall only be for the purpose of allowing a Party to maintain, repair or replace the existing utility lines on the other Party's property and do not grant either Party the right to install new utility lines on the other Party's property without first obtaining the other Party's written consent. Each Party shall have the right to relocate, at that Party's sole cost and expense, the Utility Easement and utility lines located on its land if necessary to accommodate the Party's future development and construction of improvements on its land, provided, (i) such relocation continues to provide the other Party with substantially similar rights for and access to the utilities being relocated, (ii) the relocating Party gives the other Party at least

3

ninety (90) days written notice of such planned relocation prior to commencing work thereon, and (iii) there is no material interruption of the ability of the non-relocating Party to access the utilities being relocated as needed to service non-relocating Party's remaining property. In the event a Party exercises its right to relocate a Utility Easement and utility lines, it agrees to do so in the manner least intrusive to the other Party and with the least interruption in said utility services. No utility lines shall be placed above ground without the express permission of the Party owning fee simple title to the relevant portion of the land on which such utility lines are to be located.

The Party owning fee simple title to the relevant portion of the Utility Easements reserves the right, for itself and its successors owning all or any part of the Austal Land or the EAMA Land, to grant from time to time and at any time, utility easement rights within the Utility Easements to any governmental entity, utility company, service provider or other person that has a duty or privilege, duly granted and/or certificated or authorized by law and/or by any local, state or federal commission, department or agency having lawful authority so to grant or certificate, of providing a utility or beneficial service of use or useful in the development, improvement, maintenance, occupancy and use of all or any part of the Austal Land or the EAMA Land.

The Party owning fee simple title to the relevant portion of the Utility Easements reserves, for itself and its successors owning any part of the Austal Land or the EAMA Land, all right, title, interest, and privilege as may be exercised and enjoyed without interference with or abridgement of the easement rights hereby conveyed, including without limitation the right to improve and use the surface of any part of the Utility Easements for any lawful purpose not otherwise inconsistent with the easement rights hereby conveyed and covenants hereby declared.

3.    Default. If any Party hereunder fails to perform its obligations under this Agreement after written notice and thirty (30) days to cure, then any other Party may, in its sole discretion (a) seek specific performance of such obligation, (b) perform such obligation on behalf of the nonperforming Party and the nonperforming Party shall reimburse the performing Party for the reasonable costs and expenses related to such performance within thirty (30) days after written demand; or (c) pursue all legal and equitable remedies against the nonperforming Party. If any Party shall take any action on behalf of any nonperforming Party, then (i) the performing Party shall be deemed to have an easement over land owned by the nonperforming Party to the extent reasonably necessary to compete such action, (ii) any action related to construction, maintenance or replacement work shall be subject to the terms of the maintenance easements set forth herein, and (iii) the nonperforming Party shall on demand reimburse the Party paying such sum or taking such action for the monies actually expended by it plus a fee equal to ten percent (10%) of such sum.

4.    Liability Insurance. Each Party shall, at all times during the term of this Agreement, maintain or cause to be maintained in effect a commercial general liability or marine general liability insurance policy covering the EAMA Land or the Austal Land, respectively, including coverage for any accident resulting in bodily injury to or the death of any person and consequential damages arising therefrom, and property damage, in an amount not less than $2,000,000 per occurrence and liability assumed in an insured

4

contract. Each Party's commercial general liability policy shall cause each other Party to be an additional insured. A Party that is to be named as an additional insured need not be named individually or by an endorsement to such policy, but may be named as part of a class or group of parties granted additional insured status under such policy. Each Party shall furnish to each other Party requesting the same in writing evidence that the insurance referred to in this Section is in effect.

5.    Easements Appurtenant. The easements, rights, obligations and liabilities set forth herein shall be deemed to be easements appurtenant to the EAMA Land and the Austal Land. Any transferee of any part of the EAMA Land or the Austal Land shall automatically be deemed, by acceptance of the title to any portion of the EAMA Land or the Austal Land, to be a Party, to have received all of the rights and benefits and to have assumed all obligations of this Agreement relating thereto to the extent they affect the property acquired and to have agreed with the then Party(s) of all other portions of the EAMA Land and the Austal Land to do any and all things reasonably required to carry out the intention of this Agreement and the transferor shall upon the completion of such transfer be relieved of all further liability under this Agreement to the extent they affect the property transferred, except liability with respect to matters that may have arisen during its period of ownership of the portion of the EAMA Land or the Austal Land so conveyed that remain unsatisfied.

6.    Notices. Any notices, requests or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or a widely recognized national overnight courier service or mailed by United States registered or certified mail, return receipt requested, postage prepaid and addressed to each Party at its address as set forth below:

> To EAMA:    Epic Alabama Maritime Assets, LLC
> 660 Dunlap Drive
> Mobile, Alabama 36602
> Attention: Samantha Johnston
>
> To Austal:    Austal USA, LLC
> 100 Austal Way
> Mobile, AL 36602
> Attention: Rusty Murdaugh, CEO

Any such notice, request or other communication shall be considered given or delivered, as the case may be, on the date of hand or overnight courier delivery or upon receipt by certified mail but not more than three (3) days after deposit in the United States mail as provided above. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, request or other communication. By giving at least five (5) days prior written notice thereof, any Party may from time to time at any time change its mailing address hereunder.

7.    Severability. If any term or condition of this Agreement shall be invalid or unenforceable for any reason, the remainder of this Agreement shall not be affected thereby.

5

8.    <u>Amendment</u>.  This Agreement may be amended, modified or terminated only by a written instrument executed by all the Parties.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

#101154445v2

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**EAMA:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _____

Name: _____

Its: _____

STATE OF _____)
PARISH OF _____)

I, the undersigned Notary Public in and for said County in said State, hereby certify that John Herren , whose name as Authorized Signatory of EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the_____day of _____, 2023.


[SEAL]                          _____
                                NOTARY PUBLIC

                                My Commission Expires:_____

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**AUSTAL:**

**AUSTAL USA, LLC**
**An Alabama limited liability company**

By: _R. Murdach_

Name: _Rusty Murdoyh_

Its: _Austal USA President_

STATE OF ALABAMA       )
COUNTY OF MOBILE       )

I, the undersigned Notary Public in and for said County in said State, hereby certify that _____, whose name as_____ of AUSTAL USA, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____day of _____, 2023.

[SEAL]                         _____
                               NOTARY PUBLIC

                               My Commission Expires:_____

## CONSENT AND SUBORDINATION

The undersigned, as holder and beneficiary of that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Epic Alabama Maritime Assets, LLC to White Oak Global Advisors, as Administrative Agent, dated December 21, 2018 and recorded on December 27, 2018 as Instrument # 2018071818 in the public records of the Office of the Judge of Probate of Mobile County, Alabama (the "**Mortgage**"), hereby consents to the foregoing Mutual Access and Utility Easement Agreement ("**Agreement**") executed by Epic Alabama Maritime Assets, LLC and Austal USA, LLC to which this Consent and Subordination is attached and agrees that the lien of the Mortgage shall be subject and subordinate to said Agreement so that in the event of any foreclosure of or execution upon the lien of the Mortgage, said Agreement shall survive such foreclosure or execution. Except as subordinated, the Mortgage shall remain in full force and effect.

**WHITE OAK GLOBAL ADVISORS**

By: _____

Name: _____

Its: _____

STATE OF _____ )
COUNTY OF _____ )

I, the undersigned Notary Public in and for said County in said State, hereby certify that _ _____, whose name as_____of WHITE OAK GLOBAL ADVISORS, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the_____day of _____, 2023.

[SEAL]                              _____
                                    NOTARY PUBLIC
                                    My Commission Expires:_____

## CONSENT AND SUBORDINATION

The undersigned, as holder and beneficiary of that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Epic Alabama Maritime Assets, LLC to Acqua Liana Capital Partners, LLC, dated July 22, 2019 and recorded on August 2, 2019 as Instrument # 2019044562 in the public records of the Office of the Judge of Probate of Mobile County, Alabama (the "**Mortgage**"), hereby consents to the foregoing Mutual Access and Utility Easement Agreement ("**Agreement**") executed by Epic Alabama Maritime Assets, LLC and Austal USA, LLC to which this Consent and Subordination is attached and agrees that the lien of the Mortgage shall be subject and subordinate to said Agreement so that in the event of any foreclosure of or execution upon the lien of the Mortgage, said Agreement shall survive such foreclosure or execution. Except as subordinated, the Mortgage shall remain in full force and effect.

**ACQUA LIANA CAPITAL PARTNERS, LLC**

By: _____

Name: _____

Its: _____

STATE OF _____ )
COUNTY OF _____ )

I, the undersigned Notary Public in and for said County in said State, hereby certify that _ _____, whose name as_____of   ACQUA   LIANA CAPITAL PARTNERS, LLC, a _____ limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer of the company and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the_____day of _____, 2023.

[SEAL]                      _____
                            NOTARY PUBLIC
                            My Commission Expires:_____

#101154445v2

**EXHIBIT A**

**EAMA LAND**

Lot 2 as shown on the subdivision plat of Pinto Island Industrial Park recorded on March 30, 2023 as Instrument # 2023019114  in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

**EXHIBIT B**

**<u>AUSTAL LAND</u>**

Lots 1 and 3 as shown on the subdivision plat of Pinto Island Industrial Park recorded on March 30, 2023 as Instrument # <u>2023019114</u> in the public records of the Office of the Judge of Probate of Mobile County, Alabama.

# 1st Amendment to PSA

Final Audit Report                                                        2023-04-07

| | |
|---|---|
| Created: | 2023-04-07 |
| By: | Kelton Tonn (kt@navarrocapitalpartners.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAXj3y9Ck5ZPttgvIHzxmghIEDKPur7_Ey |

## "1st Amendment to PSA" History

📄 Document created by Kelton Tonn (kt@navarrocapitalpartners.com)
2023-04-07 - 9:39:04 PM GMT- IP address: 23.30.85.209

📧 Document emailed to johnkherren@gmail.com for signature
2023-04-07 - 9:40:57 PM GMT

📄 Email viewed by johnkherren@gmail.com
2023-04-07 - 9:41:01 PM GMT- IP address: 66.249.88.147

✍ Signer johnkherren@gmail.com entered name at signing as John Herren
2023-04-07 - 9:41:55 PM GMT- IP address: 104.62.161.16

✍ Document e-signed by John Herren (johnkherren@gmail.com)
Signature Date: 2023-04-07 - 9:41:57 PM GMT - Time Source: server- IP address: 104.62.161.16

✅ Agreement completed.
2023-04-07 - 9:41:57 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

**Adobe Acrobat Sign**

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (this "**Second Amendment**") is made and entered into as of this __*11TH*__ day of __*APRIL*__ _____, 2023 ("**Second Amendment Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**Seller**"), and AUSTAL USA, LLC, an Alabama limited liability company ("**Purchaser**"). Capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed in the Agreement.

### RECITALS

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated March 8, 2023, as amended by that certain First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 7, 2023 (the "**Agreement**"), with respect to certain real property described therein; and,

**WHEREAS,** the parties hereto desire to further amend the Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

**1.     Amendments.**

1.1     The first sentence of Section 7.1 of the Agreement is deleted and replaced with the following:

"Unless this Agreement is terminated as provided herein, the purchase and sale transaction contemplated hereunder shall be consummated (the "**Closing**") at a time and location as shall be mutually agreed upon by Seller and Purchaser. Seller and Purchaser agree that the target Closing Date shall be Wednesday, April 12, 2023.

**2.     General Provisions.**

2.1     This Second Amendment may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

2.2     Except as amended by this Second Amendment, the Agreement shall remain in full force and effect.

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the date first above written.

**SELLER:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _Ron J. McAlear_

Name: _RON J. McALEAR_

Its: _MEMBER OF THE BOARD_

**[SELLER'S SIGNATURE PAGE TO SECOND AMENDMENT]**

PURCHASER:

AUSTAL USA, LLC
an Alabama limited liability company

By: _____

Name: _Rusty Murdaugh_____

Its: _President   Austal USA_____

**[PURCHASER'S SIGNATURE PAGE TO SECOND AMENDMENT]**

## THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This Third Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (this "**Third Amendment**") is made and entered into as of this _12TH_ day of _APRIL_ _____, 2023 ("**Third Amendment Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**Seller**"), and AUSTAL USA, LLC, an Alabama limited liability company ("**Purchaser**"). Capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed in the Agreement.

### RECITALS

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated March 8, 2023, as amended by that certain First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 7, 2023, as amended by that certain Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 11, 2023 (together, the "**Agreement**"), with respect to certain real property described therein; and,

**WHEREAS,** the parties hereto desire to further amend the Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

1.    **Amendments.**

1.1    The first sentence of Section 7.1 of the Agreement is deleted and replaced with the following:

"Unless this Agreement is terminated as provided herein, the purchase and sale transaction contemplated hereunder shall be consummated (the "**Closing**") at a time and location as shall be mutually agreed upon by Seller and Purchaser. Seller and Purchaser agree that the target Closing Date shall be Friday, April 14, 2023.

2.    **General Provisions.**

2.1    This Third Amendment may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

2.2    Except as amended by this Third Amendment, the Agreement shall remain in full force and effect.

### [SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Third Amendment as of the date first above written.

SELLER:

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _Ron J. Mc Alear_

Name: _Ron J. Mc Alear_

Its: _MEMBER BOARD of DIRECTORS_

**[SELLER'S SIGNATURE PAGE TO THIRD AMENDMENT]**

**PURCHASER:**

**AUSTAL USA, LLC**
**an Alabama limited liability company**

By: _____

Name: _Rusty Murdaugh_

Its: _President Austal USA_

**[PURCHASER'S SIGNATURE PAGE TO THIRD AMENDMENT]**

## FOURTH AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This Fourth Amendment to Purchase and Sale Agreement and Joint Escrow Instructions (this "**Fourth Amendment**") is made and entered into as of this *14th* day of *APRIL*, 2023 ("**Fourth Amendment Effective Date**"), by and between EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company ("**Seller**"), and AUSTAL USA, LLC, an Alabama limited liability company ("**Purchaser**"). Capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed in the Agreement.

### RECITALS

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated March 8, 2023, as amended by that certain First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 7, 2023, as amended by that certain Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 11, 2023, as amended by that Third Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated April 12, 2023 (together, the "**Agreement**"), with respect to certain real property described therein; and,

**WHEREAS,** the parties hereto desire to further amend the Agreement as set forth herein.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

**1.    Amendments.**

1.1    The first sentence of Section 7.1 of the Agreement is deleted and replaced with the following:

"Unless this Agreement is terminated as provided herein, the purchase and sale transaction contemplated hereunder shall be consummated (the "**Closing**") at a time and location as shall be mutually agreed upon by Seller and Purchaser. Seller and Purchaser agree that the target Closing Date shall be Tuesday, April 18, 2023.

**2.    General Provisions.**

2.1    This Fourth Amendment may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

2.2    Except as amended by this Fourth Amendment, the Agreement shall remain in full force and effect.

### [SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment as of the date first above written.

**SELLER:**

**EPIC ALABAMA MARITIME ASSETS, LLC**
**a Delaware limited liability company**

By: _Ron J. Mc Alear_

Name: _RON J. MC ALEAR_

Its: _MEMBER BOARD of DIRECTORS_

**[SELLER'S SIGNATURE PAGE TO FOURTH AMENDMENT]**

**PURCHASER:**

**AUSTAL USA, LLC**
**an Alabama limited liability company**

By: _____

Name: _Rusty Murdaugh_

Its: _President   Austal USA_

**[PURCHASER'S SIGNATURE PAGE TO FOURTH AMENDMENT]**