# Islam Declaration

# Exhibit 2

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

dated as of July 22, 2019

among

**EPIC ALABAMA MARITIME ASSETS, LLC**

AND SUCH ADDITIONAL BORROWERS FROM TIME TO TIME PARTY HERETO

as Borrowers,

**EPIC ALABAMA HOLDINGS, LLC, EPIC MARITIME ASSET HOLDINGS, LLC, EPIC ALABAMA SHIPYARD, LLC, EPIC RECYCLING SERVICES, LLC, EPIC ALABAMA RECYCLERS, LLC,** and **ERP ENVIRONMENTAL FUND, INC.**

AND SUCH ADDITIONAL PARTIES
FROM TIME TO TIME PARTY HERETO

as Guarantors,

**THE SEVERAL ENTITIES FROM TIME TO TIME PARTY HERETO**

as Lenders,

and

**WHITE OAK GLOBAL ADVISORS, LLC,**

as Administrative Agent

# TABLE OF CONTENTS

**Page**

**ARTICLE I. Certain Defined Terms; Certain Rules of Construction**........................................................**3**

    Section 1.01.    Certain Defined Terms..................................................3
    Section 1.02.    Certain Rules of Construction........................................26

**ARTICLE II. Credit Extensions**......................................................................................................**28**

    Section 2.01.    Loans. ....................................................................28
    Section 2.02.    Interest. ..................................................................28
    Section 2.03.    Payment and Prepayments of Principal. ..............................29
    Section 2.04.    Certain Fees. .............................................................31
    Section 2.05.    Brokers and Financial Advisors......................................31
    Section 2.06.    Manner of Payments. ...................................................31
    Section 2.07.    Increased Costs. ........................................................32
    Section 2.08.    Payments Free of Taxes. ...............................................33
    Section 2.09.    Sharing of Payments. ...................................................34
    Section 2.10.    Payments Generally; Right of Administrative Agent to Make Deductions Automatically. ..........................................................34
    Section 2.11.    Defaulting Lenders. ....................................................35
    Section 2.12.    Replacement of Lenders. ...............................................36
    Section 2.13.    Joint and several liability. .............................................37
    Section 2.14.    Administrative Loan Party. ............................................38

**ARTICLE III. The Collateral**.........................................................................................................**38**

    Section 3.01.    Grant of Security Interest. .............................................38
    Section 3.02.    Administrative Agent's Rights Regarding the Collateral. .........39
    Section 3.03.    Grant of License to Use Intellectual Property Collateral; Additional Intellectual Property. ..............................................................40
    Section 3.04.    Authorization to File Financing Statements........................41

**ARTICLE IV. Conditions Precedent**..............................................................................................**41**

    Section 4.01.    Conditions Precedent To Effectiveness. ............................41

**ARTICLE V. Representations and Warranties**..............................................................................**42**

    Section 5.01.    Corporate Existence and Power. .....................................42
    Section 5.02.    Corporate Authorization; No Contravention.......................43
    Section 5.03.    Governmental Authorization; Compliance with Laws; Cooperation.................43
    Section 5.04.    Binding Effect. ..........................................................44
    Section 5.05.    Litigation. ................................................................44
    Section 5.06.    No Defaults. .............................................................44
    Section 5.07.    Employee Benefit Plans. ...............................................44
    Section 5.08.    [Reserved]. ...............................................................45
    Section 5.09.    Title to Properties. .....................................................45
    Section 5.10.    Taxes. ....................................................................45
    Section 5.11.    Financial Condition. ...................................................46
    Section 5.12.    Environmental Matters. ...............................................46
    Section 5.13.    Margin Regulations; Regulated Entities. ...........................46
    Section 5.14.    Swap Obligations. ......................................................46
    Section 5.15.    Intellectual Property....................................................46
    Section 5.16.    Equity Interests and Investment Held by Loan Parties; Equity Interests in Loan Parties. ..................................................................47
    Section 5.17.    Insurance. ................................................................47
    Section 5.18.    Collateral and Collateral Documents. ...............................47
    Section 5.19.    Labor Relations. ........................................................47

Section 5.20.    [Reserved]...................................................................................................48
Section 5.21.    Matters Relating to the Facilities.............................................................48
Section 5.22.    Full Disclosure..........................................................................................48
Section 5.23.    Interrelated businesses..............................................................................48
Section 5.24.    OCS Leases.................................................................................................48
Section 5.25.    [Reserved]...................................................................................................49
Section 5.26.    Locations of M&E......................................................................................49
Section 5.27.    Burdensome Obligations............................................................................49

**ARTICLE VI. Affirmative Covenants .....................................................................................49**

Section 6.01.    Financial Statements..................................................................................49
Section 6.02.    Certificates; Other Information.................................................................50
Section 6.03.    Notices.........................................................................................................51
Section 6.04.    Payment of Certain Obligations.................................................................52
Section 6.05.    Preservation of Existence, Etc...................................................................53
Section 6.06.    Maintenance of Properties..........................................................................53
Section 6.07.    Maintenance of Insurance...........................................................................53
Section 6.08.    Compliance with Laws................................................................................54
Section 6.09.    Books and Records......................................................................................54
Section 6.10.    Appraisals; Inspection Rights; Lender Meetings.......................................54
Section 6.11.    DISSOLUTION............................................................................................54
Section 6.12.    Collateral Accounts and Excluded Accounts.............................................55
Section 6.13.    Financial Covenants....................................................................................55
Section 6.14.    Protection of Intellectual Property Rights..................................................55
Section 6.15.    Litigation Cooperation.................................................................................55
Section 6.16.    ERISA Compliance......................................................................................55
Section 6.17.    [Reserved].....................................................................................................55
Section 6.18.    Additional Items in Connection with the Facilities....................................55
Section 6.19.    Board Observation Rights............................................................................56
Section 6.20.    Further Assurances.......................................................................................56
Section 6.21.    **Post-Closing Matters.** ..............................................................................57
Section 6.22.    Material Contracts........................................................................................57
Section 6.23.    Environmental Matters.................................................................................57
Section 6.24.    **Access To Data.** .........................................................................................57
Section 6.25.    Independent Board Members.......................................................................57
Section 6.26.    **Financial Advisor** .....................................................................................58
Section 6.27.    **Transition Plans.** ......................................................................................58

**ARTICLE VII. Negative Covenants .........................................................................................58**

Section 7.01.    Liens.............................................................................................................58
Section 7.02.    Investments...................................................................................................60
Section 7.03.    Debt..............................................................................................................60
Section 7.04.    Fundamental Changes..................................................................................61
Section 7.05.    Dispositions..................................................................................................62
Section 7.06.    Restricted Payments.....................................................................................62
Section 7.07.    Capital Expenditures....................................................................................62
Section 7.08.    Transactions with Affiliates.........................................................................63
Section 7.09.    Burdensome Agreements..............................................................................63
Section 7.10.    [Reserved].....................................................................................................63
Section 7.11.    Certain Governmental Regulations..............................................................63
Section 7.12.    Disqualified Equity Interests. .....................................................................64

**ARTICLE VIII. Events of Default and Remedies ...................................................................64**

Section 8.01.    Events of Default.........................................................................................64
Section 8.02.    Rights and Remedies....................................................................................66

ii

**ARTICLE IX. Administrative Agent** ...........................................................................................................**69**

Section 9.01.    Appointment and Authorization of Administrative Agent...............................69
Section 9.02.    Rights as a Lender. ....................................................................................70
Section 9.03.    Exculpatory Provisions. .............................................................................70
Section 9.04.    Reliance by Administrative Agent. ..............................................................70
Section 9.05.    Delegation of Duties. .................................................................................71
Section 9.06.    Resignation of Administrative Agent. ..........................................................71
Section 9.07.    Non-Reliance on Administrative Agent and Other Lenders. .............................71
Section 9.08.    No Other Duties, Etc...................................................................................72
Section 9.09.    Administrative Agent May File Proofs of Claim............................................72
Section 9.10.    Guaranty Matters. .....................................................................................72
Section 9.11.    Collateral and Other Matters......................................................................72

**ARTICLE X. General Provisions** ...............................................................................................**73**

Section 10.01.    Amendments, Etc....................................................................................73
Section 10.02.    Notices; Electronic Communications. ......................................................74
Section 10.03.    No Waiver; Cumulative Remedies. ...........................................................76
Section 10.04.    Expenses; Indemnity; Damage Waiver......................................................76
Section 10.05.    Marshalling; Payments Set Aside. ............................................................77
Section 10.06.    Successors and Assigns. ..........................................................................78
Section 10.07.    Treatment of Certain Information; Confidentiality.......................................81
Section 10.08.    Right of Setoff. ......................................................................................81
Section 10.09.    Interest Rate Limitation. ..........................................................................82
Section 10.10.    Counterparts; Integration; Effectiveness....................................................82
Section 10.11.    Survival of Representations and Warranties. ..............................................82
Section 10.12.    Severability...............................................................................................82
Section 10.13.    Patriot Act Notice.....................................................................................83
Section 10.14.    Guaranty. ................................................................................................83
Section 10.15.    Time of the Essence...................................................................................88
Section 10.16.    Governing Law; Jurisdiction; Etc. ............................................................88
Section 10.17.    Waiver of Right to Jury Trial.....................................................................88
Section 10.18.    Acknowledgment and Consent to Bail-In of EEA Financial Institutions. ..........89
Section 10.19.    **Effect of Amendment and Restatement**. ...................................................89
Section 10.20.    INTERCREDITOR AGREEMENT. ..........................................................90

**SCHEDULES**

1.01-A    Schedule of Equity Holder Pledgors
1.01-B    Schedule of Certain Material Contracts
1.01-C    Schedule of Real Property
2.01      Schedule of Lenders; Percentage Shares
5.05      Schedule of Certain Litigation
5.06      Schedule of Defaults under Contractual Obligations
5.16      Schedule of Equity Interests Held by Loan Parties; Equity Interests in Loan Parties
5.19      Schedule of Certain Labor Issues
5.21      Schedule of Permits
5.26      Schedule of Locations of M&E
6.12      Schedule of Collateral Accounts and Excluded Accounts
6.21      Schedule of Post-Closing Deliverables
7.01      Schedule of Certain Permitted Liens
7.03      Schedule of Certain Permitted Debt
10.02     Administrative Agent's Office; Certain Addresses for Notices

**EXHIBITS**

A    Form of Assignment and Assumption
B    Form of Compliance Certificate
C    Form of U.S. Tax Compliance Certificate
D    Form of Excess Cash Flow Certificate

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT, dated as of July 22, 2019, is entered into among, Epic Alabama Maritime Assets, LLC, a Delaware limited liability company, a Delaware limited liability company ("**EAMA**", together with any other Persons that become a "Borrower" hereunder, each a "**Borrower**", and collectively, jointly and severally, the "**Borrowers**"), Epic Alabama Holdings, LLC, a Delaware limited liability company ("**Epic Alabama Holdings**"), Epic Maritime Asset Holdings, LLC ("**Maritime**"), Epic Alabama Shipyard, LLC, a Delaware limited liability company ("**Epic Alabama Shipyard**"), Epic Recycling Services, LLC, a Delaware limited liability company ("**Epic Recycling**"), Epic Alabama Recyclers, LLC, a Delaware limited liability company ("**Epic Alabama Recyclers**"), and ERP Environmental Fund, Inc., a West Virginia corporation ("**ERP**", together with Epic Alabama Holdings, Epic Alabama Shipyard, Maritime, Epic Recycling and Epic Alabama Recyclers and any other Persons that become a "Guarantor" hereunder, each a "**Guarantor**", and collectively, jointly and severally, the "**Guarantors**"), the several entities from time to time party hereto as Lenders, and White Oak Global Advisors, LLC, a Delaware limited liability company ("**White Oak**"), as administrative agent for the Lending Parties (as defined herein) under each of the Loan Documents (as defined herein) (White Oak, or any successor appointed in accordance with **Section 9**.**06** hereof in such capacity, the "**Administrative Agent**").

RECITALS

WHEREAS Epic Companies, LLC, a Delaware limited liability company ("**Epic**"), as the sole Borrower, Epic Diving & Marine Services, LLC, a Delaware limited liability company ("**Epic Diving**"), Epic Applied Technologies, LLC, a Delaware limited liability company ("**Epic Applied**"), and TSB Offshore Inc., a Delaware corporation ("**TSB Offshore**"), as "Guarantors", certain entities as from time to time party thereto as "Lenders" (the "**Existing Lenders**") and White Oak, as "Administrative Agent" (the "**Existing Administrative Agent**") entered into that certain Loan and Security Agreement, dated as of 2014 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Existing Loan Agreement**");

WHEREAS pursuant to that certain Joinder, Fourth Amendment and Waiver to Loan and Security Agreement dated as of October 12, 2018, Maritime (together with Epic, each an "**Existing Borrower**", and collectively, jointly and severally, the "**Existing Borrowers**") became a Borrower under the Existing Loan Agreement;

WHEREAS pursuant to various amendments to the Existing Loan Agreement, Epic Alabama Holdings, EAMA, Epic Alabama Shipyard, Epic Recycling, Epic Alabama Recyclers, Cedar Creek Aviation, LLC, a Virginia limited liability company ("**Cedar Creek**"), Epic Specialty Services, LLC, a Delaware limited liability company ("**Epic Specialty**"), King Aire, Inc., a West Virginia corporation ("**King Aire**"), Zuma Rock Energy Services, LLC, a Texas limited liability company ("**Zuma Rock**"), Navarro Capital Partners, LLC, a Texas limited liability company ("**Navarro**"), Ranger Offshore International, LLC, a Delaware limited liability company ("**Ranger Offshore**"), TSB Holding Company, LLC, a Delaware limited liability company ("**TSB Holdco**") and ERP (Epic Diving, Epic Applied, TSB Offshore, Epic Alabama Holdings, EAMA, Epic Alabama Shipyard, Epic Recycling, Epic Alabama Recyclers, Cedar Creek, Epic Specialty, King Aire, Zuma Rock, Navarro, Ranger Offshore, TSB Holdco and ERP, each an "**Existing Guarantor**" and collectively, jointly and severally, the "**Existing Guarantors**") (the Existing Guarantors, together with the Existing Borrowers, the "**Existing Loan Parties**") became "Guarantors" under the Existing Loan Agreement;

WHEREAS pursuant to that certain Amended and Restated Personal Guarantee, dated as of June 14, 2019 among Thomas M. Clarke ("**Clarke**"), David A. Wiley ("**Wiley**") and Existomg Administrative Agent (the "**Clarke/Wiley Personal Guaranty**"), Clarke and Wiley absolutely and unconditionally, jointly and severally, guaranteed to Existing Administrative Agent and the Lenders the full and prompt payment when due, the amount of the Obligations (as defined in the Existing Loan Agreement);

WHEREAS pursuant to that certain Personal Guarantee, dated as of June 14, 2019 among Ana M. Clarke ("**AMC**") and Existing Administrative Agent (the "**AMC Personal Guaranty**", together with the Clake/Wiley Personal Guaranty, the "**Personal Guarantees**"), AMC absolutely and unconditionally guaranteed to Existing

Administrative Agent and the Lenders, subject to the limitations therein, the full and prompt payment when due, the amount of the Obligations (as defined in the Existing Loan Agreement);

WHEREAS as of the date hereof, the aggregate amount of Credit Outstandings (as defined in the Existing Loan Agreement) plus all accrued and unpaid interest thereon is $106,902,442.86 (the "*Existing Outstanding Amount*");

WHEREAS in connection with a restructuring of Epic and its Subsidiaries, Existing Administrative Agent and the Existing Lenders have agreed that the Debt evidenced by the Existing Loan Agreement shall be allocated among the Existing Borrowers and Existing Guarantors, with the result being that (1) EAMA shall be liable as a borrower with respect to $45,000,000 of the Existing Outstanding Amount pursuant to this Agreement, (2) Navarro shall be liable as a borrower with respect to $15,000,000 of the Existing Outstanding Amount pursuant to that certain Amended and Restated Loan and Security agreement dated as of the date hereof (the "*Navarro Loan Agreement*") among Navarro (together with any other Persons that become a "Borrower" thereunder, each a "*Navarro Borrower*", and collectively, jointly and severally, the "*Navarro Borrowers*"), Ranger Offshore and ERP (together with any other Persons that become a "Guarantor" thereunder, each a "*Navarro Guarantor*", and collectively, jointly and severally, the "*Navarro Guarantors*"), the several entities from time to time party thereto as "Lenders", and White Oak, as "Administrative Agent", (3) Epic shall be liable as a borrower with respect to $46,902,442.86 of the Existing Outstanding Amount pursuant to that certain Amended and Restated Loan and Security agreement dated as of the date hereof (the "*Epic Loan Agreement*") among Epic (together with any other Persons that become a "Borrower" thereunder, each a "*Epic Borrower*", and collectively, jointly and severally, the "*Epic Borrowers*") Epic Diving, Epic Applied, Epic Specialty, Epic SF, King Aire, Zuma Rock, Epic Alabama Steel, TSB Holdco, TSB Offshore and ERP and any other Persons that become a "Guarantor" hereunder, each an "*Epic Guarantor*", and collectively, jointly and severally, the "*Epic Guarantors*", the several entities from time to time party thereto as "Lenders", and White Oak as "Administrative Agent" and (4) the Existing Loan Agreement shall be amended and restated pursuant to the terms of the Epic Loan Agreement, the Shipyard Loan Agreement and this Agreement;

WHEREAS in connection with the allocation and amendment and restatement of the Obligations described above (a) Epic Borrowers and the Epic Guarantors shall only be obligated in respect of the Debt evidenced by the Navarro Loan Agreement and the other loan documents executed in connection therewith, (b) Navarro Borrowers and the Navarro Guarantors shall only be obligated in respect of the Debt evidenced by the Navarro Loan Agreement and the other loan documents executed in connection therewith, and (c) EAMA and the other Loan Parties shall only be obligated in respect of the Debt evidenced by this Agreement and the other Loan Documents;

WHEREAS the obligations of the Epic Borrowers, Epic Guarantors, Shipyard Borrowers, Shipyard Guarantors and Borrowers and Guarantors shall, subject to amended and restated personal guarantees, (a) continue to be guaranteed by Clarke, Wiley and AMC, subject to any limitations set forth in the Existing Personal Guarantees, (b) subject to the Epic Loan Agreement, the Shipyard Loan Agreement and this Agreement, continue to be guaranteed by ERP, and (c) subject to the Sanare Pledge Agreement, be secured by the pledge by Stockbridge Natural Resources, LLC, a Texas limited liability company ("*Stockbridge*") of the Equity Interests in Sanare Energy Partners, LLC.

WHEREAS so long as, among other conditions precedent set forth herein, (1) the Navarro Borrowers and Navarro Guarantors enter into the Navarro Loan Agreement, (2) the Epic Borrowers and Epic Guarantors enter into the Epic Loan Agreement, (3) Clarke, Wiley and AMC enter into amended and restated personal guarantees to evidence their guarantees of the obligations of Navarro Borrowers, Navarro Guarantors, Epic Borrowers, Epic Guarantors and Borrowers and Guarantors, and (4) Stockbridge enters into the Sanare Pledge Agreement, Administrative Agent and Lenders are willing to enter into this Agreement to partially amend and restate the Existing Loan Agreement;

NOW THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

**AGREEMENT**

**ARTICLE I.**
**CERTAIN DEFINED TERMS; CERTAIN RULES OF CONSTRUCTION**

**Section 1.01.**    CERTAIN DEFINED TERMS.

As used herein:

"***Account Debtor***" means any Person who is or may become obligated with respect to, or on account of, an Account, Chattel Paper or General Intangible (including a payment intangible (as that term is defined in the Uniform Commercial Code)).

"***Account(s)***" means, as to any Person, all accounts (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including: (a) all "accounts" (as that term is defined in the Uniform Commercial Code), "payment intangibles" (as that term is defined in the Uniform Commercial Code), other receivables, book debts, all other rights to payment and/or reimbursement of every kind and description, including under governmental entitlement programs, and all other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the Uniform Commercial Code); (b) all of such Person's rights in, to and under all purchase orders or receipts for goods or services; (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights or rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods); (d) all rights to payment due to such Person for goods or other property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person); and (e) all collateral security of any kind given by any Account Debtor or any other Person with respect to any of the foregoing.

"***Acqua Liana***" means Acqua Liana Capital Partners, LLC.

"***Adjustment Date***" has the meaning ascribed thereto in the definition of "Applicable Margin" herein.

"***Administrative Agent***" means, at any time, administrative agent for the Lending Parties under each of the Loan Documents (which, initially, shall be White Oak and, thereafter, shall include any successor appointed in accordance with **Section 9.06**).

"***Administrative Agent's Office***" means Administrative Agent's address and, as appropriate, account as set forth on **Schedule 10.02**, or such other address or account as Administrative Agent may from time to time notify Administrative Loan Party and each other Lending Party.

"***Administrative Detail Form***" means an administrative detail form in a form supplied by, or otherwise acceptable to, Administrative Agent.

"***Administrative Loan Party***" has the meaning ascribed thereto in **Section 2.14**.

"***Affiliate***" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"***Agreement***" means this Amended and Restated Loan and Security Agreement as amended, restated, modified or supplemented from time to time.

"***AMC***" has the meaning set forth in the recitals to this Agreement.

"**_Anti-Terrorism Law_**" means, collectively:  (a) the Patriot Act; (b) the Executive Order; (c) the Trading With the Enemy Act (50 U.S.C. § 1 *et seq.*); and (d) any similar Law enacted in the United States following the date of this Agreement.

"**_Applicable Rate_**" means eight and one half percent (8.5%).

"**_Approved Bank_**" has the meaning ascribed thereto in the definition of "**_Cash Equivalents_**" contained herein.

"**_Approved Fund_**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities, which Person is administered or managed by (a) a Lending Party, (b) an Affiliate of a Lending Party or (c) an entity or an Affiliate of an entity that administers or manages a Lending Party; *provided* that an "**_Approved Fund_**" shall not include any Individual Guarantor, any Equity Holder Pledgor, any Loan Party or any of their respective Affiliates.

"**_Assignment and Assumption_**" means an assignment and assumption entered into by a Lending Party and an Eligible Assignee (with the consent of any party whose consent is required by **Section 10.06(b)**), and accepted by Administrative Agent, substantially in the form attached hereto as **Exhibit A**, or in such other form as agreed to by Administrative Agent, in its sole discretion.

"**_Attributable Debt_**" means, on any date of determination:  (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP; and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"**_Bail-In Action_**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**_Bail-In Legislation_**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**_Bankruptcy Code_**" means the federal Bankruptcy Reform Act of 1978 (11 U.S.C. Sections 101 *et seq.*).

"**_Bankruptcy Laws_**" means, collectively:  (a) the Bankruptcy Code; and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor-relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**_Books and Records_**" means, as to any Person, all of such Person's books and records including ledgers, Tax Returns, records regarding such Person's assets or liabilities, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**_Borrower_**" or "**_Borrowers_**" has the meaning ascribed thereto in the introductory paragraph hereof and shall include, jointly and severally, any additional borrower that joins this Agreement and the other Loan Documents as a "Borrower" following the date hereof. Borrower is defined collectively to include all Persons constituting Borrower; provided, however, that any references herein to "any Borrower", "each Borrower", "a Borrower" or similar references, shall be construed as a reference to each individual Person comprising Borrower. In addition, each Person comprising Borrower hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon each Person comprising Borrower.

"***Business Day***" means any day other than (i) a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, San Francisco, California or the city and state where Administrative Agent's Office is located, (ii) any day that any of the Federal Reserve Bank of New York or the New York Stock Exchange is closed and (iii) any other day included in the recommended holiday schedule of the Loan Syndications and Trading Association for calculating delayed compensation.

"***Capital Expenditures***" means, with respect to any Person, all expenditures (whether paid in cash or other consideration or accrued as a liability and including that portion of capital leases that is capitalized on the balance sheet of such Person including in connection with a sale-leaseback transaction) by such Person for the acquisition or leasing of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that are required to be capitalized under GAAP on a balance sheet of such Person.  For purposes of this definition:  (a) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment owned by such Person thereof or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price *minus* the credit granted by the seller of such equipment for such equipment being traded in at such time, or the amount of such proceeds, as the case may be; and (b) an acquisition to the extent made with the proceeds of a Disposition in accordance with **Section 7.05(c)** shall not constitute a "***Capital Expenditure***."

"***Capital Lease Obligations***" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; *provided*, that all obligations of any Person that are or would be characterized as an operating lease in accordance with GAAP as in effect on the Effective Date (whether or not such operating lease obligations were in effect on the Effective Date) shall continue to be accounted for as an operating lease (and not as a capital lease) for purposes of this Agreement regardless of any change in GAAP following the Effective Date (or any required implementation of any change in GAAP promulgated prior to the Effective Date) that would otherwise require such obligations to be recharacterized as Capital Lease Obligations.

"***Cash Equivalents***" means, as to any Person:  (a) securities issued or directly and fully and unconditionally guaranteed or insured by the United States or any agency or instrumentality thereof (but only so long as the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition; (b) securities issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than ninety (90) days from the date of acquisition and having one of the two highest ratings from either S&P or Moody's; (c) certificates of deposit, denominated solely in Dollars, maturing within two years after the date of acquisition, issued by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia or that is a U.S. Subsidiary of a foreign commercial bank; in each of the foregoing cases, solely to the extent that:  (i) such commercial bank's short-term commercial paper is rated at least A-1 or the equivalent by S&P or at least P-1 or the equivalent thereof by Moody's (any such commercial bank, an "***Approved Bank***"); or (ii) the par amount of all certificates of deposit acquired from such commercial bank are fully insured by the Federal Deposit Insurance Corporation; or (d) commercial paper issued by any Approved Bank (or by the parent company thereof), in each case maturing not more than two hundred seventy (270) days after the date of acquisition.

"***Cedar Creek***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any Law; (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything to the contrary contained herein:  (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory

authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "***Change in Law***" regardless of the date enacted, adopted or issued.

"***Change of Control***" means (a) (x) prior to an Epic Alabama Holdings Warrant Exercise Event, the failure of Parent to own directly or indirectly, beneficially and of record, one hundred percent (100.00%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of Epic Alabama Holdings, and (y) from and after an Epic Alabama Holdings Warrant Exercise Event, the failure of Parent to own directly or indirectly, beneficially and of record, twenty five percent (25%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests in Epic Alabama Holdings; (b) [reserved]; (c) the failure of Clarke, together with AMC, to own directly or indirectly, beneficially and of record, one hundred percent (100.00%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of Parent; (d) the failure of Epic Alabama Holdings to own directly or indirectly, beneficially and of record, one hundred percent (100.00%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of EAMA; and (e) [reserved].  The death of any Individual Guarantor shall not trigger a Change of Control so long as the Obligations may be asserted against the estate of such deceased Individual Guarantor.

"***Chattel Paper***" means, as to any Person, all chattel paper (as that term is defined in the Uniform Commercial Code), including electronic chattel paper (as that term is defined in the Uniform Commercial Code), now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party).

"***Claims***" means, collectively, any claim or cause of action based upon or arising out of this Agreement, the other Loan Documents or any of the transactions contemplated hereby or thereby, including contract claims, tort claims, breach of duty claims, and all other common law or statutory claims.

"***Clarke***" has the meaning set forth in the recitals to this Agreement.

"***Closing Financial Statements***" has the meaning set forth in **Section 5.11(a)**.

"***Code***" means the Internal Revenue Code of 1986, and, as applicable, the Treasury Regulations promulgated thereunder, or, if applicable, any successor Laws.

"***Collateral***" means, collectively, all right, title and interest of each Loan Party, whether now owned or hereafter acquired or arising (or in which such Loan Party has rights or the power to transfer rights to a secured party), in, to or upon all Accounts, Chattel Paper, Collateral Accounts, commercial tort claims, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Permits, Supporting Obligations, Books and Records, immovable or real property, motor vehicles and other title vehicles, and all other assets, corporeal or tangible and incorporeal or intangible, real and personal, of such Loan Party and all Proceeds (in whatever form or nature) of the foregoing; provided that, notwithstanding the foregoing, "Collateral" shall not include Excluded Property of any such Loan Party.

"***Collateral Accounts***" means all commodity accounts, deposit accounts and securities accounts (in each case, as defined in the Uniform Commercial Code) of any Loan Party other than the Excluded Accounts.

"***Collateral Documents***" means, collectively: (a) this Agreement; (b) each Control Agreement entered into in connection with this Agreement; (c) each Intellectual Property assignment or security agreement, each in form and substance satisfactory to Administrative Agent, entered into in connection with this Agreement; (d) each Deed of Trust; (e) [reserved], (f) the Sanare Pledge Agreement, (g) the Equity Holder Pledge Agreement, (h) any security agreement or other document similar to the documents referred to in clauses (a) through (g) of this definition executed on or after the Effective Date pursuant to the terms hereof or otherwise in connection with the transactions contemplated hereby; and (i) all financing statements (or comparable documents now or hereafter filed in accordance with the Uniform Commercial Code or other comparable Law) against any Loan Party, Equity Holder Pledgor, Stockbridge or any other Loan Document as debtor in favor of Administrative Agent, for the benefit of each Lending Party (or any of the foregoing), as secured party.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"***Compliance Certificate***" means a certificate substantially in the form of **Exhibit B**.

"***Contractual Obligation***" means, as to any Person, any document or other agreement or undertaking to which such Person is a party or by which it or any of its property is bound.

"***Control***" means (other than when used in the terms "***Change of Control***" and "***Control Agreement***") the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. The terms "***Controlling***" and "***Controlled***" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, the power to vote ten percent (10.00%) or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent. Notwithstanding the foregoing, none of Agent, any Lender or any of their Affiliates shall be deemed to have "Control" over any Loan Party, any Equity Holder Pledgor or any Individual Guarantor.

"***Control Agreement***" means any agreement entered into among a depository institution at which a Loan Party maintains a Collateral Account, such Loan Party and Administrative Agent, pursuant to which Administrative Agent obtains control (within the meaning of the Uniform Commercial Code) over such Collateral Account.

"***Copyright License***" means, as to any Person, all rights under any written document now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party) granting the right to use any Copyright or Copyright registration.

"***Copyrights***" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person: (a) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed, all registrations and applications for registration of any such copyrights in the United States or any other country, including registrations, recordings and applications, and supplemental registrations, recordings, and applications in the United States Copyright Office; and (b) all proceeds of the foregoing, including license royalties and proceeds of infringement suits, the right to sue for past, present and future infringements, all rights corresponding thereto throughout the world and all renewals and extensions thereof.

"***Credit Extensions***" means all of the following: (a) the Term Loans; and (b) all Protective Advances.

"***Credit Outstandings***" means, as of any date of determination, the then Outstanding Amount of all Credit Extensions owing with respect thereto.

"***Debt***" means, as to any Person as of any date of determination, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial letters of credit), bankers' acceptances, bank guaranties, surety bonds and similar instruments; (c) the swap termination value under all Swap Contracts or hedge contracts to which such Person is a party; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business not past due for more than sixty (60) days after the date on which such trade account payable was created); (e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) the amount of Attributable Debt in respect of all capital lease obligations and Synthetic Lease Obligations of such Person; (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Equity Interest, valued, in the case of a Disqualified Equity Interest that is a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends; and (h) all Guarantees of such Person in respect of any Debt referred to in the immediately preceding clauses (a) through (g). For all purposes hereof, the Debt of any

7

Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venture, unless such Debt is expressly made non-recourse to such Person.

"***Deed of Trust***" means each mortgage, leasehold mortgage or deed of trust or other similar document executed and delivered to Administrative Agent pursuant to the terms hereof or otherwise in connection herewith by Borrowers, any Guarantor or any other Loan Party, as security for the Obligations, as each may be amended, amended and restated or otherwise modified from time to time, including that certain (a) Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated December 21, 2018, given by EAMA in favor of Existing Administrative Agent for the benefit of the Existing Lenders, granting Existing Administrative Agent a Lien upon the Facility located in Mobile county, Alabama and (b) Amended and Restated First Preferred Ship Mortgage on the Whole of the Vessel Named ALABAMA, dated on or around the Effective Date, given by EAMA in favor of Administrative Agent.

"***Default***" means any Event of Default or any event or condition that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"***Default Rate***" means an interest rate equal to the sum of:  (a) Applicable Margin; plus (b) 300.00 basis points *per annum*.

"***Defaulting Lender***" means, subject to **Section 2.11**, any Lender that has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Bankruptcy Laws, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"***Deposit Account***" means any deposit account (as that term is defined in the Uniform Commercial Code).

"***Disposition***" means the sale, assignment transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction, any allocation of assets by division into two or more legal entities, and any allocation of assets among newly divided limited liability companies pursuant to a "plan of division" or similar plan under Section 18-217 of the Delaware Limited Liability Company Act or any similar laws of any other jurisdiction) of any property by any Person, including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  The term "***Dispose***" has a meaning correlative thereto.

"***Disqualified Equity Interest***" means any Equity Interest of any Person that, by its terms (or by the terms of any Equity Interest or other security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event or circumstance, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires or mandates payments or distributions in cash, on or prior to the date that is one year after the Maturity Date.

"***Documents***" means, as to any Person, all documents (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located, including all bills of lading, dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

"***Dollar***" and "***$***" mean lawful money of the United States.

8

"***Due Diligence Certificate***" means a due diligence certificate in form acceptable to Administrative Agent.

"***EAMA***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***EBITDA***" means, with respect to the Shipyard Loan Parties and their respective Subsidiaries for any period, Net Income for such period *plus* (a) without duplication and to the extent deducted in determining Net Income for such period, the sum of the following:

(i)        Interest Expense for such period,

(ii)       income tax expense for such period,

(iii)      all amounts attributable to depreciation and amortization expense for such period,

(iv)      any other non-cash losses, charges or expenses for such period (but excluding any non-cash losses, charges or expenses in respect of an item that was included in Net Income in a prior period),

*minus*

(b) without duplication and to the extent included in Net Income, any extraordinary gains and any non-cash items of income for such period, all calculated for the Shipyard Loan Parties and their Subsidiaries on a consolidated basis in accordance with GAAP.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Effective Date***" means the first date on which all of the conditions precedent in **Section 4.01** are satisfied (or waived in accordance with **Section 10.01**).

"***Eighth Amendment***" means that certain Eighth Amendment to Loan and Security Agreement, by and among the Existing Loan Parties party thereto, Administrative Agent, and the Existing Lenders party thereto, dated as of the Eighth Amendment Effective Date, pursuant to which, among other things, the Existing Lenders party thereto made the Eight Amendment Protective Advances (as defined therein) to the Existing Borrowers.

"***Eighth Amendment Effective Date***" means June 13, 2019.

"***Electronic Platform***" means an electronic system for the delivery of information (including documents), such as IntraLinks On-Demand Workspaces™ or DXSyndicate™, or Firmex that may or may not be provided or administered by Administrative Agent or an Affiliate thereof.

"***Eligible Assignee***" means any of the following:  (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; (d) any fund or account managed or administered solely by White Oak or any of its Affiliates or (e)

any other Person designated by a Lender as an Eligible Assignee; *provided* that "***Eligible Assignee***" shall not include any Defaulting Lender.

"***Environmental Claims***" means all claims, however asserted, by any Governmental Authority or other Person alleging Environmental Liabilities.

"***Environmental Laws***" means all existing or future Laws and regulations, including requirements imposed by applicable common law, relating to the pollution or the protection of the environment and natural resources including the use, handling, transportation, treatment, storage, disposal, or release of, or exposure to, Hazardous Materials.

"***Environmental Liability***" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon: (a) violation of any Environmental Laws; (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (c) exposure to any Hazardous Materials; (d) the release or threatened release of any Hazardous Materials into the environment; or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Epic***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Alabama Holdings***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Alabama Holdings Warrant Agreement***" means a warrant agreement dated as of Effective Date by and between Navarro Holdco and Epic Alabama Holdings, in form and substance satisfactory to Administrative Agent.

"***Epic Alabama Holdings Warrant Exercise Event***" means the exercise by Navarro Holdco of its rights to seventy five percent (75.00%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of Epic Alabama Holdings, pursuant to the Epic Alabama Holdings Warrant Agreement.

"***Epic Alabama Recyclers***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Alabama Shipyard***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Alabama Steel***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Applied***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Diving***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Maritime***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Recycling Services***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic SF***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Epic Specialty***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Equipment***" means, as to any Person, all equipment (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located, including any and all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other corporeal or tangible personal property (other than Inventory) of every kind and description, and all parts, accessories and accessions thereto and substitutions and replacements therefor.

"***Equity Holder Pledge Agreement***" means that certain Third Amended and Restated Pledge Agreement, dated on or about the Effective Date, given by the Equity Holder Pledgors pursuant to which each Equity Holder Pledgor pledges and hypothecates to Administrative Agent the Equity Interests of any Loan Party owned by such Equity Holder Pledgor.

"***Equity Holder Pledgors***" means and refers to those Persons more fully identified on **Schedule 1.01-A** hereto.

"***Equity Interests***" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***ERISA Affiliate***" means any trade or business (whether or not incorporated) under common control with any Loan Party or any Subsidiary thereof within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"***ERISA Event***" means any of the following: (a) a Reportable Event with respect to a Pension Plan; (b) the incurrence by any Loan Party or any ERISA Affiliate of any liability with respect to a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the incurrence by any Loan Party or any ERISA Affiliate of any liability with respect to a complete or partial withdrawal by any Parent or any ERISA Affiliate from a Multiemployer Plan or the receipt by any Loan Party or an ERISA Affiliate of notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate.

"***ERP***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Event of Default*" has the meaning ascribed thereto in **Section 8.01**.

"*Event of Loss*" means, with respect to any property of any Loan Party, any of the following: (a) any loss, destruction or damage of such property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property, or confiscation of such property or the requisition of the title or use of such property.

"*Excess Cash Flow*" means, with respect to the Shipyard Loan Parties for any period, the amount, if any, by which: (a) EBITDA for such period; *exceeds* (b) the sum for such period of (without duplication), in each case where applicable to the extent made from Internally Generated Cash: (i) Capital Expenditures actually made in cash by the Shipyard Loan Parties (net of any insurance proceeds, condemnation awards or proceeds relating to any financing with respect to such expenditures); *plus* (ii) taxes on or measured by income, profits or capital that are paid in cash by the Shipyard Loan Parties; *plus* (iii) [reserved]; *plus* (iv) Interest Expense (exclusive of any debt discount) paid in cash by the Shipyard Loan Parties; *plus* (v) scheduled principal payments on account of capital leases and other Debt (provided that payments of revolving Debt shall not be deducted from Excess Cash Flow unless accompanied by a permanent reduction in the relevant commitment) of the Shipyard Loan Parties, but in each of the foregoing cases solely to the extent paid in cash; *plus* (vi) the amount, if any, by which (A) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the end of such period is greater than (B) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the beginning of such period; *plus* (vii) the amount if any by which (A) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the end of such period is less than (B) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the beginning of such period; *minus* (viii) the amount, if any, by which (A) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the end of such period is less than (B) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the beginning of such period; *minus* (ix) the amount if any by which (A) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the end of such period is greater than (B) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the beginning of such period, *plus* (x) all add-backs with respect to cash payments added back to EBITDA under clause (a) of the definition of "EBITDA", *plus* (xi) the aggregate consideration paid in cash during such period in respect of Investments permitted hereunder, <u>less</u> any amounts received in respect thereof as a return of capital.

"*Excess Cash Flow Certificate*" means a certificate substantially in the form of **Exhibit D**.

"*Excess Cash Flow Percentage*" means 75%.

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*Excluded Accounts*" means, with respect to any Loan Party: (i) those deposit accounts described as such on **Schedule 6.12**, and (ii) such other deposit accounts of such Loan Party constituting a payroll account, a pension or pension reserve account, or an employee benefits account; *provided*, that such accounts shall, in the aggregate, hold no more than the amount needed to fund payroll for the then-next two (2) payroll cycles.

"*Excluded Property*" means collectively, all right, title and interest of each Loan Party, whether now owned or hereafter acquired or arising (or in which such Loan Party has rights or the power to transfer rights to a secured party), in, to or upon:

(a)    any rights or interest in any contract, lease, Permit, charter or license agreement covering real or personal property of any Loan Party if, under the terms of such contract, lease, Permit, charter or license agreement, or applicable Law with respect thereto, the grant of a Lien therein is prohibited as a matter of law or under the terms of such contract, lease, Permit, charter or license agreement, except, in each of the foregoing cases, to the extent (i) any described prohibition or restriction is unenforceable under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code or other applicable Laws, or (ii) any consent or waiver has been obtained that would permit the Lien notwithstanding the prohibition or restriction on the pledge of such asset;

(b)      any property now owned or hereafter acquired by any Loan Party that is subject to a purchase money Lien or a capital lease permitted hereunder if the contractual obligation pursuant to which such Lien is granted (or the documentation providing for such purchase money Lien or capital lease) validly prohibits the creation by such Loan Party of a Lien thereon or expressly requires the consent of any Person other than a Loan Party or its Affiliates which consent has not been obtained as a condition to the creation of any other Lien on such property;

(c)      any "intent to use" Trademark applications for which a statement of use has not been filed (but only until such statement is filed); and

(d)      all Excluded Accounts and all amounts deposited therein or credited thereto except to the extent any such amounts were deposited therein or credited thereto other than for the purposes for which such Excluded Accounts were established;

*provided* that:  (i) "Excluded Property" shall not include any Proceeds, products, substitutions or replacements of any Excluded Property (unless such Proceeds, products, substitutions or replacements would otherwise constitute Excluded Property); and (ii) if any assets constitute "Excluded Property" as a result of the failure of the applicable Loan Party to obtain consent as described in clauses (a) and (b) of this definition, such Loan Party shall use commercially reasonable efforts to obtain such consent, and, upon obtaining such consent, such property shall cease to constitute "Excluded Property."

"***Excluded Swap Obligation***" means, with respect to any Person that has Guaranteed a Swap Obligation, including the grant of a Lien to secure the Guarantee of such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty or grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Term Loan pursuant to the Laws in effect on the date on which (i) such Lender acquires such interest in the Term Loan or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 2.08**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with **Section 2.08(d)** and (d) any U.S. federal withholding Taxes imposed under FATCA.

"***Executive Order***" means Executive Order No. 13224 of September 23, 2001 (effective September 24, 2001), Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism.

"***Existing Administrative Agent***" has the meaning ascribed thereto in the Recitals hereto.

"***Existing Borrowers***" has the meaning ascribed thereto in the Recitals hereto.

"***Existing Guaranteed Obligations***" has the meaning ascribed thereto in **Section 10.14(j)**.

"***Existing Guarantors***" has the meaning ascribed thereto in the Recitals hereto.

13

"***Existing Lenders***" has the meaning ascribed thereto in the Recitals hereto.

"***Existing Loan Agreement***" has the meaning ascribed thereto in the Recitals hereto.

"***Existing Term Loans***" means the "Term Loans" as defined in the Existing Loan Agreement.

"***Extraordinary Receipts***" means any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds relating to an Event of Loss or Disposition, as described in **Section 2.03(c)(ii)** of this Agreement) consisting of (a) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, (b) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries), and (c) any purchase price adjustment (other than working capital and other similar adjustments) made pursuant to any acquisition document and/or indemnification payments made pursuant to any acquisition document (other than such indemnification payments to the extent that the amounts so received are applied by a Loan Party for the purpose of replacing, repairing or restoring any assets or properties of a Loan Party, thereby satisfying the condition giving rise to the claim for indemnification, or otherwise covering any out-of-pocket expenses incurred by any Loan Party in obtaining such payments).

"***Facility***" *or* "***Facilities***" means and refers to (i) the Shipyard Property and (ii) any parcels of immovable or real property, OCS leases, and OCS rights-of-way (ROW) or rights-of-use and easements (RUE).

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"***Federal Funds Rate***" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, then the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, then the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of one one-hundredth of 1.00%) charged to major money center banks on such day on such transactions as determined by Administrative Agent.

"***Fiscal Month***" means, as of any date of determination with respect to Loan Parties, each calendar month occurring during each Fiscal Year.

"***Fiscal Quarter***" means, as of any date of determination with respect to Loan Parties, each calendar quarter occurring during each Fiscal Year.

"***Fiscal Year***" means, as of any date of determination with respect to Loan Parties, the fiscal year of Loan Parties, which begins on January 1 and ends on December 31 in each calendar year.

"***Foreign Lender***" means any Lender that is not a "United States Person" (as such term is defined in Section 7701(a)(30) of the Code).

"***FRB***" means the Board of Governors of the Federal Reserve System of the United States.

"***GAAP***" means generally accepted accounting principles in the United States set forth in the Accounting Standards Codification of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*General Intangibles*" means, as to any Person, all general intangibles (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all right, title and interest that such Person may now or hereafter have under any contract, all payment intangibles (as that term is defined in the Uniform Commercial Code), customer lists, licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, databases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, immovable or real property, corporeal or tangible rights or incorporeal or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses-in-action, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for Equity Interests and other Investment Property, and rights of indemnification.

"*Goods*" means, as to any Person, all goods (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located, including embedded software to the extent included in goods (as that term is defined in the Uniform Commercial Code) and fixtures (as that term is defined in the Uniform Commercial Code).

"*Goodwill*" means, as to any Person, all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party).

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" means, as to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, whether direct or indirect:  (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation; (b) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation; (c) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation; or (d) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "*Guarantee*" as a verb has a correlative meaning.

"*Guaranteed Obligations*" has the meaning ascribed thereto in **Section 10.14(a)**.

"*Guarantor Subordinated Debt*" has the meaning ascribed thereto in **Section 10.14(i).**

"*Guarantor Subordinated Debt Payments*" has the meaning ascribed thereto in **Section 10.14(i).**

"*Guarantors*" means, collectively, the following (together with their respective successors and assigns): (a) those entities named in the introductory paragraph hereto as Guarantors and each other Subsidiary or Affiliate of Borrowers that is a party hereto as a Guarantor as of the Effective Date or thereafter by joinder in form and substance satisfactory to Administrative Agent; (b) each Individual Guarantor; and (c) any other Person who, on or after the date hereof pursuant to the terms of any Loan Document, has executed or is required to execute: (i) as a

guarantor, a Guaranty of all or any portion of the Obligations; or (ii) as a pledgor, a third party pledge agreement (or similar document) in favor of Administrative Agent or the Lending Parties with respect to all or any portion of the Obligations; each sometimes being referred to herein individually as a "Guarantor"; provided, that all references to "Guarantor" in this Agreement shall only refer to (x) ERP and (y) Subsidiaries of Borrowers, and all references to any individual who is party to a Guaranty shall be referred to as an Individual Guarantor and provided further, that Article III hereof shall not apply to ERP.

"***Guaranty***" means any guaranty or third party pledge agreement (or similar document), in form and substance satisfactory to Administrative Agent, made by a Person for the benefit of the Lending Parties or Administrative Agent for the benefit of the Lending Parties and includes the Guaranty of the Guarantors set forth in **Section 10.14**.

"***Hazardous Materials***" means any pollutant, contaminant, material, chemical, waste, compound, constituent, or substance subject to regulation or which can give rise to liability under Environmental Law, including but not limited to polychlorinated biphenyls ("PCBs") or any substance or compound containing PCBs, asbestos or any asbestos-containing materials in any form or condition, radon or any other radioactive materials, and petroleum, crude oil or any fraction thereof.

"***Hedging Obligations***" means, with respect to any Loan Party, all liabilities of such Person under Swap Contracts entered into with any Lender or an Affiliate of any Lender in connection with all or any portion of the Loans; *provided* that such liabilities under any Swap Contract with an Affiliate of a Lender shall not constitute "***Hedging Obligations***" hereunder unless and until such liabilities are certified as such in writing to Administrative Agent by Administrative Loan Party and such Affiliate of a Lender.

"***Income Tax Purposes***" means U.S. federal income and applicable state, local and foreign income and franchise tax purposes.

"***Indemnified Taxes***" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"***Indemnitees***" means, collectively, each Lending Party and each Related Party of any of the foregoing Persons.

"***Index Adjustment Date***" means (a) the Effective Date, and (b) thereafter, the first calendar day of each calendar month.

"***Individual Guarantor***" means Clarke, Wiley or AMC, individually, and "***Individual Guarantors***" means Clarke, Wiley and AMC, collectively.

"***Individual Guaranty***" means each Guaranty executed by an Individual Guarantor.

"***Information***" has the meaning ascribed thereto in **Section 10.07**.

"***Interest Expense***" means, for any period, total interest expense (including that attributable to Capital Lease Obligations) of the Shipyard Loan Parties for such period with respect to all outstanding Debt of the Shipyard Loan Parties (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Contracts in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Shipyard Loan Parties for such period in accordance with GAAP.

"***Internally Generated Cash***" shall mean any cash or Cash Equivalents of any Shipyard Loan Party that is not generated from a Disposition, an Event of Loss, an incurrence of Debt, an issuance of Equity Interests or a capital contribution.

"***Instrument***" means, as to any Person, all instruments (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located, including all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are part of a group of writings that constitute, Chattel Paper.

"***Intellectual Property***" means, as to any Person, all Copyrights, Licenses, Patents, Trademarks, inventions, designs, trade secrets and customers lists now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"***Intercreditor Agreement***" means that certain Intercreditor and Subordination Agreement between Administrative Agent and Acqua Liana, as administrative agent under the Junior Loan Agreement, as amended, restated or otherwise modified from time to time.

"***Inventory***" means, as to any Person, all inventory (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located, including all inventory, merchandise, goods and other personal property that are held by or on behalf of such Person for sale or lease or are furnished or to be furnished under a contract of service or that constitute raw materials, work in process, finished goods, returned goods or materials or supplies of any kind.

"***Investment***" means, as to any Person, any direct or indirect acquisition or investment by such Person in another Person, whether by means of:  (a) the purchase or other acquisition of capital stock or other securities of another Person; (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or Equity Interest in, another Person, including any partnership or limited liability company interest in such other Person and any arrangement pursuant to which the investor Guarantees Debt of such other Person; or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"***Investment Property***" means, as to any Person, all investment property (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"***IRS***" means the United States Internal Revenue Service or, as applicable, any successor agency.

"***Joinder Agreement***" means an agreement (in form and substance satisfactory to Administrative Agent) entered into by a Subsidiary of any Loan Party on or following the date hereof to join in the Guaranty set forth in **Section 10.14**.

"***Junior Loan Agreement***" means that certain Third Amended and Restated Loan and Security Agreement dated as of the date hereof, as amended, restated, supplemented or otherwise modified from time to time, by and among Borrowers, Guarantors, Acqua Liana Capital Partners, LLC, as administrative agent thereunder, and the lenders from time to time a party thereto.

"***King Aire***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Laws***" means, collectively, all international, foreign, federal, state and local laws, statutes, treaties, rules, authorities, guidelines, regulations, ordinances, codes and administrative or judicial precedents or Orders, Permits and other governmental restrictions, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations, concessions, grants, franchises and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

17

"***Lender***" means, as of any date of determination, any Lender party to this Agreement that has Term Loan Exposure or a Protective Advance owing to them at such time; sometimes being referred to herein collectively as the "***Lenders***".

"***Lending Office***" means, as to any Lender, the office or account of such Lender described as such in such Lender's Administrative Detail Form, or such other account, office or offices as a Lender may from time to time notify Administrative Loan Party and Lending Parties.

"***Lending Parties***" means, collectively, Administrative Agent and Lenders, and "***Lending Party***" means each or any of them individually.

"***Letter-of-Credit Rights***" means, as to any Person, all letter-of-credit rights (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including rights to payment or performance under a letter of credit, whether or not such Person, as beneficiary, has demanded or is entitled to demand payment or performance thereunder.

"***Licenses***" means, as to any Person, all Copyright Licenses, Patent Licenses, Trademark Licenses or other licenses of rights or interests now held or hereafter acquired by such Person.

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, privilege, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any easement, right of way or other encumbrance on title to immovable or real property).

"***Loan Documents***" means, collectively, this Agreement, each Note, each Guaranty, each Collateral Document, all subordination agreements respecting Subordinated Debt (if any), each Due Diligence Certificate and all other present or future documents entered into by any Loan Party, any Individual Guarantor or any Equity Holder Pledgor for the benefit of Lending Parties (or any of them), in connection with this Agreement.

"***Loan Parties***" means, collectively, Borrowers and the Guarantors, and "***Loan Party***" means each or any of them individually.

"***Loans***" means the Term Loans.

"***M&E***" means all Equipment (as defined in the Uniform Commercial Code) (in each case, other than fixtures (unless otherwise agreed by Administrative Agent), tooling, rolling stock or any equipment subject to special perfection requirements under federal law).

"***Make-Whole Amount***" means in connection with any required or actual prepayment or repayment of all or any portion of the Outstanding Amount of the Term Loans, (i) on or after the Effective Date but on or prior to August 30, 2020, two percent of the Outstanding Amount of the Term Loans being, or required to be, so prepaid or repaid; (ii) after August 30, 2020 but on or prior to August 30, 2021, one percent of the Outstanding Amount of the Term Loans being, or required to be, so prepaid or repaid; or (iii) after August 30, 2021, zero.

"***Maritime***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Maritime Warrant Agreement***" means a warrant agreement dated as of Effective Date by and between Navarro Holdco and Maritime, in form and substance satisfactory to Administrative Agent.

"***Maritime Warrant Exercise Event***" means the exercise by Navarro Holdco of its rights to seventy five percent (75.00%) of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of Maritime, pursuant to the Maritime Warrant Agreement.

"***Material Adverse Effect***" means any of the following:  (a) a material adverse change in or a material adverse effect upon (in either case, irrespective of whether occurring as a result of a specific event or circumstance or otherwise) the business, financial condition or results of operations of either:  (i) Borrowers; (ii) Borrowers and the other Shipyard Loan Parties taken as a whole; or (iii) Borrowers and the Loan Parties taken as a whole; (b) a material impairment (irrespective of whether occurring as a result of a specific event or circumstance or otherwise) of the ability of either (i) Borrowers; (ii) Shipyard Loan Parties taken as a whole or (iii) Loan Parties taken as a whole, for any of them to perform their respective obligations under the Loan Documents; or (c) except if caused by actions or inactions of any Lending Party, a material adverse effect (irrespective of whether occurring as a result of a specific event or circumstance or otherwise) upon:  (i) the legality, validity, binding effect or enforceability of any Loan Document to which any Loan Party is a party against either:  (A) Borrowers; (B) Shipyard Loan Parties taken as a whole or (C) Loan Parties taken as a whole; or (ii) the rights and remedies of Administrative Agent or any other Lending Party under or in respect of any Loan Document.

"***Material Contract***" means, with respect to Loan Parties and their Subsidiaries:  (a) each contract or agreement listed on **Schedule 1.01-B**; (b) each other contract or agreement, or series of contracts or agreements (irrespective of whether related to the same subject matter), to which any Loan Party or any of its Subsidiaries is a party involving aggregate consideration under each such contract and agreement payable to any Loan Party or any of its Subsidiaries by a specific Person or such Person's Affiliates of $5 million or more in any calendar year, or by any Loan Party or any of its Subsidiaries to a specific Person or such Person's Affiliates of $400,000 or more in any calendar year; and (c) any other contract or agreement the loss of which could reasonably be expected to result in a Material Adverse Effect.

"***Maturity Date***" means, subject to the provisions hereof, July 21, 2023.

"***Maximum Rate***" means, at any time, the maximum rate of non-usurious interest permitted by applicable Laws.

"***Money Laundering Laws***" means, collectively:  (a) the Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(b) and 1951-1959); and (b) the applicable money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any Governmental Authority.

"***Moody's***" means Moody's Investors Service, Inc.

"***Multiemployer Plan***" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA to which any of the Loan Parties or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"***Navarro***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Navarro Holdco***" shall mean Navarro Holdco, LLC, a Delaware limited liability company.

"***Net Income***" means, for any period, the consolidated net income (or loss) of the Shipyard Loan Parties determined on a consolidated basis in accordance with GAAP; *provided*, that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Shipyard Loan Party or is merged into or consolidated with the Shipyard Loan Parties, (b) the income (or deficit) of any Person (other than a Shipyard Loan Party) in which a Shipyard Loan Party has an ownership interest, except to the extent that any such income is actually received by such Shipyard Loan Party in the form of dividends or similar distributions, and (c) the undistributed earnings of any Shipyard Loan Party to the extent that the declaration or payment of dividends or similar distributions by such Shipyard Loan Party is not at the time permitted by the terms of its Organizational Documents or any Contractual Obligation or Laws applicable to such Shipyard Loan Party or by which Shipyard Loan Party is bound.

"***Net Proceeds***" means, in respect of any Disposition or Event of Loss, the proceeds in cash or Cash Equivalents received by any Loan Party or any Subsidiary thereof with respect to or on account of such Disposition or Event of Loss, net of:  (a) in the case of a Disposition, the direct costs of such Disposition then payable by the recipient of such proceeds, or, in the case of an Event of Loss, the direct costs of collecting insurance or other proceeds, in each case excluding amounts payable to any Loan Party or any Affiliate of any Loan Party; (b) sales and use taxes paid or payable by such recipient as a result thereof; and (c) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Debt secured by a Permitted Lien on the properties subject to such Disposition.

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

"***Note***" means each promissory note (if any) executed and delivered by Borrowers in favor of a Lender evidencing that portion of the Term Loans owed to such Lender, such note being in form and substance acceptable to Administrative Agent.

"***Obligations***" means, collectively, all advances, debts, liabilities, obligations, covenants and duties of each Loan Party, Individual Guarantor, Equity Holder Pledgor, Wiley and Stockbridge (each, an "***Obligor***") to any Lending Party, in each of the foregoing cases, under or in respect of any Loan Document, whether with respect to the Credit Extensions (including any Protective Advances) or otherwise (including all Hedging Obligations), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Obligor or any Affiliate thereof of any Proceeding under any Bankruptcy Laws naming such Person as the debtor in such Proceeding, regardless of whether such interest and fees are allowed claims in such Proceeding; provided, that "Obligations" shall not include Excluded Swap Obligations.

"***Observation Party***" has the meaning ascribed thereto in Section 6.19(a).

"***OFAC***" means the United States Department of Treasury's Office of Foreign Assets Control and any successor thereto.

"***Operating Account***" means, with respect to any Loan Party, those Deposit Accounts described as such on **Schedule 6.12** (and specifically excluding the accounts identified therein as an Excluded Account), which Deposit Accounts are subject to a Control Agreement in favor of Administrative Agent.

 "***Order***" means any judgment, order, decree, writ, ruling, injunction, arbitration award or other award or other determination made or issued by any Governmental Authority or in or as a result of any Proceeding.

"***Organizational Documents***" means:  (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) of such Person; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement of such Person; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization of such Person and any agreement, instrument, filing or notice with respect thereto filed in connection with such Person's formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such Person.

"***Original Effective Date***" means July 20, 2018.

"***Orinoco***" means Orinoco Natural Resources, LLC, a Virginia limited liability company.

"***Other Connection Taxes***" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a Lien under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Term Loan or Loan Document).

"***Other Taxes***" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"***Outstanding Amount***" means, with respect to any Term Loans or Protective Advances on any date, the aggregate outstanding principal amount thereof after giving effect to prepayments or repayments of such Term Loans occurring on such date or the making, or prepayments or repayments, of Protective Advances, as the case may be, occurring on such date.

"***paid in full***" or "***repaid in full***" (or any variation thereof, such as "***payment in full***" or "***repayment in full***") means, with respect to any Obligations, the indefeasible payment in full of such Obligations in cash (or otherwise to the written satisfaction, in such holder's discretion, of the holder thereof), and, in the event any such Obligations are paid over time or modified pursuant to section 1129 of the Bankruptcy Code (or any similar provision of any other applicable Bankruptcy Laws), shall further mean that the holder thereof shall have received the final payment due on account of such Obligations. For purposes of the foregoing, the "holder" of any applicable Obligations shall be deemed to be the Person entitled to receipt of payment thereof.

"***Parent***" means Orinoco.

"***Participant***" has the meaning ascribed thereto in **Section 10.06(d)**.

"***Participant Register***" has the meaning ascribed thereto in **Section 10.06(d)**.

"*Patent License*" means, as to any Person, all rights under any written agreement now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party) granting any right with respect to any invention on which a Patent is in existence.

"***Patents***" means, as to any Person, all of the following in which such Person now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory thereof, or any other country; and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"***Patriot Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"***Payment Date***" means: (a) the first (1st) Business Day of each calendar month during the term hereof commencing with August 1, 2019; and (b) the Maturity Date.

"***PBGC***" means the Pension Benefit Guaranty Corporation or, if applicable, any successor entity.

"***Pension Plan***" means any "employee pension benefit plan" (as that term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Loan Parties or any ERISA Affiliate or to which Loan Parties or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"***Percentage Share***" means, as to any Lender, (a) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (i) the Term Loan Exposure of that Lender by (ii) the aggregate Term Loan Exposure of all Lenders, and (b) for all other purposes with respect to each Lender, the percentage obtained by dividing (i) the sum of the Term Loan Exposure of that Lender plus the Outstanding Amount of all Protective Advances (if any) owing to that Lender by (ii) the sum of the aggregate Term Loan Exposure of all Lenders plus the Outstanding Amount of all Protective Advances (if any) owing to all Lenders,

in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to **Section 10.06**. The Percentage Share of each Lender for purposes of each of clauses (a) and (b) of the preceding sentence is set forth opposite the name of such Lender on **Schedule 2.01** or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as applicable.

"***Permit***" means any permit, approval, authorization, certification, license, consent, exemption, variance, accreditation or permission required from or issued or granted by a Governmental Authority under any applicable Laws or any accrediting organization.

"***Permitted Exceptions***" means (i) the exceptions to title as set forth in the title insurance policy approved by the Administrative Agent with respect to any Facility subject to a Deed of Trust, and (ii) easements, rights-of-way, restrictions, plats, declarations of covenants, conditions and restrictions, or similar encumbrances on the use of real property which do not interfere with the ordinary conduct of business of any Loan Party or materially detract from the value or use of such real property.

"***Permitted Liens***" has the meaning ascribed thereto in ***Section 7.01***.

"***Permitted Protest***" means the right of Loan Parties and their respective Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than Taxes subject to withholding or that are the subject of a United States federal tax lien), or rental payment, *provided* that (a) a reserve with respect to such obligation is established on its books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Parties and their respective Subsidiaries, and (c) Administrative Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Administrative Agent's or any Lender's Liens.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"***PIK Interest***" means any interest that has been added to the outstanding principal balance of the Term Loans in accordance with **Section 2.02(a)**.

"***Plan***" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by Loan Parties or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"***Proceeding***" means any suit, action, case, arbitration, mediation, audit, investigation, or other proceeding before or by any Governmental Authority, recognized industry trade or professional association or organization, or other Person by whose Order the parties thereto have agreed or consented to be bound.

"***Proceeds***" means proceeds (as that term is defined in the Uniform Commercial Code).

"***Protective Advances***" has the meaning ascribed thereto in **Section 8.02(c)**.

"***Public Lender***" has the meaning ascribed thereto in **Section 10.02(b)(ii)**.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Shipyard Loan Party that has total assets exceeding $10,000,000 at the time the relevant guaranty, keep well, or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keep well under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Ranger Offshore***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Real Property***" means any estates or interests in real property now owned or hereafter acquired by any Loan Party or one of its Subsidiaries and the improvements thereto.

"***Real Property Collateral***" means (a) the Real Property identified on **Schedule 1.01-C** to this Agreement, and (b) any Real Property hereafter acquired by any Loan Party or one of its Subsidiaries with a fair market value in excess of $500,000.

"***Recipient***" means (a) Administrative Agent, (b) any Lender or (c) any other Person entitled to payments under this Agreement or under any other Loan Document.

"***Register***" means a register for the recordation of the names and addresses of Lenders and, as applicable, the Credit Outstandings owing to each Lender pursuant to the terms hereof from time to time, and the principal amount of (and interest on) Lenders' interests in the Loans and other Obligations.

"***Related Business***" means any business that is the same or substantially similar to the businesses of Shipyard Loan Parties and their Subsidiaries on the Effective Date.

"***Related Parties***" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates, and specifically includes, in the case of the Lending Parties, White Oak in its capacity as Administrative Agent; provided that White Oak shall not be deemed to be a Related Party to any Loan Party or Affiliate thereof.

"***Reportable Event***" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived.

"***Required Lenders***" means Non-Defaulting Lenders holding in excess of fifty percent (50.00%) of the aggregate Term Loan Exposure of all Non-Defaulting Lenders; provided, however that if there are two or more Lenders, then "Required Lenders" must include more than one Lender.

"***Resignation Agreement***" means that certain Resignation, Loan Purchase and Sale Agreement, made as of October 12, 2018, by and among White Oak, the Selling Lenders (as defined therein), Acqua Liana and the Borrowers (as defined therein).

"***Responsible Officer***" means:   (i) with respect to any Loan Party in connection with any request for any Term Loan, any Compliance Certificate or any other certificate or notice pertaining to any financial information required to be delivered by any Loan Party hereunder or under any other Loan Document, the chief financial officer, treasurer or controller of such Person or of the managing member or manager of such Person; and (ii) otherwise, with respect to any Loan Party, the chief executive officer, president, chief financial officer, treasurer or controller of such Person or of the managing member or manager of such Person.

"***Restricted Party***" means any Person listed:  (a) in the Annex to the Executive Order; (b) on the "Specially Designated Nationals and Blocked Persons" list maintained by the OFAC; (c) in any successor list to either of the foregoing; (d) any Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or (e) any Person designated as the target of any Sanctions.

"***Restricted Payment***" means, as to any Person:  (a) any dividend or other distribution by such Person (whether in cash, securities or other property) with respect to any Equity Interests of such Person; (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest; (c) any payment of principal or interest or any purchase, redemption, retirement, acquisition or defeasance with respect to any Debt of such Person which is subordinated to the payment of the Obligations; (d) the acquisition for value by such Person of any Equity Interests issued by such Person or any other Person that Controls such Person; (e) any management, servicing or other similar fees payable to any Loan Party or any Affiliate thereof; (f) any payment of management fees and (g) any other transaction that has a similar effect as clauses (a) through (f) of this definition.

"***S&P***" means Standard & Poor's Financial Services LLC, a division of S&P Global Inc.

"***Sanare Pledge Agreement***" means that certain Pledge Agreement, dated on or about the Effective Date, given by Stockbridge pursuant to which Stockbridge pledges and hypothecates to Administrative Agent the Equity Interests of Sanare Energy Partners, LLC owned by Stockbridge.

"***Sanctions***" means any sanctions administered or enforced by the OFAC, the United Nations Security Council or any other relevant sanctions authority.

"***Seller Note***" means that certain $10,000,000 Term Note dated as of October 12, 2018 from Epic Maritime in favor of BAE Systems Southeast Shipyards AMHC Inc., a Florida corporation, as such note is in effect on the Fourth Amendment Effective Date and as may be amended from time to time with the prior written consent of the Administrative Agent.

"***Seller Subordination Agreement***" means that certain Subordination Agreement which is in form and substance satisfactory to Administrative Agent, dated as of the date hereof between the Administrative Agent and BAE Systems Southeast Shipyards AMHC Inc., a Florida corporation, as the same may be amended, restated or otherwise modified from time to time.

"***Shipyard Allocated Portion***" means the portion of the Existing Term Loans allocated by the Existing Lenders to the Borrowers hereunder.

"***Shipyard Loan Parties***" means collectively, EAMA and each of its direct and indirect Subsidiaries that are Loan Parties, and "***Shipyard Loan Party***" means each or any of them individually.

"***Shipyard Property***" means the Facility described in the definition of the Deed of Trust.

"***Software***" means, as to any Person, all software (as that term is defined in the Uniform Commercial Code) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all computer programs and all supporting information provided in connection with a transaction related to any program.

"***Specified Materials***" means, collectively, all materials or information provided by or on behalf of any Loan Party, as well as all documents and other written materials relating to Loan Parties (or any of them) or their respective Affiliates or any other materials or matters relating to the Loan Documents (including any amendments or waivers of the terms thereof or supplements thereto).

"***Stockbridge***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Subordinated Debt***" means, collectively, any Debt which has been subordinated to the Obligations on terms and conditions, and pursuant to documents, satisfactory to Administrative Agent.

"***Subsidiary***" of a Person means any other Person of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "***Subsidiary***" or to "***Subsidiaries***" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"***Supporting Obligations***" means all supporting obligations (as that term is defined in the Uniform Commercial Code), including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

24

"***Swap Contract***" means:  (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement; and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement including any such obligations or liabilities under any such master agreement (in each case, together with any related schedules).

"***Swap Obligation***" means any Swap Contract that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"***Synthetic Lease Obligation***" means the monetary obligation of a Person under either:  (a) a so-called synthetic, off-balance sheet or tax retention lease; or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"***Taxes***" means all present or future federal, state, local, county, foreign and other taxes, assessments or other government charges, including, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital, stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not.

"***Tax Return***" means any report, return, declaration, claim for refund or other information or statement or schedule supplied or required to be supplied to a Governmental Authority relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"***Term Loan Exposure***" means, with respect to any Lender as of any date of determination, the Outstanding Amount of the Term Loan of that Lender.

"***Term Loans***" has the meaning specified thereto in **Section 2.01(b)**.

 "***Threshold Amount***" means Two Hundred Fifty Thousand Dollars ($250,000).

"***Trademark License***" means, as to any Person, all rights under any written document now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party) granting any right to use any Trademark or Trademark registration.

"***Trademarks***" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person:  (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or Territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all Goodwill associated with or symbolized by any of the foregoing.

LEGAL_US_W # 99272313.3

"***Treasury Regulations***" means the temporary and final U.S. Treasury Regulations promulgated under the Code.

"***TSB Holdings***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

"***Unasserted Obligations***" means, at any time, Obligations consisting of obligations for Taxes, costs, indemnifications, reimbursements, damages and other liabilities (except for the principal of and interest on, and fees relating to, any Debt) in respect of which no claim or demand for payment has been made (or, in the case of obligations for indemnification, no notice for indemnification has been issued by the Indemnitee) at such time.

"***Unfunded Pension Liability***" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"***Uniform Commercial Code***" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"***United States***" and "***U.S.***" mean the United States of America.

"***U.S. Tax Compliance Certificate***" has the meaning ascribed thereto in **Section 2.08(d)(i)(B)**.

"***White Oak***" means White Oak Global Advisors, LLC, a Delaware limited liability company.

"***Wiley***" has the meaning set forth in the recitals to this Agreement.

"***Write-Down and Conversion Powers***" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"***Zuma Rock***" has the meaning set forth in the recitals to this Agreement and shall extend to all permitted successors and assigns of such Person.

**Section 1.02.**    **CERTAIN RULES OF CONSTRUCTION.**

(a)    **General Rules.**

(i)    Unless the context otherwise clearly requires, the meaning of a defined term is applicable equally to the singular and plural forms thereof.

(ii)    The words "***hereof***," "***herein***," "***hereunder***" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iii)    The word "***documents***" includes instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(iv)    The words "***include***," "***includes***" and "***including***" are not limiting and, unless the context otherwise clearly requires, the word "***or***" is not exclusive.

(v)    A "***Default***" or "***Event of Default***" hereunder referenced as "***continuing***" (or any variation thereof) shall (i) with respect to a Default that has not yet matured into an Event of Default, be deemed to be continuing unless and until cured within any applicable cure period set forth in this Agreement (if susceptible to cure), and (ii) with respect to an Event of Default, be deemed to be continuing unless and until waived in writing by Administrative Agent.

(vi)    In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*"; the words "*to*" and "*until*" each mean "*to but excluding*" and the word "*through*" means "*to and including*."

(vii)    Unless the context otherwise clearly requires, the words "*property*," "*properties*," "*asset*" and "*assets*" refer to both personal property (whether corporeal or tangible or incorporeal or intangible) and immovable or real property.

(viii)    As used herein, "*ordinary course of business*" means, in respect of any transaction involving any Loan Party, the ordinary course of business of such Loan Party, as undertaken by such Loan Party in accordance with past practices or reasonable extensions of such past practices, as applicable, or otherwise undertaken by such Loan Party in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

(ix)    Unless the context otherwise clearly requires:  (A) Article, Section, subsection, clause, Schedule and Exhibit references are to this Agreement; (B) references to documents (including this Agreement) shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document; (C) references to any Law are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the Law; and (D) or unless prohibited by the terms of any Loan Document, references to any Person shall be deemed to include such Person's successors and assigns.

(b)    **Time References**.  Unless the context otherwise clearly requires, all references herein to times of day shall be references to Pacific time (daylight or standard, as applicable).

(c)    **Captions**.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(d)    **Cumulative Nature of Certain Provisions**.  This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall be performed in accordance with their respective terms.

(e)    **No Construction against any Party**.  This Agreement and the other Loan Documents are the result of negotiations among, and have been reviewed by counsel to, Loan Parties, Administrative Agent and the other Lending Parties and are the products of all parties.  Accordingly, they shall not be construed against Administrative Agent or any other Lending Party merely because of the involvement of any or all of the preceding Persons in their preparation.

(f)    **GAAP**.  Unless the context otherwise clearly requires, all accounting terms not expressly defined herein shall be construed, and all financial computations required under this Agreement shall be made, in accordance with GAAP applied in a manner consistent with that used in preparing the Closing Financial Statements, except as otherwise specifically prescribed herein. If at any time any change in GAAP would affect the computation of any financial ratio, financial covenant or other requirement set forth in any Loan Document, and either Administrative Loan Party or Required Lenders shall so request, Administrative Agent, Lending Parties and Administrative Loan Party shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Required Lenders); *provided* that, until so amended:  (i) such financial ratio, financial covenant or other requirement shall continue to be computed in accordance with GAAP prior to such change therein; and (ii) the Loan Parties shall provide or cause to be provided to Administrative Agent and the other Lending Parties financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such financial ratio, financial covenant or other requirement made before and after giving effect to such change in GAAP. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification Topic No. 825-10-25 - *Fair Value Option* (formerly known as the Statement of Financial Accounting Standards No. 159) or any other accounting

principle that would result in any financial liability being set forth at an amount less than the actual outstanding principal amount thereof.

(g)    **Rounding**.  Any financial ratios required to be maintained by Loan Parties or any of them pursuant to the Loan Documents shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number using the common – or symmetric arithmetic – method of rounding (in other words, rounding-up if there is no nearest number).

(h)    **Documents Executed by Responsible Officers**.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate or other organizational action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

# ARTICLE II.
# CREDIT EXTENSIONS

**Section 2.01.    LOANS.**

(a)    **Term Loans.**   Certain Existing Lenders previously made the Existing Term Loans.  The parties hereto agree that the Shipyard Allocated Portion of the Existing Term Loans made under the Existing Loan Agreement shall each be deemed one term loan made by the Lenders hereunder (the "***Term Loans***"), in the aggregate amount of $45,000,000 (the "***Term Loan Amount***") and each Lender shall be deemed to have made a Term Loan to Borrowers in the amount of its Percentage Share of the Term Loan Amount. The Borrowers hereby assume the Shipyard Allocated Portion of the Existing Term Loans.

(b)    **[Reserved].**

(c)    **Limit on Credit Extensions**.  No Lender will be required or have any obligation to make any extensions of credit hereunder.  No Credit Extension (or any portion thereof) that has been repaid or prepaid may be re-borrowed.  Notwithstanding anything to the contrary contained herein, in no event shall Lenders be obligated to make to Borrowers, or Borrowers be entitled to borrow or receive from Lenders, any loans, advances or extensions of credit hereunder.

**Section 2.02.    INTEREST.**

(a)    **Interest**.  Subject to the provisions hereof (including **Section 2.02(d)**), the outstanding principal balance of each Term Loan (which, for purposes of this **Section 2.02(a)**, shall *include* all PIK Interest) shall bear interest from the Effective Date until such Term Loan is repaid in full at an annual rate of interest equal to the Applicable Rate, payable (i) from the Effective Date until January 22, 2020, automatically and without further action, by the addition of such interest to the outstanding principal balance of such Term Loan effective on each Interest Payment Date during such period and (ii) at all times from and including January 22, 2020, in cash.  Interest on the Term Loans shall be calculated based on a principal balance equal to the Outstanding Amount thereof.

(b)    [**Reserved**].

(c)    **Payment Dates**.  Interest on the Outstanding Amount of the Term Loans shall accrue beginning on the Effective Date from the first calendar day of each calendar month following the Effective Date through the last day of each calendar month, and be due and payable in arrears on each Payment Date and at such other times as may be specified herein.  Subject to the provisions hereof (including **Section 2.02(e)**), Borrowers shall pay accrued and unpaid interest under **Section 2.02(a)** to Administrative Agent, on behalf of Lenders, for delivery to Lenders as follows:    (i) subject to **Section 2.02(b)**, on a calendar month basis in arrears on each Payment Date; (ii) contemporaneously with the payment or prepayment of the principal balance of the Term Loans or any portion thereof on the amount so paid or prepaid in accordance with **Section 2.03**, and (iii) on the Maturity Date.  Interest

hereunder shall be due and payable in accordance with the terms hereof both before and after judgment, and both before and after the commencement of any proceeding under any Bankruptcy Law.

(d)    **Default Rate**.  Notwithstanding anything to the contrary contained in **Section 2.02(a)**, at any time that an Event of Default exists, then, unless Required Lenders otherwise agree and without affecting any of Administrative Agent's or any Lender's rights and remedies hereunder or in respect hereof, all (or, in the sole discretion of Required Lenders, any portion) of the Obligations shall bear interest contemplated by **Section 2.02(a)**, at the Default Rate, such interest to be payable in cash upon demand therefor by Administrative Agent.

(e)    **Compounding**.  Subject to the other provisions of this **Section 2.02**, without affecting any of Administrative Agent's or any Lender's rights and remedies hereunder or in respect hereof, the failure to timely pay all interest (including interest at the Default Rate) on the Term Loans when due shall, at Administrative Agent's discretion (acting at the direction of the Required Lenders), either be declared an Event of Default hereunder and the Term Loans shall thereupon be subject to the Default Rate retroactively effective as of the date such payment was due or the amount of such unpaid interest shall be added, effective as of the date such payment was due, to the Outstanding Amount thereof, and thereafter bear interest at the rate then applicable to the Outstanding Amount of the Term Loans.

**Section 2.03.    PAYMENT AND PREPAYMENTS OF PRINCIPAL.**

Subject to the provisions hereof:

(a)    **Payments**.  Borrowers shall repay the Outstanding Amount of the Term Loans and shall repay in full the remaining Credit Outstandings and all other Obligations on the Maturity Date.

(b)    **Voluntary Prepayments of the Term Loans**.

Borrowers may voluntarily prepay the Outstanding Amount of the Term Loans, in an amount not less than $1,000,000.00 or an integral multiple of $100,000.00 in excess thereof (or, if less the entire Outstanding Amount of the Term Loans). upon not less than fifteen Business Days prior irrevocable written notice to Administrative Agent, which notice shall state the Outstanding Amount of the Term Loans being prepaid.  In connection with any such voluntary prepayment, Borrowers shall pay the sum of:  (x) the Outstanding Amount of the Term Loans being prepaid; plus (y) interest at the rate then applicable to the Term Loans on the amounts prepaid through and including the date of prepayment; plus (z) the applicable Make-Whole Amount.  All such prepayments of Term Loans made pursuant to this **Section 2.03(b)** shall not reduce the mandatory prepayments of the Term Loans otherwise required pursuant to **Section 2.03(c)**.  In connection with any such voluntary prepayment of the Term Loans, each Borrower acknowledges that such prepayment may result in Lenders incurring additional costs, expenses or liabilities, and that, as of the date hereof, it is difficult to ascertain the full extent of such costs, expenses or liabilities.  Accordingly, each Borrower agrees that the applicable Make-Whole Amount payable in connection with any such voluntary prepayment represents a reasonable estimate of the costs, expenses or liabilities of Lenders in connection with any such prepayment.  Without affecting any of any Lending Party's rights and remedies hereunder or in respect hereof, if Borrowers fail to pay the applicable Make-Whole Amount when due, then the amount thereof shall thereafter bear interest until paid in full at the Default Rate.

The foregoing provisions of this **Section 2.03(b)** to the contrary notwithstanding, in no event shall Borrowers prepay the Term Loans in full unless the Debt described in **Section 7.03(c)** has been paid in full in immediately available funds.

(c)    **Mandatory Repayments of the Term Loans.**

(i)    <u>Excess Cash Flow</u>.  Within 10 days after the date on which the financial statements required to have been delivered pursuant to **Section 6.01(a)** and the related Compliance Certificate required to have been delivered pursuant to **Section 6.02(b)** are required to be delivered, so long as any Obligations (other than Unasserted Obligations) remain outstanding, commencing with the Effective Date through the Fiscal Year ending December 31, 2019 and with respect to each Fiscal Year thereafter, Borrowers shall prepay the outstanding principal

balance of the Term Loans in an amount equal to the Excess Cash Flow Percentage of the Excess Cash Flow for the Fiscal Year most recently ended (or, in the case of the Fiscal Year ending December 31, 2019, the portion of such Fiscal Year from the Effective Date) (as calculated based on the financial information contained in Loan Parties' financial statements delivered pursuant to **Section 6.01(a)**, and the Excess Cash Flow Certificate delivered pursuant to **Section 6.01(g)**) but in no event more than the Outstanding Amount of the Term Loans.

(ii)     _Loss and Disposition Payments_.  In the event that and Net Proceeds result from any (A) Event of Loss or (B) Disposition or series of Dispositions by Loan Parties or any Subsidiary thereof undertaken pursuant to **Section 7.05(a)**, Borrowers shall, unless waived by the Required Lenders in their sole discretion, prepay the Term Loans in an amount equal to the sum of:  (1) 100% of such Net Proceeds _plus_ (2) interest at the rate then applicable to the Term Loans on the amounts in the immediately preceding clause (1) through and including the date of prepayment.  Nothing contained in this **Section 2.03(c)(ii)** shall permit Loan Parties to sell or otherwise Dispose of any assets other than in accordance with **Section 7.05(a)** or **Section 7.05(h)**.

(iii)     _Payments in respect of Extraordinary Receipts._  Within three (3) Business Days after the date of receipt by Loan Parties of the Net Proceeds of any Extraordinary Receipts, Borrowers shall, unless waived by the Required Lenders in their sole discretion, prepay the Term Loans in an amount equal to the sum of (A) the lesser of (1) 100% of such Net Proceeds received and (2) the Outstanding Amount of the Term Loans _plus_ (B) interest at the rate then applicable to the Term Loans on the amounts prepaid in the immediately preceding clause (A), through and including the date of prepayment.

(iv)     _Payments in respect of Debt._  Within three (3) Business Days after the date of receipt by Loan Parties of the Net Proceeds of any Debt incurred (other than Debt permitted under **Section 7.03**), Borrowers shall, unless waived by the Required Lenders in their sole discretion, prepay the Term Loans in an amount equal to the sum of (A) the lesser of (1) 100% of such Net Proceeds received and (2) the Outstanding Amount of the Term Loans _plus_ (B) interest at the rate then applicable to the Term Loans on the amounts prepaid in the immediately preceding clause (A), through and including the date of prepayment. The provisions of this **Section 2.03(c)(iv)** shall not be deemed to be implied consent to any incurrence of Debt otherwise prohibited by the terms of this Agreement.

(v)     [Reserved].

(vi)     _Payments in respect of Equity._  Within three (3) Business Days after the date of the issuance by any Loan Party or any of its Subsidiaries of any Equity Interests (other than (w) in the event that any Loan Party or any of its Subsidiaries forms any Subsidiary in accordance with the terms hereof, the issuance by such Subsidiary of Equity Interests to such Loan Party or such Subsidiary, as applicable, (x) the issuance of Equity Interests of any Loan Party to directors, officers and employees of any Loan Party and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the board of directors of such Loan Party, and (y) the issuance of Equity Interests by a Subsidiary of a Loan Party to its parent or member in connection with the contribution by such parent or member to such Subsidiary of the proceeds of an issuance described in clauses (w) – (x) above), Borrowers shall prepay the Term Loans in an amount equal to the sum of the lesser of (1) 100% of such Net Proceeds received in connection with such issuance and (2) the Outstanding Amount of the Term Loan.   The provisions of this **Section 2.03(c)(vi)** shall not be deemed to be implied consent to any issuance of Equity or formation or acquisition of any Subsidiary otherwise prohibited by the terms of this Agreement.

(d)     **Payments under Certain Circumstances**.  Notwithstanding anything to the contrary contained herein, at any time that an Event of Default exists (whether by virtue of the Obligations (other than Unasserted Obligations) not being paid in full on the Maturity Date or as a result of the acceleration of the Obligations in accordance with the provisions thereof or otherwise) when Borrowers make or are required to make any payment or prepayment of the Term Loan, Borrowers agree that (without notice or demand of any kind from any Lending Party, such notice and demand being hereby expressly waived) Borrowers shall be required to pay and shall pay the sum of:  (i) the Outstanding Amount of the Term Loans being paid or prepaid; _plus_ (ii) interest (at the rate then applicable to the Term Loans) on the amounts in the immediately preceding clause (i) through and including the date of prepayment or repayment.

(e)        **Notice of Payments; Interest.**  Administrative Loan Party shall provide written notice of any payments made pursuant to **Section 2.03(c)** by at least 12:00 p.m. two (2) Business Days prior to the proposed prepayment date, which notice shall state pursuant to which paragraph of **Section 2.03(c)** the prepayment is being made.  Any prepayment of the Term Loans pursuant to **Section 2.03(c)** shall be accompanied by the payment of all accrued and unpaid interest on the amount of such prepayment through to the date of prepayment.

Section 2.04.        CERTAIN FEES.

(a)        **[Reserved].**

(b)        **Certain Fees**. On each anniversary of the Original Effective Date, if any Obligations (other than Unasserted Obligations) remain outstanding, Borrowers shall pay to Administrative Agent:  (A) an annual loan administration fee equal to Ten Thousand Dollars ($10,000), and (B) an annual loan valuation fee equal to Twenty Five Thousand Dollars ($25,000); and each installment of each such fee shall be fully earned when due.

(c)        **[Reserved]**.

(d)        **Other Provisions**.  Except as otherwise expressly set forth herein, once paid, each fee (or portion thereof) referenced in this **Section 2.04** shall not be refundable under any circumstances and will not be subject to counterclaim or setoff or otherwise affected.  At the sole discretion of each Lender, all or any portion of any of the fees referenced herein that are payable to such Lender may be allocated or paid to any of its Affiliates or any other Lender(s).

Section 2.05.        BROKERS AND FINANCIAL ADVISORS.

In connection with the transactions contemplated hereby, Loan Parties have not engaged any advisors (financial or otherwise), brokers or arrangers, other than accountants and legal advisors.  Loan Parties hereby agree to pay, and hereby indemnify each Indemnitee from and against, all fees, costs and expenses of any advisors (financial or otherwise), brokers or arrangers engaged by or on behalf of Loan Parties in connection with the transactions contemplated hereby.

Section 2.06.        MANNER OF PAYMENTS.

(a)        **Payments Generally**. Each payment or prepayment of principal, interest, fees and other amounts required to be paid to Administrative Agent or Lenders under the Loan Documents shall be made to Administrative Agent on account of Administrative Agent or Lenders, as applicable, at the Administrative Agent's Office in Dollars and in immediately available funds without setoff, recoupment, deduction or counterclaim of any kind before noon on the date such payment is due.  Administrative Agent agrees to endeavor to provide Borrowers with an invoice setting forth the Outstanding Amount of the Term Loans and stating the amount of interest due on any Payment Date in reasonable detail, not later than five (5) days prior to such Payment Date; *provided* that:  (i) Administrative Agent shall have no liability for failing to do so; and (ii) any failure by Administrative Agent to provide any such invoice shall not affect Borrowers' (or any other party's) obligation to pay when due any amounts owing hereunder in accordance with the provisions hereof.

(b)        **Payments on Business Days**.  If any payment hereunder becomes due and payable on a day (including a Payment Date) that is not a Business Day, then such due date shall be extended to the next succeeding Business Day; provided that interest and fees shall continue to accrue during the period of any such extension.

(c)        **Computations**.  All interest and fees owing hereunder shall be computed on the basis of a year of three hundred and sixty (360) days and calculated in each case for the actual number of days elapsed.

(d)        **Evidence of Debt**.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by Administrative Agent in the ordinary course of business.  The accounts or records maintained by Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by Lenders to Borrowers and the interest and payments

thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect to the Obligations. If any conflict exists between the accounts and records maintained by any Lender and the accounts and records of Administrative Agent in respect of such matters, the accounts and records of Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through Administrative Agent, Borrowers shall execute and deliver to such Lender (through Administrative Agent) a Note, which shall evidence such Lender's Term Loan in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Term Loan, as applicable, and payments with respect thereto.

**Section 2.07.    INCREASED COSTS.**

(a)    **Increased Costs Generally**.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject Administrative Agent or any Recipient to any Tax of any kind whatsoever with respect to this Agreement or any Credit Extension made by it, or change the basis of taxation of payments to Administrative Agent or Recipient in respect thereof (except for any Excluded Taxes); or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Term Loan made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender or such other Person of making, converting to, continuing or maintaining any Term Loan or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lending Party, Borrowers shall pay to such Lending Party such additional amount or amounts as will compensate such Lending Party for such additional costs incurred or reduction suffered.

(b)    **Capital Requirements**.  If any Lender determines that any Change in Law affecting such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Credit Extensions made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers shall pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    **Certificates for Reimbursement**.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this **Section 2.07**, as well as the basis for determining such amount or amounts, and delivered to Borrowers shall be conclusive absent manifest error. Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    **Delay in Requests**.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this **Section 2.07** shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this **Section 2.07** for any reductions suffered more than nine months prior to the date that such Lender notifies Administrative Loan Party of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (*except* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to in this subsection (d) shall be extended to include the period of retroactive effect thereof).

(e)    **Survival**.  All obligations of each Loan Party under this **Section 2.07** shall survive the payment in full of all Obligations.

**Section 2.08.    PAYMENTS FREE OF TAXES.**

(a)    **Payments Free of Taxes**.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any and all Indemnified Taxes, and all liabilities with respect thereto, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.  If any Indemnified Taxes are required to be withheld after the date hereof from or in respect of any sum payable under this Agreement or any other Loan Document to a Recipient, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this **Section 2.08**) such Recipient receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions, (iii) Borrowers shall timely pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) Borrowers shall furnish to the Recipient the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably acceptable to such Recipient; *provided* that Borrowers shall not be required to increase such amounts payable to such Recipient with respect to any Taxes (A) that are attributable to such Recipient's failure to comply with the requirements of **Section 2.08(d)** or (B) that are United States federal withholding taxes imposed on amounts payable to such Recipient at the time such Recipient becomes entitled to payment under this Agreement, except to the extent that the such Recipient's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrowers with respect to such Taxes pursuant to this paragraph.

(b)    As soon as practicable after any payment of Taxes by any of Borrowers to a Governmental Authority pursuant to this **Section 2.08**, such Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(c)    Without duplication, each Borrower jointly and severally agrees to indemnify each Recipient for the full amount of Indemnified Taxes paid by such Recipient and any liability (including penalties, interest, and reasonable expenses) arising therefrom or with respect thereto.

(d)    Each Lender and Administrative Agent, on or prior to the date of this Agreement, and from time to time thereafter if requested in writing by Borrower, shall provide Administrative Agent with (i) a complete and properly executed IRS Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY (including all required accompanying information), as appropriate, or any successor form prescribed by the IRS (including a United States taxpayer identification number) and, to the extent applicable:  (A) certifying that such Person is entitled to benefits under an income tax treaty in which the United States is a party that reduces the rate of withholding tax on payments of interest; or (B) providing a U.S. Tax Compliance Certificate, a form of which is attached hereto at **Exhibit C**, which generally provides certification certifying that such Person is eligible for the "portfolio interest exemption"; or (C) certifying that the income receivable pursuant to this Agreement is effectively connected with the conduct of a trade or business in the United States; or (ii) an IRS Form W-9 or any successor form prescribed by the IRS.  In addition, each Lender and Administrative Agent will (A) take all actions reasonably requested in good faith by Borrowers in writing that are consistent with applicable legal and regulatory restrictions to claim any available reductions or exemptions from Indemnified Taxes and (B) otherwise cooperate with Administrative Loan Party to minimize any amounts payable by Borrowers under this **Section 2.08**; *provided* that, in each case:  (x) any out-of-pocket cost relating directly to such action or cooperation requested by Borrowers shall be borne by Borrowers, and Administrative Agent and each Lender shall not be required to take any action that it determines in its sole good faith discretion may be adverse in any non *de minimis* respect to it and not indemnified to its satisfaction; and (y) notwithstanding anything in this Agreement to the contrary, neither Administrative Agent nor Lenders will have any obligation to disclose to any Borrower or any other Person (except to a Governmental Authority in accordance with applicable Laws as determined by Administrative Agent in its reasonable discretion) the identity of any Lender.

(e)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrowers or Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably

requested by Borrowers or Administrative Agent as may be necessary for compliance with FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this **Section 2.08(e)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    For purposes of this **Section 2.08,** Administrative Agent is a "withholding agent" for purposes of Sections 1441, et seq. and FATCA, and will provide Borrowers an IRS Form W-9 or any successor form proscribed by the IRS.

(g)    Without prejudice to the survival of any other agreement of Borrowers hereunder, the agreements and obligations of Borrowers contained in this **Section 2.08** shall survive the Obligations being paid in full.

**Section 2.09.    SHARING OF PAYMENTS.**

If any Lender shall, by exercising any right of setoff, recoupment or counterclaim or otherwise, obtain payment in respect of any Credit Outstandings or accrued and unpaid interest thereon resulting in such Lender receiving payment of a proportion of the Credit Outstandings or accrued and unpaid interest thereon greater than its Percentage Share (or other applicable share) thereof as provided herein, then such Lender receiving such greater proportion shall: (a) notify Administrative Agent in writing (including via email) of such fact; and (b) purchase (for cash at face value) participations in that portion of the Credit Outstandings or accrued and unpaid interest thereon held by the other applicable Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by Lenders ratably in accordance with their respective Percentage Shares thereof; *provided* that: (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this **Section 2.09** shall not be construed to apply to: (A) any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement; or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any portion of the Credit Outstandings held by it to any assignee or participant, other than to any Loan Party (as to which the provisions of this **Section 2.09** shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Laws, that any Lender acquiring a participation pursuant to the foregoing arrangements may, except to the extent otherwise specified in such Lender's participation agreement, exercise against such Loan Party rights of setoff, recoupment and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**Section 2.10.    PAYMENTS GENERALLY; RIGHT OF ADMINISTRATIVE AGENT TO MAKE DEDUCTIONS AUTOMATICALLY.**

(a)    **Payments Generally.**

(i)    All payments to be made by any Loan Party hereunder shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by any Loan Party hereunder shall be made to Administrative Agent, for the account of the respective Lenders to which such payment is owed, at Administrative Agent's Office in Dollars and in immediately available funds not later than 11:00 a.m. on the date specified herein. Administrative Agent will promptly distribute to each Lender its applicable Percentage Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by Administrative Agent after 11:00 a.m. may, in Administrative Agent's sole discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(ii)    Each Borrower hereby authorizes Administrative Agent (A) to deduct automatically all principal, interest or fees when due hereunder or under any Note from any account (other than an Excluded

34

Account) of any Borrower maintained with or under the control of Administrative Agent (if any); and (B) if and to the extent any payment of principal, interest or fees under this Agreement or any Note is not made when due, to deduct any such amount from any or all of the accounts of any Borrower maintained at Administrative Agent or under the control of Administrative Agent (if any).  Administrative Agent agrees to provide written notice to each Borrower of any automatic deduction made pursuant to this **Section 2.10(a)(ii)** showing in reasonable detail the amounts of such deduction.  Each Lender agrees to reimburse each Borrower based on its applicable Percentage Share for any amounts deducted from such accounts in excess of amount due hereunder and under any other Loan Documents.

(b)    **Clawback Rights.**  Unless Administrative Agent shall have received notice from Administrative Loan Party prior to the date on which any payment is due hereunder to Administrative Agent for the account of Lenders that Borrowers will not make such payment, Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to Lenders the amount due.  In such event, if Borrowers have not in fact made such payment, then each Lender severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from the date such amount is distributed to it to the date of payment to Administrative Agent, at the Federal Funds Rate.  A notice of Administrative Agent to any Lender or Administrative Loan Party with respect to any amount owing under this **Section 2.10(b)** shall be conclusive, absent manifest error.

(c)    **[Reserved].**

(d)    **Obligations of Lenders Several**.  The obligations of Lenders hereunder to make the payments under **Section 10.04(c)** are several and not joint.  The failure of any Lender to make any payment under **Section 10.04(c)** on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to make its payments under **Section 10.04(c)**.

(e)    **[Reserved].**

(f)    **Cash Management**.  Administrative Agent shall have full access to all of the Operating Account and all other Deposit Accounts of Loan Parties and their Subsidiaries (excluding Excluded Accounts), including (i) direct access to all information concerning such Deposit Accounts, and (ii) in Administrative Agent's sole discretion, the institution of such automatic notifications to Administrative Agent with respect to such Deposit Accounts (or any of them) as Administrative Agent may request.  All of the foregoing Deposit Accounts (other than any of the foregoing that constitute Excluded Accounts) shall be subject to Control Agreements, and each Loan Party and each of its Subsidiaries hereby specifically grants a Lien in all such Deposit Accounts to Administrative Agent to secure the payment and performance when due of the Obligations.

**Section 2.11.    DEFAULTING LENDERS.**

(a)    **Adjustments**.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Laws:

(i)    **Waivers and Amendments**.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in **Section 10.01**.

(ii)    **Reallocation of Payments**.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 8.02** or otherwise) shall be applied at such time or times as may be determined by Administrative Agent as follows:  *first*, to the payment of any amounts owing by that Defaulting Lender to Administrative Agent hereunder; *second*, to the payment of any amounts owing to Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *third*, so long as no Default exists, to the

payment of any amounts owing to Borrowers as a result of any judgment of a court of competent jurisdiction obtained by Borrowers against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *fourth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     **Certain Fees**.  That Defaulting Lender shall not be entitled to receive any fee (if any) pursuant to **Section 2.04** for any period during which that Lender is a Defaulting Lender (and Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) for any period during which that Lender is a Defaulting Lender.

(b)     **Defaulting Lender Cure**.  If Administrative Loan Party and Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of the outstanding Term Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Term Loans to be held on a pro rata basis by the applicable Lenders in accordance with their Percentage Shares of the Term Loans; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrowers while that Lender was a Defaulting Lender; *provided further* that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)     **Replacement of Defaulting Lenders**.  If any Lender shall become a Defaulting Lender, then Administrative Agent or Borrowers may replace such Lender (the "*affected Lender*"), or cause such affected Lender to be replaced, with another lender (the "*replacement Lender*") satisfying the requirements of an Eligible Assignee of a Lender under **Section 10.06(a)** by having the affected Lender sell and assign all of its rights and obligations under this Agreement and the other Loan Documents to the replacement Lender pursuant to **Section 10.06(b)**; *provided* that, if Borrowers seeks to exercise such right, it must do so within one hundred and eighty (180) days after it first knows of the occurrence of the event or events giving rise to such right, and neither Administrative Agent nor any Lender shall have any obligation to identify or locate a replacement Lender for Borrowers (it being expressly agreed that in such circumstances it is Borrowers' obligation to identify or locate a replacement Lender that is an Eligible Assignee and is reasonably acceptable to Administrative Agent).

Section 2.12.    REPLACEMENT OF LENDERS.

(a)     If any Lender requests compensation under **Section 2.07** or **Section 2.08**, or if Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.08**, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking the Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Sections 2.07** or **2.08**, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under **Section 2.07**, or if Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.08**, then Borrowers may, at their sole expense and effort, upon notice to such Lender and Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in **Section 10.06**), all its interests, rights (other than its existing rights to payments pursuant to **Sections 2.07** or **2.08**) and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) Borrowers shall have received the prior written consent of Administrative Agent which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding

36

principal of the Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under **Section 2**.07 or payments required to be made pursuant to **Section 2**.08, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

Section 2.13.    JOINT AND SEVERAL LIABILITY.

The Term Loans deemed made to Borrowers hereunder shall be deemed jointly funded to, and received by, Borrowers.  Each Borrower jointly and severally agrees to pay, and shall be jointly and severally liable for the payment and performance of, all Obligations.  Each Borrower acknowledges and agrees that the joint and several liability of such Borrower is provided as an inducement to the Lending Parties to provide loans and other financial accommodations to Borrowers, and that each such loan or other financial accommodation shall be deemed to have been done or extended by the Lending Parties in consideration of, and in reliance upon, the joint and several liability of Borrowers.  The joint and several liability of each Borrower hereunder is absolute, unconditional and continuing, regardless of the validity or enforceability of any of the Obligations, or the fact that a Lien in any Collateral may not be enforceable or subject to equities or defenses or prior claims in favor of others, or may be invalid or defective in any way and for any reason.  Each Borrower hereby waives:  (a) all notices to which such Borrower may be entitled as a co-obligor with respect to the Obligations, including, notice of (i) acceptance of this Agreement, (ii) the making of loans or other financial accommodations under this Agreement, or the creation or existence of the Obligations, and (iii) presentment, demand, protest, notice of protest and notice of non-payment; and (b) all defenses based on (i) any modification (or series of modifications) of this Agreement or the other Loan Documents that may create a substituted contract, or that may fundamentally alter the risks imposed on such Borrower hereunder, (ii) the release of any other Borrowers (or any other Loan Party, Individual Guarantor or Equity Holder Pledgor) from its duties under this Agreement or the other Loan Documents, or the extension of the time of performance of any other Borrower's duties hereunder or thereunder, (iii) the taking, releasing, impairment or abandonment of any Collateral, or the settlement, release or compromise of the Obligations or any other Borrower's, Guarantor's or Individual Guarantor's liabilities with respect to all or any portion of the Obligations, or (iv) any other act (or any failure to act) that fundamentally alters the risks imposed on such Borrower by virtue of its joint and several liability hereunder.  It is the intent of each Borrower by this paragraph to waive any and all suretyship defenses available to such Borrower with respect to the Obligations, whether or not specifically enumerated above.  Notwithstanding any provisions of this Agreement to the contrary, it is the intent of the parties hereto that the joint and several nature of the liabilities of Borrowers, and the Liens granted by Borrowers to secure the Obligations, not constitute a fraudulent conveyance under Section 548 of Chapter 11 of Title II of the United States Code (11 U.S.C. § 101, et seq.), as amended, or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance, fraudulent transfer or similar law of any state, nation or other governmental unit, as in effect from time to time.  Accordingly, Administrative Agent and Borrowers agree that if the obligations and liabilities of any Borrower hereunder, or any Liens granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a fraudulent conveyance or fraudulent transfer under applicable Laws, the obligations and liabilities of such Borrower hereunder, as well as the Liens securing such obligations and liabilities, shall be valid and enforceable only to the maximum extent that would not cause such obligations, liabilities or Liens to constitute a fraudulent conveyance or fraudulent transfer under applicable Laws.  Each Loan Party hereby agrees that until the full and final payment and satisfaction of the Obligations and the termination of this Agreement, such Loan Party will not exercise any subrogation, contribution or other right or remedy against any other Loan Party, Individual Guarantor or Equity Holder Pledgor or any security for any of the Obligations arising by reason of such Loan Party's performance or satisfaction of its joint and several liability hereunder.  In addition, each Loan Party agrees that (a) such Loan Party's right to receive any payment of amounts due with respect to such subrogation, contribution or other rights is subordinated to the full and final payment and satisfaction of the Obligations, and (b) such Loan Party agrees not to demand, sue for or otherwise attempt to collect any such payment until the full and final payment and satisfaction of the Obligations and the termination of this Agreement.

Section 2.14.    ADMINISTRATIVE LOAN PARTY.

Each Loan Party hereby irrevocably appoints EAMA as the borrowing agent and attorney-in-fact for each Loan Party (the "***Administrative Loan Party***") which appointment shall remain in full force and effect unless and until Administrative Agent shall have received prior written notice signed by each Loan Party that such appointment has been revoked and that another Loan Party has been appointed Administrative Loan Party.  Each Loan Party hereby irrevocably appoints and authorizes Administrative Loan Party (a) to provide Administrative Agent with all notices with respect to Loans obtained for the benefit of any Loan Party and all other notices and instructions under this Agreement and (b) to take such action as Administrative Loan Party deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loans and the Collateral of Loan Parties in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Loan Parties in order to utilize the collective borrowing powers of Loan Parties in the most efficient and economical manner and at their request, and that Administrative Agent shall not incur any liability to any Loan Party as a result hereof.  Each Loan Party Loan Party expects to derive benefit, directly or indirectly, from the handling of Loans and the Collateral in a combined fashion since the successful operation of each Loan Party is dependent on the continued successful performance of the integrated group.  To induce Administrative Agent to do so, and in consideration thereof, each Loan Party hereby jointly and severally agrees to indemnify Administrative Agent and hold it harmless against any and all liability, expense, loss or claim of damage or injury, made against Administrative Agent by any Loan Party or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Collateral of Loan Parties as herein provided, (b) Administrative Agent relying on any instructions of Administrative Loan Party, or (c) any other action taken by Administrative Agent hereunder or under the other Loan Documents, *except* that Loan Parties will have no liability under this **Section 2.14** with respect to any liability that has been finally determined by a court of competent jurisdiction if such liability resulted solely from the gross negligence or willful misconduct of Administrative Agent.

## ARTICLE III.
## THE COLLATERAL

Section 3.01.    GRANT OF SECURITY INTEREST.

(a)    Pursuant to the Existing Loan Agreement, the Existing Loan Parties granted to Administrative Agent a security interest in the Collateral to secure the Obligations under the Existing Loan Agreement.  Each Existing Loan Party that is a party hereto hereby (i) reaffirms the security interest in the Collateral granted to Administrative Agent, on behalf of itself and each other Lending Party pursuant to the Existing Loan Agreement, to secure the prompt payment in full and performance when due of all of the Obligations, (ii) acknowledges and agrees that the grants of security interests by such Loan Party in the Existing Loan Agreement and the other "Loan Documents" (as defined in the Existing Loan Agreement) are, and shall remain, in full force and effect, and (iii) for the avoidance of doubt, acknowledges and agrees that its grant of a security interest in the Collateral pursuant to **Section 3.01(b)** shall not be deemed to limit or otherwise impair the grant of any security interest granted by such Existing Loan Party prior to the Effective Date.  Each Existing Loan Party that is a party hereto represents, warrants, covenants and agrees to and with the Lending Parties that (a) the security interest granted by it in the Existing Loan Agreement and reaffirmed herein is and shall at all times continue to be a perfected, first-priority (except to the extent otherwise expressly provided in any Loan Document or expressly agreed to in writing by Administrative Agent) security interest in the Collateral (subject only to Permitted Liens); (b) it has rights in and the power to transfer each item of the Collateral upon which it purports to grant a Lien pursuant to the Loan Documents, free and clear of any and all Liens or claims of others, other than Permitted Liens; and (c) no effective security agreement, mortgage, deed of trust, ship mortgage, financing statement (as that term is defined in the Uniform Commercial Code), or other security or Lien instrument covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Liens.  Nothing contained in this Agreement shall be construed as a substitution or novation of the obligations outstanding under the Existing Loan Agreement or the other Loan Documents.

(b)    Without limiting or otherwise impairing in any manner the grant of a security interest by each Existing Loan Party to Administrative Agent pursuant to the provisions of the Existing Loan Agreement, each  Loan Party hereby grants, pledges and assigns a security interest in and Lien on the Collateral to Administrative Agent, for the benefit of the Lending Parties, to secure the prompt payment in full and performance when due of all of the

Obligations.  Each Loan Party represents, warrants and covenants to the Lending Parties that:  (a) the Lien granted by it herein is and shall at all times continue to be a perfected, first priority (subject to Permitted Liens having priority by operation of law and except to the extent otherwise expressly provided in any Loan Document or expressly agreed to in writing by Administrative Agent) Lien in the Collateral (subject only to Permitted Liens); (b) it has rights in and the power to transfer each item of the Collateral upon which it purports to grant a Lien pursuant to the Loan Documents, free and clear of any and all Liens or claims of others, other than Permitted Liens; and (c) no effective security agreement, mortgage, deed of trust, financing statement (as that term is defined in the Uniform Commercial Code), or other security or Lien instrument covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Liens.  If any Loan Party shall acquire a commercial tort claim (as that term is defined in the Uniform Commercial Code), such Loan Party shall promptly notify Administrative Agent in a writing signed by such Loan Party of the details thereof and grant to Administrative Agent, for the benefit of the Lending Parties, a Lien therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Administrative Agent.  Notwithstanding any termination of this Agreement, Administrative Agent's Lien in the Collateral shall continue until all Obligations (other than Unasserted Obligations) are repaid in full.  At such time as the Obligations (other than Unasserted Obligations) have been paid in full and the Lending Parties shall have received a release of all Claims from Loan Parties, Administrative Agent shall, at Borrowers' sole cost and expense, release its Liens on the collateral the subject of all Collateral Documents.

**Section 3.02.** **ADMINISTRATIVE AGENT'S RIGHTS REGARDING THE COLLATERAL.**

(a)     If an Event of Default then exists, Administrative Agent may, (i) at any time in Administrative Agent's own name or in the name of any Loan Party, communicate with Account Debtors and obligors in respect of Instruments, Chattel Paper or other Collateral to verify to Administrative Agent's satisfaction, the existence, amount and terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper or other Collateral, and (ii) without prior notice to any Loan Party, notify Account Debtors or other Persons obligated on any Collateral that Administrative Agent has a Lien therein and that payments shall be made directly to Administrative Agent.  Upon the request of Administrative Agent, each Loan Party shall so notify such Account Debtors and other Persons.  Each Loan Party hereby appoints Administrative Agent or Administrative Agent's designee as such Person's attorney at any time an Event of Default exists, with power to endorse such Person's name upon any notes, acceptance drafts, money orders or other evidences of payment of Collateral.

(b)     Each Loan Party shall remain liable under any evidence of Collateral to observe and perform all the conditions and obligations to be observed and performed by it thereunder, and neither Administrative Agent nor any Lender shall have any obligation or liability whatsoever to any Person under any such Collateral by reason of or arising out of the execution, delivery or performance of this Agreement or the other Loan Documents, and neither Administrative Agent nor any Lender shall be required or obligated in any manner (i) to perform or fulfill any of the obligations of any Loan Party that is a party thereto, (ii) to make any payment or inquiry thereunder, or (iii) to take any action of any kind to collect, compromise or enforce any performance or the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times under or pursuant to any Collateral.

(c)     In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that perfection or priority of Administrative Agent's Lien is dependent on or enhanced by possession, Loan Parties, immediately upon the request of Administrative Agent, shall endorse and deliver physical possession of such Negotiable Collateral and all agreements and documents related thereto, to Administrative Agent or to a custodian to hold on behalf of Administrative Agent.  Upon the request of Administrative Agent, all Negotiable Collateral shall be delivered to Administrative Agent or a custodian for the benefit of Administrative Agent, duly endorsed as follows on the back of the signature page thereof or on a separate allonge affixed thereto:

> Pay to the order of White Oak Global Advisors, LLC, as Administrative Agent
> [applicable Loan Party]
> By: _____
> Name:
> Title:

(d)      Administrative Agent (through any of its officers, employees, or agents (which may include any Lending Party)) shall have the right, from time to time upon its reasonable request, and after reasonable prior notice and during regular business hours, (i) to inspect and examine the Books and Records and the Collateral, (ii) during the existence of an Event of Default, to communicate directly with any and all Account Debtors to verify the existence and terms of Collateral, and (iii) to check, test, and appraise the Collateral, or any portion thereof, in order to verify Loan Parties' financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral, and Loan Parties shall permit any designated representative of Administrative Agent (which shall include any Lending Party) to visit and inspect any of the properties of Loan Parties to inspect and to discuss its finances and properties and Collateral, during normal business hours.    Without limiting the provisions of **Section 6.10**, each Loan Party shall, with respect to any Collateral owned, leased or otherwise controlled by it, upon reasonable prior appointment during normal business hours, will:

(i)      provide access to such Collateral to Administrative Agent and its officers, employees and agents, as frequently as is commercially reasonable or, at any time an Event of Default exists, as frequently as Administrative Agent determines to be appropriate;

(ii)      permit Administrative Agent or any of its officers, employees and agents to inspect, audit and make extracts and copies from all of such Loan Party's Books and Records; and

(iii)      permit Administrative Agent to inspect, review, evaluate and make physical verifications and appraisals of the Inventory and other Collateral in any manner and through any means that Administrative Agent considers reasonably advisable, and such Loan Party agrees to render to Administrative Agent, at Borrowers' sole cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto; provided that, if an Event of Default shall have occurred and be continuing, no advance notice (whether during normal business hours or otherwise) shall be required, the rights in this clause (d) shall extend to each Lending Party and the Lending Parties shall have access at any and all times.

(e)      Beyond the exercise of reasonable care to assure the safe custody of Collateral in Administrative Agent's possession and the accounting for moneys actually received by Administrative Agent or any Lender hereunder, neither Administrative Agent nor any Lender shall have any duty or liability to exercise or preserve any rights, privileges or powers pertaining to the Collateral.

**Section 3.03.      GRANT OF LICENSE TO USE INTELLECTUAL PROPERTY COLLATERAL; ADDITIONAL INTELLECTUAL PROPERTY.**

Each Loan Party hereby grants to Administrative Agent an irrevocable, non-exclusive license, exercisable upon the occurrence and during the continuance of an Event of Default without payment of royalty or other compensation to such Loan Party, to use, transfer, license or sublicense any Intellectual Property now owned, licensed to, or hereafter acquired by such Loan Party, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, and represents, promises and agrees that any such license or sublicense is not and will not be in conflict with the contractual or commercial rights of any third Person or applicable Laws; provided that such license will terminate on the date on which all Obligations (other than Unasserted Obligations) are paid in full; provided further that, upon the request of Administrative Agent, the applicable Loan Party will use reasonable commercial efforts to obtain from any third party a Lien in any license of Intellectual Property granted by such third party to such Loan Party.    In addition, on such periodic basis as Administrative Agent shall require, Loan Parties shall: (i) provide Administrative Agent with a report of all new patentable, copyrightable, or trademarkable materials acquired or generated by each Loan Party during the prior period; (ii) cause all Intellectual Property acquired or generated by each Loan Party that is not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of such Loan Party's ownership thereof; and (iii) cause to be prepared, executed, and delivered to Administrative Agent supplemental schedules to the applicable Collateral Documents to identify such Intellectual Property as being subject to the Lien created thereunder; provided that neither Loan Parties nor any of their Subsidiaries shall register with the U.S. Copyright Office any unregistered Copyrights (whether in existence on the Effective Date or thereafter acquired, arising, or developed) unless (A) Loan Parties provide Administrative Agent with written notice of its intent to register such

Copyrights not less than thirty (30) days prior to the date of the proposed registration, and (B) prior to such registration, the applicable Loan Party executes and delivers to Administrative Agent a copyright security agreement in form and substance satisfactory to Administrative Agent, supplemental schedules to any existing copyright security agreement or such other documentation as Administrative Agent reasonably deems necessary in order to perfect and continue perfected Administrative Agent's Liens on such Copyrights following such registration.

Section 3.04.    AUTHORIZATION TO FILE FINANCING STATEMENTS.

Each Loan Party hereby authorizes Administrative Agent to file, without notice to any Loan Party, financing statements under the Uniform Commercial Code with all appropriate jurisdictions to perfect, maintain, preserve or protect Administrative Agent's and Lenders' interest or rights hereunder or any Collateral Document in the Collateral the subject hereof or thereof, including a notice that any Disposition of all or any such collateral that is not otherwise permitted hereunder, whether by any Loan Party or any other Person, shall be deemed to violate the rights of Administrative Agent and Lenders hereunder and under applicable Laws. Without limiting the generality of the foregoing, each Loan Party hereby: (a) authorizes Administrative Agent to file, without notice to any such Loan Party, financing statements under the Uniform Commercial Code with all appropriate jurisdictions listing all assets or all personal property of such Loan Party as the collateral covered by such financing statements; and (b) ratifies and approves the filing of any financing statements by or on behalf of Administrative Agent or any Lender (or any such Person's predecessor(s)-in-interest) prior to the Effective Date against such Loan Party and listing the Collateral or all assets or all personal property of such Loan Party as the collateral covered by such financing statements.

## ARTICLE IV.
## CONDITIONS PRECEDENT

Section 4.01.    CONDITIONS PRECEDENT TO EFFECTIVENESS.

The obligation of the Administrative Agent and each Lender to enter into this Agreement so the Borrowers may assume the Shipyard Allocated Portion of the Existing Term Loans as a Term Loan hereunder is subject to the satisfaction of the following conditions precedent (all Loan Documents and other documents to be delivered to Administrative Agent or any other Lending Party pursuant to this **Section 4.01** shall be subject to prior approval as to form and substance (including as to results) by Lenders, with delivery by a Lender of its signature page to this Agreement evidencing such Person's acknowledgment that the conditions set forth in this **Section 4.01** have been satisfied, unless otherwise waived in writing):

(a)    **Receipt of Certain Documents and Assurances**. Administrative Agent shall have had delivered to it all of the following, each of which shall be, unless otherwise specified herein or otherwise required by Lenders, originals (or facsimiles or portable document format versions thereof (in either such case, promptly followed by originals thereof)), each, to the extent to be executed by a Loan Party, properly executed by a Responsible Officer of such Loan Party, each dated the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date), all in sufficient number as Administrative Agent shall separately identify and the same shall be in full force and effect:

(i)    counterparts of this Agreement, duly executed by each of the parties hereto;

(ii)    if requested by any Lender, a Note duly executed by Borrowers in favor of such Lender evidencing such Lender's Percentage Share of the Term Loan owing to such Lender by Borrowers;

(iii)    counterparts of each of the other Loan Documents (including all applicable Collateral Documents), duly executed by each of the parties thereto;

(iv)    all other documents, including Uniform Commercial Code financing statements, required by applicable Laws or reasonably requested by any Lending Party to be filed, registered or recorded to reaffirm the Liens reaffirmed under this Agreement on the Effective Date;

41

(v)    such certificates of resolutions or other action, incumbency certificates or other certificates of Responsible Officers of each Loan Party that is not a natural person as any Lending Party may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the Loan Documents to which such Loan Party is a party;

(vi)    such documents and certifications as Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each such Loan Party is validly existing, in good standing and qualified to engage in business in:  (A) the State of its jurisdiction of organization or formation; and (B) each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(vii)    such other assurances, certificates, documents, consents, reports or opinions as Administrative Agent or any other Lending Party may reasonably require.

(b)    **Truth and Correctness of Representations and Warranties**; **No Default**.  The representations and warranties of Borrowers and each other Loan Party as regards any Loan Party, each Individual Guarantor and each Equity Holder Pledgor contained in **Article V** or any other Loan Document, or that are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.  No Default shall result, or then could reasonably be expected to result, from the Loan Parties entering into the Loan Documents on the Effective Date.

(c)    **Payment of Fees**.  Borrowers shall have paid:  (i) all fees required to be paid to Administrative Agent, Lenders and White Oak on or before the Effective Date; and (ii) unless any Lending Party shall have agreed in writing to any delay in such payment, all fees, charges and disbursements of counsel to such Lending Party and White Oak to the extent invoiced prior to or on the Effective Date, *plus* such additional amounts of such fees, charges and disbursements as shall constitute such Person's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (*provided* that such estimate shall not thereafter preclude a final billing by such Lending Party or White Oak).

(d)    **Other Matters**.  Administrative Agent shall have received, in form and substance satisfactory to it, such other assurances, documents or consents related to the foregoing as Administrative Agent or Required Lenders may reasonably require.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to each Lending Party that:

**Section 5.01.    CORPORATE EXISTENCE AND POWER.**

Each of the Loan Parties and their respective Subsidiaries:  (a) is a corporation, partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation (subject to such changes after the date hereof as are permitted under the Loan Documents); (b) has the power and authority and all governmental licenses, authorizations, consents and approvals:  (i) to own its assets and carry on its business, except to the extent that any failure to have any of the foregoing could not reasonably be expected to have a Material Adverse Effect; and (ii) to execute, deliver, and perform its obligations under the Loan Documents to which each is a party; and (c) is duly qualified as a foreign corporation, partnership or limited liability company, as applicable, and is licensed and in good standing under the laws of each jurisdiction where its ownership, leasing or operation of property or the conduct of its business requires such qualification or license, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02.    CORPORATE AUTHORIZATION; NO CONTRAVENTION.**

The execution and delivery by each of the Loan Parties and their respective Subsidiaries (to the extent any such Subsidiary is party hereto or to any other Loan Document) of, and the performance by each of the Loan Parties and their respective Subsidiaries of its obligations under, each Loan Document to which such Person is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not:  (a) contravene the terms of any of such Person's Organizational Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under:  (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any Subsidiary thereof or (ii) any Order to which such Person or its property is subject; or (c) violate any Laws.  Each of the Loan Parties and their respective Subsidiaries are in compliance with all Contractual Obligations referred to in clause (b)(i), except to the extent that any failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to or is bound by any Contractual Obligation, or is subject to any restriction in any Organizational Document, or any requirement of Laws, which could reasonably be expected to have a Material Adverse Effect.

**Section 5.03.    GOVERNMENTAL AUTHORIZATION; COMPLIANCE WITH LAWS; COOPERATION.**

(a)    **Governmental Authorizations**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution and delivery by any Loan Party (or any Subsidiary thereof) of, or the performance by any Loan Party (or any Subsidiary thereof) of its obligations under, any Loan Document to which it is a party other than (i) such as have been obtained or made and are in full force and effect or (ii) filings necessary to perfect Liens created by the Loan Documents.  Each Loan Party has all material Permits required for the operation of its business and the use of the Facilities and is compliance therewith.

(b)    **Compliance with Laws**.  Loan Parties and each Subsidiary thereof are in compliance in all respects with the requirements of all Laws (including the Patriot Act) applicable to it or to its properties, except in such instances in which:  (i) such requirement of Laws is being contested in good faith by appropriate Proceedings diligently conducted; or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing:

(A)    neither any Loan Party nor any Subsidiary thereof:  (1) is, or is controlled by or is acting on behalf of, a Restricted Party; (2) has received funds or other property from a Restricted Party; or (3) is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law;

(B)    Loan Parties and each Subsidiary thereof has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws;

(C)    the operations of Loan Parties and their Subsidiaries are and have been conducted at all times in compliance with applicable Anti-Terrorism Laws and Money Laundering Laws and without violation of the Sanctions, and Loan Parties and their Subsidiaries have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith;

(D)    neither Loan Parties nor any of their Subsidiaries (or, to the knowledge of Loan Parties, any director, officer, employee, agent, affiliate or representative of Loan Parties or any of their Subsidiaries) is a Person currently the subject of any Sanctions, and neither Loan Parties nor any of their Subsidiaries is located, organized or resident in a country or territory that is the subject of any Sanctions.  Each Loan Party represents that it will not directly or indirectly use the proceeds of any Credit Extension to fund any activities of or business with any Restricted Party or in any other manner that would result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of any Sanctions; and

(E)    the operations of Loan Parties and their Subsidiaries are and have been conducted at all times in material compliance with the Outer Continental Shelf Lands Act and all applicable regulations thereunder related to oil, gas and sulphur exploration, development and production operations on the Outer Continental Shelf, including decommissioning activities.

(c)    **Required Bonding.**  Loan Parties and their pertinent Subsidiaries shall obtain all required bonds and other surety arrangements that exceed the Threshold Amount relating to the ownership, use, or operation of the Facilities.

(d)    **Cooperation.**  Loan Parties and their respective Subsidiaries shall, to the extent permitted by law: (i) promptly notify the Lenders of, and if in writing, furnish the Lenders with copies of any communication to it from a Governmental Authority concerning or claiming a violation above the Threshold Amount of any applicable law or regulation, including but not limited to any incident of non-compliance, decommissioning order, civil enforcement order, or notice of investigation, and (ii) keep the Lender informed of any developments, meetings or discussions with any Governmental Authority in respect of any filings, investigation or inquiry concerning or claiming such a violation of any applicable law or regulation.

(e)    **Certain Actions.**  No Loan Party is engaged in or has engaged in any course of conduct that could subject any of their respective properties to any Lien, seizure or other forfeiture under any racketeer influenced and corrupt organizations law, whether civil or criminal, or other similar Laws.

Section 5.04.    BINDING EFFECT.

This Agreement has been, and each other Loan Document (when delivered hereunder) will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document to which any Loan Party is a party constitute the legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms, except as enforceability may be limited by applicable Bankruptcy Laws or other Laws of general application affecting enforcement of creditors' rights or general principles of equity.

Section 5.05.    LITIGATION.

Except as specifically disclosed on **Schedule 5.05**, there are no Proceedings pending, or to the knowledge of any Loan Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any Subsidiary of any Loan Party that:  (a) purport to affect or pertain to any Loan Document or any of the transactions contemplated thereby; or (b) could reasonably be expected to have a Material Adverse Effect.  No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this any Loan Document, or directing that the transactions provided for therein not be consummated as therein provided.

Section 5.06.    NO DEFAULTS.

No Default exists or could reasonably be expected to result from the incurring of any Obligations by any Loan Party or from the grant and perfection of the Liens upon collateral the subject of any Loan Document in favor of Administrative Agent.  Other than as set forth on **Schedule 5.06**, no Loan Party is in default under or with respect to any Contractual Obligation in any respect that, individually or together with all such defaults, could reasonably be expected to have a Material Adverse Effect, or that would, if such default had occurred after the Effective Date, create an Event of Default under **Section 8.01(e)**.

Section 5.07.    EMPLOYEE BENEFIT PLANS.

(a)    **Compliance with ERISA Generally**.  Each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable Laws.  Each Plan which is intended to qualify under subsection 401(a) of the Code either (i) has obtained from the IRS a favorable determination letter from the IRS as to its qualified status

44

under the Code, or the expiration of the requisite period under applicable regulations promulgated by the IRS under the Code or IRS pronouncements in which to apply for such determination letter and to make any amendments necessary to obtain a favorable determination has not occurred, or (ii) has been established under a prototype plan for which an IRS opinion letter has been obtained by the plan sponsor and is valid as to the adopting employer, and nothing has occurred that would cause the loss of such qualification.

(a)        **No Actions**.  There are no pending or, to the knowledge of Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(a)        **Certain Events**.  (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; and (iii) no event or circumstance has occurred or exists that, if such event or circumstance had occurred or arisen after the Effective Date, would create an Event of Default under **Section 8.01(i)**.

**Section 5.08.     [RESERVED].**

**Section 5.09.     TITLE TO PROPERTIES.**

(a)        [Reserved].

(b)        Each Loan Party and each Subsidiary thereof has good record and marketable title in fee simple to, or valid leasehold interests in, or valid rights to use (including easements) all real property necessary to the ordinary conduct of their respective businesses, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  As of the Effective Date, the properties of each Loan Party and each Subsidiary thereof are subject to no Liens other than Permitted Liens.

(c)        None of any Loan Party's assets are held outside of the United States of America, unless, as regards, cutting and plugging and abandonment equipment, diving equipment or aircraft, (i) the movement outside the United States was requested by the Loan Party pursuant to a form provided by Administrative Agent and (ii) Administrative Agent consents to such relocation.

**Section 5.10.     TAXES.**

Each Loan Party and its Subsidiaries have filed all Tax Returns required to be filed, and have paid all Taxes when due, regardless of whether shown on any Tax Return.  There is no proposed tax assessment against any Loan Parties and their respective Subsidiaries. Each Loan Party and its Subsidiaries have made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  No Loan Party or any Subsidiary of any Loan Party is currently a party to any tax audit or other Proceeding or controversy or knows of any proposed Tax assessment against it that is not being actively contested by such Loan Party or its Subsidiary diligently, in good faith, and by appropriate proceedings and with respect to which it has made adequate reserves in conformity with GAAP. There is no proposed tax assessment of which any Loan Party is aware against any Loan Party or any Subsidiary thereof that would, if made, have a Material Adverse Effect.

**Section 5.11.**    **FINANCIAL CONDITION.**

(a)    **Financial Statements.**    The unaudited consolidated balance sheet of Shipyard Loan Parties and their Subsidiaries dated on or about the date hereof, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the period ended on such date (collectively, the "***Closing Financial Statement***"):    (A) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (B) fairly present the consolidated financial condition of Shipyard Loan Parties and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (A) and (B), to the absence of footnotes and to normal year-end audit adjustments.

(b)    **[Reserved**].

**Section 5.12.**    **ENVIRONMENTAL MATTERS.**

Neither any Loan Party's nor any Subsidiary's past or present operations, real estate or other properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, Hazardous Material or environmental clean-up and neither any Borrower nor any Subsidiary has received any notice of any such investigation.    Neither any Loan Party nor any Subsidiary has any contingent liability in excess of the Threshold Amount with respect to any release (as defined in any applicable Environmental Law), environmental pollution or Hazardous Material on any real estate or other property now or previously owned, leased or operated by it.

**Section 5.13.**    **MARGIN REGULATIONS; REGULATED ENTITIES.**

Neither Loan Parties nor any Subsidiary thereof is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.    None of Loan Parties, any Subsidiary thereof or any Person controlling Loan Parties is an "investment company" within the meaning of the Investment Company Act of 1940.    Loan Parties are not subject to regulation under the Federal Power Act, any state public utilities code or any other federal or state statute or regulation limiting its ability to incur Debt.

**Section 5.14.**    **SWAP OBLIGATIONS.**

Neither Loan Parties nor any Subsidiary thereof has incurred any outstanding obligations under any Swap Contracts, other than obligations under Swap Contracts expressly permitted hereby.    Loan Parties have voluntarily entered into each Swap Contract to which it is a party based upon its own independent assessment of its consolidated assets, liabilities and commitments, in each case as an appropriate means of mitigating and managing risks associated with such matters, and has not relied on any swap counterparty or any Affiliate of any swap counterparty in determining whether to enter into any Swap Contract.

**Section 5.15.**    **INTELLECTUAL PROPERTY.**

Each Loan Party and each Subsidiary thereof owns or is licensed or otherwise has the right to use all of the Intellectual Property and other rights that are reasonably necessary for the operation of their respective businesses, except for those the failure of which to own or license could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.    The use of such Intellectual Property by each Loan Party and its Subsidiaries and the operation of their respective businesses do not infringe any valid and enforceable intellectual property rights of any other Person, except to the extent any such infringement could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.    No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by Loan Parties or any Subsidiary thereof infringes upon any rights held by any other Person, except to the extent any such infringement could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.    No claim or litigation regarding any of the foregoing is pending or, to the knowledge of Loan Parties,

threatened, and no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code is pending or, to the knowledge of Loan Parties, proposed, which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 5.16.    EQUITY INTERESTS AND INVESTMENT HELD BY LOAN PARTIES; EQUITY INTERESTS IN LOAN PARTIES.**

As of the Effective Date:  (a) Loan Parties have no Subsidiaries other than those listed on **Schedule 5.16**; (b) Loan Parties hold no Equity Interests in any other Person or Investments in any other Person, other than those specifically disclosed on **Schedule 5.16**; and (c) the holders of all Equity Interests in Loan Parties are those listed on **Schedule 5.16**.  All of the outstanding Equity Interests in Loan Parties and in each Subsidiary thereof have been validly issued and are fully paid and non-assessable.

**Section 5.17.    INSURANCE.**

The properties of each Loan Party and each Subsidiary thereof are insured with financially sound and reputable insurance companies or "Protection and Indemnity" clubs that are not Affiliates of any Loan Party, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Loan Party or its Subsidiary operates.

**Section 5.18.    COLLATERAL AND COLLATERAL DOCUMENTS.**

(a)    **Enforceable and Perfected Security Interest**.  The provisions of this Agreement and each of the other Collateral Documents, when delivered, are effective to create in favor of Administrative Agent, for the benefit of the Lending Parties, a valid and enforceable security interest or other Lien in all right, title, and interest of each Loan Party that is a party thereto in the collateral described therein.  Each such security interest or other Lien in favor of Administrative Agent, to the extent the same may be perfected by the filing of a Uniform Commercial Code financing statement or by control (within the meaning of the Uniform Commercial Code), has, except as otherwise expressly provided in any Collateral Document, been perfected.  Except as otherwise expressly provided herein or in any other Collateral Document, each security interest or other Lien in the Collateral described in any Collateral Document, constitutes a perfected, first-priority security interest or other Lien in the subject Collateral (subject to Liens having priority by operation of law and except to the extent otherwise expressly provided in any Loan Document or expressly agreed to in writing by Administrative Agent), subject to no Liens other than Permitted Liens.

(b)    **Truth and Correctness of Representations and Warranties**.  All representations and warranties of each Loan Party in each Collateral Document are true and correct, *provided* that, if such representations and warranties expressly relate solely to a specified date, then such representations and warranties were true and correct as of such specified date.

**Section 5.19.    LABOR RELATIONS.**

There are no strikes, lockouts or other material labor disputes against any Borrower or any Subsidiary thereof, or to any Loan Party's knowledge, threatened against or affecting any Loan Party or any Subsidiary thereof, and no significant unfair labor practice complaint is pending against any Loan Party or any Subsidiary thereof or, to the knowledge of any Loan Party, threatened against any of them before any Governmental Authority.  Except as set forth on **Schedule 5.19**:  (a) no Loan Party is a party to any collective bargaining agreements or contracts; and (b) no union representation exists and, to the knowledge of any Loan Party, no union organizing activities are taking place.

**Section 5.20.**        [RESERVED].

**Section 5.21.**        MATTERS RELATING TO THE FACILITIES.

(a)        **Compliance**; **Zoning**.  Loan Parties have complied with all Laws and all recorded instruments affecting the Facilities.  The use of the Facilities complies with all Laws and Loan Parties have provided to Administrative Agent evidence of such compliance.

(b)        **Utilities**.  To the best of Loan Parties' knowledge, in all material respects, all utility services that are necessary for the full development, construction, equipping and operation of all improvements are available at no cost or expenses and at the title lines of the Facility (or, if they pass through adjoining private land, in accordance with valid public or unencumbered private easements which inure to the benefit of Loan Parties and run with the Facility) including public sanitary sewer service, storm sewers, public water, electricity, gas and telephone service. To the best of Loan Parties' knowledge, all such utility services are non-interruptible.  All material Permits have been obtained or are available so that all improvements may be connected to the sanitary sewer service, which sanitary sewer service shall be available to the full extent required for the full operation of all improvements and shall permit the discharge of sewage for the types and amounts anticipated to be produced from the Facilities. Each Loan Party has all Permits required for the operation of its business, except for the Permits specified on **Schedule 5.21**.

**Section 5.22.**        FULL DISCLOSURE.

To the knowledge of Loan Parties after due inquiry of each Responsible Officer of Loan Parties, none of the representations or warranties made by any Loan Party in the Loan Documents to which it is a party as of the date such representations and warranties are made or deemed made, and none of the statements contained in any exhibit, report, statement or certificate furnished by or on behalf of any Loan Party in connection with the Loan Documents (including the disclosure materials delivered by or on behalf of any Loan Party to Lending Parties (or any of the foregoing Persons) prior to the Effective Date), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered; *provided* that, with respect to any projections and forecasts provided by Loan Parties (whether with respect of Borrowers or any other Loan Party): (a) Loan Parties represent that such projections and forecasts were prepared in good faith based upon assumptions believed to be reasonable at the time of the preparation thereof; and (b) Lending Parties acknowledge that such projections and forecasts are not to be viewed as facts and that actual results during the period or periods covered thereby may differ from the projected or forecasted results.

**Section 5.23.**        INTERRELATED BUSINESSES.

Loan Parties make up a related organization of various entities constituting an overall economic and business enterprise such that any benefit from the Loans or other financial accommodations hereunder received by any one of them benefits the others.  Loan Parties render services to or for the benefit of the other Loan Parties and/or purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Loan Parties and provide administrative, marketing, payroll and management services to or for the benefit of the other Loan Parties, as the case may be. Loan Parties have the same chief executive office, certain centralized accounting and legal services, certain common officers, directors and/or managers and generally do not provide consolidating financial statements to creditors. Parent is 100% direct owner of the Equity Interests in each of Epic Alabama Holdings and Maritime.  Epic Alabama Holdings is 100% direct owner of EAMA.  Maritime is 100% direct owner of Epic Alabama Shipyard.  Epic Alabama Shipyard is 100% direct owner of each of Epic Recycling and Epic Alabama Recyclers. Clarke and AMC are, collectively, 100% direct owners of the Equity Interests of Parent.

**Section 5.24.**        OCS LEASES

Each Loan Party owning an interest in and to an OCS Lease is and remains duly qualified to own or hold offshore federal leases on the Outer Continental Shelf as required by 43 U.S.C.A. § 1337 and 30 C.F.R. § 256.35.

**Section 5.25.**    [RESERVED].

**Section 5.26.**    LOCATIONS OF M&E.

The M&E of the Loan Parties is not stored with a bailee, warehouseman, or similar party and is located only at, or in-transit between, the locations identified on **Schedule 5.26** to this Agreement.

**Section 5.27.**    BURDENSOME OBLIGATIONS.

None of the Loan Parties or their Subsidiaries is a party to any agreement or contract or subject to any restriction contained in its Organizational Documents or its governing documents that could reasonably be expected to have a Material Adverse Effect.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Obligations (other than Unasserted Obligations) have not been repaid in full:

**Section 6.01.**    FINANCIAL STATEMENTS.

Administrative Loan Party shall deliver to Administrative Agent a sufficient number of copies for delivery by Administrative Agent to each Lender, in form and detail satisfactory to Administrative Agent and Required Lenders:

(a)    **Annual Financial Statements**.  As soon as available, but in any event within one hundred twenty (120) days after the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2019, a consolidated balance sheet for the Shipyard Loan Parties and their Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, shareholders'(or members') equity and cash flows for such Fiscal Year (setting forth, in comparative form, the figures for the previous Fiscal Year), all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by (i) management's discussion and analysis of financial condition and results of operations, including the applicable Loan Parties' liquidity and capital resources, and (ii) a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b)    **Fiscal Quarter Financial Statements**.  As soon as available, but in any event within forty-five (45) days after the end of each of the Fiscal Quarters (including the fourth Fiscal Quarter), unaudited consolidated balance sheets for the Shipyard Loan Parties and their Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, shareholders' (or members') equity and cash flows for such Fiscal Quarter and the portion of the Fiscal Year then ended (setting forth, in each case in comparative form, (i)  the figures for the corresponding portion of the previous Fiscal Year and (ii) the figures from the corresponding portion of such Loan Parties' budget for the current Fiscal Year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of Administrative Loan Party as fairly presenting the financial condition, results of operations, shareholders' (or members') equity and cash flows of such Loan Parties' in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and accompanied by management's discussion and analysis of financial condition and results of operations, including such Loan Parties' liquidity and capital resources;

(c)    **Fiscal Month Financial Statements**.  As soon as available, but in any event within thirty (30) days after the end of each Fiscal Month (including the last Fiscal Month of each Fiscal Quarter and of each Fiscal Year), unaudited consolidated balance sheets for the Shipyard Loan Parties and their Subsidiaries, as at the end of such Fiscal Month, and the related consolidated and consolidating statements of income or operations, shareholders' (or members') equity and cash flows for such Fiscal Month and the portion of the Fiscal Year then ended (setting forth, in each case in comparative form, (i) the figures for the corresponding portion of the previous Fiscal Year (if

applicable) and (ii) the figures from the corresponding portion of such Loan Parties' budget for the current Fiscal Year), all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of Administrative Loan Party as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of such Loan Parties and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and accompanied by management's discussion and analysis of financial condition and results of operations, including such Loan Parties' liquidity and capital resources;

(d)    **Forecasts and Budgets**.  As soon as available, but in any event no later than thirty (30) days after the end of each Fiscal Year:  (i) forecasts prepared by the management of the Shipyard Loan Parties and their Subsidiaries in form satisfactory to Administrative Agent, of consolidated balance sheets and statements of income or operations and cash flows for such Loan Parties and their respective Subsidiaries for the immediately following Fiscal Year (and each Fiscal Year thereafter through the Fiscal Year immediately following the Fiscal Year in which the Maturity Date occurs); and (ii) budgets prepared by the management of the Shipyard Loan Parties and their Subsidiaries, in form satisfactory to Administrative Agent, for such new Fiscal Year;

(e)    **Collateral and Other Reporting**. Provide Administrative Agent with the following documents at the following times in form satisfactory to Administrative Agent:

| Monthly (or more frequently if so requested by Administrative Agent): | (i)    not later than thirty (30) days after each Fiscal Month: (A) accounts receivable listings and agings and Inventory reports for the preceding Fiscal Month; and (B) accounts payable listings and agings as at the preceding Fiscal month end; |
|---|---|
| Upon request by Administrative Agent: | (ii)   a revised budget of Shipyard Loan Parties;  and |
| | (iii)  such other reports as to the Collateral, or the financial condition of Loan Parties, as Administrative Agent may reasonably request. |

(f)    **[Reserved]**

(g)    **Calculation of Excess Cash Flow**.  Not later than 120 days after the end of each Fiscal Year, an Excess Cash Flow Certificate signed by a Responsible Officer of the Administrative Borrower.

**Section 6.02.    CERTIFICATES; OTHER INFORMATION.**

Loan Parties shall deliver or cause to be delivered to Administrative Agent a sufficient number of copies for Administrative Agent to deliver to each Lender, in form and detail satisfactory to Administrative Agent and Required Lenders:

(a)    **Accountants' Certificate**.  Concurrently with the delivery of the financial statements referred to in **Section 6.01(a)**, a certificate of the independent certified public accountants of Shipyard Loan Parties certifying such financial statements and stating that, in connection with their audit, nothing came to their attention that caused them to believe that Shipyard Loan Parties and their Subsidiaries failed to comply with the terms, covenants, provisions or conditions of **Section 6.13**, insofar as such terms, covenants, provisions or conditions relate to financial and accounting matters, but also noting that their audit was not directed primarily toward obtaining knowledge of or noncompliance with **Section 6.13**;

(b)    **Compliance Certificate**.  Concurrently with the delivery of the financial statements referred to in subsections (a) and (b) and (c) of **Section 6.01**, a duly completed Compliance Certificate signed by an appropriate Responsible Officer of Administrative Loan Party;

(c)    **Additional Accountant Reports**.  Promptly after any request by Administrative Agent or any other Lending Party, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Shipyard Loan Parties by independent

accountants in connection with the accounts or books of Shipyard Loan Parties or any Subsidiary thereof, or any audit of any of them;

(d)     **Equity Interest Holder Reports and Certain Public Filings**.  If and when applicable, promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the holders of Equity Interests of Parents or any Subsidiary thereof and copies of all annual, regular, periodic and special reports and registration statements that Parents or any Subsidiary thereof may file or be required to file with the Securities and Exchange Commission under Section 13 or Section 15(d) of the Exchange Act, and, in each case, not otherwise required to be delivered to Administrative Agent pursuant hereto;

(e)     **Debt Holder Reports**.  Promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement that are not otherwise required to be furnished to Lending Parties pursuant to **Section 6.01** or any other clause of this **Section 6.02**;

(f)     **Materials from or to Governmental Authorities**.  Promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party, copies of each material notice or other correspondence received from, or delivered to, any Governmental Authority concerning any investigation or possible investigation or other inquiry by such agency regarding any material financial or other material operational results of any Loan Party or any Subsidiary thereof;

(g)     **Changes in Officers and Directors**.  Promptly, and in any event within five Business Days of a Responsible Officer of Administrative Loan Party becoming aware thereof, written notice of any change in the Persons constituting any of the officers, directors or managers of any Loan Party;

(h)     **Tax Returns**.  No later than five (5) Business Days after the date they are required to be filed (subject to any permitted extensions), copies of the executed and dated federal income tax returns of Loan Parties and each of their Subsidiaries and all related schedules, and copies of any extension requests;

(i)     **Additional Information**.  Promptly upon (but no later than three (3) Business Days after) request therefor by any Lending Party, such additional information (including budgets, sales projections, operating plans and other financial information and any information required to be delivered pursuant to the terms of the Patriot Act) regarding the business or the financial or corporate affairs of any Loan Party or any Subsidiary thereof or the compliance by Loan Parties or any Subsidiary thereof with the terms of the Loan Documents as Administrative Agent may from time to time reasonably request; and

At the request of Administrative Agent, Loan Parties shall deliver or shall cause to be delivered all documents required to be delivered pursuant to **Section 6.01** or **Section 6.02(b)** electronically (and in such format(s) as may be specified by such Lending Party (acting reasonably)).  If such documents are so delivered, they shall be deemed to have been delivered on the date:  (i) on which Loan Parties post such documents, or provides a link thereto on Loan Parties' website on the Internet at the website address listed on **Schedule 10.02**; or (ii) on which such documents are posted on Loan Parties' behalf on an Electronic Platform to which each Lending Party has access; *provided* that:  (A) Loan Parties shall also deliver paper copies of such documents to Administrative Agent (or to any Lender upon its request) until such time, if at all, that a written direction to cease delivering paper copies is given by Administrative Agent or such Lender; and (B) Loan Parties shall notify Administrative Agent (by facsimile or electronic mail) of the posting of any such documents and provide to Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents.  Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to in this paragraph, and in any event Administrative Agent shall have no responsibility to monitor compliance by Loan Parties with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**Section 6.03.**     NOTICES.

Loan Parties shall promptly notify each Lending Party in writing of:

(a)      **Defaults; Events of Loss or Damage**.  As soon as possible and in any event within five calendar days of the occurrence of:  (i) any Default; or (ii) any Event of Loss or damage with respect to the Vessels in excess of $500,000.00.

(b)      **Matters Involving a Material Adverse Effect**.  Any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including any such matter arising from:  (i) any breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, Proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; (iii) the commencement of, or any material development in, any Proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws; or (iv) the loss of all or any material portion of the Collateral;

(c)      **ERISA Events**.  The occurrence of any ERISA Event (together with a copy of any notice to or from the PBGC regarding such ERISA Event);

(d)      **Swap Contracts**.  Upon request from time to time of any Lending Party, the swap termination values thereof, together with a description of the method by which such values were determined, relating to any then-outstanding Swap Contracts to which any Loan Party is a party;

(e)      **Labor Controversies**.  Any material labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other material labor disruption against or involving any Loan Party or any Subsidiary thereof;

(f)      **Financial Matters**.  Any material change in accounting policies or financial reporting practices by Loan Parties or any Subsidiary of any Loan Party;

(g)      **Certain Dispositions**.  Any material Disposition of collateral the subject of any Collateral Document, or the incurrence of any Contractual Obligations that would qualify as a Material Contract;

(h)      **Material Contracts**.  Any termination (other than termination upon expiry of the stated term of the agreement) or loss of a Material Contract, any default or event of default (however defined) under a Material Contract that gives the non-defaulting party the right to terminate such Material Contract, or any modification, amendment or supplement to a Material Contract in a manner that could adversely affect Administrative Agent or the Lenders; and

(i)      **Environmental Matters.** The Loan Parties shall promptly notify the Administrative Agent in writing upon receipt of any written claim, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or of any remedial obligations or other liabilities under Environmental Laws that would reasonably be expected to result in greater than $100,000 in liability.

Each notice pursuant to this **Section 6.03** shall be accompanied by a statement of a Responsible Officer of Administrative Loan Party setting forth details of the occurrence referred to therein and stating what action, if any, Loan Parties (or the other applicable Person) has taken or proposes to take with respect thereto.  Each notice given pursuant to **Section 6.03(a)** shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been (or could reasonably be expected to be) breached or violated.

**Section 6.04.    PAYMENT OF CERTAIN OBLIGATIONS.**

Each Loan Party and each Subsidiary of each Loan Party will pay in full before delinquency or before the expiration of any extension period all Taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, except to the extent that the validity of such governmental assessment or Tax is the subject of a Permitted Protest.  Each Loan Party and each Subsidiary of each Loan Party will:  (a) timely and correctly file all Tax Returns required to be filed by it; and (b) withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

Section 6.05.    PRESERVATION OF EXISTENCE, ETC.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to:  (a) preserve, renew and maintain in full force and effect their respective legal existence and good standing under the Laws of the jurisdiction of their organization except in a transaction expressly permitted by **Section 7.04** or **Section 7.05**; (b) take all reasonable actions to maintain all rights, privileges, Permits, licenses and franchises necessary or desirable in the normal conduct of their respective businesses, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect; (c) use the standard of care typical in the industry in the operation and maintenance of its facilities; and (d) preserve or renew all of their respective registered Intellectual Property, the non-preservation of which would have or could reasonably be expected to have a Material Adverse Effect.

Section 6.06.    MAINTENANCE OF PROPERTIES.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to:  (a) maintain, preserve and protect all of their respective Facilities, material properties and material equipment necessary to the operation of their respective businesses in good working order and condition, ordinary wear and tear and permitted Dispositions hereunder excepted; (b) make all commercially reasonable repairs thereto and renewals and replacements thereof; in each of the foregoing clauses (a) and (b), except where the failure to do so does not have and could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) operate the facilities owned, leased or operated by such Person now or in the future in a manner consistent with Environmental Laws, zoning codes, contractual requirements and applicable prevailing industry standards in the locations where the facilities exist from time to time, except to the extent failure to do so does not and could not reasonably be expected to have a Material Adverse Effect.  Each Loan Party shall maintain all records required to be maintained by all applicable Environmental Laws. Each Loan Party shall maintain all of its assets within the United States of America, unless, as regards cutting and plugging and abandonment equipment, diving equipment or aircraft, (i) the movement outside the United States was requested the Loan Party pursuant to a form provided by Administrative Agent and (ii) Administrative Agent consents to such relocation.

Section 6.07.    MAINTENANCE OF INSURANCE.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to maintain, with financially sound and reputable insurance companies not Affiliates of any Loan Party, insurance with respect to their respective properties and businesses against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.  All property policies shall have a lender's loss payable endorsement showing Administrative Agent, for the ratable benefit of the Lending Parties, as primary loss payee and waive subrogation against the Lending Parties, and all liability policies shall show Administrative Agent, on behalf of the Lending Parties, or have endorsements showing Administrative Agent, on behalf of the Lending Parties, as an additional insured.  All policies (or the loss payable and additional insured endorsements) shall provide that the insurer shall give Administrative Agent, on behalf of the Lending Parties, at least thirty (30) days' notice before canceling, amending, or declining to renew its policy and ten (10) days' notice of any non-payment of premiums.  At any Lending Party's request, Loan Parties shall deliver certified copies of all of the insurance policies of Loan Parties and its Subsidiaries and evidence of all premium payments.  Subject to the provisions hereof, proceeds payable under any policy shall, during the existence of an Event of Default, be payable to Administrative Agent for the benefit of the Lending Parties on account of the Obligations.  If any Loan Party fails to obtain insurance as required under this **Section 6.07** or to pay any amount or furnish any required proof of payment to third persons and Lenders, Administrative Agent or Lenders may make all or part of such payments or obtain such insurance policies required in this **Section 6.07** and take any action under the policies that Lenders and Administrative Agent deem necessary or prudent. Loan Parties, upon request of Administrative Agent, will deliver to Administrative Agent from time to time the policies, standard letters of undertaking or certificates of insurance in form satisfactory to Administrative Agent, including stipulations that coverages will not be canceled or diminished without at least thirty (30) days' prior written notice to Administrative Agent.  In connection with all policies covering assets in which Administrative Agent holds or is offered a security interest for the Obligations, Loan Parties will provide Administrative Agent with such lender's loss payable or other endorsements as Administrative Agent may require.  Insurance proceeds shall be paid to Administrative Agent.

Within 60 days after the Effective Date, Clarke and Wiley shall each have obtained and shall maintain a key-man life insurance policy with a financially sound and reputable insurance company not an Affiliate of any Loan Party in an amount not less than $10,000,000. Each insurance policy shall name Administrative Agent as beneficiary and shall provide that such insurance policy may not be cancelled or diminished without at least sixty (60) days' prior written notice to Administrative Agent. At the time of obtaining such insurance, Borrowers shall have entered into, and the insurance company shall have acknowledged, an assignment of each insurance policy in favor of Administrative Agent in form and substance satisfactory to Administrative Agent. Upon request of the Administrative Agent, Borrowers shall deliver to Administrative Agent certified copies of each key-man life insurance policy and evidence of all premium payments. If Clarke or Wiley fail to obtain insurance as required under this **Section 6.07** or to pay any amount or furnish any required proof of payment to third persons and Lenders, Administrative Agent or Lenders may make all or part of such payments or obtain such insurance policy required in this **Section 6.07** and take any action under the policies that Lenders an Administrative Agent deem necessary or prudent.

### Section 6.08.    COMPLIANCE WITH LAWS.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to comply in all material respects with the requirements of all Laws and all Orders applicable to them or to their respective properties or businesses, except in such instances in which:  (a) such requirement of Laws or Order is being contested in good faith by appropriate Proceedings timely instituted and diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

### Section 6.09.    BOOKS AND RECORDS.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to:  (a) maintain proper Books and Records, in which full, true and correct (in all material respects) entries in conformity with GAAP consistently applied are made of all financial transactions and matters involving their respective properties and businesses; and (b) maintain such Books and Records in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over them, as the case may be.

### Section 6.10.    APPRAISALS; INSPECTION RIGHTS; LENDER MEETINGS.

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to permit representatives and independent contractors (including marine surveyors) of Administrative Agent to visit and inspect any of their respective properties, including the Facilities, to examine their corporate, financial and operating records, and make copies thereof or abstracts therefrom, to examine and audit the Collateral and to discuss their respective affairs, finances and accounts with their respective directors, officers, members, managers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice (which the parties contemplate to be at least two (2) days advance notice, other than under exigent circumstances as determined in Administrative Agent's reasonable judgment, where less than two (2) days advance notice may be given) to such Person; *provided* that, when an Event of Default exists, Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of Loan Parties at any time and without advance notice and as many times as Administrative Agent may require.  Loan Parties shall cause its senior management to hold meetings with Administrative Agent in person (if requested by Administrative Agent), on a semi-annual basis, to discuss Loan Parties' financial performance and projections. Loan Parties shall reimburse Administrative Agent if (but only if) a Default then exists for all reasonable out-of-pocket expenses incurred in connection with Administrative Agent's attendance at such meetings.

### Section 6.11.    DISSOLUTION

Within 10 Business Days of the Effective Date, the Loan Parties shall dissolve Maritime, Epic Alabama Shipyard, Epic Recycling Services and Epic Alabama Recyclers.  After the dissolution thereof, all references herein to the Shipyard Loan Parties shall mean Epic Alabama Holdings and EAMA.

**Section 6.12.     COLLATERAL ACCOUNTS AND EXCLUDED ACCOUNTS.**

**Schedule 6.12** sets forth details with respect to all Collateral Accounts and Excluded Accounts of each of the Loan Parties and its Subsidiaries in existence on the Effective Date.  Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to provide Administrative Agent five (5) days (or such shorter period as Administrative Agent, in its sole discretion, may otherwise agree) prior written notice before:  (a) establishing any Collateral Account or Excluded Account at or with any bank or other financial institution; or (b) terminating or otherwise materially modifying any Collateral Account or Excluded Account.  In addition, for each Collateral Account that any Loan Party or any of its Subsidiaries at any time maintains, such Loan Party or its Subsidiaries shall (except to the extent specifically not required by Administrative Agent in writing) cause the applicable bank or financial institution at or with which such Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account to perfect Administrative Agent's Lien, for the ratable benefit of each Lender, in such Collateral Account in accordance with the terms hereof and the Collateral Documents.

**Section 6.13.     FINANCIAL COVENANTS.**

(a)     **[Reserved]**

(b)     **Maximum Capital Expenditures**.  Loan Parties shall not make Capital Expenditures.

**Section 6.14.     PROTECTION OF INTELLECTUAL PROPERTY RIGHTS.**

Each of the Loan Parties shall and shall cause each of its respective Subsidiaries to:  (a) protect, defend and maintain the validity and enforceability of their respective Intellectual Property, except to the extent that the failure to do so does not and could not reasonably be expected to result in a Material Adverse Effect; (b) promptly advise Administrative Agent in writing of material infringements of their respective Intellectual Property; and (c) not allow any Intellectual Property that is material to the business of Loan Parties or any of their Subsidiaries to be abandoned, forfeited or dedicated to the public without Administrative Agent's written consent.

**Section 6.15.     LITIGATION COOPERATION.**

Loan Parties shall make available to Lending Parties, without expense to Lending Parties and as reasonably requested by Administrative Agent, each Loan Party and its officers, employees and agents and such Loan Party's Books and Records, to the extent that any Lending Party may deem them reasonably necessary to prosecute or defend any third-party Proceeding instituted by or against any Lending Party with respect to any collateral the subject of any Collateral Document or relating to such Loan Party.

**Section 6.16.     ERISA COMPLIANCE.**

Loan Parties shall comply and shall cause each of its respective Subsidiaries to comply with the provisions of ERISA with respect to any Plans to which Loan Parties or any such Subsidiary is a party as employer.

**Section 6.17.     [RESERVED]**

**Section 6.18.     ADDITIONAL ITEMS IN CONNECTION WITH THE FACILITIES.**

(a)     **Payment of Claims**.  Loan Parties shall pay and discharge all claims for labor done and materials and services furnished, and shall take all other steps to forestall the assertion of claims against or Liens upon the Facilities, except if subject to dispute by such Loan Party, the holder of such claim is not levying to enforce any Lien against the assets of such Loan Party which is not fully bonded and such dispute or claim is not in excess of the Threshold Amount.

(b)     **Compliance with Laws and Agreements**.  Loan Parties shall in all material respects comply with all Laws and with all contracts, leases, agreements and restrictions pertaining to the Facilities.

(c)    **Flood Insurance Regulations.**  Notwithstanding any provision herein to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) included in the definition of "Mortgaged Property," or "Collateral," or "Property," and no Building or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) is hereby encumbered hereby.  As used herein, "Flood Insurance Regulations" shall mean (a) the National Flood Insurance Act of 1968, (b) the Flood Disaster Protection Act of 1973, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), and (d) the Flood Insurance Reform Act of 2004, in each case as now or hereafter in effect or any successor statute thereto and including any regulations promulgated thereunder.

Section 6.19.    BOARD OBSERVATION RIGHTS.

(a)    For so long as the Loans remain outstanding, Administrative Agent shall have the right to designate one representative to exercise the rights as conferred pursuant to this **Section 6.19** (such representative being referred to as an "***Observation Party***") and shall notify the Administrative Loan Party of the identity of such Person.

(b)    The board of directors, boards of managers or similar governing bodies of the Administrative Loan Party shall hold general meetings at least four times in each calendar year for the purpose of discussing the business and operations of Borrowers and Subsidiaries.  At least three such meetings each calendar year shall be held in person at Administrative Loan Party's principal place of business.  Each Loan Party shall notify the Observation Party of the date and time for each general or special meeting of its board of directors, board of managers or similar governing body (or any committee thereof) or of the adoption of any resolutions by any such body or committee by written consent (describing in reasonable detail the nature and substance of such action) at the time notice is provided to the directors or managers of such Loan Party, and concurrently deliver to the Observation Party any materials delivered to directors or managers of such Loan Party, including a draft of any resolutions proposed to be adopted by written consent.  The Observation Party shall be free during the period prior to the meeting to contact the directors of such Loan Party and discuss the pending actions to be taken.

(c)    The Observation Party shall be entitled to, or to select one representative to, attend and participate (but not vote) in all meetings of the board of directors, board of managers or other governing body (including any committee thereof) of each of the Loan Parties, including telephonic meetings, and shall be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with such attendance and participation. The Observation Party (or its representative) shall be entitled to receive all written materials and other information given to the participants in such meetings.

(d)    Notwithstanding the foregoing, the chief executive officer or chairman of the board of directors or managers of Administrative Loan Party, after consultation with outside counsel, shall have the right to exclude any Observation Party from all or portions of any meeting of the board of directors (or similar governing body) or omit to provide the Observation Party with certain information if such persons believe in good faith that such exclusion or omission (i) is necessary in order to preserve the attorney-client privilege (provided, however, that, in any case, such Observation Party shall not be excluded unless all other persons whose receipt of such materials or presence at a meeting would result in a waiver of such privilege are also excluded) or (ii) involves information or analysis that would pose a conflict of interest relating to the Loans or with respect to any Lender or its representatives or business.  Loan Parties shall exercise good faith efforts to minimize all such exclusions.

(e)    Loan Parties shall pay all reasonable out-of-pocket expenses incurred by each Observation Party or any Lender in connection with the exercise by any Observation Party or any Lender of its rights under this **Section 6.19**.

Section 6.20.    FURTHER ASSURANCES.

Promptly upon the written request by Administrative Agent, each of the Loan Parties shall and shall cause each of its respective Subsidiaries to take such further acts (including the acknowledgment, execution, delivery, recordation, filing and registering of documents) as may reasonably be required from time to time to:  (a) carry out more effectively the purposes of this Agreement or any other Loan Document; (b) subject to the Liens created by any of the Collateral Documents any of the properties, rights or interests covered by any of the Collateral

Documents or any other properties, rights or interests (including immovable or real property) acquired by Loan Parties or any Subsidiary thereof following the Effective Date; (c) perfect and maintain the validity, effectiveness and priority of the Liens created or intended to be created by any of the Loan Documents; and (d) better assure, convey, grant, assign, transfer, preserve, protect and confirm to Lending Parties the rights, remedies and privileges existing or granted or now or hereafter intended to be granted to such Persons under any Loan Document or other document executed in connection therewith. Without limiting the generality of the foregoing, Loan Parties hereby agree that, within ten (10) Business Days of any Person becoming a Subsidiary of a Loan Party (notwithstanding any provision of this Agreement prohibiting the creation or acquisition of any such Subsidiary) following the Effective Date, Loan Partiest shall cause such Person to: (a) enter into a Joinder Agreement or otherwise deliver a Guaranty; and (b) enter into such Collateral Documents as shall be required by Administrative Agent or Required Lenders so as to create, perfect and protect a Lien in favor of Administrative Agent in all of the properties of such Person.

**Section 6.21.    POST-CLOSING MATTERS.**

With respect to each condition to closing set forth in **Section 4.01(a)** that is not delivered on or before the Effective Date, Administrative Agent shall have received the deliveries set forth on **Schedule 6.21** within the time period specified on such **Schedule 6.21** (or by such later date as Administrative Agent agrees to in its sole discretion). Any representation or covenant provided for in this Agreement that refers to the items listed in this **Section 6.21** shall not be considered in breach due solely to the fact that such item was not delivered to Administrative Agent on or before the Effective Date, and Borrowers shall have until the applicable time period provided for in this Error! Reference source not found.**1** to provide such items to Administrative Agent.

**Section 6.22.    MATERIAL CONTRACTS.**

Concurrently with the delivery of the financial statements referred to in subsections (a) and (b) of Section 6.01, provide Administrative Agent with copies of (a) each Material Contract entered into since the delivery of the previous financial statements, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previous financial statements.

**Section 6.23.    ENVIRONMENTAL MATTERS.**

Each of the Loan Parties shall and shall cause each of their Subsidiaries to: (i) conduct their operations in compliance with Environmental Laws in all material respects, including duly obtaining or filing for all permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Facilities of the Loan Parties and each of their Subsidiaries and complying with the terms and conditions of all such permits, licenses and similar authorizations; (ii) manage all Hazardous Material used or generated by the Loan Parties and each of their Subsidiaries in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment; (iii) not cause the exposure of any person or property to any Hazardous Materials in connection with any Facility or operation of the Loan Parties or any of their Subsidiaries that could reasonably be expected to violate any Environmental Law; and (iv) respond to any release of any Hazardous Materials at, on, or from any of Loan Parties or any of their Subsidiaries' Facilities as required by Environmental Laws.

**Section 6.24.    ACCESS TO DATA.**

EAMA shall at all times maintain all of its electronic business records and business systems comprising its data on a duplicate server located at 811 Louisiana St., Houston, Texas 77002, and ensure that certain employees of Administrative Agent designated by Administrative Agent shall at all times have both remote and physical access to such business records and systems pursuant to arrangements that are satisfactory to Administrative Agent.

**Section 6.25.    INDEPENDENT BOARD MEMBERS.**

Promptly upon request by Administrative Agent (and in any event within one Business Day of Epic Alabama Holdings's or Maritime's, as applicable, receipt of such request), Epic Alabama Holdings and Maritime shall each appoint three independent board members that are designated by Administrative Agent in its discretion

(the "**Initial Independent Managers**") to its board of managers. Each of Epic Alabama Holdings and Maritime shall cause its board of managers to be comprised of at least three (3) independent board members (the "**Independent Managers**") appointed by the Administrative Agent in its sole discretion (who initially shall be the Initial Independent Managers, and no more than two other members of the board of managers. No Independent Manager may be replaced without the consent of the Administrative Agent, and if any Independent Manager shall resign at any time, such Independent Manager shall be replaced with another independent board member for each such resigning Independent Manager who is acceptable to Administrative Agent in its sole discretion.

**Section 6.26.    FINANCIAL ADVISOR.**

At all times from and after the Effective Date, the Loan Parties and their respective Subsidiaries shall continuously engage a financial advisor that is acceptable to Administrative Agent in its sole discretion, which financial advisor is in place at the Loan Parties' chief executive office on terms and with a scope of work and authority at all times satisfactory to Administrative Agent in its sole discretion (it hereby being agreed that Ankura Consulting is acceptable to the Administrative Agent).

**Section 6.27.    TRANSITION PLANS.**

At all times from and after the Effective Date, the Shipyard Loan Parties shall, and shall cause their respective Subsidiaries to, comply in all respects with the CEO transition plan and CFO transition plan delivered to the Administrative Agent in connection with the Eighth Amendment.

## ARTICLE VII.
## NEGATIVE COVENANTS

So long as any Obligations (other than Unasserted Obligations) have not been repaid in full, Loan Parties shall not and shall not permit any Subsidiary of Loan Parties directly or indirectly to do any of the following:

**Section 7.01.    LIENS.**

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, including on the Collateral, Facilities, or any materials, equipment, or other property used in the Facilities other than any of the following (collectively, "**Permitted Liens**"):

(a)    any Lien created in favor of any Lending Party under any Loan Document;

(b)    any Lien existing on the date hereof and listed on **Schedule 7.01** and any renewals or extensions thereof, *provided* that: (i) the property encumbered thereby is not changed; (ii) the amount secured or benefited thereby is not increased; (iii) the direct or any contingent obligor with respect thereto is not changed; (iv) the priority of any Liens referenced in **Section 7.01(a)** are not adversely affected thereby; and (v) any renewal or extension of the obligations secured or benefited thereby is permitted by **Section 7.03(b)**;

(c)    any Lien for tax liabilities, assessments and governmental charges or levies not yet due or to the extent that non-payment thereof is permitted by **Section 6.04**; *provided* that no notice of lien has been filed or recorded under the Code;

(d)    any landlord's, supplier's, producer's, carrier's, warehouseman's, mechanic's, materialman's, repairman's or other like Lien arising in the ordinary course of business that is not overdue for a period of more than thirty (30) days or that is being contested in good faith and by appropriate proceedings timely instituted and diligently conducted, if adequate reserves with respect thereto, if any are required under GAAP, are set aside on the financial statements of the applicable Person;

(e)    any pledge or deposit in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

58

(f)      any deposit to secure the performance of bids, trade contracts or leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(g)      any sublease of immovable or real property in the ordinary course of business and any lease, sublease, easement, right-of-way, encroachment, restriction or other similar encumbrance affecting immovable or real property that, when aggregated with all other such Liens, does not in any case materially detract from the value of the property subject thereto or adversely affect the priority or value of any rights arising from or related to such property, or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)      any Lien securing a judgment for the payment of money not constituting an Event of Default under **Section 8**.**01(h)** or securing an appeal or other surety bond related to any such judgment;

(i)      any Lien existing on any property prior to the acquisition thereof by any Loan Party or any Subsidiary thereof or existing on any property of any Person that becomes a Subsidiary of a Loan Party after the date hereof prior to the time such Person becomes a Subsidiary of such Loan Party; *provided* that:  (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary of a Loan Party, as the case may be; (ii) such Lien shall not apply to any other property or assets of a Loan Party or any Subsidiary thereof; (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary of a Loan Party, as the case may be; and (iv) such Lien does not adversely affect the priority of any Liens referenced in **Section 7.01(a)**;

(j)      subject to the restrictions on Capital Expenditures set forth in **Section 7**.**07**, any Lien securing obligations in respect of a capital lease on the assets subject to such lease; *provided* that such capital lease is otherwise permitted hereunder;

(k)      any Lien arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; *provided* that:  (i) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by any Loan Party or any Subsidiary thereof in excess of those set forth by regulations promulgated by the FRB; and (ii) such deposit account is not intended by a Loan Party or any Subsidiary thereof to provide collateral to the depository institution;

(l)      subject to the restrictions on Capital Expenditures set forth in **Section 7**.**07**, any Lien securing Debt permitted under **Section 7.03(d)(ii)** to the extent that the aggregate amount of all Debt at any time outstanding secured by all such Liens does not exceed the Threshold Amount; *provided* that:  (i) any such Lien does not at any time encumber any property other than the property financed by the related Debt; and (ii) the Debt secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of the acquisition thereof;

(m)      the right of a licensee under a license agreement entered into by a Loan Party or any Subsidiary thereof, as licensor, in the ordinary course of business for the use of Intellectual Property or other incorporeal or intangible assets of a Loan Party or any such Subsidiary; *provided* that, in the case of any such license granted by a Loan Party or any such Subsidiary on an exclusive basis:  (i) such Person shall have determined in its reasonable business judgment that such Intellectual Property or other incorporeal or intangible assets are no longer useful in the ordinary course of business; (ii) such license is for the use of Intellectual Property or other incorporeal or intangible assets in geographic regions in which a Loan Party or any Subsidiary thereof does not have material operations or in connection with the exploitation of any product not then produced or planned to be produced by a Loan Party or any Subsidiary thereof; or (iii) such license is granted in connection with a transaction otherwise permitted by this Agreement in which a third party acquires the right to manufacture or sell any product covered by such Intellectual Property or other incorporeal or intangible assets from a Loan Party or such Subsidiary; *provided further* that, in the case of clauses (ii) and (iii) of this subsection (m), a Loan Party or such Subsidiary has determined that it is in its best economic interest to grant such license;

(n)      Permitted Maritime Liens;

(o)  Permitted Exceptions; and

(p)  Liens securing Debt permitted under Section 7.03(c)

**Section 7.02.  INVESTMENTS.**

Make or suffer to exist any Investments, except:

(a)  Investments in cash and Cash Equivalents;

(b)  Investments arising from transactions by a Loan Party or any Subsidiary thereof with customers or suppliers in the ordinary course of business, including Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers and suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(c)  Investments of Loan Parties on the Effective Date disclosed on **Schedule 5.16**;

(d)  Investments made for the benefit of employees of Loan Parties or any Subsidiary thereof for the purposes of deferred compensation in the ordinary course of business in accordance with past practices;

(e)  Investments consisting of Capital Expenditures permitted by **Section 7.07**; and

(f)  Investments existing as of the date hereof and disclosed in the Closing Financial Statements.

**Section 7.03.  DEBT.**

Create, incur, assume or suffer to exist any Debt, except:

(a)  Debt under the Loan Documents;

(b)  Debt outstanding on the date hereof and listed on **Schedule 7.03**, and any refinancings, refundings, renewals or extensions thereof; *provided* that:  (i) the amount of such Debt is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder; and (ii) the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Debt, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to Loan Parties or Lenders than the terms of any agreement or instrument governing the Debt being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Debt does not exceed the then applicable market interest rate;

(c)  Debt incurred under the Junior Loan Agreement in an aggregate principal balance not to exceed $35,000,000 outstanding at any time (plus any interest that is paid in kind by being added to the principal balance thereof), so long as such Debt is, at all times subject to the Intercreditor Agreement;

(d)  subject to the restrictions on Capital Expenditures set forth in **Section 7.07**, Debt in respect of: (i) capital leases; and (ii) purchase money obligations for fixed or capital assets within the limitations set forth in **Section 7.01(j)** and **Section 7.01(l)**;

(e)  Subordinated Debt;

(f)  Debt in respect of:  (i) workers' compensation claims or obligations in respect of health, disability or other employee benefits; (ii) property, casualty or liability insurance or self-insurance; (iii) completion, bid, performance, appeal or surety bonds issued for the account of Loan Parties or any Subsidiary thereof; (iv) taxes,

60

assessments or other government charges not yet delinquent or which are being contested in compliance with **Section 6.04**; or (v) bankers' acceptances and other similar obligations not constituting Debt for borrowed money; in each of the foregoing cases, to the extent incurred in the ordinary course of business;

(g)        intercompany Debt of Loan Parties or any Subsidiary owing to and held by Loan Parties or any Subsidiary; *provided* that (i) if a Loan Party is the obligor on such Debt and any Subsidiary (other than a Guarantor) is the obligee thereof, such Debt must be unsecured and expressly subordinated to the prior payment in full in cash of all Obligations (including, with respect to any Guarantor, its obligations under **Section 10.14**), and (ii) Debt owed to Loan Parties or any Guarantor shall not be in excess of the Threshold Amount in the aggregate during the term of this Agreement and must be evidenced by an unsubordinated promissory note pledged to Administrative Agent under the applicable Collateral Document;

(h)        Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, *provided* that such Debt is promptly extinguished;

(i)        Debt arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(j)        Debt of Loan Parties or any of their Subsidiaries arising from customary cash management services or in connection with any automated clearinghouse transfer of funds in the ordinary course of business;

(k)        Debt of Loan Parties or any of their Subsidiaries, in an aggregate outstanding face amount not to exceed at any time the Threshold Amount, arising under or in respect of letters of credit that secure obligations under immovable or real property leases and subleases;

(l)        Credit cards of any Loan Party in amounts ordinary and customary and consistent with past credit amounts not to exceed, in the aggregate outstanding at any time, Seven Hundred Thousand Dollars ($700,000); and

(m)        [reserved]; and

(n)        Debt incurred under the Seller Note so long as (i) such Debt is at all times subject to the Seller Subordination Agreement and (ii) no payments or prepayments of any kind in cash (whether in respect of principal, interest, expenses or other amounts) may be made thereon except to the extent permitted under the Seller Subordination Agreement.

In addition, neither Loan Parties nor any of their Subsidiaries shall maintain any Collateral Account other than in accordance with the provisions of **Section 6.12**.

**Section 7.04.    FUNDAMENTAL CHANGES.**

(a)        Engage in any material line of business other than a Related Business;

(b)        Subject to **Section 6.11**, merge, dissolve, liquidate, consolidate (including, without limitation, by division or by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" or similar plan under the Delaware Limited Liability Company Act or any similar law of any other jurisdiction) with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(i)        any Subsidiary of Loan Parties may merge with a Borrower, provided that such Borrower shall be the continuing or surviving Person; and

(ii)        any Subsidiary of Loan Parties may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Loan Party or to another Subsidiary of a Loan Party; provided that if the

transferor in such a transaction is a wholly-owned Subsidiary of a Borrower, then the transferee must either be a Borrower or a wholly-owned Subsidiary of a Borrower.

(c)    Make any voluntary, optional payment or prepayment on account of, or optional redemption or acquisition for value of any portion of, any Debt for borrowed money (other than that arising under:  (i) the Loan Documents in accordance with the provisions thereof and (ii) corporate credit cards to the extent such Debt is otherwise permitted under **Section 7.03**);

(d)    Without at least thirty (30) days' prior written notice to Administrative Agent:  (i) change its jurisdiction of organization; (ii) change its organizational structure or type; (iii) change its legal name; or

(e)    Create or acquire any Subsidiary.

**Section 7.05.    DISPOSITIONS.**

Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of used, obsolete, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and the abandonment or other Disposition of Intellectual Property that is, in the reasonable judgment of the management of a Loan Party, no longer economically practicable to maintain or useful in the conduct of the business of such Loan Party and its Subsidiaries, taken as a whole;

(b)    Dispositions of:  (i) inventory or Intellectual Property in the ordinary course of business consistent with past practices; or (ii) Intellectual Property pursuant to licenses permitted by **Section 7.01(m)**;

(c)    Dispositions of equipment to the extent that:  (i) such property is exchanged for credit against the purchase price of similar replacement equipment; or (ii) the proceeds of such Disposition are reasonably promptly applied to the acquisition of such replacement equipment;

(d)    Dispositions permitted by **Section 7.04(b)**;

(e)    (i) the unwinding of any Swap Contract; (ii) to the extent permitted hereunder, Restricted Payments; and (iii) to the extent permitted hereunder and otherwise constituting Dispositions, Investments;

(f)    Dispositions of cash and Cash Equivalents in the ordinary course of business; and

(g)    Dispositions of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business.

**Section 7.06.    RESTRICTED PAYMENTS.**

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, *except* that:  (a) each Subsidiary may make Restricted Payments to Loan Parties (and, in the case of a Restricted Payment by a non-wholly-owned Subsidiary, to Loan Parties and to any Subsidiary and to each other owner of Equity Interests of such Subsidiary on a pro rata basis based on their relative ownership interests); (b) Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such Person; and (c) Loan Parties and each Subsidiary may purchase, redeem or otherwise acquire its common Equity Interests or warrants or options to acquire any such common Equity Interests (i) with the proceeds received from the substantially concurrent issue of new common Equity Interests or (ii) from service providers at cost upon termination of employment or service.

**Section 7.07.    CAPITAL EXPENDITURES.**

Make (whether in one transaction or a series of transactions) any financed or unfinanced Capital Expenditures.

**Section 7.08.**    **TRANSACTIONS WITH AFFILIATES.**

Enter into any transaction of any kind with any Affiliate of Loan Parties, any Affiliate of any Individual Guarantor or any Affiliate of any Equity Holder Pledgor, irrespective of whether in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Loan Parties or a Subsidiary of Loan Parties as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than such Affiliate, provided that the foregoing restriction shall not apply to: (a) transactions between or among Borrowers and Guarantors, (b) Restricted Payments permitted hereunder, and (c) transactions with Acqua Liana, White Oak, any Affiliate of Acqua Liana or White Oak, the Selling Lenders (as defined in the Resignation Agreement), or the Lenders (as defined in the Existing Credit Agreement). Notwithstanding the foregoing proviso, Loan Parties shall not permit any use of the Shipyard Property by any Person other than Epic Alabama or any real property lessee of any portion of the Shipyard Property pursuant to a real property lease agreement approved in writing by Administrative Agent in its discretion and subject to the satisfaction of such conditions as Administrative Agent may require in its discretion, and other than their respective invitees.

**Section 7.09.**    **BURDENSOME AGREEMENTS.**

(a)    Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that: (i) limits the ability:  (A) of any Subsidiary of Loan Parties to make Restricted Payments to Loan Parties or to otherwise transfer property to Loan Parties; (B) of any Subsidiary of Loan Parties to Guarantee the Debt of Loan Parties; or (C) of Loan Parties or any Subsidiary thereof to create, incur, assume or suffer to exist Liens on property of such Person; *provided* that this sub-clause (C) shall not prohibit any negative pledge incurred or provided in favor of any holder of Debt under **Section 7.03(b)**, **Section 7.03(d)** or **Section 7.03(f)** solely to the extent that any such negative pledge relates to the property financed by or the subject of such Debt; or (ii) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person;

(b)    (i) Amend, supplement, modify, waive or alter (or agree to do so):  (A) any provisions of the Merdia Note without the express prior written consent of Administrative Agent, (B) any provisions of the Seller Note without the express prior written consent of Administrative Agent, (C) any of its material rights or material obligations, including any of the foregoing arising under any Material Contract, without the express prior written consent of Administrative Agent unless no Default exists or could reasonably be expected to result by virtue thereof; or (D) its Organizational Documents unless no Default exists or could reasonably be expected to result by virtue thereof; or (ii) terminate any Material Contract other than as a result of a material breach by the counterparty(ies) thereunder; or

(c)    Pay salaries, bonuses, commissions, consultant fees or other compensation to any officer, director, manager, equity holder or consultant of any Loan Party or any of its Subsidiaries, or any family member of any of the foregoing unless the board of directors of such Loan Party, acting in good faith, has determined that such amounts are not excessive or unreasonable.

**Section 7.10.**    **[RESERVED].**

**Section 7.11.**    **CERTAIN GOVERNMENTAL REGULATIONS.**

(a)    Be or become subject at any time to any law, regulation, or list of any government agency (including the OFAC list) that prohibits or limits any Lending Party from making any loans or extensions of credit to any Loan Party or from otherwise conducting business with any Loan Party, or (b) fail to provide documentary and other evidence of any Loan Party's identity as may be requested by any Lending Party at any time to enable such Lending Party to verify any Loan Party's identity or to comply with any applicable Laws, including Section 326 of the Patriot Act.

**Section 7.12.    DISQUALIFIED EQUITY INTERESTS.**

(a)    Issue any Disqualified Equity Interests, or (b) be or become liable in respect of any obligation (contingent or otherwise) to purchase, redeem, retire, acquire or make any other payment in respect of any Equity Interests of any Loan Party or any Subsidiary, except as permitted under **Section 7.06**.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01.    EVENTS OF DEFAULT.**

Each of the following shall constitute an event of default hereunder (each, an "***Event of Default***"):

(a)    **Non-Payment**.  Borrowers, any other Loan Party, any Individual Guarantor or any Equity Holder Pledgor fails to pay:  (i) when and as required to be paid herein, any amount of principal of any Term Loan; (ii) within three (3) Business Days after the same becomes due, any interest on any Term Loan or any fee due hereunder; or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    **Specific Covenants**.  (i) Any Loan Party or Subsidiary thereof, any Individual Guarantor or any Equity Holder Pledgor fails to perform or observe:  (A) any term, covenant or agreement contained in any of **Section 3.05**, **Section 6.01**, **Section 6.02**, **Section 6.03**, **Section 6.05**, **Section 6.07**, **Section 6.10**, **Section 6.11**, **Section 6.13**, **Section 6.17**, **Section 6.18, Section 6.19, Section 6.21** or **Article VII**; or (B) any other term, covenant or agreement contained in any Loan Document, which failure is determined by Required Lenders (acting reasonably) not to be capable of being cured; or (ii) any Equity Holder Pledgor fails to perform or observe any term, covenant or agreement contained in its Equity Holder Pledge Agreement; (iii) Stockbridge fails to perform or observe any term, covenant or agreement contained in the Sanare Pledge Agreement, (iv) [reserved]; or (v) any "event of default" occurs under any Ship Mortgage; or

(c)    **Representations and Warranties**.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party, Equity Holder Pledgor, any Individual Guarantor, Stockbridge, Wiley or ERP herein, in any other Loan Document or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(d)    **Other Defaults**.  Any Loan Party, any Individual Guarantor, Equity Holder Pledgor, Stockbridge, Wiley or ERP fails to perform or observe any other covenant or agreement (not specified in **Section 8.01(a)**, **Section 8.01(b) or Section 8.01(c)**) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days; or

(e)    **Cross-Default.** (x) Loan Parties or any Subsidiary thereof:  (i) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Debt (other than Debt hereunder and Debt under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount; (ii) fails to observe or perform any other agreement or condition relating to any such other Debt or contained in any document evidencing, securing or relating to any of the foregoing, or any other default or event occurs, the effect of which failure, default or other event is to cause, or to permit the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Debt to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity or (iii) [reserved]; or (y) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from:  (A) any event of default under such Swap Contract as to which Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract); or (B) any Termination Event (as so defined) under such Swap Contract as to which any Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by any Loan Party or any such Subsidiary as a result thereof is greater than the Threshold Amount; or

(f)    **Insolvency Proceedings**, **Etc**.  Any Loan Party, any Individual Guarantor, any Equity Holder Pledgor or any Subsidiary thereof institutes or consents to the institution of any Proceeding under any Bankruptcy Laws, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for forty-five (45) days; or any Proceeding under any Bankruptcy Laws relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for forty-five (45) days, or an order for relief is entered in any such Proceeding; or

(g)    **Inability to Pay Debts**; **Attachment**.  (i) Any Loan Party, any Individual Guarantor, any Equity Holder Pledgor or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)    **Judgments**.  There is entered against any Loan Party or any Subsidiary thereof:  (i) a final Order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage); or (ii) any one or more non-monetary final Orders that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case:  (A) enforcement Proceedings are commenced by any creditor upon such Order; or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such Order, by reason of a pending appeal or otherwise, is not in effect; or

(i)    **ERISA**.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of Loan Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount; or (ii) Loan Parties or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    **Invalidity of Loan Documents**.  Any Loan Document or any provision thereof, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all of the Obligations (other than Unasserted Obligations) and other than as a result of an action or inaction by Administrative Agent or any Lender, ceases to be in full force and effect in accordance with its terms; or any Loan Party, any Individual Guarantor, any Equity Holder Pledgor or any other Person (other than a Lending Party) contests in any manner in writing the validity or enforceability of any Loan Document or any provision thereof; or any Loan Party, any Individual Guarantor or any Equity Holder Pledgor or any other Person obligated under any Loan Document denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document or any provision thereof; or

(k)    **Impairment of Collateral**.  Any Lien purported to be created by any Collateral Document shall cease to be, or shall be asserted by any Loan Party or any Equity Holder Pledgor or any other Person obligated thereunder not to be, a valid, perfected, first-priority Lien (except as otherwise expressly provided in this Agreement or such Collateral Document and subject to Permitted Liens) in the assets covered thereby, other than in respect of assets that, individually and in the aggregate, are not material to Loan Parties, taken as a whole, or in respect of which the failure of the Lien thereon to be a valid, perfected first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) Lien could not in the reasonable judgment of Administrative Agent or Required Lenders, be expected to have a Material Adverse Effect; or

(l)    **[Reserved]**;

(m)    **Default Under Subordinated Debt Documents**.    Any Person (other than a Lending Party) party to a document subordinating Subordinated Debt shall fail to observe or perform any covenant, condition or agreement contained in such document; or

(n)     **Certain Actions**.  Any Loan Party, any Individual Guarantor or any Equity Holder Pledgor or any of any of their senior officers is criminally indicted or convicted of (i) a felony or (ii) violating any state or federal Laws (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that has resulted in, or could reasonably be expected to lead to, a forfeiture of any material property or any assets (including the Collateral) upon which such Loan Party has granted a Lien to Administrative Agent or the right to conduct a material part of its business; or

(o)     **Change of Control**.  There occurs a Change of Control; or

(p)     **Material Contracts**.  Any termination (other than termination upon expiry of the stated term of the agreement) or loss of a Material Contract, or any default or event of default (however defined) under a Material Contract that gives the non-defaulting party the right to terminate such Material Contract in a manner that could adversely affect Administrative Agent or the Lenders; or

(q)     **Material Adverse Effect**.  There occurs a Material Adverse Effect.

**Section 8.02.**    RIGHTS AND REMEDIES.

(a)     **Rights and Remedies Generally**.  While an Event of Default exists, Administrative Agent may (or, upon the request of the Required Lenders, shall), without notice or demand, do any or all of the following:

(i)     declare all Obligations immediately due and payable (but if an Event of Default described in **Section 8.01(f)** occurs, all Obligations shall immediately be due and payable without any action by Administrative Agent or any Lender);

(ii)    stop advancing money or extending credit for Borrowers' benefit under this Agreement or under any other agreement among Borrowers and Administrative Agent or any Lender;

(iii)   settle or adjust disputes and claims directly with Account Debtors on accounts of any Loan Party for amounts on terms and in any order that Administrative Agent considers advisable, notify any Person owing money to any Loan Party, of Administrative Agent's Lien on such funds, and verify the amount of such account.  Each Loan Party shall collect all payments in trust for Administrative Agent for the benefit of Lenders and, if requested by Administrative Agent, immediately deliver the payments to Lenders in the form received from the Account Debtor, with proper endorsement for deposit;

(iv)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its Lien upon the Collateral.  Each Loan Party shall assemble the Collateral if Administrative Agent so requests and make it available as Administrative Agent so designates.  Administrative Agent or any Lender may enter the premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to Administrative Agent's Lien thereon and pay all expenses incurred.  Each Loan Party grants Administrative Agent for the benefit of Lenders a license to enter and occupy any of its premises, without charge, to exercise any of Administrative Agent's or any other Lending Party's rights or remedies;

(v)     apply to the Obligations any (A) balances and deposits of any Loan Party that it holds, or (B) amount held by Administrative Agent or Lenders owing to or for the credit or the account of any Loan Party;

(vi)    ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral.  Administrative Agent is hereby granted a non-exclusive, royalty-free license or other right to use without charge, Loan Parties' or any of their Subsidiaries' labels, patents, copyrights, mask works, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, other Intellectual Property, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Administrative Agent's exercise of its rights under this Section 8.02, Loan Parties' and each of their Subsidiaries' rights under all licenses and all franchise agreements inure to Administrative Agent for benefit of Lenders;

(vii)    place a "hold" on any account maintained with Administrative Agent and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(viii)    demand and receive possession of the Books and Records of each Loan Party; and

(ix)    exercise all default rights and remedies available to Lending Parties under the Loan Documents or at law or equity, including all default remedies provided under the Uniform Commercial Code (including disposal of the collateral (including all Collateral) pursuant to the terms thereof).

(b)    Power of Attorney. Each Loan Party hereby irrevocably appoints Administrative Agent as its lawful attorney-in-fact, to: (i) if such Loan Party refuses to, or fails timely to execute and deliver any of the documents required to be delivered by it pursuant to the terms hereof, sign the name of such Loan Party on any of such documents; (ii) at any time that an Event of Default has occurred that has not been waived in writing by Administrative Agent: (A) endorse such Loan Party's name on any checks or other forms of payment or security, sign such Loan Party's name on any invoice or bill of lading for any account or drafts against Account Debtors or sign such Loan Party's name on any notices to Account Debtors; (B) endorse such Loan Party's name on any collection item that may come into Administrative Agent's possession; (C) make, settle, and adjust all claims under such Loan Party's policies of insurance and make all determinations and decisions with respect to such policies of insurance; (D) take control, in any manner, of any item of payment or proceeds relating to any Collateral; (E) prepare, file, and sign such Loan Party's name to a proof of claim in bankruptcy or similar document against any Account Debtor, or to any notice of lien, assignment, or satisfaction of lien or similar document in connection with any of the Collateral; (F) receive, open and dispose of all mail addressed to such Loan Party, and upon Administrative Agent's commencement of any enforcement action, notify postal authorities to change the address for delivery thereof to such address as Administrative Agent may designate; (G) use the information recorded on or contained in any data processing equipment, computer hardware, and software relating to the Collateral; (H) settle and adjust disputes and claims respecting the Accounts, Chattel Paper or General Intangibles directly with Account Debtors, for amounts and upon terms that Administrative Agent determines to be reasonable, and Administrative Agent may cause to be executed and delivered any documents and releases that Administrative Agent determines to be necessary; (I) cause an Account Debtor's insurers to add Administrative Agent as loss payee under the relevant insurance policy; (J) pay, contest or settle any Lien, charge or adverse claim in, to or upon any or all of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (K) transfer any Collateral into the name of Administrative Agent for the benefit of Lenders or a third party as the Uniform Commercial Code permits; and (L) do all other acts and things necessary, in Administrative Agent's determination, to fulfill such Loan Party's obligations under this Agreement; and (iii) at any time: (A) send request for verification of Accounts; and (B) file UCC-3 assignments reflecting Administrative Agent as assignee of such Loan Party with respect to any UCC-1 financing statements filed by such Loan Party in connection with Collateral. Each Loan Party hereby appoints Administrative Agent as its lawful attorney-in-fact to sign such Loan Party's name on any documents necessary to perfect or continue the perfection of any security interest or other Lien in the Collateral regardless of whether an Event of Default has occurred until all Obligations (other than Unasserted Obligations) have been repaid in full. Administrative Agent's foregoing appointment as the attorney-in-fact for each Loan Party, and all of Administrative Agent's rights and powers, being coupled with an interest, are irrevocable until all Obligations (other than Unasserted Obligations) have been fully paid and performed when due (as applicable).

(c)    **Protective Advances**. Administrative Agent for itself or on behalf of Lenders (shall be authorized, in its sole discretion, regardless of (i) the existence of a Default or an Event of Default, or (ii) any other contrary provision of this Agreement, to make loans on behalf of the Borrowers (or any of them), if and to the extent that Administrative Agent deems such loans are necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of, or maximize the amount of, repayment of the Obligations, or (C) to pay for insurance or any other amount which a Loan Party is obligated to pay under this Agreement, any other Loan Document or otherwise (each such loan, a "***Protective Advance***"). Administrative Agent shall use commercially reasonable efforts, to the extent practicable, to consult with Lenders (as applicable) prior to making any Protective Advance. Without limiting the generality of the foregoing, it is anticipated that Borrowers may need Protective Advances in an aggregate principal amount of up to $10,000,000 to fund their working capital needs, which Protective Advances may be made in the Lenders' sole and absolute discretion. Accordingly, in the event

67

that Administrative Agent and any Lender elects to make any such Protective Advance during such time period (without any obligation to do so), and without limiting the right of Administrative Agent and the Lenders to make Protective Advances at other times or in different amounts without the consent of Borrowers, Borrowers hereby consent and agree to the foregoing. Administrative Agent shall use commercially reasonable efforts, to the extent practicable, to consult with Lenders (as applicable) prior to making any Protective Advance. Notwithstanding the foregoing, in no event shall Administrative Agent or any Lender have any duty or obligation to make any Protective Advance. All Protective Advances shall constitute expenses reimbursable under **Section 10.04**, shall be immediately due and payable, shall bear cash interest until paid at the then highest interest rate applicable to any of the Obligations and shall be secured by the Collateral. The making of any Protective Advances shall not be or be deemed to be an agreement to make Protective Advances in similar or different circumstances in the future and shall not operate or be deemed to operate as a waiver by Administrative Agent or any Lender of any Event of Default.

(d)     **Application of Funds.**

(i)     No Loan Party shall have the right to specify the order or the accounts to which Administrative Agent shall allocate or apply any payments required to be made by Borrowers to Administrative Agent for the benefit of the Lending Parties or otherwise received by Administrative Agent on behalf of Lenders under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(ii)     All payments, prepayments, and proceeds of collateral (including the Collateral) and any other amounts received on account of the Obligations shall be applied by Administrative Agent until exhausted in the following order:

(A)     *first*, to Administrative Agent, to pay all fees, costs, expenses and indemnification payments then due to Administrative Agent under the Loan Documents (excluding all Protective Advances made by Administrative Agent);

(B)     *second*, *pro rata*, to Administrative Agent and any Lender which has made a Protective Advance, to pay all accrued but unpaid interest (including interest at the Default Rate) in respect of all Protective Advances made by such Persons;

(C)     *third*, *pro rata*, to Administrative Agent and any Lender which has made a Protective Advance, to pay the principal of all Protective Advances made by such Persons;

(D)     *fourth, pro rata*, to Lenders according to their respective Percentage Shares, to pay all accrued but unpaid interest (including interest at the Default Rate) on the Term Loans owing to Lenders;

(E)     *fifth*, *pro rata*, to Lenders according to their respective Percentage Shares, to pay the Outstanding Amount of the Term Loans, *pro rata*, until such time as the Outstanding Amount of the Term Loans has been paid in full; and

(F)     *sixth*, *pro rata*, to Administrative Agent and Lenders, to pay all remaining Credit Outstandings and other Obligations owing to Administrative Agent or any Lenders;

After payment in full of all Obligations (other than Unasserted Obligations), any surplus remaining shall be paid to Borrowers or other Persons legally entitled thereto; if any deficiency exists, Borrowers shall remain liable to Administrative Agent and Lenders for such deficiency. If Administrative Agent or any Lender, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of any collateral (including the Collateral), Administrative Agent or such Lender, as applicable, shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Administrative Agent or such Lender of cash therefor.

(iii)    Unless otherwise expressly provided for herein, all payments made to any Lending Party for the benefit of Lenders (or any of them) on account of the Obligations (other than that portion of the Obligations consisting of the Outstanding Amount of all Credit Outstandings or any fees payable in connection with the retirement, prepayment or termination of all or a portion of the Obligations) shall be treated as interest for U.S. federal income tax purposes.

(e)    **Administrative Agent's Liability for Collateral**.  So long as Administrative Agent and Lenders comply with reasonable banking practices regarding the safekeeping of any collateral the subject of the Collateral Documents, Administrative Agent and Lenders shall not be liable or responsible for:  (i) the safekeeping of all or any such collateral; (ii) any loss or damage to all or any such collateral; (iii) any diminution in the value of all or any such collateral; or (iv) any act or default of any carrier, warehouseman, bailee, or other Person.  Loan Parties bear all risk of loss, damage or destruction of any collateral the subject of the Collateral Documents.

(f)    **No Waiver**.  Administrative Agent's or any Lender's failure, at any time or times, to require strict performance by any Loan Party, any Individual Guarantor or any Equity Holder Pledgor of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Administrative Agent or such Lender thereafter to demand strict performance and compliance herewith or therewith.  Administrative Agent and Lenders have all rights and remedies provided under the Uniform Commercial Code, by law, or in equity.  Any amounts paid by Administrative Agent or any Lender on any Loan Party's or any Individual Guarantor's behalf as provided herein are expenses reimbursable under **Section 10.04** and shall bear interest at the highest interest rate then applicable to any of the Obligations and shall be secured by the collateral the subject of the Collateral Documents.  No payments by Administrative Agent or any Lender shall be deemed an agreement to make similar payments in the future or a waiver of any Event of Default by Administrative Agent or any Lender.

## ARTICLE IX.
## ADMINISTRATIVE AGENT

**Section 9.01.    APPOINTMENT AND AUTHORIZATION OF ADMINISTRATIVE AGENT.**

(a)    Each Lender hereby irrevocably appoints White Oak to act on its behalf as Administrative Agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.  Each Lender appoints the Administrative Agent to act as trustee in connection with the Collateral Documents.  The Administrative Agent accepts such appointment as trustee of any collateral under the Collateral Documents and declares that it holds such collateral on trust for the Lenders on the terms contained in this Agreement and the Collateral Documents.  Except for the provisions of **Section 9.06**, the provisions of this **Article IX** are solely for the benefit of Lending Parties, and none of Borrowers or any other Loan Party or any other Person shall have rights as a third party beneficiary of any of such provisions.

(b)    Each Lending Party hereby further designates, appoints and transfers to Administrative Agent the respective rights of each other Lending Party to receive, hold, administer and enforce each Ship Mortgage covering the Vessels as trustee mortgagee on behalf of Lending Parties, and to take such action as trustee mortgagee and to exercise such powers and discretion respecting each Ship Mortgage as are delegated to a ship mortgagee under each Ship Mortgage or by applicable Law, together with such powers and discretion that are reasonably incidental thereto.  Administrative Agent, as trustee mortgagee hereby declares that it accepts the trust hereby created for the limited purpose of holding each Ship Mortgage and exercising remedies thereunder and agrees to perform such trust for the sole use and benefit of Lending Parties on the terms set forth herein and upon execution and delivery of the Ship Mortgages.  In its capacity as trustee mortgagee, Administrative Agent is entitled to all of the protections and indemnities of Administrative Agent.  The institution that serves as Administrative Agent shall also serve as the trustee mortgagee.

69

**Section 9.02.   RIGHTS AS A LENDER.**

If the Person serving as Administrative Agent hereunder is also a Lender, such Person shall have the same rights and powers in such capacity(ies) as any other Person in such capacity(ies) and may exercise the same as though it were not Administrative Agent.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Loan Parties or any Subsidiary or Affiliate of Loan Parties as if such Person were not Administrative Agent hereunder and without any duty to account therefor to any other Lending Party.

**Section 9.03.   EXCULPATORY PROVISIONS.**

Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, Administrative Agent:

(a)   **No Fiduciary Duties.**  Shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)   **No Obligations Regarding Certain Actions**.  Shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by Required Lenders (or such other number or percentage of Lenders as shall be expressly provided for herein or in any other Loan Documents); *provided* that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable Laws;

(c)   **Disclosure Obligations**.  Shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; and

(d)   **Limitation on Liability**.  Shall not be liable for any action taken or not taken by it:  (i) with the consent or at the request of Required Lenders (or such other number or percentage of Lenders as shall be necessary, or as Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Section 8.02** and **Section 10.01**); or (ii) in the absence of its own gross negligence or willful misconduct. Administrative Agent shall be deemed not to have knowledge of any Default, unless and until a Loan Party, or a Lending Party provides written notice to Administrative Agent describing such Default.  Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into:  (A) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document; (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default; (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document; or (E) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent.

**Section 9.04.   RELIANCE BY ADMINISTRATIVE AGENT.**

Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of the Term Loans that by its terms must be fulfilled to the satisfaction of a specified Lending Party, Administrative Agent may presume that such condition is satisfactory to such Lending Party, unless Administrative Agent shall have

received notice to the contrary from such Lending Party prior to the making of the Term Loans. Administrative Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts it selects and shall not be liable for any action it takes or does not take in accordance with the advice of any such counsel, accountants or experts.

**Section 9.05.    DELEGATION OF DUTIES.**

Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents it appoints. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this **Article IX** shall apply to any such sub-agent and to the Related Parties of Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein, as well as activities as Administrative Agent.

**Section 9.06.    RESIGNATION OF ADMINISTRATIVE AGENT.**

Administrative Agent may at any time give notice of its resignation to Lending Parties and Administrative Loan Party. Upon receipt of any such notice of resignation, Required Lenders shall have the right, with, unless an Event of Default exists, the consent of Administrative Loan Party (which consent shall not be unreasonably withheld or delayed), to appoint a successor. If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lending Parties, appoint a successor Administrative Agent; *provided* that, if Administrative Agent shall notify Lending Parties and Administrative Loan Party that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (*except* that in the case of any collateral security held by Administrative Agent on behalf of any Lending Party under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through Administrative Agent shall instead be made by or to each Lending Party directly, until such time as Required Lenders appoint a successor Administrative Agent as provided for in this **Section 9.06**. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided in this **Section 9.06**). The fees payable by Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed among Borrowers and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and **Section 10.04** shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 9.07.    NON-RELIANCE ON ADMINISTRATIVE AGENT AND OTHER LENDERS.**

Each Lending Party acknowledges that it has, independently and without reliance upon Administrative Agent, any other Lending Party or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lending Party also acknowledges that it will, independently and without reliance upon Administrative Agent, any other Lending Party or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08.    NO OTHER DUTIES, ETC.

Notwithstanding anything to the contrary contained herein, no Person identified herein or on the facing page or signature pages hereof as a "Documentation Administrative Agent," "Co-Administrative Agent," "Book Manager," "Book Runner," "Arranger," "Lead Arranger," "Co-Lead Arranger" or "Co-Arranger," if any, shall have or be deemed to have any right, power, obligation, liability, responsibility or duty under this Agreement or the other Loan Documents, other than: (a) in such Person's capacity as: (i) Administrative Agent or a Lender hereunder; and (ii) an Indemnitee hereunder; or (b) under **Section 9.05**.

Section 9.09.    ADMINISTRATIVE AGENT MAY FILE PROOFS OF CLAIM.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other Proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of the Term Loans shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise: (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lending Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of Lending Parties and their respective agents and counsel and all other amounts due Lending Parties under **Sections 2.04**, **Section 2.09** and **Section 10.04**) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lending Party to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under **Section 2.09** and **Section 10.04**.  Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any of the Lending Parties any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any of the Lending Parties or to authorize Administrative Agent to vote in respect of the claim of any of the Lending Parties in any such proceeding.

Section 9.10.    GUARANTY MATTERS.

Each Lending Party hereby:  (a) irrevocably authorizes Administrative Agent, at its option and in its discretion, to release any Guarantor from its obligations under a Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and (b) agrees that, upon request by Administrative Agent at any time, it will confirm in writing Administrative Agent's authority to release any such Guarantor pursuant to this **Section 9.10**.

Section 9.11.    COLLATERAL AND OTHER MATTERS.

(a)    **Directions by Lenders**.  Each Lender hereby irrevocably authorizes and directs Administrative Agent:  (i) to enter into the Collateral Documents for the benefit of such Person; (ii) without the necessity of any notice to or further consent from any such Person from time to time prior to an Event of Default, to take any action with respect to any Collateral Documents or the collateral the subject thereof that may be necessary to perfect and maintain perfected the Liens upon the collateral granted pursuant to the Collateral Documents; (iii) to release any Lien on any property granted to or held by Administrative Agent under any Loan Document:  (A) upon payment in full of all Obligations (other than Unasserted Obligations); (B) that is sold or to be sold as part of or in connection with any Disposition permitted hereunder or under any other Loan Document; (C) subject to Section 10.01, if approved, authorized or ratified in writing by Required Lenders; or (D) in connection with any foreclosure sale or other Disposition of any collateral the subject of any Collateral Document after the occurrence of an Event of Default; and (iv) to subordinate any Lien on any property granted to or held by Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by this Agreement or any other Loan Document to be senior to the Lien of Administrative Agent.  Upon request by Administrative Agent at any time,

each Lender will confirm in writing Administrative Agent's authority to release or subordinate its interest in particular types or items of collateral the subject of any Collateral Document pursuant to this Section 9.11.

(b)    **Certain Actions by Administrative Agent**.    Subject to Section 9.11(a)(iii) and Section 9.11(a)(iv), Administrative Agent shall (and is hereby irrevocably authorized by each Lender to) execute such documents as may be necessary to evidence the release or subordination of Liens granted to Administrative Agent herein or pursuant hereto upon the applicable collateral; provided that:  (i) Administrative Agent shall not be required to execute any such document on terms that, in Administrative Agent's opinion, would expose Administrative Agent to or create any liability or entail any consequence other than the release or subordination of such Liens without recourse or warranty; and (ii) such release or subordination shall not in any manner discharge, affect or impair the Obligations or any Liens upon (or obligations of Borrowers or any other Loan Party in respect of) all interests retained by Borrowers or any other Loan Party, including the proceeds of the sale, all of which shall continue to constitute part of the collateral the subject of the Collateral Documents.  In the event of any sale or transfer of any collateral the subject of any of the Collateral Documents, or any foreclosure with respect to any of the collateral the subject of any of the Collateral Documents, Administrative Agent shall be authorized to deduct all expenses reasonably incurred by Administrative Agent from the proceeds of any such sale, transfer or foreclosure.

(c)    **No Obligations Regarding Certain Actions.**    Administrative Agent shall have no obligation whatsoever to any Lending Party or any other Person to assure that all or any of the collateral the subject of the Collateral Documents exists or is owned by Borrowers or any other Loan Party or is cared for, protected or insured or that the Liens granted to Administrative Agent herein or in any of the Collateral Documents or pursuant hereto or thereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to Administrative Agent in this Section 9.11 or in any of the Collateral Documents, it being understood and agreed that in respect of the collateral the subject of the Collateral Documents, or any act, omission or event related thereto, Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, if Administrative Agent has an interest in the collateral the subject of the Collateral Documents by virtue of being one of the Lending Parties.

(d)    **Appointment of Lending Parties as Agents**.    Each Lending Party hereby appoints each other such Person as agent for the purpose of perfecting Administrative Agent's or such Person's security interest or other Lien in assets that, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession.  Should any such Person (other than Administrative Agent) obtain possession of any collateral the subject of the Collateral Documents, such Person shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefor, shall deliver such collateral to Administrative Agent or in accordance with Administrative Agent's instructions.

## ARTICLE X.
## GENERAL PROVISIONS

**Section 10.01.    AMENDMENTS, ETC.**

No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrowers or any other Loan Party therefrom, shall be effective unless in writing signed by Required Lenders and Administrative Agent, or Administrative Agent acting at the written request of Required Lenders, and Borrowers or the applicable Loan Party, as the case may be, with receipt acknowledged by Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    Unless in writing and signed by Administrative Loan Party and by any such Lender as to whom such amendment, waiver or consent is intended to apply, with receipt acknowledged by Administrative Agent, do any of the following:

(i)    reinstate the Commitment (as defined in the Existing Loan Agreement) of any Lender (or any portion thereof);

(ii)     postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, any fees or other amounts due to any Lender hereunder or under any other Loan Document, including any prepayments specified under **Section 2**.**03**, or reduce the amount due to any Lender on any such date;

(iii)     reduce the principal of, or the rate of interest specified herein on, any or all of the Term Loans or other amounts payable to any Lender hereunder or under any other Loan Document; or

(b)     Unless in writing and signed by all Lenders and Administrative Loan Party, with receipt acknowledged by Administrative Agent, do any of the following:

(i)     amend this **Section 10**.**01**, **Section 2**.**09** or **Section 8**.**02(d)** or any provision herein providing for consent or other action by all Lenders;

(ii)     release, compromise or subordinate all or any portion of the collateral the subject of the Collateral Documents and securing the Obligations, except as otherwise expressly provided in any of the Collateral Documents, or amend the definition of the obligations secured by any of the Collateral Documents;

(iii)     [reserved],

(iv)     release, compromise, subordinate or terminate any of the Guaranties except as otherwise expressly provided herein or in any of the Loan Documents;

(v)     amend the definition of "***Maturity Date***" contained in **Section 1**.**01**;

(vi)     amend the definition of "***Required Lenders***" contained in **Section 1**.**01**; or

(vii)     amend **Section 10.06(b)(v)**; *provided further* that, notwithstanding anything to the contrary contained herein:   (1) no amendment, waiver or consent shall, unless in writing and signed by Administrative Agent in addition to such Lenders as are otherwise required by this **Section 10**.**1**, affect the rights or duties of Administrative Agent under this Agreement or any other Loan Document; (2) no consent of Administrative Loan Party shall be required with respect to any amendment or waiver described in **Section 10.01(b)(i)**, or **Section 10.01(b)(vi)**, if, at the time of such amendment or waiver, an Event of Default exists, (3) any amendment, waiver, or consent with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lending Parties among themselves, and that does not affect the rights or obligations of Loan Parties (or any of them), shall not require consent by or the agreement of Administrative Loan Party, and (4) Administrative Agent and Administrative Loan Party may with Borrowers amend any Loan Document without the consent of any Lender in order to correct technical errors, omissions or inconsistencies within or between the Loan Documents.

Notwithstanding anything to the contrary herein, no Lender who is at the time a Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder.

**Section 10.02.**   NOTICES; ELECTRONIC COMMUNICATIONS.

(a)     **Notices Generally**.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by facsimile transmission or sent by approved electronic communication in accordance with **Section 10.02(b)**, and all notices and other communications expressly permitted to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to Borrowers, Administrative Loan Party, any Guarantor or Administrative Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on **Schedule 10.02**; and

(ii)    if to any Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Detail Form.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, and notices sent by facsimile transmission or by means of approved electronic communication shall be deemed to have been given when sent (*except* that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient); *provided* that notices delivered through electronic communications to the extent provided by **Section 10.02(b)** shall be effective as provided in such subsection (b).

(b)    **Electronic Communications.**

(i)    Each Lender agrees that notices and other communications to it hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to **Article II** if such Lender has notified Administrative Agent that it is incapable of receiving notices under **Article II** by electronic communication; *provided further* that, as of the date hereof, each Lender that is a party hereto confirms that it is capable of receiving notices under **Article II** by electronic communication.  In furtherance of the foregoing, each Lender hereby agrees to notify Administrative Agent in writing, on or before the date such Lender becomes a party to this Agreement, of such Lender's e-mail address to which a notice may be sent (and from time to time thereafter to ensure that Administrative Agent has on record an effective e-mail address for such Lender).  Each of Administrative Agent and Administrative Loan Party, on behalf of Loan Parties, may, in such Person's discretion, agree to accept notices and other communications to it hereunder by means of electronic communication pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless Administrative Agent otherwise prescribes:    (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient; and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(iii)    Each Loan Party hereby acknowledges that:    (A) Administrative Agent may make Specified Materials available to Lending Parties by posting some or all of the Specified Materials on an Electronic Platform; (B) the distribution of materials and information through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with any such distribution; (C) the Electronic Platform is provided and used on an "As Is," "As Available" basis; and (D) neither Administrative Agent nor any of its Affiliates warrants the accuracy, completeness, timeliness, sufficiency or sequencing of the Specified Materials posted on the Electronic Platform.  Each Loan Party further acknowledges that certain of the Lending Parties (each, a "***Public Lender***") may have personnel who do not wish to receive material non-public information with respect to Loan Parties or their Subsidiaries or Affiliates or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Each Loan Party hereby agrees that:  (1) all Specified Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (2) by marking Specified Materials "PUBLIC," each Loan Party shall be deemed to have authorized Lending Parties to treat such Specified Materials as not containing any material non-public information with respect to each Loan Party or its securities for purposes of United States federal and state securities laws (*provided* that, to the extent such Specified Materials constitute Information, they shall be treated as set forth in **Section 10.07**); (3) all Specified Materials marked "PUBLIC" may be made available through a portion of the Electronic Platform designated "Public Investor" (or words of similar effect); and (4) Administrative Agent shall be entitled to treat any Specified Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Electronic Platform not designated "Public Investor" (or words of similar effect).

(iv)     Administrative Agent, on behalf of itself and its Affiliates, expressly and specifically disclaims, with respect to the Electronic Platform, delays in posting or delivery, or problems accessing the Specified Materials posted on the Electronic Platform, and any liability for any losses, costs, expenses or liabilities that may be suffered or incurred in connection with the Electronic Platform.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by Administrative Agent or any of its Affiliates in connection with the Electronic Platform.

(v)     Each Lender hereby agrees that notice to it in accordance with this **Section 10.02(b)** specifying that any Specified Materials have been posted to the Electronic Platform shall, for purposes of this Agreement, constitute effective delivery to such Lender of such Specified Materials.  Each Lender:  (A) acknowledges that the Specified Materials, including information furnished to it by any Loan Party or Administrative Agent pursuant to, or in the course of administering, the Loan Documents, may include material, non-public information concerning Loan Parties and their respective Subsidiaries or Affiliates or their respective securities; and (B) confirms that:  (1) it has developed compliance procedures regarding the use of material, non-public information; (2) it will handle such material, non-public information in accordance with such procedures and applicable Laws, include federal and state securities laws; and (3) to the extent it has such a person, it has identified in its Administrative Detail Form a contact person who may receive Specified Materials that may contain material, non-public information in accordance with its compliance procedures and applicable Laws.

(c)     **Change of Address**, **Etc**.  Administrative Loan Party, for itself and for Loan Parties, and Administrative Agent may change their respective address(es), facsimile number(s), telephone number(s) or e-mail address(es) for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address(es), facsimile number(s), telephone number(s) or e-mail address(es) for notices and other communications hereunder by written notice to Administrative Loan Party and Administrative Agent.

(d)     **Reliance by Lending Parties**.  Lending Parties shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Loan Party even if:  (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein; or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Loan Parties shall indemnify each Indemnitee from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Loan Party.  All telephonic notices to and other telephonic communications with Administrative Agent may be recorded by Administrative Agent, and each of the parties hereto hereby consents to such recording.

**Section 10.03.     NO WAIVER; CUMULATIVE REMEDIES.**

No failure by Administrative Agent or any other Lending Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; no single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**Section 10.04.     EXPENSES; INDEMNITY; DAMAGE WAIVER.**

(a)     **Costs and Expenses**.  Borrowers shall pay:  (i) subject to clause (ii) of this **Section 10.04(a)**: (A) all reasonable out-of-pocket expenses (including all wire transfer and other bank charges incurred in connection with this Agreement) incurred, without duplication, by Administrative Agent, White Oak, Lenders and their respective Affiliates (including the reasonable fees, charges and disbursements of counsel for Administrative Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of, or consents relating to, the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (ii) all actual and reasonable out-of-pocket expenses incurred by Administrative Agent or any other Lending Party (including the fees, charges and disbursements of any counsel for Administrative Agent and any other Lending Party), and shall pay all fees and time charges for attorneys, who may be employees of Administrative Agent or any other Lending Party, in connection with the

enforcement or protection of its rights:  (A) in connection with this Agreement and the other Loan Documents, including its rights under this **Section 10**.**04**; or (B) in connection with the Term Loans made hereunder, including all such actual and reasonable out-of-pocket expenses incurred during any workout or restructuring (or negotiations in connection with the foregoing) in respect of the Term Loans.

(b)    **Indemnification by Loan Parties**.  Subject to **Section 10**.**04(a)**, Loan Parties shall indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Loan Parties arising out of, in connection with, or as a result of:  (i) the execution or delivery of this Agreement, any other Loan Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (ii) any Term Loan or the use or proposed use of the proceeds thereof; (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Loan Parties or any Subsidiary thereof or any Environmental Claim or Environmental Liability related in any way to Loan Parties or any Subsidiary thereof; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Loan Parties or any Subsidiary thereof, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted result from the gross negligence or willful misconduct of such Indemnitee.  This **Section 10**.**04(b)** shall not apply to Taxes other than any Taxes that constitute losses, claims, damages, liabilities or expenses arising from any non-Tax action, claim, litigation, investigation or proceeding.

(c)    **Reimbursement by Lenders**.  If Borrowers for any reason fail to pay when due any amount that it is required to pay under **Section 10**.**04(a)** or **Section 10**.**04(b)** to Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (based on its Percentage Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against Administrative Agent (or any such sub-agent) or any Related Party of any of the foregoing acting for Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of Lenders under this subsection (c) are subject to the provisions of **Section 2**.**10(d)**.

(d)    **Waiver of Consequential Damages**, **Etc**.  To the fullest extent permitted by applicable Laws, no Loan Party shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any document contemplated hereby, the transactions contemplated hereby or thereby, any of the Term Loans or the use of the proceeds thereof.  No Indemnitee referred to in **Section 10**.**04(b)** shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    **Payments**.  All amounts due under this **Section 10**.**04** shall be payable not later than three (3) Business Days after demand therefor.

(f)    **Survival**.  The agreements in this **Section 10**.**04** shall survive the resignation of Administrative Agent and the payment in full, satisfaction or discharge of all Obligations.

**Section 10.05.    Marshalling; Payments Set Aside.**

Neither Administrative Agent nor any other Lending Party shall be under any obligation to marshal any asset in favor of Loan Parties or any other Person or against or in payment of any or all of the Obligations.  To the

extent that any payment by or on behalf of Loan Parties is made to Administrative Agent or any other Lending Party, or Administrative Agent or any other Lending Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or any other Lending Party in such Person's discretion) to be repaid to a trustee, receiver or any other party, in connection with any Proceeding under any Bankruptcy Laws or otherwise, then:  (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred; and (b) each Lending Party severally agrees to pay to Administrative Agent upon demand its Percentage Share (without duplication) of any amount so recovered from or repaid by Administrative Agent *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.  The obligations of each Lending Party under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.06.    SUCCESSORS AND ASSIGNS.

(a)    **Successors and Assigns Generally**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, *except* that neither Borrowers nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Administrative Agent and each Lending Party, and no Lender may assign or otherwise transfer any of its rights or obligation hereunder except:  (i) in accordance with the provisions of **Section 10.06(b)**; (ii) by way of a participation recorded in a Participant Register in accordance with the provisions of **Section 10.06(d)**; or (iii) by way of pledge or assignment of a Lien subject to the restrictions of **Section 10.06(f)**; and any other attempted assignment or transfer by any party hereto shall be null and void.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in **Section 10.06(d)** and, to the extent expressly contemplated hereby, the Related Parties of each of Administrative Agent and each other Lending Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.  Notwithstanding anything to the contrary herein, upon an Event of Default, a Lender may assign or otherwise transfer, any of its rights or obligations hereunder to any Person at its sole discretion without any consent of Borrowers or any other Loan Party.

(b)    **Assignments by any Lender**.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    *Minimum Amounts*.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Term Loans at the time owing to it, no minimum amount need be assigned;

(B)    in any case not described in the immediately preceding sub-clause (A), the Outstanding Amount of all Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Agent shall not be less than One Million Dollars ($1,000,000), in the case of any assignment in respect of the Outstanding Amount of the Term Loans, unless (I) Administrative Agent consents (which consent shall not be unreasonably withheld, conditioned or delayed) and (II) so long as a Default has not occurred and is continuing, Administrative Loan Party consents (which consent shall not be unreasonably withheld, conditioned or delayed); *provided* that Administrative Loan Party shall be deemed to have consented to any such amount unless it shall have objected thereto by written notice to Administrative Agent within five (5) Business Days following the date it receives notice of such amount.

(ii)    *[Reserved.]*

(iii)    *Required Consents*.  No consent shall be required for any assignment other than:

(A)    any consent required by required by **Section 10.06(b)(i)(B)**; and

(B)    the consent of Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed) if such assignment is:  an assignment of Term Loans to a Person that is not an Eligible Assignee.

(iv)    *Assignment and Assumption.*  The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of Three Thousand Five Hundred Dollars ($3,500); *provided* that Administrative Agent:  (A) may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and (B) shall waive such processing and recordation fee in the case of any assignment by a Lender to an Eligible Assignee.  The assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Detail Form and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(v)    *No Assignment to any Loan Party.*  No such assignment shall be made to any Loan Party or any of its Affiliates or Subsidiaries.

(vi)    *No Assignment to Natural Persons.*  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by Administrative Agent pursuant to **Section 10.06(c)**, and receipt by Administrative Agent of all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act for the assignee, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the assigning Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lending Party's rights and obligations under this Agreement, such Lending Party shall cease to be a party hereto) but shall continue to be entitled to the benefits of **Section 2.07**, **Section 2.08** and **Section 10.04** with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, Borrowers (at their expense) shall execute and deliver Notes to the assignee Lending Party.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **Section 10.06(d)**.  Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents:  (A) no Lender shall be required to comply with this **Section 10.06(b)** in connection with any assignment of all or any portion of its rights and other obligations under or relating to the Term Loans, this Agreement and the other Loan Documents to any Affiliate of such Lender (other than any Loan Party, any Affiliate thereof or a natural person) or any Approved Fund related to such Lender, and such Lender shall have no obligation to disclose any such assignment to any such Person; *provided* that such Lender shall continue to be liable as a "*Lender*" under this Agreement and the other Loan Documents until such time, if at all, that such Lender and such other Person have complied with the provisions of this **Section 10.06(b)** in order for such other Person to become a "*Lender*" hereunder; (B) a Lender may pledge, or grant a Lien in, all or any portion of its rights and other obligations under or relating to the Term Loans, this Agreement and the other Loan Documents to a financial institution or other funding source (other than any Loan Party, any Affiliate thereof or any natural person) or any trustee or agent therefor in support of obligations owing by such Lender to such Person(s); (C) any Lender which is a fund may pledge, or grant a Lien in, all or any portion of its rights and other obligations under or relating to the Term Loans, this Agreement and the other Loan Documents to its trustee (except if such trustee is any Loan Party, any Affiliate thereof or a natural person) in support of its obligation to its trustee; and (D) no pledge or grant of a Lien pursuant to the immediately preceding clauses (B) or (C) shall release the transferor Lender from any of its obligations hereunder or under any of the other Loan Documents and such Lender such Lender shall continue to be liable as a "*Lender*" under this Agreement and the other Loan Documents until such time, if at all, that such Lender and such other Person have complied with the provisions of this **Section 10.06(b)** in order for such other Person to become a "*Lender*" hereunder.

(c)      **Register**.  Administrative Agent, acting solely for this purpose as an on-fiduciary agent of Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a Register.  The entries in the Register shall be conclusive, and Borrowers and Lending Parties may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrowers and each Lender at any reasonable time and from time to time upon reasonable prior written notice.  In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender wishing to consult with other Lenders in connection therewith may request and receive from Administrative Agent a copy of the Register.

(d)      **Participations**.  Any Lender may at any time, without the consent of, or notice to, Administrative Loan Party or Administrative Agent, sell participations to any Person (other than a natural Person, any Loan Party or any Loan Party's Affiliates or Subsidiaries) (each, a "***Participant***") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Term Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under **Section 2.08(d)** with respect to any payments made by such Lender to its Participant(s).  Any document pursuant to which a Lender sells such a participation shall provide that such Person shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; *provided* that such document may provide that such Person will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to **Section 10.01** that affects such Participant.  Borrowers agree that each Participant shall be entitled to the benefits of **Section 2.07** and **Section 2.08**, (subject to the requirements and limitations therein) (it being understood that the documentation required under **Section 2.08(g)** shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 10.06(b)**; *provided* that such Participant shall not be entitled to receive any greater payment under **Section 2.07** or **Section 2.08**, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by applicable Laws, each Participant also shall be entitled to the benefits of **Section 10.08** as though it were a Lender; *provided* that such Participant agrees to be subject to **Section 2.09** as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loan or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)      **Certain Pledges**.  Any Lender may at any time pledge or assign a Lien in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender owing to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)      **Electronic Execution of Assignments**.  The words "***execution***," "***signed***," "***signature***," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and

80

as provided for in any applicable Laws, including the Federal Electronic Signatures in Global and National Commerce Act or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 10.07.    TREATMENT OF CERTAIN INFORMATION; CONFIDENTIALITY.**

Administrative Agent and each other Lending Party each agrees to maintain the confidentiality of the Information, *except* that Information may be disclosed (including by means of the Electronic Platform): (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors, representatives and funding and financing sources (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential on the same terms as provided herein); (b) to the extent requested by any Governmental Authority, purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), *provided* that to the extent permitted by applicable Law, Administrative Agent will use reasonably commercial efforts to provide Administrative Loan Party with notice of any such request so received prior to the release thereof, however, Administrative Agent's failure to so provide such notice (or any notice) will not be deemed a violation of any obligation of Administrative Agent to Borrowers hereunder or otherwise expose Administrative Agent to any claim or liability to any Person as a result of such failure; (c) to the extent required by applicable Laws or by any subpoena or similar legal process, *provided* that to the extent permitted by applicable Law, Administrative Agent will use reasonably commercial efforts to provide Administrative Loan Party with notice of any such required disclosure prior to the release thereof, however, Administrative Agent's failure to so provide such notice (or any notice) will not be deemed a violation of any obligation of Administrative Agent to Borrowers hereunder or otherwise expose Administrative Agent to any claim or liability to any Person as a result of such failure; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any Proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) to "Gold Sheets" or other similar bank trade publications; *provided* that such information consist solely of deal terms and other information customarily found in such publications; (g) unless an Event of Default has occurred and is continuing, subject to an agreement containing provisions substantially the same as those of this **Section 10**.07 to: (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement; or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party; (h) with the consent of Borrowers; or (i) to the extent such Information: (i) becomes publicly available other than as a result of a breach of this **Section 10**.07; or (ii) becomes available to Administrative Agent, any Lending Party or any of their respective Affiliates on a non-confidential basis from a source other any Loan Party and not in contravention of this **Section 10.07**. For purposes of this **Section 10.07**, "***Information***" means all information (including financial information) received from any Loan Party relating to such Loan Party or its business, other than any such information that is available to Administrative Agent or any other Lending Party on a nonconfidential basis, and not in contravention of this **Section 10.07**, prior to disclosure by such Loan Party. Any Person required to maintain the confidentiality of Information as provided in this **Section 10.07**: (A) shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information; and (B) shall not disclose any financial information concerning any Loan Party or its business (including any information based on any such financial information) or use any such financial information for commercial purposes without the prior written consent of the applicable Loan Party. Notwithstanding the foregoing, each Loan Party authorizes each Lending Party to make appropriate announcements of the financial arrangements entered into among Loan Parties, Administrative Agent, and Lenders, including announcements which are commonly known as "tombstones," in such publications and to such selected parties as each Lending Party may in its sole and absolute discretion deem appropriate.

**Section 10.08.    RIGHT OF SETOFF.**

If an Event of Default shall have occurred and be continuing, each of Lending Parties and their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Laws, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lending Party to or for the credit or the account of Borrowers or any other Loan Party against any and all of the Obligations to such Lending Party or such Affiliate, irrespective of whether or not such Lending Party shall have made any demand

under this Agreement or any other Loan Document and although such obligations of Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lending Party different from the branch or office holding such deposit or obligated on such obligations. The rights of each Lending Party and its Affiliates under this **Section 10.08** are in addition to other rights and remedies (including other rights of setoff) that such Lending Party or its Affiliates may have. Each Lending Party agrees to notify Administrative Loan Party and Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the foregoing, no Lending Party shall exercise, or attempt to exercise, any right of set-off, banker's lien, or the like, against any deposit account or property of Borrowers or any other Loan Party held or maintained by such Lending Party without the prior written consent of Administrative Agent.

### Section 10.09.    INTEREST RATE LIMITATION.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the Maximum Rate. If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to Borrowers. In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Laws: (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

### Section 10.10.    COUNTERPARTS; INTEGRATION; EFFECTIVENESS.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous documents, agreements and understandings, oral or written, relating to the subject matter hereof. Subject to the limitations provided in **Section 4.01**, this Agreement shall become effective when it shall have been executed and delivered by Administrative Agent and when Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in portable document format shall be effective as delivery of a manually executed counterpart of this Agreement.

### Section 10.11.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by Administrative Agent and each Lender, regardless of any investigation made by Administrative Agent or any Lender or on their behalf and notwithstanding that Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of the making of any Term Loan, and shall continue in full force and effect as long as any Term Loans or any other Obligations (other than Unasserted Obligations) have not been paid in full.

### Section 10.12.    SEVERABILITY.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.13.    PATRIOT ACT NOTICE.

Each Lending Party that is subject to the Patriot Act and Administrative Agent (for itself and not on behalf of any Lending Party) hereby notify Loan Parties that, pursuant to the requirements of the Patriot Act, they are each required to obtain, verify and record information that identifies Loan Parties, which information includes the name and address of Loan Parties and other information that will allow such Lending Party or Administrative Agent, as applicable, to identify Loan Parties in accordance with the Patriot Act.

Section 10.14.    GUARANTY.

(a)    **Guaranty**.

(i)    Pursuant to the Existing Loan Agreement (and any joinder agreements thereto), each of the Existing Guarantors unconditionally and irrevocably guaranteed to Existing Administrative Agent the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "*Guaranteed Obligations*") (the "*Existing Guaranty*").   Each Existing Guarantor party hereto hereby (i) reaffirms the Existing Guaranty in favor of Existing Administrative Agent, on behalf of itself and each Existing Lender, pursuant to the Existing Loan Agreement, (ii) acknowledges and agrees that the Existing Guaranty by such Loan Party is, and shall remain, in full force and effect, and (iii) for the avoidance of doubt, acknowledges and agrees that its Guaranty of the Guarantied Obligations pursuant to **Section 10.14(a)(ii)** shall not be deemed to limit or otherwise impair the Existing Guaranty by such Existing Loan Party prior to the Effective Date.

(ii)    Each Guarantor party hereto unconditionally and irrevocably guarantees to Administrative Agent and the other Lending Parties the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "*Guaranteed Obligations*").  The Guaranteed Obligations include interest that, but for a Proceeding under any Bankruptcy Laws, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrowers for such interest in any such Proceeding.

(b)    **Separate Obligation**.  Each Guarantor party hereto acknowledges and agrees that:  (i) the Guaranteed Obligations are separate and distinct from any Debt arising under or in connection with any other document, including under any provision of this Agreement other than this **Section 10.14**, executed at any time by such Guarantor in favor of Administrative Agent or any other Lending Party; and (ii) such Guarantor shall pay and perform all of the Guaranteed Obligations as required under this **Section 10.14**, and Administrative Agent and the other Lending Parties may enforce any and all of their respective rights and remedies hereunder, without regard to any other document, including any provision of this Agreement other than this **Section 10.14**, at any time executed by such Guarantor in favor of Administrative Agent or any other Lending Party, irrespective of whether any such other document, or any provision thereof or hereof, shall for any reason become unenforceable or any of the Debt thereunder shall have been discharged, whether by performance, avoidance or otherwise.   Each Guarantor acknowledges that, in providing benefits to Borrowers, Lending Parties are relying upon the enforceability of this **Section 10.14** and the Guaranteed Obligations as separate and distinct Debt of such Guarantor, and each Guarantor agrees that Lending Parties would be denied the full benefit of their bargain if at any time this **Section 10.14** or the Guaranteed Obligations were treated any differently. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrowers and Guarantors and shall in no way impair or adversely affect the rights or benefits of Lending Parties under this **Section 10.14**.  Each Guarantor agrees to execute and deliver a separate document, immediately upon request at any time of Administrative Agent or any other Lending Party, evidencing such Guarantor's obligations under this **Section 10.14**.  Upon the occurrence of any Event of Default, a separate action or actions may be brought against such Guarantor, whether or not Borrowers, any other Guarantor or any other Person is joined therein or a separate action or actions are brought against Borrowers, any such other Guarantor or any such other Person.

(c)    **Limitation of Guaranty**.  To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that Administrative Agent or any other Lending Party can enforce under this **Section 10.14**, Administrative Agent and the other Lending Parties by

their acceptance hereof accept such limitation on the amount of such Guarantor's liability hereunder to the extent needed to make this **Section 10.14** fully enforceable and non-avoidable.

(d)    **Liability of Guarantors**.  The liability of any Guarantor under this **Section 10.14** shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations (other than Unasserted Obligations).  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(i)    such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon Administrative Agent's or any Lending Party's exercise or enforcement of any remedy it may have against Borrowers or any other Person, or against any collateral or other security for any Guaranteed Obligations;

(ii)    this Guaranty is a guaranty of payment when due and not merely of collectability;

(iii)    Administrative Agent and the other Lending Parties may enforce this **Section 10.14** upon the occurrence of an Event of Default notwithstanding the existence of any dispute among Administrative Agent and the other Lending Parties, on the one hand, and Borrowers or any other Person, on the other hand, with respect to the existence of such Event of Default;

(iv)    such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(v)    such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(A)    any Proceeding under any Bankruptcy Laws;

(B)    any limitation, discharge, or cessation of the liability of Borrowers or any other Person for any Guaranteed Obligations due to any Law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(C)    any merger, acquisition, consolidation or change in structure of Borrowers, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other Disposition of any or all of the assets or shares of Borrowers or any other Person;

(D)    any assignment or other transfer, in whole or in part, of Administrative Agent's or any Lending Party's interests in and rights under this Agreement (including this Section 10.14) or the other Loan Documents;

(E)    any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrowers, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(F)    Administrative Agent's or any other Lending Party's amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations;

(G)    Administrative Agent's or any Lending Party's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations or any collateral;

(H)     Administrative Agent's or any Lending Party's vote, claim, distribution, election, acceptance, action or inaction in any Proceeding under any Bankruptcy Laws; or

(I)     any other guaranty, whether by such Guarantor or any other Person, of all or any part of the Guaranteed Obligations or any other indebtedness, obligations or liabilities of Borrowers to Administrative Agent or any other Lending Party.

(e)     **Consents of Guarantors**.  Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(i)     the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrowers under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(ii)     the time for Borrowers' (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as Administrative Agent and the other Lending Parties (as applicable under the relevant Loan Documents) may deem proper;

(iii)     Administrative Agent and the other Lending Parties may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(iv)     Administrative Agent or the other Lending Parties may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrowers.

(f)     **Guarantor's Waivers**.  Each Guarantor waives and agrees not to assert:

(i)     any right to require Administrative Agent or any other Lending Party to proceed against Borrowers, any other Guarantor or any other Person, or to pursue any other right, remedy, power or privilege of Administrative Agent or any other Lending Party whatsoever;

(ii)     the defense of the statute of limitations in any action hereunder or for the collection or performance of the Guaranteed Obligations;

(iii)     any defense arising by reason of any lack of corporate or other authority or any other defense of Borrowers, such Guarantor or any other Person;

(iv)     any defense based upon Administrative Agent's or any Lending Party's errors or omissions in the administration of the Guaranteed Obligations;

(v)     any rights to set-offs and counterclaims;

(vi)     without limiting the generality of the foregoing, to the fullest extent permitted by Laws, any defenses or benefits that may be derived from or afforded by applicable Laws limiting the liability of or exonerating guarantors or sureties, or that may conflict with the terms of this Section 10.14; and

(vii)     any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations, or the reliance by Administrative Agent and the other Lending Parties upon this Guaranty, or the exercise of any right, power or

85

privilege hereunder.  The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty.  Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrowers, each Guarantor or any other Person with respect to the Guaranteed Obligations.

(g)    **Financial Condition of Borrowers**.  No Guarantor shall have any right to require Administrative Agent or any other Lending Party to obtain or disclose any information with respect to:  the financial condition or character of Borrowers or the ability of Borrowers to pay and perform the Guaranteed Obligations; the Guaranteed Obligations; any collateral or other security for any or all of the Guaranteed Obligations; the existence or nonexistence of any other guarantees of all or any part of the Guaranteed Obligations; any action or inaction on the part of Administrative Agent or any other Lending Party or any other Person; or any other matter, fact or occurrence whatsoever.  Each Guarantor hereby acknowledges that it has undertaken its own independent investigation of the financial condition of Borrowers and all other matters pertaining to this Guaranty and further acknowledges that it is not relying in any manner upon any representation or statement of Administrative Agent or any other Lending Party with respect thereto.

(h)    **Subrogation**.  Until the Guaranteed Obligations (other than Unasserted Obligations) shall be paid in full, each Guarantor shall not have, and shall not directly or indirectly exercise:  (i) any rights that it may acquire by way of subrogation under this **Section 10.14**, by any payment hereunder or otherwise; (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this **Section 10.14**; or (iii) any other right that it might otherwise have or acquire (in any way whatsoever) that could entitle it at any time to share or participate in any right, remedy or security of Administrative Agent or any other Lending Party as against any Borrower or other Guarantors or any other Person, whether in connection with this **Section 10.14**, any of the other Loan Documents or otherwise.  If any amount shall be paid to any Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations (other than Unasserted Obligations) shall not have been paid in full, such amount shall be held in trust for the benefit of Administrative Agent and the other Lending Parties and shall forthwith be paid to Administrative Agent to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents.

(i)    **Subordination**.  All payments on account of all indebtedness, liabilities and other obligations of Borrowers to any Guarantor, whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined (the "Guarantor Subordinated Debt") shall be subject, subordinate and junior in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in cash or cash equivalents of the Guaranteed Obligations.  As long as any of the Guaranteed Obligations (other than Unasserted Obligations) shall remain outstanding and unpaid, each Guarantor shall not accept or receive any payment or distribution by or on behalf of Borrowers or any other Guarantor, directly or indirectly, or assets of Borrowers or any other Guarantor, of any kind or character, whether in cash, property or securities, including on account of the purchase, redemption or other acquisition of Guarantor Subordinated Debt, as a result of any collection, sale or other Disposition of collateral, or by setoff, exchange or in any other manner, for or on account of the Guarantor Subordinated Debt ("Guarantor Subordinated Debt Payments"), except that, so long as an Event of Default does not then exist, any Guarantor shall be entitled to accept and receive payments on its Guarantor Subordinated Debt, in accordance with past business practices of such Guarantor and Borrowers (or any other applicable Guarantor) and not in contravention of any Laws or the terms of the Loan Documents.  If any Guarantor Subordinated Debt Payments shall be received in contravention of this **Section 10.14**, such Guarantor Subordinated Debt Payments shall be held in trust for the benefit of Administrative Agent and the other Lending Parties and shall be paid over or delivered to Administrative Agent for application to the payment in full in cash or cash equivalents of all Guaranteed Obligations remaining unpaid to the extent necessary to give effect to this **Section 10.14** after giving effect to any concurrent payments or distributions to Administrative Agent and the other Lending Parties in respect of the Guaranteed Obligations.

(j)    **Continuing Guaranty**.  This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until payment and performance in full of the Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and each Guarantor expressly acknowledges that this Guaranty shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist.  This Guaranty shall continue in effect and be binding upon each Guarantor until actual receipt by Administrative

86

Agent of written notice from such Guarantor of its intention to discontinue this Guaranty as to future transactions (which notice shall not be effective until 11:00 a.m. on the day that is five (5) Business Days following such receipt); provided that no revocation or termination of this Guaranty shall affect in any way any rights of Administrative Agent, or any Lending Party hereunder with respect to any Guaranteed Obligations arising or outstanding on the date of receipt of such notice, including any subsequent continuation, extension, or renewal thereof, or change in the terms or conditions thereof, or any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of any Lending Party in existence as of the date of such revocation (collectively, "***Existing Guaranteed Obligations***"), and the sole effect of such notice shall be to exclude from this Guaranty Guaranteed Obligations thereafter arising which are unconnected to any Existing Guaranteed Obligations.

(k)    **Reinstatement**.  This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of Borrowers (or receipt of any proceeds of collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrowers, its estate, trustee, receiver or any other Person (including under any Bankruptcy Laws), or must otherwise be restored by Administrative Agent or any other Lending Party, whether as a result of Proceedings under any Bankruptcy Laws or otherwise.  All losses, damages, costs and expenses that Administrative Agent, or any Lending Party may suffer or incur as a result of any voided or otherwise set aside payments shall be specifically covered by the indemnity in favor of Administrative Agent and the other Lending Parties contained in **Section 10.04**.

(l)    **Substantial Benefits**.  The Credit Extensions provided to or for the benefit of Borrowers hereunder by Lending Parties have been and are to be contemporaneously used for the benefit of Borrowers and each Guarantor.  It is the position, intent and expectation of the parties that Borrowers and each Guarantor have derived and will derive significant and substantial benefits from the Credit Extensions to be made available by Lending Parties under the Loan Documents.  Each Guarantor has received at least "reasonably equivalent value" (as such phrase is used in Section 548 of the Bankruptcy Code and in comparable provisions of other applicable Laws) and more than sufficient consideration to support its obligations hereunder in respect of the Guaranteed Obligations.

(m)    **Knowing and Explicit Waivers**.  Each Guarantor acknowledges that it either has obtained the advice of legal counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this Section 10.14.  Each Guarantor acknowledges and agrees that each of the waivers and consents set forth herein is made with full knowledge of its significance and consequences, that all such waivers and consents herein are explicit and knowing and that each Guarantor expects such waivers and consents to be fully enforceable. If, while any Guarantor Subordinated Debt is outstanding, any Proceeding under any Bankruptcy Laws is commenced by or against Borrowers or their property, Administrative Agent, when so instructed by Required Lenders, is hereby irrevocably authorized and empowered (in the name of Lending Parties or in the name of any Guarantor or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution in respect of all Guarantor Subordinated Debt and give acquittances therefor and to file claims and proofs of claim and take such other action (including voting the Guarantor Subordinated Debt) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of Administrative Agent and the other Lending Parties; and each Guarantor shall promptly take such action as Administrative Agent (on instruction from Required Lenders) may reasonably request: (i) to collect the Guarantor Subordinated Debt for the account of the Lending Parties and to file appropriate claims or proofs of claim in respect of the Guarantor Subordinated Debt; (ii) to execute and deliver to Administrative Agent such powers of attorney, assignments and other instruments as it may request to enable it to enforce any and all claims with respect to the Guarantor Subordinated Debt; and (iii) to collect and receive any and all Guarantor Subordinated Debt Payments.

(n)    **Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to guaranty and otherwise honor all Obligations in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.14(n) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.14(n), or otherwise under the Loan Documents, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor

intends that this **Section 10.14** constitute, and this **Section 10.14** shall be deemed to constitute, a "keep well, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**Section 10.15.    TIME OF THE ESSENCE.**

Time is of the essence of the Loan Documents.

**Section 10.16.    GOVERNING LAW; JURISDICTION; ETC.**

(a)    GOVERNING LAW.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW 5-1401 AND 5-1402.

(b)    SUBMISSION TO JURISDICTION.    EACH LOAN PARTY HEREUNDER HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE CITY AND COUNTY OF NEW YORK AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO WHICH EACH IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURTS OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURTS. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ANY OF ITS PROPERTIES IN THE COURTS OF ANY OTHER JURISDICTION.

(c)    WAIVER OF VENUE.    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION (B) OF THIS SECTION 10.16.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAWS.

**Section 10.17.    WAIVER OF RIGHT TO JURY TRIAL.**

TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM.  EACH OF THE PARTIES HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH

LEGAL COUNSEL ON SUCH MATTERS.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 10.18.    ACKNOWLEDGMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)        the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)        the effects of any Bail-in Action on any such liability, including, if applicable:

(i)        a reduction in full or in part or cancellation of any such liability;

(ii)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)        the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority

Section 10.19.    EFFECT OF AMENDMENT AND RESTATEMENT.

Upon the Effective Date, the Debt, obligations and other liabilities (including, without limitation, interest and fees accrued to the date hereof) governed by the Existing Loan Agreement (collectively, the "*Existing Obligations*") shall continue to be in full force and effect, but shall be governed by the terms and conditions set forth in this Agreement, the Navarro Loan Agreement and the Epic Loan Agreement, as set forth herein and therein. Notwithstanding the delivery of that certain letter dated as of July 19, 2019 from Existing Administrative Agent under the Existing Loan Agreement to the Existing Borrowers which declared the Existing Obligations immediately due and payable, from and after the effectiveness of this Agreement, the Existing Obligations, to the extent evidenced hereby, shall no longer be immediately due and payable and shall instead be payable in accordance with the terms hereof.  The Existing Obligations, to the extent evidenced hereby, together with any and all additional Obligations incurred by the Borrowers and/or the Loan Parties hereunder or under any of the other Loan Documents, shall continue to be secured by all pledges and grants of security interests provided by the Equity Holder Pledgors and Loan Parties in connection with the Existing Loan Agreement as and to the extent provided for in, and subject to the terms of, this Agreement, and as amended, amended and restated, supplemented or otherwise modified by this Agreement and by any other Loan Documents delivered on the Amendment Effective Date (and, from and after the date hereof, shall be secured by all of the pledges and grants of security interests provided by the Equity Holder Pledgors and Loan Parties in connection with this Agreement as and to the extent provided for in, and subject to the terms of, this Agreement and the other Loan Documents). Each Borrower, Guarantor, Equity Holder Pledgor and Individual Guarantor hereby reaffirms their respective obligations under each Loan Document (as defined in the Existing Loan Agreement, collectively, the "*Existing Credit Documents*") to which it is party, as amended, amended and restated, supplemented or otherwise modified by this Agreement and by any other Loan Documents delivered on the Effective Date.  Each Borrower, Guarantor, Equity Holder Pledgor and Individual Guarantor further agrees that each such Existing Loan Document (other than the Existing Loan Agreement or otherwise to the extent amended, amended and restated, supplemented or otherwise modified or replaced by any other Loan Document delivered on the Effective Date) shall remain in full force and effect following the execution and delivery of this Agreement and that all references to the "Loan Agreement" in such Existing Loan Documents shall be deemed to refer to this Agreement, the Navarro Loan Agreement and the Epic Loan Agreement, collectively.  The execution

and delivery of this Agreement, the Epic Loan Agreement and the Shipyard Loan Agreement shall constitute an amendment, replacement and restatement, but not a novation, of the Existing Obligations.  Each of the Loan Parties acknowledges that "Events of Default" (as defined in the Existing Loan Agreement) (the "**Existing Events of Default**") have occurred and are continuing.  Nothing herein shall be deemed to constitute a waiver of any such Existing Events of Default and parties hereto agree that such Existing Events of Default shall be deemed to be Events of Default hereunder.  The execution and delivery of this Agreement, the Navarro Loan Agreement and the Epic Loan Agreement shall constitute an amendment, replacement and restatement, but not a novation, of the Existing Obligations.  For the avoidance of doubt, (a) Navarro Borrowers and the Navarro Guarantors shall only be obligated in respect of the Debt evidenced by the Navarro Loan Agreement and the other loan documents executed in connection therewith, (b) Epic Borrowers and the Epic Guarantors shall only be obligated in respect of the Debt evidenced by the Epic Loan Agreement and the other loan documents executed in connection therewith, and (c) EAMA and the other Loan Parties shall only be obligated in respect of the Obligations evidenced by this Agreement and the other Loan Documents.  In addition, the obligations of the Navarro Borrowers, Navarro Guarantors, Epic Borrowers, Epic Guarantors and Borrowers and Guarantors (a) in accordance with the terms of the amended and restated personal guarantees, shall continue to be guaranteed by Clarke, Wiley and AMC, (b) subject to the Navarro Loan Agreement, the Epic Loan Agreement and this Agreement, continue to be guaranteed by ERP,  (c) subject to the Sanare Pledge Agreement, be secured by the pledge by Stockbridge of the Equity Interests in Sanare Energy Partners, LLC and (d) [reserved].

**Section 10.20.    INTERCREDITOR AGREEMENT.**

Anything herein to the contrary notwithstanding, the liens and security interests securing the obligations evidenced by this Agreement, the exercise of any right or remedy with respect thereto, and certain of the rights of the holder hereof are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**BORROWERS:**

**Epic Alabama Maritime Assets, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**GUARANTORS:**

**Epic Alabama Holdings, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Alabama Maritime Asset Holdings, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Alabama Shipyard, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Recycling Services, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Alabama Recyclers, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**ERP Environmental Fund, Inc.**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

*[Signature Page to Amended and Restated Senior Loan and Security Agreement (Shipyard)]*

**Administrative Agent:**

**WHITE OAK GLOBAL ADVISORS, LLC**

By: _____
Name: Barbara J. S. McKee
Title: Managing Partner

**Lenders:**

**WHITE OAK GLOBAL ADVISORS, LLC,**
a Delaware limited liability company, as Investment
Manager for the Lenders identified on Schedule 2

By: _____
Name: Barbara J. S. McKee
Title: Managing Partner

*[Signature Page to Amended and Restated Senior Loan and Security Agreement (Shipyard)]*

**CONSENTED AND AGREED TO AS OF**

**THE EFFECTIVE DATE:**

**Orinoco Natural Resources, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Oakridge Energy Partners, LLC**

By: _____
Name: _____
Title: _____

**Navarro Capital Partners, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Ranger Offshore International, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Companies, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Diving & Marine Services, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**Epic Applied Technologies, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory

**CONSENTED AND AGREED TO AS OF**

**THE EFFECTIVE DATE:**

**Orinoco Natural Resources, LLC**

By:_____
Name:_____
Title: _____

**Oakridge Energy Partners, LLC**

By:_____
Name:____David Wiley_____
Title: ____Member_____

**Navarro Capital Partners, LLC**

By:_____
Name:_____
Title: _____

**Ranger Offshore International, LLC**

By:_____
Name:_____
Title: _____

**Epic Companies, LLC**

By:_____
Name:_____
Title: _____

**Epic Diving & Marine Services, LLC**

By:_____
Name:_____
Title: _____

**Epic Applied Technologies, LLC**

By:_____
Name:_____
Title: _____

**Cedar Creek Aviation, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


**Epic Specialty Services, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


**TSB Offshore Inc.**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


**TSB Holding Company, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


**King Aire, Inc.**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


**Zuma Rock Energy Services, LLC**

By: _____
Name: Thomas M. Clarke
Title: Authorized Signatory


_____
Ana M. Clarke


_____
Thomas M. Clarke


_____
David A. Wiley


*[Signature Page to Amended and Restated Senior Loan and Security Agreement (Shipyard)]*

**Cedar Creek Aviation, LLC**

By:_____
Name:_____
Title: _____


**Epic Specialty Services, LLC**

By:_____
Name:_____
Title: _____


**TSB Offshore Inc.**

By:_____
Name:_____
Title: _____


**TSB Holding Company, LLC**

By:_____
Name:_____
Title: _____


**King Aire, Inc.**

By:_____
Name:_____
Title: _____

**Zuma Rock Energy Services, LLC**

By:_____
Name:_____
Title: _____


_____
Ana M. Clarke


_____
Thomas M. Clarke


_____
David A. Wiley


[*Signature Page to Amended and Restated Senior Loan and Security Agreement (Shipyard)*]

**SCHEDULE 1.01-A**

**Equity Holder Pledgors**

Orinoco Natural Resources, LLC, a Delaware limited liability company

Epic Maritime Asset Holdings, LLC, a Delaware limited liability company

Epic Alabama Holdings, LLC

**SCHEDULE 1.01-B**

**Certain Material Contracts**[1]

---

[1] To be updated.

**SCHEDULE 1.01-C**

**Real Property**

| Loan Party | Address | Owned/Leased |
|---|---|---|
| Epic Alabama Shipyard, LLC | 660 Dunlap Drive<br>Mobile, AL 36602<br>Mobile County | Owned |

**SCHEDULE 2.01**

**Lenders; Percentage Shares**

The aggregate amount of all Term Loans as of the Effective Date are as follows:

| Lenders | Outstanding Amount | Percentage Share |
|---------|-------------------|------------------|
| ASRS | $ 3,592,104.55 | 7.98% |
| TEAMSTERS | $ 2,811,837.52 | 6.25% |
| WOSF REV | $ 28,641,457.40 | 63.65% |
| WOFI C | $ 9,954,600.53 | 22.12% |
| **Total** | **$ 45,000,000.00** | **100.00%** |

\*    Lenders specified in this Schedule 2.01 by code names are identified by their respective legal names in the books and records of White Oak Global Advisors, LLC.

**SCHEDULE 5.05**

**Certain Litigation**[1]

| ITEM NO. | Matter | Plaintiff | Defendant | Type of Case | Case Number | Court Venue |
|---|---|---|---|---|---|---|
| 1. | | | | | | |

---

[1] To be updated.

**SCHEDULE 5.06**

**DEFAULTS UNDER CONTRACTUAL OBLIGATIONS**

**SCHEDULE 5.16**

**Subsidiaries; Investments; Equity Interests in Loan Parties**

Orinoco Natural Resources, LLC owns 100% of the shares or limited liability company interests in the following entities:

| | |
|---|---|
| Epic Alabama Holdings, LLC | 100% |
| Epic Maritime Asset Holdings, LLC | 100% |

Epic Maritime Asset Holdings, LLC owns 100% of the shares or limited liability company interests in the following entity:

| | |
|---|---|
| Epic Alabama Shipyard, LLC | 100% |

Epic Alabama Holdings, LLC owns 100% of the shares or limited liability company interests in the following entity:

| | |
|---|---|
| Epic Alabama Maritime Assets, LLC | 100% |

Epic Alabama Shipyard, LLC owns 100% of the shares or limited liability company interests in the following entities:

| | |
|---|---|
| Epic Recycling Services, LLC | 100% |
| Epic Alabama Recyclers, LLC | 100% |

**EMPLOYEE LOANS**

None.

**LOAN RECEIVABLE – OTHER**

None.

## SCHEDULE 5.19

## Certain Labor Issues[1]

---

[1] To be updated.

**SCHEDULE 5.21**

**Permits**
**(List of Required Permits Not Currently Held by the Loan Parties)**

**SCHEDULE 5.26**

**Locations of M&E[1]**

| Location | Equipment Maintained |
|---|---|
| 10456 Highway 23<br>Belle Chase, LA 70037 | Diving Equipment |
| 216 Millstone Road<br>Broussard, LA 70518 | Cutting Equipment |
| 309 Dixon Road<br>Houma, LA 70363 | Plugging and Abandonment Equipment |
| Port Fourchon<br>137 A.J. Estay Road<br>Golden Meadow, LA | Incidental equipment for dock-related purposes. |
| 115 Menard Road<br>Houma, Louisiana 70363 | Diving Equipment purchased form Ranger Offshore, Inc. |
| 6072 Candice Lane<br>Lake Charles, LA 70615 | Equipment purchased from Wright's Well Control Service, LLC |
| 660 Dunlap Drive<br>Mobile, AL 36602<br>Mobile County | Vessel fabrication, repair, maintenance and scrapping equipment |

---

[1] To be updated.

**SCHEDULE 6.12**

**Collateral Accounts and Excluded Accounts**[1]

**Operating Accounts:**
**These bank accounts are in the name of Epic Alabama Shipyard, LLC or Epic Alabama Maritime Assets, LLC**

| Account Number | Bank | Use |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
| Excluded Accounts: |  |  |
|  |  |  |

---

[1] To be updated.

**SCHEDULE 6.21**

**POST- CLOSING DELIVERIES**

1. Within 10 days of the Effective Date, recordation of the Amended and Restated Ship Mortgage on the Whole of the Vessel Named Alabama (Official No. 641504) by EAMA in favor of Administrative Agent
2. Within 10 days of the Effective Date, a Certificate of Ownership re: the Vessel Named Alabama (Official No. 641504)
3. Within 10 days of the Effective Date, a Letter of Undertaking confirming insurance coverage on the Vessel Named Alabama in favor of Administrative Agent
4. Within 10 days of the Effective Date, execution and delivery of an amendment to the Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated December 21, 2018, given by EAMA in favor of Existing Administrative Agent, granting Existing Administrative Agent a Lien upon the Facility located in Mobile county, Alabama, and within 10 Business Days of the Effective Date, recordation thereof
5. Within 30 days of the Effective Date, execution and delivery by the applicable Loan Party and deposit bank of a Control Agreement in favor of Administrative Agent with respect to any Collateral Account of a Loan Party that is not subject to a Control Agreement in favor of the Administrative Agent as of the Effective Date
6. Within 15 Business Days of the Effective Date, execution and delivery of an intercreditor agreement relating to the Liens granted pursuant to the Sanare Pledge Agreement

**SCHEDULE 7.01**

**Certain Permitted Liens**

None.

**SCHEDULE 7.03**

**Certain Permitted Debt**

None.

**SCHEDULE 10.02**

**Administrative Agent's Office; Certain Addresses for Notices**

If to Loan Parties:

>Epic Alabama Maritime Assets, LLC, as Administrative Loan Party
>1080 Eldridge Parkway, Suite 1300
>Houston, Texas 77077
>Attention:  Kelton Tonn, General Counsel
>Email:  ktonn@epiccompanies.com

>with a copy to (which shall be required to give effective notice):

>Orinoco Natural Resources, LLC
>192 Summerfield Court, Suite 201
>Email Address:  tom.clarke@kissito.org
>Attention:  Thomas M. Clarke
>Email Address:  jbell@erpfuels.com
>Attention:  Jennifer Bell

>If to Administrative Agent:

>White Oak Global Advisors, LLC
>3 Embarcadero Center, Suite 550
>San Francisco, CA  94111
>Facsimile No.:  415-644-4199
>Email Address:  generalcounsel@whiteoaksf.com

>with a copy to (which shall not constitute notice):

>Cortland Capital Market Services LLC
>225 W. Washington Street, 9th Floor
>Chicago, IL  60606
>Email Address:  whiteoakagency@whiteoaksf.com
>Attention:  Agency Services-White Oak Global Advisors

>with a copy to (which shall not constitute notice):

>Paul Hastings LLP
>515 South Flower Street, 25th Floor
>Los Angeles, CA 90071
>Attention: Peter Burke, Esq.
>Email:  peterburke@paulhastings.com

**EXHIBIT A**

**[FORM OF ASSIGNMENT AND ASSUMPTION]**

**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "***Assignment and Assumption***") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "***Assignor***") and the Assignee identified in item 2 below (the "***Assignee***"). Capitalized terms used but not defined herein shall have the meanings given to them in the Loan Agreement identified below (as amended, the "***Loan Agreement***"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as an "***Assigned Interest***"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor:                 [_____].

2.  Assignee:                 [_____].

3.  Borrowers:             Epic Alabama Maritime Assets, LLC, a Delaware limited liability company, together with any other Persons that become a "Borrower" under the Loan Agreement.

4.  Administrative Agent:   WHITE OAK GLOBAL ADVISORS, LLC, as administrative agent under the Loan Agreement.

5.  Loan Agreement:       The Amended and Restated Loan and Security Agreement dated as of July 22, 2019 among Borrowers, the Affiliates of Borrowers from time to time party thereto as Guarantors, the entities from time to time party thereto as Lenders, and Administrative Agent.

6.      Assigned Interests:

| Assignor | Assignee | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans |
|---|---|---|---|---|
| [_____] | [_____] | $[_____] | $[_____] | [_____]% |

Effective Date: _____ __, 20__

[SIGNATURE PAGE FOLLOWS]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR:

_____

By: _____
Title:

ASSIGNEE:

_____

By:_____
Title:

[ADMINISTRATIVE LOAN PARTY:

_____

By:_____
Title:][1]

[Consented to and Accepted:

WHITE OAK GLOBAL ADVISORS, LLC, as
Administrative Agent

By:_____
Title:][2]

---

[1]    To the extent required by Section 10.06(b)(iii) of the Loan Agreement.
[2]    To the extent required by Section 10.06(b)(iii) of the Loan Agreement.

ANNEX 1

The Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***"), among EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company (together with any other Persons that become a "Borrower" thereunder, each a "***Borrower***", and collectively, jointly and severally, the "***Borrowers***"), the Affiliates of Borrowers from time to time party thereto as Guarantors, the entities from time to time party thereto as Lenders, and WHITE OAK GLOBAL ADVISORS, LLC, a Delaware limited liability company, as administrative agent ("***Administrative Agent***") for such Lenders.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

        1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or the performance or observance by Borrowers, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

        1.2     Assignee.  The Assignee (a) represents and warrants that (i) it is an Eligible Assignee, (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, it meets all the requirements to be an assignee under **Section 10.06** of the Loan Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to **Section 6.01** thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest, and (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (b) agrees that (i) it will, independently and without reliance on Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

        1.3     Payments.  From and after the Effective Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.  Notwithstanding the foregoing, Administrative Agent shall

make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

       2.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York, without regard to principles of conflicts of law other than New York General Obligations Law 5-1401 and 5-1402.

**EXHIBIT B**

**[FORM OF] COMPLIANCE CERTIFICATE**

Financial Statement Date: _____, 20__

The undersigned, _____, hereby refers to that certain Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***"), among EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company (together with any other Persons that become a "Borrower" thereunder, each a "***Borrower***", and collectively, jointly and severally, the "***Borrowers***"), the Affiliates of Borrowers from time to time party thereto as Guarantors, the entities from time to time party thereto as Lenders, and WHITE OAK GLOBAL ADVISORS, LLC, a Delaware limited liability company, as administrative agent ("***Administrative Agent***") for such Lenders.  Unless otherwise defined herein, each capitalized term used herein has the meaning ascribed thereto in the Loan Agreement.

The undersigned hereby certifies, as of the date hereof, to Administrative Agent and Lenders, on behalf of Loan Parties as an officer of Administrative Loan Party and not in his or her individual capacity, that:  (a) s/he holds the office of _____ of Administrative Loan Party and is a Responsible Officer of Administrative Loan Party; (b) as a Responsible Officer of Administrative Loan Party, s/he is authorized to execute and deliver this Compliance Certificate to Administrative Agent and Lenders on behalf of the Loan Parties; and (c):

    1.    Attached hereto is [please check as appropriate]:

☐ a consolidated balance sheet for the Shipyard Loan Parties and their Subsidiaries, as at the end of the Fiscal Year ended [_____ __, 20__ ] (the "***Subject Fiscal Year***"), and the related consolidated statements of income or operations, shareholders' (or members') equity and cash flows for such Subject Fiscal Year (setting forth, in each case in comparative form, the figures for the previous Fiscal Year), all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by (i) management's discussion and analysis of financial condition and results of operation, including the applicable Loan Parties' liquidity and capital resources, and (ii) a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.

☐ unaudited consolidated balance sheets for the Shipyard Loan Parties and their Subsidiaries, as at the end of the Fiscal Quarter ended [_____ __, 20__] (the "***Subject Fiscal Quarter***"), and the related consolidated statements of income or operations, shareholders' (or members') equity and cash flows for such Subject Fiscal Quarter and the portion of the Fiscal Year then ended (setting forth, in each case in comparative form, (i) the figures for the corresponding portion of the previous Fiscal Year and (ii) the figures from the corresponding portion of such Loan Parties' budget for the current Fiscal Year), all in reasonable detail and accompanied by management's discussion and analysis of financial condition and results of operations, including such Loan Parties' liquidity and capital resources.

☐ unaudited consolidated balance sheets for the Shipyard Loan Parties and their Subsidiaries, as at the end of the Fiscal Month ended [_____ __, 20__] (the "***Subject Fiscal Month***"), and the related consolidated and consolidating statements of income or operations, shareholders' (or members') equity and cash flows for such Subject Fiscal Month and the portion of the Fiscal Year then ended (setting forth, in each case in comparative form, (i) the figures for the corresponding portion of the previous Fiscal Year (if applicable) and (ii) the figures from the corresponding portion of such Loan Parties' budget for the current Fiscal Year), all in reasonable detail and accompanied by management's discussion and analysis of financial condition and results of operations, including such Loan Parties' liquidity and capital resources.

☐ forecasts prepared by the management of the Shipyard Loan Parties and their Subsidiaries, in form satisfactory to Administrative Agent, of consolidated balance sheets and statements of income or operations and cash flows for such Loan Parties and their respective Subsidiaries for the Fiscal Year ending [_____ __, 20__ ] (the "***Forecasted Fiscal Year***") (and each Fiscal Year thereafter through the Fiscal Year immediately following the Fiscal Year in which the Maturity Date occurs); and budgets prepared by the management of the Shipyard Loan Parties and their Subsidiaries, in form satisfactory to Administrative Agent, for such Forecasted Fiscal Year.

2.     The financial statements referred to in Paragraph (c)(1) fairly present the consolidated financial condition, results of operations, shareholders' (or members') equity and cash flows of the Shipyard Loan Parties and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

3.     The undersigned has reviewed and is familiar with the terms of the Loan Agreement and the other Loan Documents and has made, or has caused to be made under my supervision, a detailed review of the transactions and conditions (financial or otherwise) of the Shipyard Loan Parties and their Subsidiaries during the accounting period covered by the attached financial statements.

4.     The financial condition covenants and other compliance calculations and information set forth on **Schedule I** attached hereto are true, complete and accurate on and as of the date hereof.

5.     To the undersigned's knowledge the Loan Parties have, during such period, observed, performed and/or satisfied and/or have caused to be observed, performed and/or satisfied all of their respective covenants and other agreements contained in the Loan Documents to which they are a party, and have satisfied every condition in the Loan Documents to which they are a party to be observed, performed and/or satisfied by them, and the undersigned has no knowledge of any condition, event or occurrence, which constitutes a Default or Event of Default, except as set forth below:

[Describe below (or in a separate attachment to this Certificate) the exceptions, if any, to Paragraph 5 hereof by listing, in detail and with reference to specific sections of the Loan Agreement or applicable Loan Document, the nature of the condition, event or occurrence, the period during which it has existed and the actions that Loan Parties have taken, is taking or proposes to take with respect to such condition, event or occurrence.]

The foregoing certifications are made as of _____ __, 20__ pursuant to the provisions of the Loan Agreement.

_____
as Administrative Loan Party

By: _____
Name:
Title:

**SCHEDULE I**

To Compliance Certificate

Compliance Calculations
for the Amended and Restated Loan and Security Agreement dated as of July 22, 2019 (the "***Loan Agreement***")

Calculations as of [_____, ____]
for [Fiscal Month][Fiscal Quarter][Fiscal Year] ending [_____, ____]

**EXHIBIT C**

**[FORM OF]** U.S. TAX COMPLIANCE CERTIFICATE
[For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes]

Reference is made to that certain Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***"), among EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company (together with any other Persons that become a "Borrower" thereunder, each a "***Borrower***", and collectively, jointly and severally, the "***Borrowers***"), the Affiliates of Borrowers from time to time party thereto as Guarantors, the entities from time to time party thereto as Lenders, and WHITE OAK GLOBAL ADVISORS, LLC, a Delaware limited liability company, as administrative agent ("***Administrative Agent***") for such Lenders, as Administrative Agent for the benefit of Lenders.  Unless otherwise defined herein, each capitalized term used herein has the meaning ascribed thereto in the Loan Agreement.

Pursuant to the provisions of **Section 2.08** of the Loan Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the Obligations (as well as the Note evidencing the Obligations, if any) in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten percent shareholder of any Loan Party within the meaning of Section 871(h)(3)(B) of the Code and (d) it is not a controlled foreign corporation related to any Loan Party as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (a) if the information provided on this certificate changes, the undersigned shall promptly so inform the Administrative Agent, and (b) the undersigned shall have at all times furnished the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
      Name:
      Title:

Date: _____

**EXHIBIT D**

**[Form of]** Excess Cash Flow Certificate

Excess Cash Flow Certificate Date: _____ __, 20__

The undersigned, _____, hereby refers to that certain Amended and Restated Loan Agreement, dated as of July 22, 2019 (as it may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "*Loan Agreement*"), by and among EPIC ALABAMA MARITIME ASSETS, LLC, a Delaware limited liability company (together with any other Persons that become a "Borrower" thereunder, each a "*Borrower*", and collectively, jointly and severally, the "*Borrowers*"), the Affiliates of Borrowers from time to time party thereto as Guarantors, the several entities from time to time party hereto as Lenders, and WHITE OAK GLOBAL ADVISORS, LLC, as administrative agent ("*Administrative Agent*") for such Lenders. Unless otherwise defined herein, each capitalized term used herein has the meaning ascribed thereto in the Loan Agreement.

The undersigned hereby certifies, solely in the capacity as a Responsible Officer of Administrative Borrower and not in any individual capacity, as of the date hereof, to Administrative Agent and Lenders that:

1. [_____] holds the office of _____ of Administrative Borrower, and is a Responsible Officer of Administrative Borrower;

2. As a Responsible Officer of Administrative Borrower, s/he is authorized to execute and deliver this Excess Cash Flow Certificate to Administrative Agent and Lenders on behalf of Administrative Borrower;

3. This Excess Cash Flow Certificate is delivered pursuant to **Section 6.01(g)** of the Loan Agreement;

4. Attached hereto as <u>Schedule A</u> is a calculation of Excess Cash Flow based upon the financial statements for such Fiscal Year delivered pursuant to **Section 6.01(a)** of the Loan Agreement;

5. The Excess Cash Flow Percentage is 75%;

6. The Excess Cash Flow Percentage multiplied by the Excess Cash Flow is $_____;

7. The amount of Excess Cash Flow required to be paid pursuant to **Section 2.03(c)(i)** of the Loan Agreement is: $_____.[1]

In the event of any conflict between this certificate or <u>Schedule A</u> attached hereto and the Loan Agreement, the Loan Agreement shall govern.

*[Signature Page Follows.]*

---

[1] The prepayment shall be the amount equal to the Excess Cash Flow Percentage of the Excess Cash Flow for the Fiscal Year most recently ended but in no event more than the Outstanding Amount of the Term Loans.

**IN WITNESS WHEREOF**, the foregoing certifications are made as of the date first written above pursuant to the provisions of the Loan Agreement.

**EPIC ALABAMA MARITIME ASSETS, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**Schedule A**

**Excess Cash Flow Calculations**

Calculations as of [_____, ____] (the "***Reference Date***") for the period consisting of the Fiscal Year ending on the Reference Date.

| Excess Cash Flow Calculations | |
|---|---|
| A.  Excess Cash Flow | |
| EBITDA for such period: | $ |
| 1.  Capital Expenditures actually made in cash by the Shipyard Loan Parties (net of any insurance proceeds, condemnation awards or proceeds relating to any financing with respect to such expenditures): | $ |
| 2.  taxes on or measured by income, profits or capital that are paid in cash by the Shipyard Loan Parties: | $ |
| 3.  [reserved] | |
| 4.  Interest Expense (exclusive of any debt discount) paid in cash by the Shipyard Loan Parties: | $ |
| 5.  scheduled principal payments on account of capital leases and other Debt (provided that payments of revolving Debt shall not be deducted from Excess Cash Flow unless accompanied by a permanent reduction in the relevant commitment) of the Shipyard Loan Parties, but in each of the foregoing cases solely to the extent paid in cash: | $ |
| 6.  the amount, if any, by which (A) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the end of such period is greater than (B) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the beginning of such period: | $ |
| 7.  the amount if any by which (A) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the end of such period is less than (B) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the beginning of such period: | $ |
| 8.  the amount, if any, by which (A) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the end of such period is less than (B) the current assets (exclusive of cash and Cash Equivalents) of the Shipyard Loan Parties at the beginning of such period: | $ |
| 9.  the amount if any by which (A) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the end of such period is greater than (B) the current liabilities (exclusive of the current portion of long term Debt) of the Shipyard Loan Parties at the beginning of such period: | $ |
| 10.  all add-backs with respect to cash payments added back to EBITDA under clause (a) of the definition of "EBITDA": | $ |
| 11.  the aggregate consideration paid in cash during such period in respect Investments permitted under the Loan Agreement, *less* any amounts received in respect thereof as a return of capital: | $ |
| 12.  Line A.2. *plus* A.3. *plus* A.4. *plus* A.5. *plus* A.6. *plus* A.7. *plus* A.8 *minus* A.9 *minus* A.10 *plus* A.11. *plus* A.12.[1] | $_____ |
| 13.  Line A.1. *minus* A.13. | $ |

---

[1] For each of Lines A.2 through A.12, calculated where applicable to the extent made from Internally Generated Cash.