# Islam Declaration

# Exhibit 13

EXECUTION COPY

# SECOND AMENDED AND RESTATED SENIOR SECURED PROMISSORY NOTE
# OF
# ACQUA LIANA CAPITAL PARTNERS, LLC

Original Principal Amount:     April 5, 2019
**$123,803,933.21**

    1.    Acqua Liana Capital Partners, LLC, a Texas limited liability company (the "Payor"), for value received, pursuant to (i) that certain Resignation, Loan Purchase and Sale Agreement, dated as of October 12, 2018 (as amended, restated, modified or supplemented from time to time, the "Loan Purchase and Sale Agreement"), among the Payor, the selling lenders party thereto (collectively, the "White Oak Lenders", "Noteholders", or "Holders"), White Oak Global Advisors, LLC, a Delaware limited liability company ("WOGA"), in its capacity as administrative agent for the White Oak Lenders (in such capacity, "Agent") under that certain Collateral Agency Agreement, dated as of October 12, 2018 (the "Collateral Agency Agreement"), among each White Oak Lender and Agent, with its principal office at 3 Embarcadero Center #550, San Francisco, CA 94111, and (ii) that certain Ranger Loan (as defined below), hereby promises to pay to Agent for the benefit of the Holders, to be applied in accordance with the terms of the Collateral Agency Agreement, the sum of (a) the original principal amount of $ $123,803,933.21 plus (b) interest accrued thereon, as set forth in Section 2 of this Second Amended and Restated Senior Secured Promissory Note of Acqua Liana Capital Partners, LLC (this "Note"). The ratable share of each Holder in respect of the principal balance of this Note is as set forth on Exhibit A hereto (as to each Holder, the ratable share of such Holder in the outstanding principal balance of this Note as set forth on Exhibit A being referred to as such Holder's "Ratable Share"). As used herein, "Ranger Loan" shall mean that certain loan in the aggregate principal amount of $5,000,000 made by Holders to Payor on the date hereof, the proceeds of which shall be (a) initially funded on the date hereof to that certain deposit account number 359681540084 and maintained with KeyBank, N.A., which deposit account is in the name of the Agent (the "Restricted Account"), and (b) thereafter used by Payor to make one or more term loans, in an aggregate principal amount equal to $5,000,000, to the Ranger Borrowers (as defined below) under that certain Second Amended and Restated Loan and Security Agreement dated as of the date hereof by and among Payor (as successor Administrative Agent thereunder and as a Lender thereunder), the several entities from time to time party thereto as lenders (the "Ranger Lenders"), Ranger Offshore, Inc., a Delaware corporation and the other borrowers party thereto, as Borrowers (collectively, the "Ranger Borrowers"), Epic Companies, LLC, a Delaware limited liability company ("Epic"), as Parent Guarantor, and certain subsidiaries of Epic as Guarantors (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), solely upon the satisfaction of the Release Conditions (as defined below). Payor hereby irrevocably instructs the Agent to deposit the proceeds of the Ranger Loan to the Restricted Account, which funds shall be released by Agent from the Restricted Account to Payor in $250,000 increments to fund term loans to the Ranger Borrowers under the Loan Agreement solely on each Release Date and in an amount not to exceed the Release Amount (as defined below) as of such date until the aggregate proceeds of the Ranger Loan released to Payor equal $5,000,000 (such conditions, the "Release Conditions").

LEGAL_US_W # 97857056.7

As used herein (a) "Release Date" shall mean each date on which the Agent shall have received evidence reasonably satisfactory to it that Tom Clarke, an individual ("Clarke"), has made a common equity contribution to Epic in an amount equal to at least $250,000; (b) "Release Amount" shall mean the difference between (i) the aggregate amount of Qualifying Equity Contribution Amounts and (ii) the aggregate amount of funds released from the Restricted Account; provided, that if the Release Amount is not an integral multiple of $250,000, then the Release Amount as of any date shall be deemed to be the highest integral multiple of $250,000 that is less than the amount that would otherwise constitute the Release Amount and (c) "Qualifying Equity Contribution Amounts" shall mean the amount of common equity contributions made by Clarke to Epic after April 5, 2019 less the total amount of payments made by any Loan Party (as defined in the Loan Agreement) after April 5, 2019 in respect of management fees or other similar fees to any of the Loan Parties' Affiliates (as defined in the Loan Agreement). Funds on deposit in the Restricted Account shall accrue a commitment fee in an amount equal to (i) from and including the date hereof through and including June 22, 2019, 2% per annum on the balance of funds in the Escrow Account (the "Escrow Balance"), and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount (as defined below), (ii) from and including June 23, 2019 through and including June 22, 2020, 5% per annum on the Escrow Balance, and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount, (iii) from and after June 23, 2020, 10% per annum on the Escrow Balance, and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount, and (iv) from and after June 23, 2021, 10% per annum on the Escrow Balance, and shall be paid in arrears in cash on the first day of each calendar month (in each instance, computed on the basis of the actual number of days elapsed and a year of 365 days). For the avoidance of doubt, the Ranger Loan shall be deemed to be made to Payor, and interest shall begin to accrue thereon, on each Release Date on the amount so released from the Restricted Account.

2. **Payments**. The principal amount of this Note, and all unpaid interest accrued thereon ("Outstanding Amount"), shall be payable at the principal offices of Agent or the Noteholders or by mail to the registered address of Agent (i) immediately after a Default (as defined below); or (ii) if not previously paid in full, on February 29, 2024 (the "Maturity Date"). Interest shall accrue on the outstanding principal amount (i) from and including the date hereof through and including June 22, 2019, at a rate of 2% per annum, and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount, (ii) from and including June 23, 2019 through and including June 22, 2020, at a rate of 5% per annum, and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount, (iii) from and after June 23, 2020, at a rate of 10% per annum, and shall be paid in kind on the first day of each calendar month by adding the amount thereof to the Outstanding Amount, and (iv) from and after June 23, 2021, at a rate of 10% per annum, and shall be paid in arrears in cash on the first day of each calendar month (in each instance, computed on the basis of the actual number of days elapsed and a year of 365 days). For the avoidance of doubt, any interest payable hereunder through June 22, 2021 shall automatically accrue and be capitalized to the principal amount of this Note ("PIK Interest"), and shall thereafter be deemed to be a part of the principal amount of this Note, unless such interest is paid in cash. All PIK Interest that has accrued and has not been paid in cash shall be payable upon the earlier of a Default or the Maturity Date. The Payor shall not issue additional

promissory notes to represent the PIK Interest, and, in lieu thereof, Agent or the Noteholders shall keep a ledger of the amount of PIK Interest that has accrued, which ledger shall be presumed to be correct.

3. ***Personal Guarantee***.  The obligations under this Note are guaranteed, subject to the limitations set forth therein, under the terms of the Personal Guarantee dated as of October 12, 2018 made between Tom Clarke, an individual, and Agent (the "<u>Clarke Personal Guarantee</u>") and the Personal Guarantee dated as of October 12, 2018 made by David Wiley, an individual, and Agent (the "<u>Wiley Personal Guarantee</u>", and together with the Clarke Personal Guarantee, each a "<u>Personal Guarantee</u>" and, collectively, the "<u>Personal Guarantees</u>").  Agent and the Noteholders shall be entitled to all the benefits provided in the Personal Guarantees, provided that Agent and the Noteholders shall not be obligated to proceed first against either Personal Guarantee, but may proceed directly on this Note. In the event that Agent or the Noteholders proceed against either Personal Guarantee and the proceeds of same are inadequate to pay any amounts due on this Note, the undersigned shall remain liable for any deficiency thereof.

4. ***Acqua Liana Security Agreement***.  This Note is secured under the terms of the Amended and Restated Security Agreement dated as of October 12, 2018 made by and between Payor and Agent (the "<u>Acqua Security Agreement</u>").  Agent and the Noteholders shall be entitled to all the benefits of the security as provided in the Acqua Security Agreement, provided that Agent and the Noteholders shall not be obligated to proceed first against the Collateral (as defined in the Acqua Security Agreement), but may proceed directly on this Note. In the event Agent proceeds against the Collateral (as defined in the Acqua Security Agreement) and the proceeds of same are inadequate to pay any amounts due on this Note, Payor shall remain liable for any deficiency.

5. ***Collateral Assignment of Ranger Loan.***  This Note shall also be secured by a collateral assignment of all of Payor's right, title and interest in the Loan Agreement and all related loan documents, security documents or mortgages (collectively, the "<u>Loan Documents</u>") upon terms and conditions acceptable to Agent.  Agent shall retain possession of all original Loan Documents unless and until this Note is paid in full.

6. ***Mandatory Prepayments under Ranger Loan and Required Consent to Amendments or Enforcement.***  As further security for this Note, Payor hereby covenants, acknowledges and agrees that any amount payable to Payor under the Loan Purchase and Sale Agreement, Loan Agreement or Loan Documents shall, in lieu of being retained by Payor, be paid to Agent for the benefit of the Noteholders as a mandatory prepayment of all advances, debts, liabilities, obligations, covenants, and duties of Payor under or in respect of this Note and any related documents.  In addition, Payor hereby covenants, acknowledges and agrees that Payor shall not (i) amend, waive, modify or otherwise alter the Loan Agreement or Loan Documents to the extent such amendment, waiver, modification or other alteration would (A) increase, or extend the expiry of, the Commitment (as such term is defined in the Loan Agreement) of any Lender (as such term is defined in the Loan Agreement) (or reinstate any such Commitment to the extent terminated pursuant to **Section 8.02** of the Loan Agreement), (B) postpone or delay any date fixed by the Loan Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to any Lender under the Loan Agreement or under any other Loan Document beyond the Maturity Date as set forth herein, or

reduce the amount due to any Lender on any such date, (C) reduce the principal of any or all of the Term Loans (as such term is defined in the Loan Agreement) or other amounts payable to any Lender under the Loan Agreement or under any other Loan Document, (D) reduce the rate of interest on any Term Loan specified in the Loan Agreement below the rate of interest set forth in this Note with respect to the obligations hereunder, (E) increase the Aggregate Commitments (as such term is defined in the Loan Agreement), (F) release, compromise or subordinate all or any portion of the collateral securing the Obligations (as such term is defined in the Loan Agreement), except as otherwise expressly provided in the Loan Agreement or in any of the Collateral Documents (as such term is defined in the Loan Agreement), or amend the definition of the obligations secured by any of the Collateral Documents to narrow the scope of such obligations so secured, and except for a subordination to liens existing as of the date hereof with respect to all or any portion of the collateral securing the Obligations, (G) release, compromise, subordinate or terminate any of the Guaranties (as such term is defined in the Loan Agreement) except as otherwise expressly provided in the Loan Agreement or in any of the Loan Documents, or (H) amend the definition of Maturity Date (as such term is defined in the Loan Agreement) to extend such date beyond the Maturity Date (as such term is defined in this Note), or (ii) assign or transfer its rights under the Loan Agreement or the Loan Documents, in each case without the express written consent of Agent, unless and until this Note has been paid in full.

7. **Default**. The following shall constitute a "Default" under this Note: (i) if the Payor fails to make any payment of principal or interest due and payable under the terms of this Note, (ii) any breach of any term, condition, representation or warranty under either Personal Guarantee by the applicable Guarantor (as defined therein), (iii) any breach of any term, condition, representation, warranty or covenant under the pledge or collateral assignment of the Loan Agreement and Loan Documents, (iv) any breach of any term, condition, representation, warranty or covenant by Payor pursuant to the Acqua Security Agreement or the Loan Purchase and Sale Agreement, (v) any breach by Payor of any term, condition, representation, warranty or covenant contained herein, (vi) if, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors (a "Bankruptcy Law"), Payor shall (a) commence a voluntary case or proceeding; (b) consent to the entry of an order for relief against it in an involuntary case; (c) consent to the appointment of a trustee, receiver, assignee, liquidator, or similar official; (d) make an assignment for the benefit of its creditors; (e) admit in writing its inability to pay its debts as they become due, (f) if a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Payor in an involuntary case or (ii) appoints a trustee, receiver, assignee, liquidator, or similar official for Payor or substantially all of Payor's assets or properties, (vi) an "Event of Default" occurs under Section 8.01(a), 8.01(f) or 8.01(g) of the Epic Loan Agreement (as defined below) or any acceleration of the Obligations (as defined in the Epic Loan Agreement) shall occur or (vii) if Payor has not have received, on or before May 2, 2019 (or such later date as may be agreed to by the Agent in its sole discretion) (I) (a) a warrant agreement issued by Epic in favor of Payor, pursuant to which Epic issues to Payor warrants which may be exercised such that Payor may acquire up to 25% of the equity interests in Epic, calculated on a fully diluted basis, (b) a letter agreement by and between Payor and Agent for the benefit of the Ranger Lenders, and (c) an amended and restated operating agreement for Epic, each in form and substance satisfactory to Agent, duly executed by the parties thereto and (II) (a) a warrant agreement by TSB Holding Company, LLC ("TSB Holdco") in favor of Payor, pursuant to which TSB Holdco issues to Payor warrants which may be exercised such that Payor may

acquire up to 25% of the equity interests in TSB Holdco, calculated on a fully diluted basis, (b) a letter by and between Payor and Agent for the benefit of the Ranger Lenders, and (c) an amended and restated operating agreement for TSB Holdco, each in form and substance satisfactory to Agent, duly executed by the parties thereto. Upon the occurrence and continuance of a Default, Payor is responsible for any and all fees, costs and expenses, including legal fees, in connection with enforcement efforts or actions by the White Oak Lenders and Agent.

8. *Exchange*. Upon the payment in full of the Obligations under that certain Loan and Security Agreement, dated as of July 20, 2018, as amended, restated, supplemented or otherwise modified from time to time, by and among Epic, certain of Epic's subsidiaries, and White Oak Global Advisors, LLC, in its capacity as agent thereunder, and the lenders from time to time party thereto, as it has been and may be hereinafter amended, restated or modified from time to time (the "Epic Loan Agreement", and together with each of the other agreements, instruments or documents delivered in connection therewith, the "Epic Loan Documents") and the termination the Epic Loan Documents, Agent shall have the right, but not the obligation, to exchange this Note at par (and without premium) for all (but not less than all) of the Obligations under the Loan Agreement (the "Exchange").

Immediately effective upon the exchange of this Note (such date, the "Exchange Date"), (a) this Note shall be cancelled and shall be of no further force and effect, except, to the extent any provision hereof expressly survives such termination or cancellation, (b) Payor shall cease to be a Lender under the Loan Agreement, (c) Payor shall resign as Administrative Agent under the Loan Agreement as permitted by Section 9.06 of the Loan Agreement and shall cease to be an Agent thereunder, (d) White Oak Global Advisors, LLC shall hereby be appointed as successor Administrative Agent under the Loan Agreement in accordance with Section 9.06 thereof, (e) each Noteholder shall become a Lender under the Loan Agreement, and (f) the Clarke Personal Guarantee (solely with respect to the Note), the Wiley Personal Guarantee (solely with respect to the Note), and the Acqua Security Agreement shall be of no further force and effect, except, to the extent any provision thereof expressly survives such termination or cancellation.

In connection with the Exchange, Payor agrees to enter into and deliver to Agent and the Noteholders on the Exchange Date, as a condition to closing, a fully-executed assignment agreement substantially in the form annexed to the Loan Agreement as Exhibit A thereto. Administrative Agent under the Loan Agreement shall assume complete responsibility for the servicing and administration under the Loan Agreement, including, but not limited to, (a) succeeding to and becoming vested with all of the rights, powers, privileges and duties of the Administrative Agent, (b) the collection of all payments thereunder, and (c) taking such actions on each Lender's behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Agreement, together with such actions and powers as are reasonably incidental thereto. Payor shall be discharged from all of its duties and obligations under the Loan Agreement and the other Loan Documents (if not already discharged therefrom as provided in Section 9.06 of the Loan Agreement).

9. *Waivers.* Payor hereby waives demand for payment, presentment, protest, notice of protest and non-payment, or other notice of default, notice of acceleration and intention to accelerate, and agrees that Payor's liability under this Note shall not be affected by any renewal or extension in time of payment hereof, or in any indulgences, or by any release or change in any

5

LEGAL_US_W # 97857056.7

security for the payment of this Note, and hereby consents to any and all renewals, extensions, indulgences, release or changes, regardless of the number of such renewals, extensions, indulgences, releases or changes.  No waiver by any Holder of any of its rights and remedies hereunder or under any other document evidencing or securing this Note or otherwise shall be considered a waiver of any other subsequent right or remedy of any Holder, and no exercise or enforcement of any such rights or remedies shall ever be held to exhaust any right or remedy of any Holder.

10. *GOVERNING LAW*.  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS (OTHER THAN CONFLICT LAWS) OF THE STATE OF NEW YORK.  THE PARTIES HERETO HEREBY (I) CONSENT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK IN CONNECTION WITH ANY CONTROVERSY RELATED TO THIS NOTE; (II) WAIVE ANY ARGUMENT THAT VENUE IN ANY SUCH FORUM IS NOT CONVENIENT, (III) AGREE THAT ANY LITIGATION INITIATED BY HOLDERS OR PAYOR IN CONNECTION WITH THIS NOTE MAY BE VENUED IN THE STATE OR FEDERAL COURTS LOCATED IN THE CITY, COUNTY AND STATE OF NEW YORK; AND (IV) AGREE THAT A FINAL JUDGMENT IN ANY SUCH SUIT, ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

11. **Waiver of Jury Trial**. THE PARTIES HERETO EACH HEREBY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, ANY ALLEGED TORTIOUS CONDUCT BY THE PARTIES HERETO OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN THE PARTIES HERETO.

(Remainder of Page Intentionally Left Blank)

LEGAL_US_W # 97857056.7

**IN WITNESS WHEREOF,** the Payor has caused this Note to be executed as of the date first above written.

<table>
<tr><td>

**PAYOR:**

</td><td>

**ACQUA LIANA CAPITAL PARTNERS, LLC**, a Texas limited liability company

By: _____/s/ Thomas M. Clarke_____
Name: Thomas M. Clarke
Title: Authorized Signatory

</td></tr>
</table>

**EXHIBIT A**

| LENDER | TOTAL AMOUNT OUTSTANDING |
|---|---|
| ASRS | $ 19,183,799.09 |
| E-OC | $ 1,690,226.01 |
| PINN | $ 33,003,475.17 |
| SJFD | $ 3,122,636.97 |
| SJPF | $ 3,122,636.97 |
| TEAMSTERS | $ 19,137,572.65 |
| WO NDT | $ 12,338,959.89 |
| WOFI C | $ 9,996,222.91 |
| WOSF REV | $ 22,208,403.55 |
| | Total = $ 123,803,933.21 |

*Exhibit A*