UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITE OAK GLOBAL ADVISORS, LLC,<br><br>     Plaintiff,<br><br>  -v-<br><br>THOMAS M. CLARKE, ANA M.<br>CLARKE, and DAVID WILEY,<br>individually, and THOMAS M.<br>CLARKE and ANA M. CLARKE, as<br>Trustees for THOMAS M. CLARKE<br>AND ANA M. CLARKE 100% JTWROS,<br><br>     Defendants. | 24-cv-2128 (JSR)<br><br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

On December 9, 2024, the Court issued a bottom-line order in the above-captioned case. See ECF No. 36. That order denied the motion of plaintiff White Oak Global Advisors, LLC ("White Oak") for summary judgment and directed the parties to call into Chambers to set a schedule for discovery. This Opinion explains the reasons for the Court's decision.

## I.   Factual Background

This dispute stems from defendants' guaranties of a series of loan agreements. Epic Companies, LLC and its subsidiaries provided support services for the energy industry. These services involved, among other capabilities, heavy lifting, diving, specialty cutting, and well plugging, in order to support the decommissioning, installation, and maintenance of oil-and-gas properties. Epic was owned by two companies: Orinoco Natural

Resources, LLC ("Orinoco") and Oakridge Energy Partners, LLC ("Oakridge"). Orinoco, in turn, was owned by defendants Thomas M. Clarke ("T. Clarke") and Ana M. Clarke ("A. Clarke"), and Oakridge was owned by defendant David Wiley ("Wiley").

Starting in 2018, Epic and several of its subsidiaries entered into a series of loan agreements, for which plaintiff White Oak acted either as the administrative agent or as a lender. Two loan agreements are relevant to this dispute.[1] First, there is an Amended and Restated Loan and Security Agreement, dated July 22, 2019, which extends a $15 million term loan to Navarro Capital Partners, LLC ("Navarro Capital"), a subsidiary of Epic. See McKee Decl., Ex. 2. The parties refer to this agreement as the "Navarro Senior LSA." According to White Oak, the Navarro Senior LSA matured on July 21, 2023, and, as of October 31, 2024, had accrued interest in the amount of $15,434,079. See Islam Suppl. Decl. ¶ 32.

Second, as part of a restructuring transaction for which Acqua Liana Capital Partners, LLC ("Acqua Liana") was the administrative agent, White Oak and Acqua Liana entered into a promissory note, which was amended and restated several times. The Fourth Amended and Restated Senior Secured Promissory Note of Acqua Liana Capital

---

[1] White Oak discusses a third loan agreement in its briefing: a Third Amended and Restated Loan and Security Agreement, dated July 22, 2019 ("Navarro Junior LSA"). See McKee Decl., Ex. 3. At oral argument, however, counsel for White Oak indicated that for purposes of the instant motion it is not "pursuing the guaranteed amount based on the Junior LSA." ECF No. 34 at 3:7-9.

Partners, LLC, dated December 31, 2020 ("Fourth A&R Promissory Note"), evidences the current obligations of the original note owed by Acqua Liana to White Oak. See McKee Decl., Ex. 4. According to White Oak, the Fourth A&R Promissory Note matured on July 21, 2023, and, as of September 20, 2024, the amount alleged to be outstanding under that agreement was $187,729,973. See Islam Suppl. Decl. ¶ 32.

White Oak's motion for summary judgment focuses on defendants' guaranties of these loan agreements. White Oak alleges that defendants guaranteed the loan agreements, that the underlying loan obligations are past due, and that defendants now owe more than $200 million. Defendants do not dispute that they guaranteed the Navarro Senior LSA, that they guaranteed the Second A&R Promissory Note, and that they reaffirmed and consented to the Third A&R Promissory Note. See ECF No. 34 at 7:14-24. Both sides also agree that a subsequent side letter agreement, entered on August 26, 2019, limits defendants' liability under their respective guaranties to $20 million each. See ECF No. 16 at 7; ECF No. 20 at 11; ECF No. 21 at 13. Accordingly, White Oak seeks a total of $60 million: (1) $20 million from T. Clarke and Thomas M. Clarke and Ana M. Clarke 100% JTWROS; (2) $20 million from A. Clarke and Thomas M. Clarke and Ana M. Clarke 100% JTWROS; and (3) $20 million from Wiley.

The parties' dispute centers on White Oak's disposition of several assets once owned by Epic or its subsidiaries. Defendants argue that the sale of collateral may reduce the amount they owe under the guaranties, or that, at the very least, the lack of factual development of that issue should lead the Court to deny summary judgment and to permit some amount of discovery. Specifically, defendants point to: (1) the sale of land at 660 Dunlap Drive in Mobile, Alabama, for $32.5 million by Epic Maritime Asset Holdings in April 2023; (2) the sale of the Global Orion, a dive-support vessel, with a fair-market value of between $10 and $13 million, by Navarro Capital in August 2022; (3) the sale of the DB Hedron, a heavy-lift derrick barge with a fair-market value of $17 to $22 million, by a Navarro subsidiary in February 2022; (4) three arbitration awards, in the amounts of $31,776,000, $22,056,415, and $53,200,000, to a Navarro subsidiary based in Mexico; and (5) the sale of a shipyard in Alabama for $225 million. See ECF No. 20 at 12–14; ECF No. 21 ¶¶ 51–57; ECF No. 27 at 2–3.

## II.  Procedural Background

In December 2023, White Oak moved for summary judgment, in lieu of filing a complaint, in New York State court under C.P.L.R. 3213.[2] Several months later, in March 2023, T. Clarke,

---

[2] N.Y. C.P.L.R. 3213 permits a plaintiff to "serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint" when "an action is based upon an instrument for the payment of money only or upon any judgment."

A. Clarke, and Wiley, in their individual capacities, and T. Clarke and A. Clarke, in their capacity as trustees for Thomas M. Clarke and Ana M. Clarke 100% JTWROS, removed the case to this Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. See ECF No. 1.

On June 7, 2024, White Oak renewed its motion for summary judgment in this Court. See ECF No. 15. Defendants responded two weeks later, and White Oak submitted a reply brief the following week. See ECF Nos. 20, 24. The Court later allowed defendants to submit a surreply and White Oak to submit a short brief in response to defendants' surreply. See ECF Nos. 27, 30. After holding oral argument on White Oak's motion on November 19, 2024, the Court issued a bottom-line order several weeks later, on December 9, 2024. See ECF No. 36. The Court denied plaintiff's motion for summary judgment and ordered the parties to call into Chambers to set a schedule for discovery. See id. at 1. This was done and a case management schedule set. See ECF No. 37.

## III. Analysis

Defendants challenge White Oak's motion on two main grounds. First, they argue that White Oak has not supplied sufficient evidence to support its claim. Second, they argue that the amounts outstanding under the Navarro Senior LSA and Fourth A&R Promissory Note are in dispute because of the sale of various assets as

collateral.[3] Accordingly, defendants have submitted a declaration under Rule 56(d) of the Federal Rules of Civil Procedure outlining the "essential facts" for which defendants need discovery in order to "properly oppose White Oak's motion." Kalmanson Decl. at 1. For its part, White Oak insists that even if defendants' arguments are credited, they still owe more than $60 million and, therefore, judgment should be entered in its favor.

Upon removal, a motion for summary judgment in lieu of a complaint under C.P.L.R. 3213 is converted to a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. See UBS AG, London Branch v. Greka Integrated, Inc., No. 21-1385, 2022 WL 2297904, at *2 (2d Cir. June 27, 2022).[4] Rule 56(a) requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[3] Defendants also challenge White Oak's factual assertion that they guaranteed the Navarro Junior LSA and reaffirmed their guaranty of the Fourth A&R Promissory Note. As explained, White Oak is not pursuing the purported guaranty of the Navarro Junior LSA for purposes of this motion. See supra at p. 2 n.1. And the Court need not determine at this time whether defendants reaffirmed their guaranty of the Fourth A&R Promissory Note. Even assuming defendants reaffirmed the guaranty, the total amount of collateral sold exceeds the value of the outstanding loan obligations under the Fourth A&R Promissory Note and the Navarro Senior LSA. For that reason, as explained in greater detail below, see infra at pp. 11-17, the Court denies summary judgment at this time and permits the parties to conduct limited discovery on the disputed collateral.

[4] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find[,] after drawing all reasonable inferences in favor of a non-movant[,] that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).

To support its claim, White Oak must show "(1) the existence of the guaranty; (2) the underlying debt; and (3) the guarantor's failure to perform under the guaranty." UMB Bank, N.A. v. Bluestone Coke, LLC, No. 20-cv-2043, 2020 WL 6712307, at *4 (S.D.N.Y. Nov. 16, 2020) (citing Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 25 N.Y.3d 485, 492 (N.Y. 2015)). "The burden then shifts to the defendant to raise a triable issue of fact in the form of a bona fide defense against the note." Id. Ultimately, to prevail on its motion for summary judgment, White Oak "must demonstrate that there are no genuine disputes surrounding any of the facts that are material to these three requirements." Torin Assocs., Inc. v. Perez, No. 15-cv-8043, 2016 WL 6662271, at *4 (S.D.N.Y. Nov. 10, 2016).

Contrary to defendants' argument that White Oak has not supplied sufficient evidence to support its claim, White Oak satisfies the three elements of its prima facie burden. In support of its motion, White Oak submitted the declaration of Barbara

McKee, an Authorized Signer at White Oak. McKee attached to her declaration defendants' guaranties of the Navarro Senior LSA, see McKee Decl., Ex. 5 (T. Clarke's and Wiley's Second Amended and Restated Personal Guarantee, dated July 22, 2019) & Ex. 6 (A. Clarke's Amended and Restated Personal Guarantee, dated July 22, 2019), and defendants' purported guaranties of the Fourth A&R Promissory Note, see McKee Decl., Ex. 7 (T. Clarke's and T. Clarke's and A. Clarke's as trustees for 100% JTWROS Second Amended and Restated Personal Guarantee of the Second A&R Promissory Note), Ex. 8 (Wiley's Amended and Restated Personal Guarantee of the Second A&R Promissory Note), Ex. 9 (A. Clarke's Personal Guarantee of the Second A&R Promissory Note) & Ex. 10 (Reaffirmation and Consent of the Note Guaranties). Likewise, McKee attached the underlying loan agreements. See McKee Decl., Ex. 2 (Navarro Senior LSA) & Ex. 4 (Fourth A&R Promissory Note). Finally, McKee submitted the demands for payment sent by White Oak to defendants, see McKee Decl., Ex. 12, explained that the demands "provided a ten-day payment period," and stated that "[d]efendants have not made any payment in response to the Demands for Payment," see McKee Decl. ¶¶ 20-21.[5]

---

[5] Defendants claim that "Wiley did not receive a Demand for Payment in accordance with the notice provisions of the Guarantees." ECF No. 20 at 12 n.3. White Oak counters that defendants waived any demand of payment but that it, nevertheless, delivered a physical copy of the demand to Wiley. ECF No. 16 at 7. Defendants do not, at this time, rest their defense for Wiley on the demand issue.

Defendants respond that White Oak fails to show "(1) when payments became due and payable under the underlying debt instruments; (2) whether payments were made; or (3) how the purported outstanding principal and interest debt amounts were calculated." ECF No. 20 at 16. To the extent defendants argue that these alleged omissions in White Oak's opening brief doom its motion at the start, they misunderstand a plaintiff's burden in this context. White Oak provided what was initially required: documents supporting the existence of the guaranty, the underlying debt, and defendants' failure to pay. Still, White Oak's alleged omissions, even if not relevant to its prima facie burden, could create a fact issue requiring denial of summary judgment, so it is important to examine each of defendants' arguments in greater detail.

Defendants' first argument -- that White Oak fails to show "when payments became due and payable under the underlying debt instruments" -- overlooks White Oak's evidence. The loan agreements reflect that each underlying debt matured on July 21, 2023. See McKee Decl., Ex. 2 at 17; Ex. 4 at 1. And each agreement, in turn, defines the payment date as the maturity date. ECF No. 24 at 5-6; see also McKee Decl., Ex. 2 at 27 ("Borrowers shall repay the Outstanding Amount of the Term Loans and shall repay in full the remaining Credit Outstandings and all other Obligations on the Maturity Date."); Ex. 4 at 1 ("The principal amount of this Note,

9

and all unpaid interest accrued thereon . . . , shall be payable
. . . (i) immediately after a Default . . . ; or (ii) if not
previously paid in full, on July 21, 2023 (the 'Maturity Date').").
Accordingly, contrary to defendants' position, the agreements
clearly reflect that "payments became due and payable under the
underlying debt instrument" on July 21, 2023.

Defendants also claim that White Oak did not demonstrate "how
the purported outstanding principal and interest debt amounts were
calculated," but, with its reply brief, White Oak submitted a
responsive declaration from Nyall Islam, the Director of Complex
Credit for White Oak.[6] Among the exhibits submitted by Mr. Islam
is a summary spreadsheet that reflects the amount outstanding on
each loan and the interest calculations used to determine the total
amount of defendants' outstanding liability. See Islam Decl.,
Ex. 12. White Oak has not identified any flaw in this spreadsheet

---

[6] In their surreply, defendants argue that "[a] party seeking
summary judgment cannot meet its prima facie burden by submitting
documentation on reply, even if it supplements its original
submission." ECF No. 27 at 6. This argument is misleading. White
Oak satisfied its prima facie burden in its opening brief; the
burden then shifts to defendants to identify an issue of fact that
prevents summary judgment. See supra at p. 7. It would be
counterintuitive if White Oak were then foreclosed from submitting
evidence responsive to the arguments raised by defendants. See,
e.g., Torin Assocs., Inc. v. Perez, No. 15-cv-8043, 2016 WL
6662271, at *7 n.10 (S.D.N.Y. Nov. 10, 2016) ("There is no absolute
rule that in a CPLR 3213 motion, a plaintiff cannot supplement its
papers in response to a defendant's arguments, so as to establish
its entitlement to summary judgment in lieu of complaint.")
(quoting Sea Trade Mar. Corp. v. Coutsodontis, 111 A.D. 3d 483,
486 (1st Dep't 2013)).

or explained what discovery it would need to evaluate Mr. Islam's calculations. Again, contrary to defendants' position, White Oak has submitted sufficient evidentiary support to demonstrate "how the purported outstanding principal and interest debt amounts were calculated."

The strongest argument presented by defendants -- _viz._, "whether payments were made" on the underlying loan obligations that would decrease (or even wipe out) defendants' guaranty obligations -- is closely tied to defendants' argument that the amounts owed under the Navarro Senior LSA and Fourth A&R Promissory Note are in dispute because of the sale of various assets by White Oak as collateral. The Court thus considers these arguments together. Specifically, defendants point to the sale of land located at 660 Dunlap Drive in Mobile, Alabama; the sale of the Global Orion, a dive-support vessel; the sale of the DB Hedron, a heavy-lift derrick barge; three arbitration awards received by Navarro Mexico; and the sale of a shipyard in Alabama. In total, defendants estimate that these sums represent nearly $400 million collected by White Oak through the sale of collateral securing the underlying loans. Indeed, if all proceeds were applied to the debts underlying the guaranty obligations, defendants would no longer be liable for the $200 million that allegedly remains outstanding under the loan agreements.

White Oak responds through the declaration of Mr. Islam. He details the actual sale price of each asset and how the proceeds were applied to the various loan obligations. <u>See</u> Islam Decl. ¶¶ 4-16; Islam Suppl. Decl. ¶¶ 9-32. Islam cites documentary evidence in support of his proposed interpretation:

- <u>660 Dunlap Drive in Mobile, Alabama</u>: Islam attaches a Loan and Security Agreement that reflects a purchase price of $32,420,159.66. <u>See</u> Islam Decl., Ex. 1. He then notes that the plot of land was collateral for a different loan and security agreement, described as the Alabama Shipyard LSA. <u>See</u> Islam Decl., Ex. 2. Islam attaches application-of-funds documentation and a payment notice to show that the $25,369,693.34 was paid by White Oak on the debt underlying the Alabama Shipyard LSA. <u>See</u> Islam Decl., Exs. 3 & 4.

- <u>Global Orion</u>: Islam attaches a Letter Agreement that reflects a purchase price of $17 million. <u>See</u> Islam Decl., Ex. 5. According to Islam, a portion of the proceeds was applied to a short-term loan made to Navarro Capital, and then a total of $11,783,573 was applied to the Navarro Senior LSA. <u>See</u> Islam Decl., Exs. 6-9 (documentation reflecting allocation and payment of Global Orion proceeds). Islam explains that the relevant proceeds have already been applied to the Navarro Senior LSA's balance (and are thus accounted for in White Oak's opening brief). Islam Decl. ¶ 16.

- <u>DB Hedron</u>: Islam attaches a Purchase and Sale Agreement that reflects a sale price of $22,500,000. <u>See</u> Islam Decl., Ex. 10. Islam states that $7,082,224.12 was applied to the Navarro Senior LSA and that the remainder was applied to other obligations not implicated in this matter. <u>See</u> Islam Decl., Ex. 11 (payment notice confirming the DB Hedron proceeds were applied to the Navarro Senior LSA). Islam again explains that the relevant proceeds have already been applied to the Navarro Senior LSA's balance (and are accounted for in White Oak's opening brief). Islam Decl. ¶ 16.

- <u>Arbitration Awards</u>: Although defendants allege that Navarro Mexico received three arbitration awards, in the amount of $31,776,000, $22,056,415, and $53,200,000, Islam

explains that only "$1,500,000 has been received from the
Arbitration Awards related to bond refunds and the majority
was used for taxes, legal fees, and working capital for
Navarro Capital." Islam Decl. ¶ 11. Islam further states
that "White Oak does not expect to collect any significant
recovery from the Arbitration Awards that would materially
impact the guaranteed obligations because . . . the
entities that are responsible for paying the Arbitration
Awards lack the financial assets to pay the Arbitration
Awards." Id.

- Alabama Shipyard: In a supplemental declaration, Islam
  explains that the shipyard was purchased for a total of
  $225 million, with $125 million in an upfront cash payment
  and the balance of $100 million "in the form of a seller's
  note, which is not due and payable until the earliest of
  March 31, 2025, and subject to extension through June 30,
  2025." Islam Suppl. Decl. ¶ 8; see also Islam Suppl. Decl.,
  Exs. 7-8. Islam then describes a series of deductions
  totaling $35,306,646 from the $125 million cash payment,
  including fees and sale expenses, management incentive plan
  agreements (to retain key employees), and tax liability.
  Islam Suppl. Decl., Exs. 9-13. Of the remaining sum,
  $48,420,299 was used to pay down senior debt arising under
  the Alabama Shipyard LSA, and $7,673,457 was used to
  purchase a Navarro holding company's equity ownership in
  the shipyard. Islam Suppl. Decl. ¶¶ 22-23. Islam explains
  that these deductions leave $36,775,531 that could be
  applied to the Fourth A&R Promissory Note. Islam Suppl.
  Decl. ¶ 23. Islam further estimates that White Oak could
  apply $86,515,852 from the $100,000,000 seller's note to
  the Fourth A&R Promissory Note. Islam Suppl. Decl. ¶ 30.

White Oak's strongest rebuttal to defendants' argument relies
on simple arithmetic. Based on the conclusions and evidence
outlined above, White Oak asserts that even if over $120 million
from the shipyard sale is applied to the Fourth A&R Promissory
Note, defendants' liability under their guaranties exceeds the
$60 million limit agreed to in the parties' side letter agreement.
White Oak, in other words, argues that there exists no genuine

dispute of material fact because defendants are liable for at least $60 million however the proceeds are allocated.

While White Oak's argument has intuitive appeal, the Court is ultimately convinced by defendants' position at this early stage of the litigation. Although White Oak, through Mr. Islam, has submitted a declaration and supporting evidence explaining that the proceeds from these sales either were related to other loan obligations that are not the subject of this lawsuit or have already been applied to the outstanding obligations identified in White Oak's briefing, defendants have had no opportunity to conduct discovery of White Oak's corporate records or, indeed, depose Mr. Islam. For example, while Mr. Islam outlines how White Oak has applied the proceeds across different debts, the evidence submitted by White Oak does not conclusively establish that this was the proper, or only, way to allocate those funds. Other corporate documents or deposition testimony might indicate that White Oak should have allocated the proceeds differently. Further discovery might confirm Mr. Islam's account, but given that defendants have pointed to hundreds of millions of dollars that might affect the underlying loan obligations, some discovery is needed. This conclusion is bolstered by the fact that White Oak's "arithmetic" has become increasingly complex as the case has progressed, both because the amount of collateral sold has

increased and because the guaranty obligations upon which White Oak relies have shifted.

To avoid this conclusion, White Oak emphasizes that "when executing the Personal Guarantees, [d]efendants agreed that White Oak had no obligation to seek recovery first from others or marshal collateral for [d]efendants' benefit." ECF No. 24 at 6; see also ECF No. 30 at 1. White Oak is correct that the provisions in the guaranty agreements appear to grant it a nearly unqualified right to enforce the guaranties before liquidating any collateral. See McKee Decl., Ex. 5 at 4 (White Oak "shall not be required first to resort for payment of the Guaranteed Obligations to any Borrower or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Guaranteed Obligations, before enforcing this Guaranty."), Ex. 6 at 4 (same) & Ex. 9 at 4 (substantially the same). New York law likewise protects White Oak's right to apply the proceeds from the sale of any collateral securing more than one debt however it sees fit. See Walther v. Bank of N.Y., 772 F. Supp. 754, 762 (S.D.N.Y. 1991).

But defendants seek neither to force White Oak to sell additional collateral before enforcing the guaranties nor to dictate how White Oak, within its lawful discretion, applies the proceeds from the disposition of any collateral that it has already sold. Instead, they want to ensure that sums collected by White Oak have been properly applied to any obligation connected to their

guaranties in this case. That concern is significant, especially because the guaranties themselves preserve the defense of discharge by payment in full. See McKee Decl., Ex. 5 at 4, Ex. 6 at 4 & Ex. 9 at 3. The Court cannot rely on the broad language in the guaranties and Mr. Islam's say-so to grant summary judgment at this time.

The real issue for White Oak stems from the unique procedural posture of this case and not from deficiencies in its own briefing. Defendants have had no opportunity to press the factual basis of White Oak's detailed assertions. White Oak may yet prove to be correct, but the Court is unable to say that no genuine factual dispute exists where there remains a possibility that the proceeds from the collateral sold could settle the amount owed under the loan agreements and clear defendants' liability.

At the same time, the Court recognizes that the value of a guaranty is in its prompt enforcement. The procedural vehicle utilized in this case recognizes that reality. See Cooperatieve Centrale, 25 N.Y.3d at 491-92 ("CPLR 3213 was enacted to provide quick relief on documentary claims so presumptively meritorious that a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless."). The Court has accordingly set an expedited discovery schedule and cabined the scope of discovery permitted. See ECF No. 36 ("The Court advises the parties that discovery in this case

will be cabined, both in temporal scope and subject matter. Specifically, discovery will be narrowly constrained to the sale of collateral (i.e., those assets discussed in the parties' summary-judgment briefing) and to how the proceeds of those sales were allocated (e.g., whether applied to one of the loan obligations guaranteed by defendants, to another loan obligation, to fees and sale expenses, or to tax liability).").

*    *    *

White Oak makes a closing argument in its response to defendants' surreply. Perhaps recognizing that defendants' liability is partly cast in doubt by the amount of collateral sold, White Oak asks the Court to grant summary judgment on defendants' liability and allow discovery on damages. White Oak points to UMB Bank, N.A. v. Bluestone Coke, LLC, which involved a similar motion brought under C.P.L.R. 3213 against two of the same defendants in this case. UMB Bank, 2020 WL 6712307, at *1-2. There, too, the defendants disputed the extent of their liability. Id. at *5. Judge Liman, however, observed in that case that "the need to establish the final damages calculations is not a bar to summary judgment." Id. Accordingly, he granted summary judgment in plaintiff's favor with respect to liability and allowed the parties to conduct additional discovery on damages. Id. at *5-6; see also UMB Bank, Nat'l Ass'n v. Bluestone Coke, LLC, No. 20-cv-2043, 2021 WL 3292519, at *1 (S.D.N.Y. Aug. 2, 2021).

In this case, however, the evidence submitted by White Oak does not <u>conclusively</u> establish that defendants are liable. For example, if discovery indicates that previous asset sales cover the debts owed on the underlying loan agreements, defendants would no longer be liable under the guaranty provisions. Admittedly, based on the evidence thus far presented by White Oak, the likelihood of this outcome is slim, but -- without further discovery -- it is premature for the Court to reach any firm conclusions about the merits of White Oak's claim.

Any issues on the merits not fully considered in this Opinion -- including whether defendants guaranteed the Navarro Junior LSA and whether defendants reaffirmed their guaranty for the Fourth A&R Promissory Note -- may be later raised by the parties with the benefit of further discovery.

SO ORDERED.

New York, NY
March 2⅄, 2025

JED S. RAKOFF, U.S.D.J.