UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WHITE OAK GLOBAL ADVISORS LLC,

      Plaintiff,

   -v-

THOMAS M. CLARKE, et al.,

      Defendants.

---

24-cv-2128 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

On July 11, 2025, the Court issued a "bottom-line" Order (the "July 11 Order") deciding the motions for summary judgment filed by plaintiff White Oak Global Advisors LLC and defendants Thomas M. Clarke, Ana M. Clarke, and Thomas M. Clarke and Ana M. Clarke as Trustees for Thomas M. Clarke and Ana M. Clarke 100% JTWROS. See ECF No. 70. That Order granted plaintiff's motion and denied defendants' cross-motion. See id. This Opinion sets forth the reasons for the July 11 Order, and directs the entry of final judgment.

I.   Background

Plaintiff White Oak initially brought this action in New York state court, moving under CPLR 3213 for summary judgment in lieu of filing a complaint. See White Oak Global Advisors, LLC v. Clarke, et al., Index No. 656462/2023, Doc. No. 2 (N.Y. Sup. Ct. Dec. 22, 2023). In March 2024, defendants removed the case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. See ECF No. 1. On June 7, 2024, White Oak renewed its motion for summary judgment in this Court, and the Court heard oral argument on that motion on November

1

19, 2024. See ECF No. 15. On December 9, 2024, the Court issued an Order (the "December 9 Order") denying White Oak's motion for summary judgment. See ECF No. 36. An Opinion explaining the reasoning for that Order, reaching certain legal conclusions, and directing that limited discovery be taken, issued on March 21, 2025. See ECF No. 40. Following completion of that discovery, both parties moved for summary judgment.

As this Court observed in the Opinion issued on March 21, this case arises out of the defendants' guaranties of a series of loan agreements. See id. at 1. White Oak served as either the administrative agent or as a lender for each of the loan agreements, and the borrowers were Epic Companies, LLC ("Epic") and several of its subsidiaries. See id. at 1-2. Epic and its subsidiaries provided support services for the energy industry. See id. Epic was indirectly owned, in part, by defendants Thomas M. Clarke ("T. Clarke") and Ana M. Clarke ("A. Clarke") (collectively the "Clarkes"). See id.[1] Epic was also indirectly owned, in part, by David Wiley, a former co-defendant of the Clarkes' in this action who was dismissed pursuant to a settlement agreement with White Oak. See id.; ECF No. 47.

With respect to its elaboration of the July 11 Order, the Court begins by summarizing the loan agreements that are relevant to the parties' dispute. First, on July 22, 2019, an Amended and Restated

---

[1] T. Clarke and A. Clarke are defendants in this action personally and as joint trustees of the Thomas M. Clarke and Ana M. Clarke 100% JTWROS. Because the Clarkes' status as trustees is not pertinent to the Court's analysis of the parties' motions, and for the convenience of the reader, this Opinion refers to T. Clarke and A. Clarke in their personal capacities.

Loan and Security Agreement extended a $15 million term loan to Navarro Capital Partners, LLC ("Navarro Capital"), a subsidiary of Epic. See ECF No. 40 at 2. This "Navarro Senior LSA" matured on July 21, 2023. According to White Oak, the amount outstanding under the Navarro Senior LSA, as of April 30, 2025, was $29,009,929. See ECF No. 51-100 at 1.[2] Second, as part of a restructuring transaction for which Acqua Liana Capital Partners, LLC ("Acqua Liana") was the administrative agent, White Oak and Acqua Liana entered into a promissory note, which was amended and restated several times. See ECF No. 40 at 2-3. The Fourth Amended and Restated Senior Secured Promissory Note of Acqua Liana Capital Partners, LLC, dated December 31, 2020 (the "Fourth Note"), represents the current obligations of the original promissory note. See id. The Fourth Note matured on July 21, 2023. According to White Oak, the amount outstanding under the Fourth Note, as of April 30, 2025, was $179,225,502. See ECF No. 51-100 at 1.

On White Oak's previous motion for summary judgment, the Court held that the Clarkes personally guaranteed the Navarro Senior LSA and a prior iteration of the Fourth Note, namely, the "Second Amended and Restated Promissory Senior Secured Promissory Note of Acqua Liana Capital Partners, LLC" (the "Second Note"), as well as that the Clarkes reaffirmed and consented to another prior iteration of the Fourth

---

[2] By White Oak's calculations, the exact balance of the Navarro Senior LSA as of April 30, 2025, was $29,009,929.62. Id. Here and throughout this Opinion, both for simplicity and because no fraction of a dollar affects the outcome of the parties' motions for summary judgment, the Court refers to dollar amounts only in whole-number increments, disregarding any cents.

Note, namely, the "Third Amended and Restated Senior Secured Promissory Note of Acqua Liana Capital Partners, LLC" (the "Third Note"). See ECF No. 40 at 3; see also ECF Nos. 51-59, 51-61. The Court also held that, under a side-letter agreement executed on August 26, 2019, the Clarkes' maximum liability under their respective guaranties is $20 million each. See ECF No. 40 at 3. The Court concluded that White Oak had established the existence of the guaranties, the existence of the underlying debt, and the Clarkes' failure to perform under the guaranties. See id. at 7-10. Interpreting the guaranty agreements, the Court held that provisions in those agreements grant White Oak a "nearly unqualified right to enforce the guaranties before liquidating any collateral," and that, under New York law, White Oak may generally "apply the proceeds from the sale of any collateral securing more than one debt" however White Oak sees fit. See id. at 15. Finally, the Court concluded that the Clarkes' personal guaranties preserve the defense of discharge by payment in full. See id. at 16.

Despite these holdings, the Court denied White Oak's prior motion for summary judgment because White Oak did not conclusively establish that the Clarkes were liable under their personal guaranties and, if so, in what amounts. See id. at 18. Moreover, the Clarkes did not have an opportunity to conduct discovery of White Oak's corporate records concerning White Oak's sales of collateral and the application of the proceeds of such sales to the debts that the Clarkes guaranteed. See id. at 14-16. Accordingly, the Court ordered limited discovery into those subjects. See id. at 16-17.

4

Following discovery, White Oak filed its present motion for summary judgment on June 2, 2025. See ECF No. 48. The Clarkes filed a cross-motion for summary judgment on June 23, 2025. See ECF No. 54. The motions were fully briefed on July 7, 2025. See ECF No. 65.

## II. Legal Standards

The familiar standard for summary judgment is that it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where opposing parties each file motions for summary judgment, the Court is to consider each motion independently, evaluating it "on its own merits" and drawing "all reasonable inferences . . . against the party whose motion is under consideration." Roberts v. Genting N.Y. LLC, 68 F.4th 81, 88 (2d Cir. 2023) (cleaned up). The Court "need not enter judgment for either party," and summary judgment may be entered only where, "on the record presented, considered in the light most favorable to the non-moving party, no reasonable fact-finder could find in [the non-moving party's] favor." Id. (cleaned up). On summary judgment, a court is obliged to consider only admissible evidence. See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009).

In New York, guaranties are generally subject to ordinary principles of contract construction. See, e.g., 20 Rewe St., Ltd. v. Zheng, 228 A.D.3d 607, 608 (2d Dep't 2024). However, "[t]he terms of a guaranty are to be strictly construed, and a guarantor should not be found liable beyond the express terms of the guaranty." Solco

Plumbing Supply, Inc. v. Hart, 123 A.D.3d 798, 800 (2d Dep't 2014). Moreover, "[a] guarantor's obligation cannot be altered without its consent." White Rose Food v. Saleh, 99 N.Y.2d 589, 591 (2003). A guarantor may give such consent by means of a provision in the guaranty agreement that expressly allows for an underlying contract or obligation to be modified. See County Glen, L.L.C. v. Himmelfarb, 4 Misc. 3d 1015(A), at *4 (N.Y. Sup. Ct. 2004) (collecting Appellate Division cases). Thus, guaranties that expressly provide that a guarantor's obligations are not discharged by a modification of the underlying contract are enforceable. See, e.g., Davimos v. Halle, 60 A.D.3d 576, 577 (1st Dep't 2009).

Where a written guaranty agreement waives certain legal defenses that a party might later raise, New York courts enforce such waivers absent evidence of duress, coercion, or procedural unconscionability in the formation of the guaranty agreement. See, e.g., 159 MP Corp. v. Redbridge Bedford, LLC, 33 N.Y.3d 353, 360 (2019); cf. Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10-11 (1988). The defense of unconscionability, which is one of the defenses that may be waived in this manner, generally "exists to protect the commercially illiterate, such that it does not lie in a commercial setting, where the parties dealing at arm's length have equality of bargaining power." Norman Realty & Constr. Corp. v. 151 E. 170th Lender LLC, 74 Misc. 3d 1223(A), at *6 (N.Y. Sup. Ct. 2022), aff'd, 215 A.D.3d 424 (1st Dep't 2023).

III. Analysis

The parties' cross-motions for summary judgment concern two clusters of issues. The first cluster has to do with the scope of the Clarkes' personal guaranties and is predominantly legal in nature. Although the parties agree that the Clarkes' personal guaranties apply to the Navarro Senior LSA, they dispute whether the guaranties also apply to the Fourth Note and whether, if they do, the guaranty agreements applicable to the Fourth Note are unconscionable as a matter of law. The parties also dispute whether A. Clarke is liable under her guaranty of the Fourth Note, which contains certain conditions precedent. The second cluster of issues, as to which there are some disputed facts, has to do with the sale of collateral assets, the application of the proceeds of those sales to the debts underlying the personal guaranties, and the remaining amount, if any, of the Clarkes' liability under the personal guaranties. The Court addresses each cluster of issues in turn.

A.    The Scope of the Personal Guaranties

The parties' disputes about the Clarkes' guaranties of the Fourth Note are, at bottom, matters of contract interpretation. That is, the parties contest how the Fourth Note should be interpreted in relation to other relevant documents. There are no disputed material facts. For the following reasons, the Court concludes that the Clarkes guaranteed the Fourth Note, that they waived the defense of unconscionability, and that there is insufficient evidence before the Court to determine whether A. Clarke is liable under her guaranty of the Fourth Note.

1.    Relevant Contractual Provisions

The contractual provisions chiefly at issue are the following:

- T. Clarke's Second Amended and Restated Personal Guarantee, ("T. Clarke's Personal Guarantee") dated June 14, 2019, provides that "Acqua Liana Capital Partners, LLC, a Texas limited liability company (the 'Payor'), has entered into that certain [Second Note] dated as of the date hereof in favor of [White Oak], for the benefit of the White Oak Lenders (as the same may be amended, amended and restated, modified, restated, and/or otherwise supplemented from time to time, the 'Note') pursuant to which Payor promises to pay to Agent $123,803,933.21 plus accrued interest (including PIK Interest) (the 'Outstanding Amount')." ECF No. 51-60 at 617.[3]

- T. Clarke's Personal Guarantee defines the "Guaranteed Obligations" as follows: "In recognition of the direct and indirect benefits to be received by Guarantor from the purchase of certain loans by [Acqua Liana], the Guarantor, jointly and severally, hereby absolutely and unconditionally guarantees as a primary obligor and not merely as a surety to Agent the full and prompt payment when due . . . of the Outstanding Amount . . . and any and all expenses incurred by [White Oak] or the Holders (including reasonable counsel fees and expenses) incurred in enforcing any rights under the Note, this Guaranty, or any other agreement related thereto." Id.

- T. Clarke's Personal Guarantee further provides that "[t]he Guarantor's liability shall not be affected or impaired by any of the following acts or things[:] . . . (ii) one or more extensions or renewals of the Guaranteed Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities, if any, or other contractual terms applicable to any of the Guaranteed Obligations or any amendment or modification of any of the terms of any loan agreement, promissory note or other agreement under which the Guaranteed Obligations or any part thereof arose; . . . (vi) any failure to obtain collateral security . . . ; [and] (vii) any collection, sale, lease or disposition of, or any other foreclosure or enforcement of or realization on, any collateral security." Id. at 618-19.

---

[3] In citing to exhibits presented by the parties in support of their respective motions for summary judgment, the Court refers to the last three digits of any Bates numbers that appear on the exhibits. Moreover, because the parties do not dispute that the Clarkes personally guaranteed the Navarro Senior LSA, the provisions enumerated here concern the Clarkes' guaranties of the various Notes.

- Under T. Clarke's Personal Guarantee, "[t]he Guarantor waives any and all defenses, claims, setoffs and discharges . . . except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against Agent any defense of . . . illegality or unenforceability." Id. at 619.

- T. Clarke's Personal Guarantee provides that White Oak "shall not be required first to resort for payment of the Guaranteed Obligations to the Payor or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Guaranteed Obligations, before enforcing this Guaranty." Id. at 620.

- A separate Personal Guarantee executed by A. Clarke on June 14, 2019 ("A. Clarke's Personal Guarantee") contains language that is identical or nearly identical to each of the above-quoted provisions. See ECF No. 51-65 at 608-11.

- A. Clarke's Personal Guarantee further provides that she "shall not have any obligations under this Guaranty unless one or more of the following shall have occurred: any sale, assignment or other transfer of assets by or on behalf of Thomas M. Clarke to the Guarantor or any other Person for the benefit . . . of the Individual Guarantor on or after July 20, 2018." Id. at 612. No analogous provision appears in T. Clarke's Personal Guarantee or in A. Clarke's guaranty of the Navarro Senior LSA. See ECF No. 51-64.

- The Third Note, which is dated July 22, 2019, provides that "[t]he obligations under this Note are guaranteed, subject to the limitations set forth therein, under the terms of (a) [T. Clarke's Personal Guarantee], [and] (b) [A. Clarke's Personal Guarantee]." ECF No. 51-61 at 716.

- On July 22, 2019, the same date that the Third Note was executed, T. Clarke and A. Clarke executed a "Reaffirmation and Consent." The Reaffirmation and Consent provides that each of the Clarkes "hereby . . . (b) consents to the amendment and restatement of the Existing Note as set forth in the Amended Note; (c) acknowledges and reaffirms its obligations owing to the Agent under the Personal Guarantee(s) to which it is a party; (d) agrees that each of the Personal Guarantees to which it is a party is and shall remain in full force and effect and that the 'Note' referred to in the definition of 'Guaranteed Obligations' in such Personal Guarantee(s) shall refer to the Amended Note; and (e) represents and warrants that it has read

9

and understands the Amended Note and this Reaffirmation and Consent, has consulted with and been represented by independent legal counsel of its own choosing in negotiations for and the preparation of such documents, has read such documents in full and final form, and has been advised by counsel of its rights and obligations hereunder and thereunder." ECF No. 51-62 at 994. The Reaffirmation and Consent defines the "Amended Note" as the Third Note "as the same may be amended, amended and restated, modified, restated, and/or otherwise supplemented from time to time for any purpose, including, without limitation, to increase the principal amount thereof." Id.

- Finally, the Fourth Note, in language virtually identical to that of the Third Note, provides that "[t]he obligations under this Note are guaranteed, subject to the limitations set forth therein, under the terms of (a) [T. Clarke's Personal Guarantee] [and] (b) [A. Clarke's Personal Guarantee]." ECF No. 51-69 at 755-56.

    2.   The Guaranties and the Fourth Note

The Court agrees with White Oak that the plain meaning of these provisions, taken together, is that the Clarkes' personal guaranties apply to the Fourth Note. The Court previously concluded, and the Clarkes do not dispute, that their respective personal guaranties applied to the Second Note. See ECF No. 40 at 3; ECF No. 51-62 at 994. The Court also previously concluded, and the Clarkes again do not dispute, that they consented to the Third Note, which the Reaffirmation and Consent defines to include that note as it "may be amended and restated . . . from time to time for any purpose, including, without limitation, to increase the principal amount thereof." See ECF No. 40 at 3; ECF No. 51-62 at 994. Thus, the Clarkes gave express advance consent to the further amendment of the Third Note, including amendments that would increase the principal amount of that obligation. Thus, what the Reaffirmation and Consent contemplated is precisely

what the Fourth Note accomplished, that is, the Fourth Note amended the Third Note by, among other things, providing an original principal amount some $15 million greater than the original principal amount under the Third Note. Compare ECF No. 51-61 at 715 with ECF No. 51-69 at 755. To be sure, this increase in principal did not necessarily mean that the Clarkes' liability under their personal guaranties correspondingly increased. As the Court previously found, and no party disputes, each Clarke's liability is capped at $20 million. See ECF No. 40 at 3; ECF No. 51-63 at 463 (setting forth $20 million "aggregate maximum liability" for each of T. Clarke and A. Clarke).

The Clarkes' arguments to the contrary are unavailing. Primarily, the Clarkes contend that they guaranteed only the "Outstanding Amount," that is, the sum-certain stated in their respective personal guaranties. See ECF No. 55 at 7. This argument fails from the outset because, whatever else the personal guaranties do, they define the "Outstanding Amount" in reference to a sum-certain "plus accrued interest." See ECF No. 51-60 at 617; ECF No. 51-65 at 608. Moreover, the personal guaranties define the Clarkes' "Guaranteed Obligations" in reference, not only to the Outstanding Amount, but also to "any interest that accrues after the commencement of an Insolvency Proceeding" and "any and all expenses incurred . . . in enforcing any rights under the Note, this Guarantee, or any other agreement related thereto." See ECF No. 51-60 at 617; ECF No. 51-65 at 608.

The Clarkes further contend that they did not guarantee the Note, although it is unclear whether the Clarkes mean all of the Second,

Third, and Fourth Notes, and that their guaranties do not expressly refer to the prospect that the Outstanding Amount might subsequently increase. See ECF No. 55 at 8-10. But the Clarkes' personal guaranties define the Outstanding Amount in relation to the Note. See ECF No. 51-60 at 617; ECF No. 51-65 at 608. And in the Reaffirmation and Consent, the Clarkes acknowledged that the Note "may be amended . . . for any purpose, including, without limitation, to increase the principal amount thereof," and they consented "to the amendment and restatement of the [Second Note] as set forth in the [Third Note]." ECF No. 51-62 at 994.

Next, the Clarkes argue that their personal guaranties did not contain "unequivocal advanced [sic] consent for a future increase in the liability guaranteed." See ECF No. 55 at 10-13. They point to Section 6 of the personal guaranties, entitled "Agent's Rights," which provides that the liability of each of the Clarkes "shall not be affected or impaired by," among other things, "any modification of the interest rates, maturities, if any, or other contractual terms" applicable to the Guaranteed Obligations, or "any amendment or modification of any of the terms of provisions of any loan agreements . . . under which the Guaranteed Obligations" arose. ECF No. 51-60 at 618-19; ECF No. 51-65 at 609-10. But that section cannot mean, as the Clarkes appear to contend, that the amount of their liability can never be changed: if that were the case, their numerous arguments that they should be credited for certain collateral sales would fail because such credits would "affect[]" their liability. See

ECF No. 65 at 4-5. Nor does it make sense, as the Clarkes insist, to read "affected" as a synonym for "increased" and to read "impaired" as a synonym for "decreased." See ECF No. 55 at 11-12. Not even the dictionary definitions the Clarkes cite support that interpretation. See id. (citing definitions of "affected" and "affect" that do not refer to increases in value). Rather than operating to prevent the amount of the Clarkes' personal guaranties from ever changing, Section 6 provides that whether the Clarkes are liable under the personal guaranties does not depend on, among other things, modifications of the underlying loan agreements.

Thus, the documents clearly and collectively provide that the Clarkes' personal guaranties initially applied to the Second Note, were reaffirmed to apply to the Third Note, and then came to apply to the Fourth Note when that instrument took the place of the Third Note. But even assuming, arguendo, that these provisions were somehow ambiguous, the extrinsic evidence supports the Court's conclusion. The Clarkes each gave deposition testimony that, after they guaranteed the Second Note, they consented and reaffirmed their guaranties as to the Third Note. See ECF No. 67-3 at 92; 67-4 at 49. Moreover, the Clarkes have presented no evidence to suggest that the amount of indebtedness to which their guaranties apply would be any less under the Third Note than under the Fourth Note. To the contrary, White Oak submitted a declaration in which Nyall Islam, its Managing Director of Complex Credit, explained that "the total hypothetical amount outstanding under the Third Note is . . . the same amount actually outstanding

under the Fourth Note" and that the difference between the original principal amounts of the Third and Fourth Notes "is merely the accrual of the PIK Interest which automatically accrued and was capitalized to the principal amount under the express terms of the Third Note." ECF No. 68 ¶¶ 3-8.

      3.   Unconscionability

In the alternative, the Clarkes contend that, the personal guaranties are unconscionable and, for that reason, unenforceable. See ECF No. 55 at 13-14.

The Clarkes specifically waived the defense of unconscionability when they executed their respective guaranties. Those guaranties expressly preclude the Clarkes from raising "any defense of . . . illegality or unenforceability," ECF No. 51-60 at 619; ECF No. 51-65 at 10, a category that plainly includes the unconscionability defense to which they now resort. The Clarkes then knowingly extended their waiver by executing the Reaffirmation and Consent, in which they affirmed that "each of the Personal Guarantees . . . is and shall remain in full force and effect" and that they had consulted legal counsel with regard to their rights and obligations under the guaranties. See ECF No. 51-62 at 994.

Even were an unconscionability defense available to the Clarkes, they have offered no more than a conclusory argument that the terms of the personal guaranties were "so grossly unreasonable or unconscionable . . . as to be unenforcible." Sablosky v. Edward S. Gordon Co., Inc., 73 N.Y.2d 133, 138 (1989) (cleaned up). Moreover,

they have not laid a sufficient foundation concerning the guaranty agreements' "commercial setting, purpose and effect," id., such as would be necessary for the Court to determine that the terms of the guaranties were unconscionable in relation to relevant commercial practices. Nor have the Clarkes alleged that they were in a position of unequal bargaining power or that they lacked meaningful choice in executing the guaranties; in fact, they testified to having been well-counseled and to being experienced in negotiating and executing personal guaranties. See, e.g., ECF No. 67-3 at 11-12, 23.

4.    A. Clarke's Personal Guaranty

A. Clarke contends that White Oak has not shown that the conditions precedent to her personal guaranty of the Notes were met. See ECF No. 55 at 14-15. Although White Oak acknowledges that it has not presented evidence showing that those conditions were met, it points out that the limitations the Court placed on discovery in this matter precluded it from taking discovery regarding any transfers that T. Clarke may have made to benefit A. Clarke. See ECF No. 65 at 8-9.

The conditions precedent to which A. Clarke refers, however, appear only in her personal guaranty of the Notes, not her separate personal guaranty of the Navarro Senior LSA. Compare ECF No. 51-65 with ECF No. 51-64. Thus, to the extent that there is outstanding indebtedness under the Navarro Senior LSA, A. Clarke is liable, under her personal guaranty of that loan agreement and the parties' side-letter agreement, for up to $20 million. For the reasons the Court sets forth in the following section of this Opinion, the outstanding

indebtedness under the Navarro Senior LSA is greater than $20 million. Because White Oak is thereby entitled to a judgment that A. Clarke is liable for that sum, the Court need not order further discovery.

* * *

For the foregoing reasons, the Court concludes that (1) the Clarkes' personal guaranties apply to the Fourth Note as well as the Navarro Senior LSA; (2) the Clarkes have waived the defense of unconscionability and, even had they not, have not presented evidence sufficient to create a triable issue of fact as to whether the personal guaranties are unconscionable; and (3) insufficient evidence is before the Court to determine whether A. Clarke is liable under her guaranty of the Fourth Note.

B.   Sale and Application of Collateral Assets

Having determined that the Clarkes are liable under the personal guaranties for up to $20 million each -- T. Clarke in connection with both the Fourth Note and the Navarro Senior LSA and A. Clarke in connection with the Navarro Senior LSA alone -- the Court turns to the second cluster of issues presented by the parties' motions for summary judgment.

The parties agree that numerous collateral assets have been sold in partial satisfaction of the Fourth Note, the Navarro Senior LSA, and other Epic-related debts. See ECF No. 49 at 7-14; ECF No. 55 at 15-26. They also agree that White Oak had a perfected, first-priority security interest in many of those assets. See, e.g., ECF No. 66 ("56.1

Statement") ¶ 91.[4] And they agree that certain other collateral assets, the proceeds of which could conceivably be allocated to the Fourth Note and/or the Navarro Senior LSA, have not yet been sold. See ECF No. 49 at 28-29; ECF No. 55 at 26-29; ECF No. 65 at 18-23. The parties disagree, however, as to whether (1) White Oak properly applied all relevant proceeds of collateral sales to the Fourth Note and/or the Navarro Senior LSA and (2) the Clarkes should be credited for the value of any unsold collateral assets.

The background principle against which these arguments arise is, as this Court previously held, that the Clarkes' personal guaranties "grant [White Oak] a nearly unqualified right to enforce the guaranties before liquidating any collateral." ECF No. 40 at 15; see ECF No. 51-60 at 620 (providing that White Oak "shall not be required . . . first to enforce, realize upon or exhaust any collateral security for the Guaranteed Obligations, before enforcing this Guaranty"); ECF No. 51-65 at 611 (same). As White Oak points out, the Clarkes do not contest this principle. See ECF No. 65 at 10. Thus, because White Oak need not have sold any collateral before proceeding against the Clarkes under the guaranties, the Clarkes' arguments that they deserve credit for

---

[4] ECF No. 66, "Plaintiff's Rule 56.1 Response to Defendants' Statement of Undisputed Material Facts in Further Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment," contains the Clarkes' responses to the facts stated by White Oak, and vice versa; it also contains citations to the underlying evidence that the parties have proffered in support of their respective motions for summary judgment. Here and elsewhere, the Court cites the 56.1 Statement for the convenience of the reader, although the Court has carefully reviewed each piece of evidence cited.

the value of certain unsold collateral assets are foreclosed from the outset. Moreover, even considering the Clarkes' arguments about the alleged misapplication of certain proceeds of the disposition of collateral, no admissible evidence shows that their liability could possibly be less than $20 million each.

The Clarkes make another threshold legal error. They claim that "[a]ll of the collateral backed all of the debt." ECF No. 55 at 17. They rely for that proposition on T. Clarke's deposition testimony and that of White Oak's corporate representative. See ECF No. 58-5 at 171-72 (T. Clarke testimony); ECF No. 58-4 at 6 (N. Islam testimony). But neither the ambiguous and arguably self-serving testimony that T. Clarke gave concerning his understanding of the background to the parties' loan agreements, nor the similarly ambiguous testimony of White Oak's executive, can overcome the express language of those agreements, which plainly specify which entities were parties to, and what assets were collateral for, which loans. See, e.g., ECF No. 51-54 at 974-75.

### 1. Admissibility of White Oak's Evidence

As a threshold matter, the Clarkes contend that much of the evidence upon which White Oak's motion for summary judgment relies is inadmissible hearsay. See ECF No. 55 at 17-19. As examples, the Clarkes point to spreadsheets, internal memoranda, and correspondence between White Oak employees and third parties. See id.

While the Clarkes are correct that the Court need not consider inadmissible evidence in evaluating a motion for summary judgment, see

_Presbyterian Church of Sudan_, 582 F.3d at 264, they are incorrect that the challenged evidence is inadmissible hearsay. Rather, as White Oak points out, the challenged evidence is admissible because White Oak has authenticated it under the hearsay exception for business records.

Federal Rule of Evidence 803(6) provides that certain records of regularly conducted activities are excepted from the rule against hearsay, so long as certain requirements are met. Three of those requirements concern the records themselves: they must be "made at or near the time by -- or from information transmitted by -- someone with knowledge"; they must have been "kept in the course of a regularly conducted activity of a business"; and "making the record [must have been] a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C). These three requirements must be "shown by the testimony of the custodian or another qualified witness," or by an appropriate certification. _Id._ R. 803(6)(D). Finally, such records are admissible only if the opponent of their admission "does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." _Id._ R. 803(6)(E).

In the Second Circuit, the "principal precondition" to the admissibility of a business record "is the sufficient trustworthiness of the record." _United States v. Strother_, 49 F.3d 869, 874 (2d Cir. 1995). The Circuit "has adopted 'a generous view' of the business records exception, 'construing it to favor the admission of evidence if it has any probative value at all.'" _Id._ (quoting _United States v. Freidin_, 849 F.2d 716, 722 (2d Cir. 1988) (alterations adopted)).

Moreover, records introduced under the business records exception "can be records of an entity not a party to the proceeding, and the foundation for their receipt can be made by a witness who is not an employee of the preparer." Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) (citing Saks Int'l, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir. 1987)).

Here, White Oak has satisfied the first four requirements, and the Clarkes have not carried their burden as to the fifth. With its motion for summary judgment, White Oak submitted a declaration that Mr. Islam, executed under penalty of perjury, in which he affirmed, among other things, that more than one hundred exhibits that White Oak submitted in support of its motion were prepared on the dates listed in those exhibits, were received and/or maintained by White Oak as part of the ordinary course of its business, and were created as a regular practice of the creator's business activity. See ECF No. 52 ¶¶ 16-72. Mr. Islam's declaration satisfies the first four requirements of the business records exception, both as to documents prepared by White and as to documents prepared by other entities. See Ortho Pharm. Corp., 828 F. Supp. at 1119. As to the fifth requirement, the Clarkes notably do not challenge any of White Oak's evidence on the basis that it is untrustworthy. Thus, the Court concludes that it may rely on the challenged evidence in resolving the parties' summary judgment motions.[5]

---

[5] Although it is not necessary to the Court's analysis, certain challenged evidence proffered by White Oak may be admissible on bases

2.  Relevant Facts

The evidence establishes that the following Epic-related assets have been sold or otherwise realized upon, with some of the proceeds applied to the Fourth Note and/or the Navarro Senior LSA.

- The <u>DB Hedron</u>, a heavy-lift derrick barge, and associated debt were sold for a total price of $22,500,000. <u>See</u> 56.1 Statement ¶ 67. The parties agree that $7,082,224 was applied to the Navarro Senior LSA. <u>Id.</u> ¶ 68. They also agree that $15,282,350 was applied to the amount outstanding under the debt that was sold as part of this transaction, although the Clarkes contest that this payment was permissible. <u>Id.</u> The parties further agree that $253,776 of the sale proceeds was applied to administrative fees and expenses, although the Clarkes challenge that application as well. <u>Id.</u>

- The <u>Global Orion</u>, a dive-support vessel, was sold for $17,000,000. <u>See id.</u> ¶ 73. The parties agree that $11,783,573 was applied to the Navarro Senior LSA, $2,280,729 was applied to a short-term loan that had been made to Navarro Capital, $388,232 was applied to legal fees, $340,000 was paid as a broker's commission, $784,980 was expended in payroll and bonuses related to the sale, and $709,147 was applied to Mexican tax payments related to the sale. <u>See id.</u> ¶ 74. The Clarkes contend that only the funds applied to the Navarro Senior LSA represented a permissible application of the sales proceeds. <u>See id.</u>

- The <u>Alabama Shipyard</u> and an associated asset, the <u>Arapaho</u>, were together sold for $225,000,000. <u>See id.</u> ¶ 91. The purchase price consisted of a $125 million cash payment and a $100 million seller's note. <u>See id.</u> The parties agree that, of the $125 million cash payment, $48,420,299 and $36,775,531, respectively, were applied to two other Epic-related debts that the Clarkes did not personally guarantee; $5,410,646 was paid in legal and service fees; $11,625,000 was allocated to a "management incentive plan" intended to retain key Alabama Shipyard employees; $18,000,000 was withheld for estimated tax

---

other than the business records exception. For instance, White Oak offers correspondence in which certain third parties discuss the compromise or pursuit of certain arbitration awards. <u>See, e.g.</u>, ECF No. 51-15, 51-16. Such evidence is not hearsay because White Oak offers it for the effect of the correspondence on its recipients, rather than for its truth. <u>See</u> Fed. R. Evid. 801(c)(2); <u>see also, e.g.</u>, <u>United States v. Dupree</u>, 706 F.3d 131, 136-38 (2d Cir. 2013).

liabilities; $7,673,456 was used to purchase a Navarro Capital entity's ownership interest in the Alabama Shipyard; and $6,436,395 (including $2,904,933 in cash that appeared on the Alabama Shipyard's balance sheet as of the date of the sale) was applied to the Fourth Note. See id. ¶ 95. On various grounds, the Clarkes challenge all of these expenditures as impermissible, other than the application of sales proceeds to the Fourth Note. See id.

On March 31, 2025, an affiliate of the Alabama Shipyard's buyer made a $10,000,000 payment under the seller's note. See id. ¶ 96. The payment had the effect of extending the maturity date of the seller's note. Id. ¶ 97. The parties agree that the $10 million is ultimately to be applied to the Fourth Note. Id.

- Land at 660 Dunlap Drive in Mobile, Alabama (the "Shipyard Excess Land") was sold for $32,500,000. Id. ¶ 88. The parties agree that $25,369,693 was applied to another Epic-related debt that the Clarkes did not personally guarantee and that $7,050,000 was applied to tax liabilities related to the sale. Id. ¶ 89.[6] The Clarkes challenge both these allocations as impermissible.

- An arbitration award was entered in favor of a Navarro Capital affiliate and against Kanutam, S. de R.L. de C.V. (the "Kanutam Arbitration") in the amount of $14,667,633. See id. ¶¶ 99-103. The parties agree that Navarro Capital settled the Kanutam Arbitration for $8,400,000. Id. ¶ 108. The proceeds of the settlement have not yet been allocated, but the parties agree that White Oak intends to apply $3,713,224 to the Navarro Senior LSA; pay $1,158,621 in value added tax; pay $1,681,810 in other taxes; pay $1,335,345 in attorney's fees; award a $300,000 "success bonus" to Navarro Capital's chief executive officer; and pay $211,000 in administrative expenses. See id. ¶¶ 109-110. The Clarkes challenge as impermissible all of those allocations other than the application of a portion of the proceeds to the Navarro Senior LSA. See id. ¶ 110. The Clarkes also object to the amount for which the arbitration was settled. See id.

- The SAT System, which had previously been installed on the Global Orion, was sold for $650,000. Id. ¶¶ 111-12. The proceeds of the sale have not yet been allocated, but the

---

[6] These expenditures total $32,419,693. Neither party has explained how the remaining $80,307 of the sales price was applied, although an exhibit of White Oak's suggests that $78,738 was applied to "accrued interest." See ECF No. 51-95 at 1.

parties agree that White Oak intends to apply them primarily to the Navarro Senior LSA. See id. ¶¶ 115-116. The Clarkes contend that the full $650,000 sale price should be applied to the Navarro Senior LSA. See id. ¶ 116. Moreover, as discussed infra, the Clarkes contend that the SAT System was sold for well under its value.

The Clarkes argue that the Court should consider two further categories of collateral. First, the Clarkes point to sources of funds that White Oak could collect, but has elected not to collect, in satisfaction of outstanding indebtedness under the Fourth Note and/or the Navarro Senior LSA. In this category, the Clarkes place (1) a legal claim that an Epic affiliate has made against Shell Petroleum Development Company ("Shell"), see id. ¶¶ 117-132, and (2) an arbitration award in favor of an Epic affiliate against Tradeco Infraestructura, S.A. de C.V. ("Tradeco") in the amount of $19,562,202, which was subsequently confirmed by the United States District Court for the Southern District of Texas, see id. ¶¶ 133-149; ECF No. 51-110. White Oak contends that both the claim against Shell and the judgment against Tradeco are uncollectable. See ECF No. 49 at 28-29; ECF No. 65 at 21-22. The Clarkes value the claim against Shell at more than $10 million and maintain that White Oak previously valued the award against Tradeco at $1.5 million. See 56.1 Statement ¶¶ 47, 176.

Second, the Clarkes argue that White Oak presently has, or formerly had but wasted, other collateral that, as a matter of law, must be applied to the outstanding indebtedness under the Fourth Note and/or the Navarro Senior LSA. In this category, the Clarkes claim credit for (1) an "additional" $107,032,415 in arbitration awards

entered in favor of Navarro Capital; (2) the balance of the $100 million seller's note issued in connection with the sale of the Alabama Shipyard; (3) between $4 and $15 million owed to White Oak under the terms of a settlement with the Clarkes' former co-defendant, Wiley; (4) $1,100,000 in alleged lost value from the sale of the SAT System; (5) $10,055,000 in a "Shipyard Project Bond" held by Navarro Capital; and (6) $746,000 in cash held by Navarro Capital as of September 2024. See id. ¶ 169. According to the Clarkes, the total value of this collateral is $238,332,415. Id. White Oak responds that the Clarkes have double-counted certain collateral and claimed credit for uncollectible (or yet-to-be-collected)) collateral. See ECF No. 65 at 20-23. Moreover, White Oak reiterates that it is under no obligation to marshal collateral before proceeding against the Clarkes under their personal guaranties. See id. at 19.

The Court now turns to the merits of the parties' arguments.

### 3.    Objections to Expenses of Disposition

As mentioned above, the Clarkes contend that White Oak improperly applied some of the proceeds from collateral sales to taxes, incentive payments, debt service, and the purchase of equity. The Clarkes argue that, because White Oak held a perfected, first-priority lien on all assets at issue in this matter, White Oak was obligated to apply "every penny of the proceeds" to the principal of the underlying debts. 56.1 Statement ¶ 109. But this is not the law. Article 9 of the Uniform Commercial Code authorizes a secured party to first use the cash proceeds of any disposition of collateral to pay "the reasonable

expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the securing party." N.Y. U.C.C. § 9-615(a)(1). Only after such reasonable expenses are paid must the secured party apply the net cash proceeds of a disposition to "the satisfaction of obligations secured by the security interest . . . under which the disposition is made"; the secured party must apply the net proceeds of a disposition to "obligations secured by the security interest . . . under which the disposition is made" prior to applying those proceeds to any obligations secured by a subordinate security interest in the same collateral. Id. § 9-615(a)(2)-(3).

The question, then, is whether the expenses of disposition that the Clarkes have challenged were reasonable.[7] The Court reviews each category of expenses in turn.

First, the Clarkes challenge the payment of taxes, including the reservation of funds for estimated tax payments, in connection with

---

[7] In addition to invoking Article 9 of the U.C.C., the Clarkes challenge certain disposition expenses under the terms of their personal guaranties. See ECF No. 55 at 20-23. For example, the Clarkes' guaranties of the Navarro Senior LSA contemplate that White Oak will deduct "all reasonable and documented out-of-pocket expenses incurred . . . in endeavoring to collect and enforce the Guaranteed Obligations." ECF No. 51-57 at 413 and 51-64 at 405. The Court regards these provisions of the guaranties as functionally coextensive with U.C.C. Article 9. To the extent that the Clarkes contend that certain disposition expenses were not "actual" expenses because they were estimates of future tax payments, the word "actual" does not (actually) appear in any relevant provisions of the guaranties. See id.; ECF No. 51-60 at 618; ECF No. 51-65 at 609.

the sale of the Global Orion, the sale of the Alabama Shipyard and Arapaho, the sale of the Shipyard Excess Land, and the settlement of the Kanutam Arbitration. See ECF No. 55 at 20-23. They argue that taxes are not "out-of-pocket" expenses or expenses that were incurred "in connection with the enforcement or protection" of a creditor's rights. Id. at 20-21. The Clarkes further argue that White Oak may not deduct estimated tax payments from sales receipts because those estimated taxes have not yet been paid. Id. at 22-23.

Although there does not appear to be New York case law precisely on point, New York courts generally regard tax liabilities as expenses that are, for purposes of the Uniform Commercial Code, incurred in the ordinary course of business. See Ford Motor Credit Co. v. New York, 219 A.D.2d 202, 203-04 (3d Dep't 1996). The courts of other states have reached similar conclusions. E.g., PNC Bank v. Marty's Mobile Homes, Inc., No. Civ. A 1434-K, 2001 WL 849866, at *2 (Del. Ch. July 10, 2001); cf. Willingham v. Gallatin Group, Inc., No. M1998-990-COA-R3-CV, 2001 WL 134599, at *2-6 (Tenn. Ct. App. Feb. 16, 2001) (distinguishing tax funds temporarily held in trust prior to payment to a taxing authority from independently owed taxes, the latter of which do not have priority over secured creditors). The Clarkes offer no authority to the contrary, nor do the Clarkes proffer any evidence that contradicts White Oak's calculation of the taxes that were paid, and the estimated taxes that were withheld, from sales proceeds. Accordingly, the Court agrees with White Oak that the taxes and

estimated taxes enumerated above are reasonable expenses of the dispositions.

Second, the Clarkes contend that portions of the Alabama Shipyard sale proceeds and the Kanutam Arbitration award were improperly diverted to the payment of employee bonuses. See ECF No. 55 at 23-24. The Clarkes do not cite caselaw in support of their apparent contention that such bonuses are facially impermissible. Nor do the Clarkes offer evidence to rebut White Oak's expert report or the declaration of the Alabama Shipyard's chief executive officer, Greg Wagner, both of which maintain that "Management Incentive Plan" payments to certain Alabama Shipyard employees were necessary to keep the shipyard functioning and to maximize its value. See ECF No. 51-113; ECF No. 53. As Mr. Wagner avers, the Management Incentive Plan was put in place to retain "key employees who were essential to going-concern operations and maximizing potential sale value"; the plan's goal was to "incentiviz[e] these employees to continue working through the closing of a sale" and thereby to avert the risk that the Alabama Shipyard would need to "either find new management or potentially reduce or cease operations." ECF No. 53 ¶¶ 7-9. Because White Oak's evidence is unrefuted, the Court concludes that the Management Incentive Plan payments, which amounted to less than five percent of the Alabama Shipyard's sale price, were reasonable expenses of "preparing" the Alabama Shipyard "for disposition," see N.Y. U.C.C. § 9-615(a)(1).

The same cannot be said, however, of the $300,000 "success bonus" that was paid to Navarro Capital's chief executive officer in

connection with the settlement of the Kanutam Arbitration. White Oak offers no evidence that such a bonus was reasonable or that it served a commercial function similar to that of the Management Incentive Plan payments. Indeed, the exhibit on which White Oak relies, an internal memorandum requesting White Oak's management committee's approval for the settlement with Kanutam, notably lacks any justification for the bonus or its amount. See ECF No. 51-30. Accordingly, the Court concludes that this expense was not reasonable and that the $300,000, like the other proceeds of the Kanutam Arbitration settlement, should have been applied to the Navarro Senior LSA.

Third, the Clarkes contend that White Oak wrongly applied certain proceeds from the sales of (1) the Global Orion, (2) the Alabama Shipyard and Arapaho, and (3) the DB Hedron and associated debt to the payment of lesser-priority debts and to the purchase of equity interests. See ECF No. 55 at 24-25. The Clarkes are correct as to the challenged proceeds of the Global Orion and Alabama Shipyard and Arapaho sales, but not as to the challenged proceeds of the sale of the DB Hedron and associated debt.

As to the Global Orion, White Oak applied more than $2.2 million of the sales proceeds to a short-term loan that Alabama Shipyard LLC made to Navarro Capital. 56.1 Statement ¶ 74. White Oak contends that the payment "did not increase the debt for which [the Clarkes] were liable." ECF No. 65 at 16. But White Oak does not attempt to rebut the Clarkes' assertions that the short-term loan was unsecured, see 56.1 Statement ¶ 171, and that, therefore, the more than $2.2 million

payment should have been applied to secured obligations, see ECF No. 55 at 24-25. Accordingly, the Court concludes that $2,280,729 should have been applied to the Navarro Senior LSA.

As to the Alabama Shipyard and Arapaho, White Oak applied more than $7.6 million of the sales proceeds to purchase Navarro Holdco, LLC's equity in the Alabama Shipyard. See 56.1 Statement ¶ 95. White Oak contends that this payment was a contractual obligation. See ECF No. 65 at 16-17. The evidence White Oak cites on this point appears to establish that the payment to Navarro Holdco was a term of a Repurchase Agreement between Alabama Maritime Asset Holdings, LLC and Navarro Holdco, LLC, see ECF No. 51-86 at 043, and that White Oak classified the payment as "Senior Equity Proceeds," see ECF No. 51-99 at 1. But the evidence does not establish that the payment was a reasonable expense of the disposition of the Alabama Shipyard or that Navarro Holdco LLC held a secured interest in the Alabama Shipyard, at least one of which would be required for the payment to even potentially have priority over the secured Fourth Note. Accordingly, the Court concludes that $7,673,458 should have been applied to the Fourth Note.

Finally, as to the DB Hedron, $15,282,350 of the $22,500,000 in sale proceeds was applied to an amount outstanding under certain debt that was purchased along with the DB Hedron. 56.1 Statement ¶ 68. White Oak presents unrebutted evidence that the debt that was purchased was not collateral for any of the loan agreements at issue in this case. See ECF No. 51-26 at 887; ECF No. 51-71 at 504-05 (reciting that

assets to be purchased and sold were the "vessel commonly referred to as EPIC HEDRON" along with various debt obligations held by numerous non-party entities). Accordingly, because this portion of the sale and its proceeds were unconnected to the DB Hedron, the $15,282,350 need not have been applied to either of the loan agreements at issue.

4.   Remaining Collateral

Separate from their arguments about White Oak's allegedly impermissible diversions of certain sales proceeds, the Clarkes argue that they are "entitled to further offsets" on account of other, unaccounted-for collateral. See ECF No. 55 at 26-27. As the Court has already set forth in greater detail above, the Clarkes contend that White Oak possesses or has wasted more than $238 million in such collateral. As the Court also observed above, the Clarkes' argument on this point runs aground because White Oak has a nearly unqualified right to enforce the Clarkes' personal guaranties before liquidating any collateral at all.[8] Thus, even to the extent that the Clarkes are correct that White Oak holds unliquidated collateral, that does not entitle them to a discharge of their obligations under the personal guaranties. The facts that White Oak holds a $90 million seller's note in connection with the sale of the Alabama Shipyard and Arapaho, that

---

[8] In passing, the Clarkes argue that the provisions in their personal guaranties that permit White Oak to enforce the guaranties before liquidating collateral are unconscionable. See ECF No. 55 at 29. In support of this argument, the Clarkes cite only generic cases defining the boundaries of the unconscionability defense and make no arguments specific to their guaranties. Moreover, as the Court concluded in Section III.A.3 supra, the Clarkes have waived any such defense.

it expects to receive $4 million under its settlement agreement with Wiley, and that it holds a $10.055 million "Shipyard Project Bond," see ECF No. 55 at 28-29; 56.1 Statement ¶ 169, are all irrelevant to calculating the Clarkes' obligations under their personal guaranties.

The Clarkes argue that certain assets were sold, and certain legal claims were settled or abandoned, for less than the value of those assets or claims. However, the Clarkes present no evidence in support of these arguments. While the Clarkes contend that they should be credited for the difference between the original amount of the Kanutam Arbitration award and the amount that Navarro Capital accepted as a settlement, see ECF No. 55 at 28-29, they do not present evidence of their own in an attempt to rebut White Oak's expert evidence that it was commercially reasonable to settle the arbitration for $8.4 million, see ECF No. 51-113 at 22 ("[I]t is reasonable for Navarro to settle the Kanutam claim, as opposed to spending additional funds on litigation chasing the claim."). As to the claim against Shell and the award against Tradeco, the Clarkes offer nothing but conclusory arguments to rebut White Oak's evidence that no recovery could reasonably be expected from either. See id. at 22-26 (setting forth rationale for expert opinion that "it is reasonable to heavily discount the value" of both claims "or write [them] off entirely").

The SAT System presents a different issue. Here, the Clarkes offer an internal White Oak memorandum, dated "September 2024," valuing the SAT System at $1.75 million. ECF No. 58-2 at 1. Based on that document, they contend that, because the system was sold for $1.1

million less than its supposed value, they are entitled to a $1.1 million credit. On reply, White Oak points to Mr. Islam's deposition testimony that, although only "two to three months" elapsed between the date of the memorandum and the date of the SAT System's sale, the SAT System was an illiquid asset that had been marketed for several years before being sold. See ECF No. 67-2 at 117-19. Thus, there is a disputed issue of fact as to whether the SAT System was sold for a commercially reasonable price. But that issue of fact is not material to the resolution of this case because the difference between the sale price and White Oak's valuation is not nearly significant enough to affect the Clarkes' ultimate liability.

* * *

Based on the above analysis, the Court concludes that (1) White Oak did not have an obligation to marshal collateral before enforcing the Clarkes' personal guaranties; (2) White Oak has presented admissible evidence with regard to the disposition of collateral; (3) the Clarkes have presented evidence sufficient to challenge White Oak's application of disposition proceeds only as to the $300,000 "success bonus" to be paid to Navarro Capital's chief executive officer, the payment of a $2,280,729 short-term loan out of the proceeds of the sale of the Global Orion, and the purchase of $7,673,457 of Navarro Holdco LLC's equity out of the proceeds of the sale of the Alabama Shipyard and Arapaho; and (4) the Clarkes have not presented sufficient evidence to create any triable issue of fact

except as to their allegations of waste in connection with the sale of the SAT System.

IV.  Conclusion

For the foregoing reasons, the Court concludes that White Oak has presented unrebutted evidence showing that that T. Clarke and A. Clarke personally guaranteed the Navarro Senior LSA, that at least T. Clarke personally guaranteed the Fourth Note, that the Clarkes' guaranties are enforceable, and that the Clarkes should be credited for some $10,254,186 in improperly applied disposition expenses.

Crediting the Clarkes does not, however, reduce the amount of either T. Clarke's or A. Clarke's obligation under their respective personal guaranties below the maximum liability that was contemplated under the parties' side-letter agreement.

As of April 30, 2025, the total owed under the Navarro Senior LSA was $29,009,930. See ECF No. 51-100 at 1. Reducing that amount by the $300,000 that was applied to the "success bonus" and the $2,280,729 that was applied to the short-term loan leaves $26,429,201 (plus interest accrued since April 30, 2025). That amount is clearly in excess of the $20 million maximum liability of T. Clarke and A. Clarke under their respective personal guaranties.

As of April 30, 2025, the total owed under the Fourth Note was $179,225,502. See id. Reducing that amount by the $7,673,457 that was applied to the purchase of Navarro Holdco's equity leaves $171,552,045 (plus interest accrued since April 30, 2025). That amount is clearly

in excess of T. Clarke's $20 million maximum liability under his personal guaranty.

Thus, as reflected in the Court's bottom-line Order of July 11, 2025, White Oak has shown that there are no material disputes of fact in this matter and that it is entitled, as a matter of law, to final judgment in the amount of $20 million against each of T. Clarke and A. Clarke. Defendants, for their part, have not demonstrated that they are entitled to judgment as a matter of law.

The Clerk of Court is respectfully directed to enter final judgment as indicated above and to close this case.

SO ORDERED.

Dated:    New York, NY
          July 29, 2025                    JED S. RAKOFF, U.S.D.J.